UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**WILLIAM JENNINGS,**

              Plaintiff,

    v.

**PATRICK FULLER, et al.,**

              Defendants.
_____/

**HONORABLE AVERN COHN**

**No. 13-13308**

**JURY TRIAL - VOLUME 1**

**Wednesday, October 19, 2016**

Appearances:

Kevin S. Ernst
Law Offices of Kevin Ernst
645 Griswold Street, #1808
Detroit, Michigan  48226
(313) 965-4822

Dean D. Elliott
321 South Williams Street
Royal Oak, Michigan  48067
(248) 543-9000
  On behalf of Plaintiff

H. William Reising
Christopher J. Scott
Plunkett & Cooney
111 E. Court Street, #1B
Flint, Michigan  48502
(810) 232-5100
 On behalf of Defendants

-  -  -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial - Volume 1*
*Wednesday, October 19, 2016*

## I  N  D  E  X

|                                                    | Page | Vol. |
|----------------------------------------------------|------|------|
| Court's Preliminary Instructions  ...............  | 10   | 1    |
| Plaintiff's Opening Statement by Mr. Ernst ......  | 17   | 1    |
| Defendant's Opening Statement by Mr. Reising ....  | 31   | 1    |

Plaintiff's Case in Chief                          Page   Vol.

**Kenneth Glaza**

|                                          |      |      |
|------------------------------------------|------|------|
|    Direct Examination By Mr. Ernst: | 49   | 1    |
| Certification of Reporter .....................    | 106  |      |

- - -

Plaintiff's Exhibits

| Number |                                       | Rcvd | Vol. |
|--------|---------------------------------------|------|------|
| 24     | ..............................        | 51   | 1    |

- - -

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 1*
*Wednesday, October 19, 2016*

V1-Page 3

1          Detroit, Michigan

2          Wednesday, October 19, 2016

3          9:08 a.m.

4          -   -   -

5          **THE CLERK:**  The Court now calls Case Number 13-13308,

6   *Jennings v. Fuller*, et al.

7          **THE COURT:**  Good morning.  Give your appearances to

8   the reporter.

9          **MR. ERNST:**  Good morning, Your Honor.  May it please

10  the Court, Kevin Ernst along with Dean Elliott on behalf of

11  Mr. Jennings.

12         **MR. REISING:**  Good morning, Your Honor,

13  William Reising and Christopher Scott on behalf of the named

14  defendants, Your Honor.

15         **THE COURT:**  I understand you have something for the

16  Court?

17         **MR. ERNST:**  Yes, Your Honor.

18         **THE COURT:**  What is it?

19         **MR. ERNST:**  Well --

20         **THE COURT:**  You can all sit down.

21         **MR. ERNST:**  Initially, Your Honor, there is -- in

22  this case our client, Mr. Jennings, was arrested for a drunk

23  driving ticket, or drink driving rather, by the Flint Township

24  Police Department.  The Flint Township officer filed a police

25  report that contains various events and information.  I have a

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 1*
*Wednesday, October 19, 2016*

V1-Page 4

1   report for the Court if the Court wants to see it as I read

2   from it.

3              **THE COURT:**  I want to know what you want me to do.

4              **MR. ERNST:**  I want you to limit the defendant from

5   mentioning all of these event that have nothing to do with this

6   case.

7              **THE COURT:**  What events?

8              **MR. ERNST:**  Okay.  Would you like a copy of the

9   report to read, Your Honor?

10             **THE COURT:**  Yes.  What exhibit number is this?

11             **MR. ERNST:**  15.

12             **THE COURT:**  What?

13             **MR. ERNST:**  15.

14             **THE COURT:**  15?

15             **MR. ERNST:**  Yes, Your Honor.

16             **THE COURT:**  That's your Exhibit 15?

17             **MR. ERNST:**  Right, but we don't intend to admit it.

18   We just intend to maybe ask the Flint police officer a couple

19   questions about it, but it contains a bunch of extraneous

20   irrelevant and highly --

21             **THE COURT:**  Well, hold on, hold on, hold on.

22   Mr. Reising, do you intended to use this report?

23             **MR. REISING:**  Yes, Your Honor, because we intend to

24   call Officer Hartner as a witness in this matter.

25             **THE COURT:**  What are you going to elicit from him?

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial - Volume 1*
*Wednesday, October 19, 2016*

V1-Page 5

1       **MR. REISING:**  Facts and circumstances surrounding

2   events leading up to the arrest and why the defendant was

3   brought to the Genesee County Jail and what happened when he

4   got to the jail because --

5       **THE COURT:**  These are all personal observations?

6       **MR. REISING:**  Yes.

7       **THE COURT:**  Well, you are not going to use the

8   report.  You will call the officer and he's going to testify,

9   right?

10      **MR. REISING:**  He is going to testify.

11      **THE COURT:**  Okay.  So there will be no reference to

12  the report.

13      **MR. REISING:**  Well, there may have to be, Your Honor,

14  because he may have to refresh his memory.

15      **THE COURT:**  If he has to refresh his memory, you may

16  use it for that limited purpose obviously, I said that to you

17  yesterday, but formally entering the report into evidence is

18  not appropriate.  There is a distinction between examining him

19  and asking him to refresh his memory and introducing the report

20  itself as substantive evidence.  So that takes care of that.

21      **MR. ERNST:**  Your Honor, what I think Mr. Reising

22  intends to do is ask the officer himself about these events,

23  and if I just may --

24      **THE COURT:**  Well, if he asks the officer a question

25  about -- the fact is that the officer arrested the plaintiff

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial - Volume 1*
*Wednesday, October 19, 2016*

V1-Page 6

 1   and he took him to the county jail.

 2           **MR. ERNST:**  And I don't have any problem with that.

 3           **THE COURT:**  Well, then if there's a specific question

 4   he asks the officer that you think is objectionable you will

 5   rise and object and I will make a ruling at that time.  I'm not

 6   going to parse the testimony of the officer before the officer

 7   takes the witness stand.

 8           **MR. ERNST:**  Okay.  But, Your Honor, my objection is

 9   regarding opening statement, and if I just may give you a

10   flavor of what's going on here.

11           **THE COURT:**  No, you don't have to give me a flavor.

12   Mr. Reising is an experienced lawyer, and he's going to testify

13   in open -- he's going to argue in opening statement the events

14   that occurred.  Okay?  I'm not going to parse everything out.

15   Sit down, please.

16           **MR. ERNST:**  Well, Your Honor, could we have a

17   clarification because this is what happened, please.  Please

18   let me tell you.  There is a -- the man says there's shots

19   fired.  He talks to a neighbor.  The neighbor says

20   William Jennings was smoking crack and drinking beer, we got in

21   a fight, and I think he's the one that fired the shots.

22           **THE COURT:**  Well, if the neighbor testifies, we'll

23   see, but if the officer -- that's not, that's not -- you

24   started out with your objection to Plaintiff's Exhibit 15, that

25   it was going to be introduced in evidence, and it's not going

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 1*
*Wednesday, October 19, 2016*

V1-Page 7

1  to be introduced in evidence.

2     Now let's go forward with the trial.  That's what you got

3  up to tell me.

4          **MR. ERNST:**  My objection was that it's mentioned in

5  opening statement, all of the events before his arrest.

6          **THE COURT:**  Yeah, he has a right to explain how the

7  plaintiff ended up at the county jail.

8          **MR. ERNST:**  Which is he got, he got arrested for

9  drunk driving.  I don't have any objection to that.

10          **THE COURT:**  I don't know what he's going to say in

11  opening statement.

12          **MR. ERNST:**  Well, that's why I'm making the motion.

13          **THE COURT:**  I don't want you jumping up in opening

14  statement.  The jury is going to be told the evidence is not

15  what the lawyers talk about.  It's what comes from the witness

16  stand.  I can't anticipate Mr. Reising contaminating the trial

17  by introducing or discussing in his opening statement matters

18  that are irrelevant.  I don't know anything about shots fired.

19  I don't think that's got anything to do with the case.  What

20  happened is the officer -- did the officer stop him?

21          **MR. ERNST:**  Yes, he arrested him.

22          **THE COURT:**  For a traffic infraction, right?

23          **MR. REISING:**  Correct.

24          **THE COURT:**  That's what the officer is going to

25  testify to.  He stopped him for a traffic infraction.  He went

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 1*
*Wednesday, October 19, 2016*

V1-Page 8

 1  up and looked at him and he determined he thought he was drunk,

 2  right?  Tell me if I'm wrong.

 3          **MR. REISING:**  I think that's essentially correct,

 4  Your Honor.

 5          **THE COURT:**  So he took him to the county jail.

 6          **MR. REISING:**  Well, he also administered certain

 7  tests, but, yes, he took him to the county jail.

 8          **THE COURT:**  But he submitted tests to determine

 9  whether or not he was drunk.

10          **MR. REISING:**  Correct.

11          **THE COURT:**  Okay.  That's all part of it.  Then he

12  concluded he was drunk and he took him to the county jail,

13  right?

14          **MR. REISING:**  Right.

15          **THE COURT:**  And he turned him over to the booking

16  officer or whatever happened, right?

17          **MR. REISING:**  Essentially that's correct, Your Honor.

18          **THE COURT:**  Okay.  Let's go ahead.

19      Is all the jury here?

20          **THE CLERK:**  Let me check because there was one juror

21  missing.

22          **THE COURT:**  Okay.  You will sit down, Mr. Ernst.

23          **THE CLERK:**  You are ready, Judge?

24          **THE COURT:**  Okay.  Do they know about the button?

25          **THE CLERK:**  I'll line them up.

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 1*
*Wednesday, October 19, 2016*

V1-Page 9

 1          **THE COURT:**  Do you want this exhibit back or is this

 2   for me?

 3          **MR. ERNST:**  I have an extra copy, Your Honor.

 4          **THE COURT:**  Okay.

 5          **THE CLERK:**  All rise for the jury.

 6       (Jury in at 9:17 a.m.)

 7          **THE COURT:**  Good morning.

 8          **THE JURORS:**  Good morning.

 9          **THE COURT:**  You may be seated.

10      My name is Avern, A-v-e-r-n, Cohn, C-o-h-n.  I'm the judge

11   who is going to try this case.  You met the lawyers yesterday.

12   You will meet some other folks today.

13      This is the case manager.  I think you have already met

14   her, and I will now ask her to give you the oath.  Please rise.

15          **THE CLERK:**  One second.

16          **THE COURT:**  Would you please rise?

17          **THE CLERK:**  I've got it.  Will the jury please stand

18   and raise your right hand to be sworn.

19      (The jury was sworn.)

20          **THE CLERK:**  You may be seated.

21          **THE COURT:**  Okay.  You know a bit about this case

22   when you were impaneled Monday so I'm not going to go over it.

23   I will tell you the trial hours are generally 9:00 to 1:00.  I

24   hope all of you are here by 9:00 o'clock.  I also hope all of

25   the lawyers and I'm here by 9:00 o'clock and Ms. Ward is here

*13-13308; Jennings v. Fuller, et al.*

*Preliminary Instructions*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 10

1    by 9:00 o'clock.  When you're all here and the lawyers are here

2    and I'm here --

3         Have you met the court reporter?

4         (Jurors indicate affirmatively.)

5         **THE COURT:**  Okay.  Then we will commence the trial.

6         You know where the jury room is.  Did anyone tell you that

7    the first one that gets here should make coffee?

8         When I want you in the courtroom, there's a double buzzer.

9    It will buzz twice.  That means you come in -- and you notice

10   there's double doors.  You've got to hold the doors.  You will

11   come in, and you will stand.  We will all stand for you, and

12   then we'll start the trial.

13        And if you have any personal problems, anything about the

14   accommodations or anything, you talk to the case manager and

15   then she talks to me.  Okay?

16        You now have been sworn as the jury to try this case.  By

17   your verdict you will decide the disputed issues of fact.  As

18   the judge, I will decide questions of law that may arise during

19   the trial.

20        Before you retire to deliberate at the close of the case I

21   will instruct you on the rules of law that you must follow and

22   apply in deciding upon a verdict.  I ask that you give careful

23   attention to the testimony and evidence which is presented

24   during the trial.  I ask that you not form or express any

25   opinion about the case until you have heard all of the evidence

*Preliminary Instructions*
*Wednesday/October 19, 2016/Volume 1*

1   and have the benefit of the closing arguments of the lawyers

2   and my instructions on the applicable law.

3       Now, the evidence from which you will decide the facts

4   consists of the testimony of witnesses, documents and other

5   things that are received into evidence as exhibits and all

6   facts which are admitted or stipulated by the parties.

7       Certain things are not evidence and should not be

8   considered by you.  Statements, arguments and questions by

9   lawyers are not evidence.

10      An objection to a question is not evidence.  The lawyer

11  has an obligation to a client to make an objection whenever the

12  lawyer believes that the evidence that is being offered is

13  improper under the rules of evidence.  Don't be influenced by

14  an objection or by my ruling on an objection.  If an objection

15  is sustained, ignore the question.  If it's overruled, treat

16  the answer like any other answer.  If I tell you that some item

17  of evidence is being received for a limited purpose only,

18  follow what I tell you.

19      Any testimony I tell you to disregard is not evidence and

20  must not be considered when you deliberate on your verdict.

21  Anything you have seen or heard outside the courtroom is not

22  evidence and must be disregarded.

23      Now, there's two kinds of evidence, direct and

24  circumstantial.  Direct evidence is direct proof of the facts,

25  such as the testimony of an eyewitness.  Circumstantial

*13-13308; Jennings v. Fuller, et al.*

*Preliminary Instructions*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 12

1  evidence is proof of one fact from which you may infer or

2  conclude that another fact exists.  I'm going to give you some

3  further instructions on these as well as other matters at the

4  end of the case.  Keep in mind though that you may consider

5  both direct evidence and circumstantial evidence.

6      Now, you are to consider only the evidence in the case,

7  but in considering the evidence you are permitted to draw such

8  reasonable inferences from facts which you feel are justified

9  in light of your own experience.

10     As to the testimony of witnesses, it's going to be up to

11 you to decide which to believe, which not to believe, and how

12 much of any witness's testimony to accept or reject.  I'll give

13 you some guidelines for this purpose at the end of the case.

14     Remember, nothing I say, nothing I do, or nothing I do not

15 do or do not say, nothing in my facial expressions or the

16 inflections in my voice during the course of the trial should

17 influence your verdict.  While I am judge of the law, you are

18 judges of the facts.

19     As a juror you play a crucial role in ensuring that all

20 parties receive a fair trial.  It is essential that your

21 decision be based solely on the information you will receive

22 from the four walls of this courtroom.  Therefore, you may not

23 discuss this case with anyone, including your family,

24 neighbors, friends, business associates and fellow jurors at

25 any time during the trial.

*13-13308; Jennings v. Fuller, et al.*

*Preliminary Instructions*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 13

1    You must not permit anyone even to attempt to discuss it

2    with you or in your presence.  If someone persists in talking

3    with you about the case despite your asking them not to do so,

4    report this to me by a note as soon as possible.  However,

5    don't discuss this with your fellow jurors.

6        Furthermore, to avoid the appearance of impropriety, you

7    must not have any conversation with the parties, the lawyers,

8    the witnesses or anyone else who you may come to recognize as

9    having some association with the case in or out of the

10   courtroom during your service as jurors, not even to pass the

11   time of day.  In no other way can all of the parties be assured

12   of the impartiality they are entitled to from you as jurors.

13       Now, many of you have cell phones, iPhones -- I've got

14   here Blackberries, but I don't think there are many of those

15   around -- and access to the internet and other tools of

16   technology.  You may not receive or send any form of electronic

17   communication about this case.  This includes texting,

18   emailing, blogging or posting information on social websites,

19   such as Facebook, MySpace, Twitter, LinkedIn and YouTube.

20       You are not to conduct any independent research about this

21   case, the matters in the case or the individuals involved.

22   Don't consult dictionaries or reference materials, blogs or any

23   other electronic tool to obtain information about the case or

24   help you decide the case.

25       You should also avoid reading any newspaper articles,

*Preliminary Instructions*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 14

1   listening to any broadcasts, print or internet, that may be

2   published about this case.  If a headline catches your eye,

3   don't read the article.  You must refrain from listening to or

4   observing any news program which mentions this case, and that's

5   not to say that any media will mention it.

6       These rules regarding focusing on the courtroom and

7   refraining from social media and the internet are posted on the

8   wall in the jury room when you come in on the left.  You will

9   see it all posted.

10      Don't form any opinion until all of the evidence is

11  presented.  Keep an open mind until you start deliberating at

12  the end of the case.

13      Once you retire to deliberate you may discuss the case

14  with your fellow jurors, but you cannot discuss the case with

15  anyone else until you have returned a verdict and the case is

16  over.  The reason for these cautions is because it's your job

17  to decide the case solely on the basis of the testimony and

18  evidence that is presented during the trial without

19  consideration of any other matters.

20      Now, on occasion it may be necessary to talk -- for me to

21  talk to the lawyers from time to time out of your hearing or

22  concerning questions of law or procedure that require

23  consideration by me.  Indeed, some of those conversations with

24  the lawyers, you may be sitting in the jury box while we're

25  talking about it.  On occasion you may be excused from the

1    courtroom while I discuss these matters with the lawyers.

2         I'll try and limit the interruptions as much as possible.

3    However, remember the importance of the issues in dispute at

4    all times.  Therefore, I ask that you be patient even though

5    the case may seem to move slowly.

6         This is how we're going to proceed.  First, the plaintiff

7    will be given an opportunity to make an opening statement, then

8    the defendants will be given an opportunity to make an opening

9    statement after the plaintiff's opening statement.  The

10   defendants may defer making an opening statement until the

11   conclusion of the plaintiff's case.

12        Neither party is required to make an opening statement.

13   An opening statement is not evidence.  It's simply designed to

14   provide you with an introduction to the evidence which the

15   party intends to introduce.

16        Second, the plaintiff will introduce evidence in support

17   of his claim.  At the conclusion of plaintiff's case the

18   defendants will introduce evidence in support their defense.

19        Then the parties will be given an opportunity to make

20   closing arguments to you.  These arguments are designed to

21   provide you with the position of the parties on the basis of

22   the evidence.  Now, what the lawyers say during closing

23   arguments, just as what they say during the opening statements,

24   is not evidence.  The plaintiff has the right to make the

25   opening statement first and also to make the closing arguments

1    first.

2        Finally, I will give you instructions on the law to which

3    you are to apply in reaching your verdict.  After the evidence

4    has been completed and the arguments and the instructions have

5    been given you, you will be asked to go to the jury room and to

6    deliberate on your verdict.  You will have to determine the

7    facts from all of the testimony you have heard and any other

8    evidence that is admitted.

9        You are the sole and exclusive judges of the facts.

10   Neither I, nor anyone, may invade your province.  On the other

11   hand, and with equal emphasis, you are bound to accept the

12   rules of law I give you whether you agree with them or not.

13       Jurors do not ask questions so -- of the witnesses or the

14   attorneys so don't interrupt a lawyer during the course of the

15   trial.  However, if you are unable to hear a witness or a

16   lawyer, raise your hand and I will see that that situation is

17   corrected.

18       Now, it may be necessary for me to caution a party or a

19   witness or an attorney who says or does something which is not

20   in keeping with the rules of evidence as I understand them.  If

21   this happens, don't draw any inference against the side to whom

22   a warning may be addressed.

23       Now, you may take notes during the course of the trial

24   since there may be some complicated issues in which the notes

25   may be helpful.  You are not obliged to take notes.  If you do

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 17

1 take notes, keep them in confidence until you retire to

2 deliberate.

3     Remember, it's not your notes which are the evidence, but

4 your recollection of the testimony and the exhibits.  So if you

5 take notes, when you get into the jury room if you get into an

6 argument over a point or differ, don't say my notes say this

7 and the other person says my notes say this.  It's your

8 recollection of what you heard or saw, not what's in your

9 notes.

10     You will have the exhibits which have been admitted into

11 evidence in the jury room when you deliberate.

12     That, ladies and gentlemen, are your preliminary

13 instructions.  So with that concluded, we turn to the plaintiff

14 for an opening statement.

15     Mr. Ernst.

16     **MR. ERNST:**  Thank you, Your Honor.

17     Good morning, ladies and gentlemen.

18     So this is my opening statement and it's my chance to tell

19 you what I think the evidence will show in this case, but

20 before I do that I would like to start by thanking you.  I know

21 this is a big sacrifice for most of you.  I will do my best to

22 respect your time and put in this case as efficiently as

23 possible.

24     But while this is a sacrifice for you guys, I think it's

25 also an opportunity that you are going to have that few people

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 18

1   ever get, and that is you are going to have an opportunity to

2   do justice in this case.  And when you do that, at the end of

3   the case I think you're going to feel good about yourselves,

4   and I think that by vindicating the Constitutional rights of

5   one of us, you vindicate the Constitutional rights all of us

6   and I think you are going to feel good about that.

7        This case is about a betrayal of trust.  Like we discussed

8   in the voir dire portion of the case, we give police officers

9   the benefit of the doubt because we need to trust them.  We

10  trust them with lots of things, and we give them lots of power.

11  We give them power to take away our liberty.  We give them the

12  ultimate power to take away -- we give them the power of life

13  and death over other citizens.  But with that power that we

14  give them, with that power is a trust that we expect out of

15  them, and this case is about betrayal of that sacred bond of

16  trust.

17       This is what I think the evidence will show in the case.

18  You know, when I was first contacted by Mr. Jennings, he came

19  to my office.  He spoke to Dean, Mr. Elliott, and I.  He said,

20  you know, I got arrested for drunk driving and they took me to

21  the Genesee County Sheriff's Department and some of the guards

22  there beat me up really badly and I didn't do anything to

23  deserve it.

24       And in fact he said he didn't -- there was no

25  justification for the assault that he got at all, and he told

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 19

1   me about the injuries he received.  And they were extremely

2   serious.  He has vision loss in both eyes, and he's almost

3   totally blind in one eye, especially if any glare is involved.

4   He had a torn rotator cuff in his shoulder.  He had a broken

5   nose, a broken eye socket.  He had a closed head injury.

6       Then he had a bunch of other psychological type injuries,

7   like he had trouble sleeping.  He had nightmares about the

8   incident, and he would wake up in the middle of the night with

9   his heart pounding.  He was having flashbacks.  He was very

10  anxious.  He had severe anxiety, and he was very irritable with

11  his family members and his girl friend.  He was distracted and

12  couldn't concentrate, and he would dwell on this assault by the

13  police.

14      And then he told me something that was rather odd and

15  somewhat disturbing.  He said he didn't really remember that

16  much about what happened to him that evening after the first

17  couple of minutes until he woke up later in a restraint bed

18  with a spit mask over his face and he couldn't breathe.

19      And so I thought, well, you know, generally people give

20  the benefit of the doubt to the police and this case doesn't

21  sound that great to me because this guy can't even remember

22  what happened for the most part.  And so Dean and I, we did

23  some investigation because there was a serious injury here, and

24  the first thing we got is the police reports.

25      And the police reports were mainly -- the main one I

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 20

1   guess, at least as far as I was concerned, was written by

2   Defendant Fuller, the man that's sitting at the far end over

3   there with the red striped tie, but there were six or

4   seven police reports that all basically said exactly the same

5   thing, which was that Mr. Jennings was violent, noncompliant

6   from the time he was arrested by a Flint Township police

7   officer, who arrested him for drunk driving and brought him to

8   the jail, basically until the time he was released out of that

9   jail the next morning.

10       So I looked at the details of the police reports, and

11  first of all, Fuller claimed that Mr. Jennings was kicking and

12  punching in the back of the Flint police car that transported

13  him to the Genesee County Jail and that he was noncompliant and

14  extremely combative.  It was a little strange to me because I

15  know that whenever somebody is transported in the back of a

16  police car they are handcuffed behind their back so I didn't

17  see how somebody could be punching, but I thought that's not

18  that huge of a point.

19       Deputy Fuller also reported that once Mr. Jennings entered

20  the jail he was, he was completely noncompliant and combative,

21  that he was out of control the whole time.  He also reported

22  that -- this was a duty that Mr. -- that Defendant Fuller would

23  have.  He received Mr. Jennings into the jail so he has to do a

24  pat-down of him.

25       Mr. Jennings would be patted down when he's first

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 21

1    arrested.  In fact, he was patted down by the Flint police

2    officer or at least he was searched once he was brought to the

3    jail.  So this was basically his third pat-down.

4        So Defendant Fuller orders Mr. Jennings to put his hands

5    up against the wall, spread his feet, and he pats him down.

6    And he said during that pat-down Mr. Jennings took his hands

7    off the wall and turned aggressively toward him in an

8    aggressive stance.  That's what it said.

9        And then he said that because he did this he "placed,"

10   quote-unquote, Mr. Jennings down on a metal bench with the help

11   of Defendant Kenamer, who had entered into this booking area

12   while Mr. Jennings was being patted down.

13       Then, according to the police reports, Mr. Jennings

14   continued to struggle, and several other officers had to assist

15   in subduing Mr. Jennings and they did that by taking him to the

16   cement floor.  They said they placed him on the floor and that

17   they eventually handcuffed him.

18       There were approximately five officers involved, and then

19   Lieutenant Nuckolls, who was in charge that evening, he walked

20   into the room, and while the other officers were trying to get

21   control of Mr. Jennings, Lieutenant Nuckolls had to

22   pepper-spray him because he was so out of control.

23       According to the police reports, even this pepper spray,

24   which, by the way, was sprayed directly into the face of

25   Mr. Jennings, was ineffective and Mr. Jennings continued to

1   struggle.

2       Because of that, the officers had to use what are called

3   stun blows, where they try to hit you like in your brachial

4   nerves and pressure points to try to, you know, inflict some

5   pain to get control of you.  These things were also

6   ineffective, and Mr. Jennings continued to struggle.

7       They finally were able to get Mr. Jennings to his feet,

8   and then Mr. Jennings, according to the police reports, flung

9   himself head first into a wall causing his facial injuries.

10  And you're going to see, you're going to see pictures of his

11  injuries to his face.

12      Then, after that happened, Mr. Jennings was taken to the

13  ground again, and then eventually he was taken into what's

14  called safety cell 6, which is a, a cell that's basically where

15  they put people who are -- you know, there's nothing in there.

16  There's just like a concrete slab and a cell, and they said,

17  according to the police reports, that once Mr. Jennings was in

18  the safety cell they took his handcuffs off even though he had

19  been struggling so mightily before that, but then Jennings

20  started struggling again and started kicking the officers and

21  so at that point they had to -- they decided they were going to

22  put Mr. Jennings in what's called a restraint chair because

23  that restrains your legs and your arms.  So they put you in a

24  chair and they tie your hands down to it, I guess it's like

25  that, and they tie your feet down to it.

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 23

1    So they attempted to remove Mr. Jennings from safety
2    cell 6, take him out in the hall, and put him in the restraint
3    chair.  Mr. Jennings was still struggling so hard that these
4    six deputies couldn't get him in the restraint chair so they
5    had to take him down to the ground, and even though there's
6    five or six deputies holding Mr. Jennings down on the ground,
7    he was still so out of control that Lieutenant Nuckolls decided
8    that he had to use a taser on him and so he had to walk up and
9    issue a taser.  Not the kind that you shoot, the two prongs,
10   but you hold it in your hand.  It's called a drive stun.

11   And even after Mr. Jennings was drive-stunned, he was
12   still out of control.  And then he started spitting at the
13   deputies, according to the police reports, so the deputies had
14   to put what's called a spit mask over him.  And that's a mask
15   that goes over your face, it's like mesh kind of, and
16   supposedly it stops you from spitting.

17   Still Mr. Jennings was so out of control that nothing was
18   working so they had to use a restraint bed, which is where you
19   tie somebody down basically onto a bed.  So the deputies
20   carried him over to the bed and tied him facedown.  And
21   finally -- they put him back in the cell, and finally the
22   events were over.

23   That's what the reports said.  And then Jennings, after
24   that, he was charged with resisting and obstructing a police
25   officer, a felony charge.

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 24

1    So when I first read these reports I thought what a nut

2  this Jennings guy is.  I mean, he had all of those injuries.

3  It sounds to me like he got what he deserved.

4    But then I started thinking about it and I thought, you

5  know, it's unusual to me that Mr. Jennings -- stand up,

6  Mr. Jennings -- who is 5'6 1/2" and 140 pounds, how he would be

7  able to resist deputies the size of those guys.  For example,

8  Defendant Fuller is literally twice his size.  He weighs 280 or

9  at least he did at the time.  And how did this little guy

10  resist all of those deputies after being pepper-sprayed in the

11  face, handcuffed, hit numerous times with these stun blows,

12  subjected to pressure points and tasered?  How did he remain so

13  resistent after all of that?

14    But I still remained somewhat skeptical.  I mean,

15  sometimes people are out of control, and so I did a little more

16  investigation.  Then I got the report of Sergeant Hartner, who

17  said that during the transport of Mr. Jennings from the time he

18  arrested him for drunk driving to the county jail there was

19  nothing that Mr. Jennings did that was combative or resistant

20  at all.

21    But then Deputy Fuller testified that Sergeant Hartner

22  told him that he was just out of control on that ride into the

23  county jail, and then I started wondering why would, why would

24  Defendant Fuller lie about that?  Why would he lie and say that

25  Jennings was kicking and punching inside the patrol car?

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 25

1    In fact, he went as far as to say that Sergeant Hartner

2    said be careful of this guy.  But then Sergeant Hartner later

3    testified that during the transport Jennings was quiet and

4    compliant and that he never told anybody at the Genesee County

5    Jail anything about the transport of Mr. Jennings.

6    So then I got the videotapes and saw the videotapes, and I

7    think you will be just as shocked as I was at what these

8    videotapes actually depict, and I think you are going to

9    conclude with me that these defendants lied under oath about

10    what happened because the video evidence tells a completely

11    different story than all those things that I just mentioned.

12    You are going to see Mr. Jennings was brought into the

13    Genesee County Jail by Sergeant Hartner from the Flint Police

14    Department.  Sergeant Hartner walks alongside him.  He's not

15    even holding on to him.  He sets Mr. Jennings down on this

16    metal bench.  He checks Mr. Jennings' hands -- or checks his

17    pockets, I mean, and there's no resistance at all.

18    Mr. Jennings sits back down on the bench.

19    Sergeant Hartner walks over to like a little desk table

20    and starts filling out paperwork.  And this goes on for about

21    two or three minutes, and Jennings is just sitting there, just

22    sitting there on the bench.  Once in a while he kind of bends

23    forwards and sits back up.  He's just sitting there.

24    Then Defendant Fuller walks into this little booking area.

25    He walks over to where the bench is with Sergeant Hartner, then

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 26

1   you see him, he walks over to Jennings.  Contrary to Jennings

2   being completely noncompliant and out of control, he appears to

3   follow his instructions, follow Fuller's instructions, and

4   Jennings turns around and puts his hands on the wall.  Then

5   Jennings takes off his hoodie in an apparent response from

6   Defendant Fuller to take off your sweatshirt.  Then Jennings

7   takes off his belt in an apparent response to Defendant

8   Fuller's order to take off your belt.

9        Jennings puts his hands back on the wall, and Defendant

10  Fuller begins patting him down.  When Defendant Fuller pats him

11  down near the groin area, Mr. Jennings takes his hand off the

12  wall for a split second and puts it back in a reaction to being

13  patted in the groin.  As soon as he did that, Defendant Fuller

14  grabs -- slams Jennings up against the wall, slams him head

15  first into the metal bench, puts his knee on Jennings' head.

16  Defendant Kenamer runs over and joins in the fray, pulling

17  Jennings' arms.  They pull him to the ground.

18       At that point they put their knee on his head, one of

19  them, while the other one like puts his knee in Jennings'

20  abdomen area.  And Jennings, who is -- who has emphysema,

21  begins screaming and he's screaming that I can't believe.

22       And at that point Defendants Wing and White, these other

23  two big guys over here, they join in the fray and all four of

24  them are like on top of Jennings, and Jennings is screaming,

25  and you can hear it, a bloodcurdling cry, because he can't

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 27

1    breathe.

2        Then Lieutenant Nuckolls, who is in charge of these men by

3    virtue of his rank, you can see him, he just walks up and

4    there's four guys on top of Mr. Jennings and he looks for an

5    opening and he bends over and shoots pepper spray directly into

6    the face of Mr. Jennings from point blank range.  And you are

7    going to hear an expert on police procedure that says that is

8    totally against policy.  You never shoot somebody in the face

9    with pepper spray from less than three feet.  It causes you to

10   be unable to breathe and it disables you.

11       Defendants Wing and White, after Jennings -- it's right

12   around the same time that Jennings is pepper-sprayed and the

13   officers kind of get off him and he's handcuffed so it's not

14   clear exactly when he gets handcuffed, but at any point,

15   shortly after he's pepper-sprayed the officers get off of him

16   and you can see him laying there handcuffed.

17       And then Defendants Wing and White then grab him by the

18   hands near his handcuffs and jerk him up, and you are going to

19   hear the same police procedure expert say you never lift

20   somebody up like that because that puts so much pressure on

21   your shoulder joints it can cause injury.

22       After they jerk him up, I think it's Defendant Wing, he

23   does like a tactical move where Jennings' hands are behind his

24   back and he slips his hand in between there, one of them, and

25   he takes his other hand and smashes him into the wall face

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 28

1   first.  You can see Jennings' face at that point and his facial

2   expressions writhing in pain.

3        After that happens, Defendant Fuller grabs his face with

4   his palm under his chin and shoves him out of this booking area

5   into this sallyport or little hallway and smashes him down on

6   his head, then pushes Jennings' head -- uses Jennings' head to

7   push himself up because he fell on top of them.

8        Shortly after, Jennings is yanked up by the handcuffs

9   again, and he's taken into this safety cell 6.  He's basically

10  taken in like that, kind of pushed in there.

11       In safety cell 6 there is a cement slab.  Jennings is

12  laying down there on the cement slab virtually motionless, and

13  he's face first and one of the officers is pushing his head

14  down into the cement.  And instead of the officers just --

15  Jennings is still handcuffed.  Instead of the officers just

16  walking away and closing the door, they decide they are going

17  to use -- go to the next phase.

18       So while Jennings is laying there for about a minute not

19  doing anything, some of the officers put on gloves, two of

20  them.  Then Lieutenant Nuckolls orders Jennings to be placed in

21  a restraint chair.  They grab Jennings out and throw him into

22  the restraint chair.  And then Defendant Fuller walks around

23  and puts his hand over Jennings' mouth like that, and Jennings

24  can be seen with his legs flailing, kicking around.  He's

25  literally fighting for his life at that point.

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 29

1    And then the officers take Jennings out of that chair,

2 throw him down to the ground, and again pile on him.  Again,

3 you will see them with their knees on him and they are all

4 holding him down, and then Lieutenant Nuckolls -- who, by the

5 way, when he was in cell 6, you can see him pacing back and

6 forth with his taser out -- he walks over while Jennings is

7 laying on the ground and they pull him up, get an area on his

8 back, and then they tase him.

9    Then, after Jennings, after they are piled on Jennings --

10 and, incidentally, that's another thing that's against police

11 policy.  You don't put anybody who has been pepper-sprayed in

12 the face facedown because there's a danger of asphyxia.

13    So, anyways, after that happens, they lift Jennings up

14 like a hogtied animal, bring him over and put him down in a

15 restraint chair and torque down.  And then you can see them.

16 They are all kneeling -- I mean a restraint bed.  They put him

17 down in a restraint bed, and they are all kneeling on him for

18 about a minute, then they torque down the restraints.

19    Again, you are going to hear that that's against policy.

20 You don't put somebody who has been pepper-sprayed in the face

21 in a restraint chair.  And, mind you, by this time he also has

22 a spit mask over his face.

23    You are also going to hear that when you pepper-spray

24 somebody you are supposed to wash them off and give them

25 uncontaminated clothes because the pepper spray continues to

*Plaintiff's Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 30

1 burn, and the clothes are so saturated even smelling them will

2 make your nose and your head burn.

3     They didn't do any of that. Instead, after they torqued

4 Mr. Jennings down in this restraint bed, they wheeled him into

5 a room and they left him there for about two and-a-half,

6 three hours until the next shift came. You are also going to

7 hear it's their own policy that they are supposed to check on

8 somebody every ten minutes when they are in that type of

9 position.

10     Jennings, who was in that restraint bed in that cell, you

11 will be able to see video of it, he was struggling to breathe.

12 He was bleeding from the facial trauma that he received and the

13 blood soaked into the spit mask, and Jennings chipped his tooth

14 trying to chew a hole in the spit mask so he could breathe.

15 And you can see him writhing around in that restraint bed while

16 he's in that cell all by himself.

17     So the next morning finally somebody comes and Jennings

18 checks out. They release Jennings on the drunk-driving charge,

19 and then shortly after in an effort to cover up this violent

20 assault the defendants falsified police reports to frame

21 Mr. Jennings and charge him with felony resisting and

22 obstructing.

23     And you are also going to hear that there was an internal

24 investigation done of these officers and they were all cleared,

25 and you know who was in charge of the internal investigation?

*13-13308; Jennings v. Fuller, et al.*

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 31

1   Lieutenant Nuckolls.  So, yeah, that's right, he investigated

2   himself and the men that were acting under his command and

3   found that they did nothing wrong.

4        So what started out as an illegal attack by Defendant

5   Fuller escalated into a retaliation and then punishment and now

6   a full-blown coverup.  You know, when you see that, when you

7   see that video, you are going to say that it's no wonder that

8   Mr. Jennings has the injuries that he did, that he received.

9   It's no wonder that he has a broken nose when you smash

10  somebody's face into a cement wall, into the ground and put

11  your knee on his head.  It's no wonder that he has a broken eye

12  socket.  It's no wonder that he has a closed head injury.  It's

13  no wonder that he has a shoulder injury, and it's no wonder why

14  he has post-traumatic stress disorder from an event like that.

15       You are going to learn that Mr. Jennings has permanent

16  life-altering injuries and that these defendants were never

17  even disciplined for what they did, and at the end of this case

18  I'm going to ask you to compensate Mr. Jennings for his serious

19  injuries and to hold these defendants accountable for their

20  misconduct and I'm going to ask you to return a

21  multi-million-dollar verdict at the end of the case.

22       Thanks a lot for your attention.

23            **THE COURT:**  Mr. Reising?

24            **MR. REISING:**  Yes, Your Honor.  Thank you.

25       Good morning, ladies and gentlemen.

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 32

1   **THE JURORS:**  Good morning.

2   **MR. REISING:**  As the judge indicated, my name is

3   Bill Reising.  I represent the defendants, those gentlemen back

4   there that you heard about from plaintiff's counsel.

5        Let me say, first of all, that I think jury duty is one of

6   the most important things a citizen of this country can do.  We

7   are one of the very few countries in the world that has a

8   system of this type where litigants, that is to say,

9   Mr. Jennings and the defendants, can come before you, present

10  their case, and you get to make the decision with respect to

11  what the facts are in the situation.  You get to decide if in

12  fact there was anything done wrong.  You get to decide based on

13  what Judge Cohn tells you the law is if there's any basis to

14  award Mr. Jennings any money, and of course I say there is

15  none, and you will hear the testimony so indicating as we go

16  through the course of this trial.

17       But I want you to understand, first of all, I really

18  appreciate that you're serving as jurors.  It's inconvenient, I

19  understand that.  You have to be down here.  It interferes with

20  your life, so to speak.  But, again, it's one of the most

21  important things that a citizen of this country can do.  It

22  really is.

23       We're in a tumultuous time in our country, as you know, to

24  a certain extent, but this process remains intact.  This

25  process is one which is a bulwark, so to speak, of our

*13-13308; Jennings v. Fuller, et al.*

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 33

1   Constitutional democracy.  That's what we are.  We are a

2   democracy based on our Constitution, and in our Constitution is

3   trial by jury and that's why we're here.

4       Now, the facts of this case.  The evidence in this case

5   from the standpoint of the defendants will establish that

6   Mr. Jennings is the guy who began this whole process because he

7   went out and got drunk.  He went to a bar called Down the Hatch

8   bar not very far from his home, and he consumed too much

9   alcohol that night.

10      Ultimately he gets arrested by Officer Hartner of the

11  Flint Township Police Department.  Why?  Because he's out

12  driving a car that had only one headlight and had no license

13  plate.

14      He gets stopped.  Officer Hartner sees what he looks like.

15  He's got watery eyes.  He smells of alcohol.  Good signs for a

16  police officer that there's a problem here, drunk driving.

17      He gives Mr. Jennings what's referred to as a portable

18  Breathalyzer test, a little device you blow into, gives you a

19  number.  He gets a number.  That number is over the number that

20  you can be if you're going to operate a motor vehicle in the

21  State of Michigan.  First sign of drunk driving.  He then gives

22  him multiple field sobriety tests that night and concludes I'm

23  going to write a ticket for operating while intoxicated, which

24  he does.

25      Then, because of that circumstance and because he cannot

*13-13308; Jennings v. Fuller, et al.*

1    let this gentleman operate a motor vehicle at that point in

2    time, he takes him to the Genesee County Jail per protocol.

3    Drunk drivers in Genesee County go to the Genesee County Jail

4    to be housed.  That's where they go.

5         Now, in association with that process, Officer Hartner

6    brought Mr. Jennings from Flint Township, which is really a

7    suburb of the City of Flint on the west side of Flint, to the

8    Genesee County Jail in downtown Flint.  That's where the jail

9    is located.

10        I heard comments made by plaintiff's counsel that Officer

11   Fuller said that Mr. Jennings was kicking and screaming in the

12   car.  That's completely untrue.  Officer Fuller is not going to

13   say that.  He's not going to say that ever happened.

14        The first contact that Deputy Fuller had with Mr. Jennings

15   that day, that night -- and really this is all taking place at

16   about 5:15 a.m.  That's about when Mr. Jennings arrives at the

17   jail, 5:15 a.m.  He had been picked up earlier, about 3:45 or

18   so, processed at the Flint Township Police Department, then

19   brought to the Genesee County Jail.  So he arrives about

20   5:15 a.m.

21        The incident that you heard described by plaintiff's

22   counsel lasted perhaps 15 to 20 minutes all together from the

23   time he gets to the jail until he's ultimately placed in the

24   restraint bed and put into a safety cell, which is under video

25   surveillance on a 24-7 basis.

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 35

1    And it's what occurred in that 20 minutes approximately,

2   that 15 to 20 minutes, that is the focus of this case.  It's

3   going to be the focus of what you're going to hear.

4    These officers are all experienced, know what they are

5   doing.  They are working the third shift.  The third shift

6   begins approximately 11:00 o'clock at night and ends

7   7:00 o'clock in the morning.  They are getting close to the end

8   of their shift, okay, at this point in time.

9    This is a Friday night.  You can imagine that probably

10  Mr. Jennings wasn't the only individual operating a motor

11  vehicle under the influence of alcohol that night that was

12  brought to jail.  Maybe the last one that night, but not the

13  only one.

14    Friday night is a big night for that kind of stuff, and

15  all of these individuals are very familiar with how to handle

16  such individuals, how you go about handling somebody who comes

17  to the jail to be processed, and there's a protocol for that.

18    Keep in mind a jail is a penal institution, all right?

19  It's a prison.  We call it a jail, but it's a prison.  You are

20  confined there and you've got rules that you've got to follow,

21  and if you don't follow those rules and if you don't follow

22  verbal instructions, there are consequences.

23    This is not the Holiday Inn.  This is a jail where they

24  have rules that you must follow.  If you don't follow those

25  rules and don't do what you are told, you could have a

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 36

1    circumstance where there is an altercation, so to speak, as

2    between yourself and one or more members of the staff of the

3    jail.

4         I'm not here telling you there was no contact from a

5    physical standpoint between five of the six people over there

6    and Mr. Jennings.  No question.  I do tell you, and you will

7    see during the course of the development of the case in this

8    matter and the video that you are going to see, that the

9    sergeant over there, one of the named defendants in this case,

10   had no contact physically with the plaintiff.  The other

11   five did to some extent, had physical contact with the

12   plaintiff at some time during the events in that window we're

13   talking about.

14        You heard reference made to Defendant Nuckolls.  Defendant

15   Nuckolls is sitting at the far end of the table there at the

16   very end.  He was the shift supervisor in the jail on the night

17   in question.  He was -- that means he is overall in charge of

18   the jail.

19        He responded along with the other individuals that you see

20   sitting there, one, two, three, four -- if you count those

21   four gentlemen, that row right there from Lieutenant Nuckolls

22   over, they all responded to the altercation which was already

23   involving Fuller and Kenamer.  Involving, I mean involving

24   those two individuals and Mr. Jennings in what's referred to as

25   the report-writing room.

1      The report-writing room is where all new prisoners at the

2  Genesee County Jail are first brought.  The officer who wants

3  to lodge the individual brings him to that room, and there's a

4  transfer that takes place, custody of the officer to the

5  custody of the Genesee County Jail.  That's where it takes

6  place there.

7      There's a pat-down process, and the pat-down process is

8  critical because the jail does not want illicit drugs, weapons,

9  anything at all going into the jail.  So they do a very

10 thorough pat-down process in association with anyone coming

11 into the jail.  Not just Mr. Jennings, anyone.

12     That's what was going to happen to Mr. Jennings when he

13 came to the so-called report-writing room on the night in

14 question.  You will see that room on the video.

15     Officer Hartner brings him in.  Initially Mr. Jennings is

16 not doing anything, all right.  He's not.  You will see that it

17 looks like he's being cooperative.  It looks like it on the

18 video.

19     Deputy Fuller comes into the room because he's going to do

20 the pat-down process.  He's going to pat down Mr. Jennings in

21 association with the placement of Mr. Jennings in the jail, a

22 process he's done many times with many individuals with no

23 difficulty whatsoever.

24     On this particular night you have heard that Mr. Jennings

25 was, so to speak, spread eagle, hands up against the wall like

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 38

1  this, arms up, feet spread, all right?  And then the officer

2  does the pat-down.  While that process is taking place as it

3  relates to Mr. Jennings, the evidence will show Mr. Jennings

4  initially drops his left shoulder and then takes his left hand

5  and arm off the wall.

6      When that occurs, Deputy Fuller is down in that area.  He

7  sees that.  You can see it in the video.  He raises back up and

8  pushes Mr. Jennings back up against the wall.  Mr. Jennings

9  then turns his head to the right and does just what Deputy

10  Fuller says in his report, makes an aggressive move as far as

11  he's concerned.  He doesn't know what Mr. Jennings has in mind

12  at that point in time.

13      He does know Mr. Jennings is coming into the jail for

14  drunk driving.  Therefore, he might be somewhat irrational.  He

15  does know that some people bring in weapons.  He does know he

16  could be injured in association with that process.  He does

17  know that the report-writing room is nonsecure, that is to say,

18  Mr. Jennings could possibly escape from the Genesee County Jail

19  back through the door he came in to start with in report

20  writing.

21      He does know all of those things.  He tells Mr. Jennings,

22  "Get your hands on the wall.  Get your hands on the wall."  You

23  can hear it in the video.  Mr. Jennings doesn't do that.

24      Officer Kenamer, he's there in the report-writing room on

25  the same date.  He's doing what's called property.  He's

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 39

1  getting all the property of Mr. Jennings put in one container

2  so that when Mr. Jennings gets released he gets everything back

3  he brought to the jail.  He's over on the other side of the

4  room.  He hears the commotion.  He comes over to assist Deputy

5  Fuller.

6      Keep in mind at this point in time Mr. Jennings is no

7  longer handcuffed.  When he takes his arm off the wall, the

8  left one, you also see in the video his right arm was cocked

9  like this.

10     Deputy Fuller in that same context knows that he has to

11 control the situation.  The way to get control from the

12 standpoint of a corrections deputy versus an inmate is to get

13 his hands behind his back and handcuff him, all right?  That's

14 the control factor we're talking about.  That's what they are

15 trying to do, get Mr. Jennings' hands behind his back and get

16 him handcuff.

17     He's initially placed on this metal bench adjacent to

18 where they are by Deputy Fuller with the assistance of Deputy

19 Kenamer.  They can't get enough leverage to get his hands

20 behind his back.  They place him on the floor.

21     By the time they place him on the floor to do that, and

22 they are down there and attempting to do that, the other

23 four individuals come into the room.  You will see that on the

24 video.  The lieutenant, sergeant and two other deputies.

25     You have heard already from Mr. Ernst that Mr. Jennings

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 40

1  received pepper spray.  He did.  Why?  Because he was not

2  paying attention to the verbal orders he was receiving to stop

3  resisting.  He was not doing anything except resisting,

4  resisting, resisting.

5      You are going to hear testimony from all of these

6  individuals that on the hit parade of resistors Mr. Jennings

7  was at the top, size aside.  And, by the way, I think he was, I

8  think, 160 pounds at the time.  Mr. Jennings was the number

9  one, so to speak, in terms of turmoil he was creating while

10  they were trying to control him.

11      They use certain techniques that you will hear about

12  related to what you do to control an inmate if you are a

13  corrections person.  You use verbal commands.  You use soft

14  open-hand techniques.  You use hard hand techniques, and you --

15  there's what's referred to as a use-of-force continuum.  It

16  goes up in terms of what a corrections-type person can do.

17      Deputy, or I should say Lieutenant Nuckolls, when he

18  assessed the situation -- and Lieutenant Nuckolls at the time

19  had been a police officer 15, 16 years, has been through all

20  kinds of good stuff, to include managing the jail, being on the

21  road.  You name it, he had done it.

22      He assessed the situation and determined he should use

23  pepper spray to try to get Mr. Jennings into compliance.  I

24  heard some comments made by plaintiff's counsel that you should

25  never spray pepper spray in the face.  Well, that's where you

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 41

1    spray it.  That's where you put it.  Why?  You want to get the

2    attention of the individual.  It's painful, but it's painful on

3    purpose.  It isn't permanent, but it's painful, and the pain is

4    meant to take the inmate's attentions away from what he's

5    doing, i.e., not cooperating, so that they can get his hands

6    behind his back and handcuff him.

7         In 98 percent of the situations when that occurs it's

8    over.  The incident is over.  They then take the inmate and

9    give him a shower because he had been pepper-sprayed, okay, and

10   give him fresh jail clothes.

11        In this particular circumstance there was no way they

12   could do that because the pepper spray had no effect, first of

13   all, on Mr. Jennings that night or that morning, and what

14   happened was ultimately they got him on the floor in the

15   report-writing room, they get him handcuffed again.  They do

16   get him handcuffed.  They bring him up.

17        Those two gentlemen right there in the middle, they bring

18   him up in the upper arm area of both arms.  He comes up to his

19   knees and then to his feet from the floor.

20        As soon as that occurs, he projects himself backwards into

21   the wall of the room.  It looks like he strikes his head.  You

22   can't see it on the video, but I think it's pretty clear he

23   did.  They didn't do that.  He did it.  That's what the

24   evidence is going to show on this video.

25        They got control of him enough to start to move him away

1   from the room, the idea being they are going to put him in a

2   safety cell, he'll calm down, and we'll move on, okay?

3       It doesn't happen.  They are moving him out of the room.

4   Deputy Fuller has ahold of the chin area of Mr. Jennings at

5   this point in time, and the reason for that is he's trying to

6   prevent Mr. Jennings from hitting his head on this metal door

7   jam they are going through.  He doesn't want Jennings to strike

8   his head because he's essentially a wild man at that point in

9   time.  He's actually almost facing Fuller as opposed to facing

10  forward.  He's backwards.

11      They are moving him.  Jennings trips, causing Fuller and

12  Jennings to go to the floor.  You will see in the video that

13  when they go to the floor Fuller puts his right hand out to

14  brace himself against a bench that's right there, but Jennings

15  does go to the floor and may well have suffered an injury to

16  the area of his face at that point in time because it's a

17  concrete floor.

18      Regardless, back up, they take him to the safety cell for

19  the first time.  The idea was, okay, we're going to put him in

20  a safety cell and he'll chill out and things will be fine.

21      Lieutenant Nuckolls goes in there, takes a look at the

22  situation.  He even took his taser out at one point in time.

23  Didn't use it in the safety cell but did take it out, and the

24  reason he took it out was because Mr. Jennings was still not

25  cooperating, was still acting out, was not doing what he should

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 43

1   have been doing, so on that basis Lieutenant Nuckolls made the

2   decision that he should be placed in a restraint chair.

3       And a restraint chair is a device used in a prison

4   facility to restrain unruly prisoners.  That's what it's for.

5   You get strapped into a chair.  It's as simple as that.

6       The one thing you will see in the video that the sergeant

7   did, it's Sergeant Kyle Guest did, he went and got the

8   restraint chair because it was away from where the safety cell

9   was.  He goes and gets the chair and brings it to where they

10  can try to put Mr. Jennings in this chair.

11      It's not going to happen.  You will see clearly on the

12  video it's not going to happen.

13      The decision is made, okay, the only thing we can do with

14  this gentleman is put him in what's called a restraint bed,

15  which is a -- you will see in the video -- it's sort of a bed,

16  I don't know, eight, nine feet long, four feet wide with some

17  restraint straps that they can put over an individual.

18      And ultimately that's what happens.  They take him out of

19  the, they take him out of the chair because they can't get him

20  in there, put him on the floor.  While he's on the floor, they

21  are restraining him.  Then you will see in the video Lieutenant

22  Nuckolls is at the feet of Mr. Jennings.  He's actually sitting

23  there on top of the feet of Mr. Jennings holding him in place,

24  so to speak, and it's from that position that he ultimately

25  does taser Mr. Jennings in the lower back.

*13-13308; Jennings v. Fuller, et al.*

*Defendants' Opening*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 44

1      You are going to hear testimony in this case that

2   Mr. Jennings says he got tasered in the face.  It never

3   happened.  There was only one taser application that night, and

4   it was to his lower back.

5      They did get him in the restraint bed.  He was put belly

6   down, and they did put a, what's referred to as a spit mask on

7   Mr. Jennings.  I've got a spit mask which I'll show you.  I'll

8   even put it on for you to show you that you can easily breathe

9   with a spit mask.  It's not a problem.

10      And he stayed in that restraint bed for about two hours, a

11   little more than two hours.  He was released on the first shift

12   the following -- because we're late in the morning, as I told

13   you, when they came in.  By the time he's out of the restraint

14   bed, shifts have changed, so he's taken out of the bed by the

15   first shift.

16      And he was cooperative at that point in time, okay?  He

17   was spent, so to speak.  So he didn't cause any more problems

18   at that point.  He was seen at the medical department and

19   ultimately released.

20      The actions of these gentlemen were actions that they took

21   because they felt they had no choice in the situation as it

22   then existed.

23      I have already indicated that there's no question but that

24   Mr. Jennings suffered certain injuries.  You will see a

25   photograph of his face.  His face is bruised, no question about

1    that.

2         You have heard about other injuries.  There will be

3    medical testimony about that circumstance that you will hear,

4    which clearly shows that, although he wants to claim those

5    injuries are due to what happened in the Genesee County Jail,

6    they didn't in fact occur as he claims, they aren't injuries

7    which could have occurred based on what plaintiff says happened

8    to him.

9         You also are going to hear from a police/corrections

10   expert, a fellow -- a gentleman by the name of

11   Dr. Darrell Ross, who is going to say that everything that

12   was done here by these six individuals was done in an

13   appropriate manner and that he finds no basis to criticize

14   these individuals with respect to what they did in association

15   with dealing with Mr. Jennings on the night in question.

16        So at the end of the case you have heard that there will

17   be closing arguments.  I'm going to ask you at that point in

18   time to find that none of those individuals seated at that

19   table did anything wrong, all right?

20        As it relates to, first of all, the claim of excessive

21   force, it's categorized, and you will hear about the word

22   "unreasonable," but it really involves was the force that was

23   used to deal with the situation excessive.  I say it's not

24   excessive, and I think the proofs will show that when you hear

25   everything.

1    Keep in mind, plaintiff gets to go first to present their

2  case and then the defense presents their case, and I think when

3  you hear all the evidence and you weigh all the evidence

4  because you get to weigh the evidence and you get to judge the

5  credibility of the witnesses who are giving that evidence, you

6  are going to conclude, just what I said, no liability on behalf

7  of these individuals.

8    There is also a second claim in this matter that was

9  referenced, and that is a claim which is referred to as

10  unlawful prosecution.  In association with dealing with

11  Mr. Jennings in the safety cell hallway, after they tried to

12  put him in the restraint chair and that was unsuccessful and

13  while they were going to get him ready to go to a restraint

14  bed, he bit Deputy Fuller in the hand.  As a result of that

15  bite, there was a criminal prosecution against Mr. Jennings.

16  He was charged with a felony for doing that.

17    There was, as there is normally in all criminal

18  proceedings in state court, a hearing before a state district

19  court judge, and at that hearing that state district court

20  judge found based on the evidence presented there was so-called

21  probable cause.

22    **MR. ERNST:**  Judge, I have an objection to this line

23  of statement.  It's a fact question for the jury.

24    **THE COURT:**  Go ahead.  Complete your -- what you were

25  going to say was the prosecution was dismissed.

V1-Page 47

1          **MR. REISING:**  Ultimately the prosecution was

2  dismissed.

3          **THE COURT:**  Talk to the jury, not to me.  I know

4  what's going on.  I know what happened.  Just the prosecution

5  was dismissed, that's enough.

6          **MR. REISING:**  All right, Your Honor.  The prosecution

7  was dismissed, but it wasn't dismissed for the reasons

8  plaintiff says, all right?  That's what the evidence will show.

9          **THE COURT:**  Are you done?

10          **MR. REISING:**  And, with that, Your Honor, I am done.

11          **THE COURT:**  Okay.  We'll get to the witnesses.

12      Call your first witness.

13          **MR. ERNST:**  Judge, we're going to need five minutes

14  to set up our video guy.

15          **THE COURT:**  All right.  So we'll take a short recess.

16      (Jury out at 10:27 a.m.)

17      (Recess from 10:27 a.m. to 10:34 a.m.)

18          **THE COURT:**  Are we all set?

19          **MR. ERNST:**  One second, Your Honor.

20      We are ready, Your Honor.

21          **THE COURT:**  Do you want a chair?  The operator.

22          **THE WITNESS:**  If I need one, yes.  I could use that

23  one there, sir, if that would be fine.

24          **THE COURT:**  Yeah.

25      Everybody rise.  You just take your seats.

*13-13308; Jennings v. Fuller, et al.*

V1-Page 48

1          (Jury in at 10:37 a.m.)

2                **THE COURT:**  Be seated.

3          Who is your first witness?

4                **MR. ERNST:**  Your Honor, Mr. Jennings calls

5     Kenneth Glaza.

6                **THE COURT:**  Pardon?

7                **MR. ERNST:**  Mr. Jennings calls Kenneth Glaza,

8     G-l-a-z-a.

9                **THE COURT:**  Are you the witness?

10               **THE WITNESS:**  Yes, sir.

11               **THE COURT:**  Raise your right hand.

12                              -   -   -

13                        **KENNETH GLAZA,**

14          being first duly sworn by the Court to tell

15          the truth, was examined and testified upon his

16          oath as follows:

17               **THE COURT:**  All right.  How do you spell your name?

18               **THE WITNESS:**  Glaza, G-l-a-z-a, is the last name.

19    Kenneth is the first, K-e-n-n-e-t-h.

20               **THE COURT:**  Okay.  Go ahead.

21          Is he on your list?

22               **MR. ERNST:**  Yes, Your Honor.

23               **THE COURT:**  Yeah, I've got it.

24          Okay.  Go ahead, sir.

25               **MR. ERNST:**  Thank you.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 49

1                              -   -   -

2                                                    (10:38 a.m.)

3                      **DIRECT EXAMINATION**

4   **BY MR. ERNST:**

5   **Q.**   Mr. Glaza, would you please state your full name for the

6   jury.

7   **A.**   Kenneth Glaza, G-l-a-z-a.

8   **Q.**   And, sir, what is your profession?

9        And please face the jury.  I'll stand over here.  Can you

10  pick up me up over here?

11       What is your profession?

12  **A.**   Audiovisual digital media expert.

13  **Q.**   And how long have you been in that professional?

14  **A.**   At least 38 years, if not longer.  Maybe 40.

15  **Q.**   And what do you -- what is -- what do you do in that

16  profession primarily?

17  **A.**   What we do is we do analysis of audio and video, media.

18  We sometimes have to interpret, sometimes we have to clarify

19  what's going on in the video and, you know, maybe even write

20  transcripts, whatever, of the video.

21  **Q.**   Do you have any formal education?

22  **A.**   Yes, sir.

23  **Q.**   What is it?

24  **A.**   Electrical engineering at the University of Michigan.

25  **Q.**   Did you receive a degree in that field?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 50

1   **A.**   Yes, sir.

2   **Q.**   And what's the nature of your degree?

3   **A.**   Bachelor.

4   **Q.**   Okay.  And when did you graduate?

5   **A.**   That was in 1974, if I remember right.  It's been a while.

6   **Q.**   And what else -- and so what did you -- how does that

7   degree help you in your current profession?

8   **A.**   Oh, the electronics education from the college and other

9   classes that I have taken since then keeps in tune with how

10  this equipment works, why it does what it does, ways of

11  improving it and designing circuitry, which I'm responsible for

12  having created some improvements to some of these devices.

13  **Q.**   All right.  Sir, have you ever served as an expert witness

14  in the field of video evidence forensics?

15  **A.**   Oh, yes, sir.

16  **Q.**   Approximately how many times?

17  **A.**   At least 30, 30 times, if not more.

18  **Q.**   Have you ever been employed by any --

19           **THE COURT:**  Mr., Mr. -- why don't we go to his

20  substantive testimony, and if he's cross-examined as to his

21  qualifications on redirect, you can bring out what you want.

22           **MR. ERNST:**  Okay.

23           **THE COURT:**  That will move us forward.

24           **MR. ERNST:**  Very well.

25

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 51

1  **BY MR. ERNST:**

2  **Q.**   Sir, did you have an opportunity to receive some video

3  from a jail from our office?

4  **A.**   Yes, I did.

5  **Q.**   All right.  And did you perform a forensic analysis on

6  that video?

7  **A.**   Yes.

8  **Q.**   Could you first play the video that you received from our

9  office.

10           **THE COURT:**   What exhibit numbers are the videos?

11           **MR. ERNST:**   They would be --

12           **MR. ELLIOTT:**   24, Your Honor.

13           **THE COURT:**   They are all on one?

14           **MR. ERNST:**   Yes, they are all in one exhibit number.

15           **THE COURT:**   All right.  Go ahead.

16      Go ahead.

17           **THE WITNESS:**   Yes, sir.

18           **THE COURT:**   Ask your question again.

19           **MR. ERNST:**   I'm asking him to play the video.  Did he

20  receive it and --

21      (Video started and continued while the following

22      proceedings occurred.)

23  **BY MR. ERNST:**

24  **Q.**   Is that the video that you received?

25  **A.**   Yes, sir, it is.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 52

1   **Q.**   All right.

2       Mr. Glaza, there's a clock up in the upper right of that

3   video.  Is that in real time?

4   **A.**   I would assume, yes, it's real time.  Yes.

5           **THE COURT:**  About how long is this video?

6           **MR. ERNST:**  About three minutes, something like that.

7   Four minutes.

8           **THE COURT:**  Witness, this is in digital format, is it

9   not?

10          **THE WITNESS:**  Correct.

11          **MR. ERNST:**  All right.  You can cut that one.

12      (Video stopped.)

13  **BY MR. ERNST:**

14  **Q.**   Okay.  Let me ask a couple of questions.  Sir, the

15  movements in that video appear kind of jerky.  Can you explain

16  to the jury why that is?

17  **A.**   Yes.

18  **Q.**   Turn.

19  **A.**   The video systems that record these kind of events are

20  usually responsible for a number of cameras that are in the

21  building, and so because it's only one computer that records

22  all of this, it takes a picture here, a picture here, a picture

23  there, a picture there, and then it comes around and it picks

24  up another picture and it goes on and on.  So there is a time

25  period in there where the cameras are not being used to collect

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 53

1   a photo.

2   **Q.**   Okay.  And what are the relative -- can you explain to the

3   jury -- let me try this.  Can you explain to the jury what

4   frame rates are?

5   **A.**   Yeah, frame rates are -- the number of frames per

6   second is what we go by.  We call it frames per second, and in

7   video what we call full frame rate is 30 frames per second.

8   Movie films that you see in a theater used to be 24 frames, but

9   now they are all doing digital so we have upped it to 30

10   frames, okay?  So frame rates are how many pictures are snapped

11   within a second.

12   **Q.**   Okay.  What's the typical frame rate for security cameras?

13   **A.**   Well, the average is somewhere between seven and ten is

14   what they recommend for a very good interpretation.

15   **Q.**   Okay.

16   **A.**   Yeah.

17   **Q.**   And did you come to any conclusions about the frame rates

18   of this particular video?

19   **A.**   Yes.  I measured the frame rates using the decryption

20   software that was provided for the playback of the encrypted

21   files.  What these servers do, they output a file that can only

22   be viewed through their decryption software.  You can't change

23   it, you can't modify it, you can't alter it.  So I used that,

24   and they have menus in there that allows me to see how many

25   frames are transpiring per second.  So there's menus in there

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 54

1   that I can check that.

2       The frame rate I got here varied depending on what we were

3   looking at, anywhere from zero when there was no activity on up

4   to as high as 3.4 I measured over a time period of frames per

5   second.  Of course there's not a .4, but that gives you an idea

6   of the frame rate.  It was very low.

7   **Q.**   All right.  And does that low frame rate affect the

8   ability to see details in the video?

9   **A.**   No, not the detail.  I think what you're asking for is the

10  connectivity between the pictures, the frames.

11  **Q.**   Well, can you explain to the jury what that is?

12  **A.**   Yeah.  When frame rates fall below 7 frames per second,

13  there is a thing in the movie industry that is very common, and

14  when a shutter opens and closes, and you may have done that

15  when you took pictures of football events or sporting events of

16  some sort when a person is running by your camera.  When you

17  look at one frame of that picture snap, okay, the look that you

18  will get will be a blurring effect behind the person.

19      So the way we connect frames when we get below seven

20  frames is we start looking for other pieces of evidence that

21  will allow me to say, well, this arm is moving here, this foot

22  is moving here, this is going there because we can look for

23  what we call motion blur.  It's very common in the film-making

24  industry.  They use motion blur when they do cartoons to make

25  it look more realistic because we are so trained to see that in

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 55

1   our movies.

2   **Q.**   All right.  Does say this particular video contain motion

3   blur?

4   **A.**   Yes.

5   **Q.**   And with regard to this low frame rate, could that result

6   in the video missing details like a gross motor movement?

7   **A.**   No, it wouldn't miss gross motor movements, such as arms

8   and bigger mass of things.  It might miss a muzzle flash or a

9   blink of an eye, but pretty much so the body is kind of in

10  continuous motion.

11  **Q.**   Could that video miss a person turning around and then

12  turning back?  Would that be depicted on that video?

13  **A.**   It could possibly be, but yeah, it would have to be pretty

14  slow.

15  **Q.**   Okay.  And -- all right.  So, sir, did you conduct a

16  forensic analysis of that particular video that we just saw?

17  **A.**   Yes.

18  **Q.**   All right.  And did you create a different video, I mean a

19  different -- did you -- can you use the one that you conducted

20  the analysis on, I guess is what I'm asking?

21  **A.**   Yes.  This is a copy of the file.  Let's see if I can get

22  it to play again.

23       (Video playing.)

24           **MR. REISING:**  Your Honor, may we approach?

25           **THE COURT:**  Yeah.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 56

1      (Video stopped.)

2      (The following sidebar conference was held:)

3          **MR. REISING:**  I object because we have never been

4   provided with this video.  This is apparently a second video.

5          **MR. ERNST:**  His report references it, and they --

6          **THE COURT:**  Wait a minute.

7      (End of discussion at side bar.)

8          **THE COURT:**  I'm going to excuse you.  Go back to the

9   jury room.

10      (Jury out at 10:55 a.m.)

11          **THE COURT:**  I don't understand the objection.  This

12   is the video.

13          **MR. REISING:**  This is a different video than the

14   video that actually took place at the jail.

15          **MR. ERNST:**  It's not different at all.  He just did a

16   forensic analysis so now he can stop each frame.

17          **THE COURT:**  This is the same video.  He's stopping it

18   frame by frame.  This is the same video.  It's not a substitute

19   video.  This is the video that --

20          **MR. REISING:**  Okay, if that's what it is.

21          **THE COURT:**  That's what it is.

22          **MR. REISING:**  If that's what he says it is.

23          **THE COURT:**  This is his analysis.

24          **THE WITNESS:**  Yes.

25          **THE COURT:**  Right?  You have already shown this

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 57

1   video.  Hold on.  You have already shown this video.  You have

2   just done an analysis of it; is that correct?

3          **THE WITNESS:**  Correct.

4          **THE COURT:**  What?

5          **THE WITNESS:**  I did an analysis of this video, yes,

6   sir.

7          **THE COURT:**  In slow motion, so to speak.

8          **THE WITNESS:**  Yes, I slowed it down.  I did different

9   things, you know, clarified the picture a little bit for myself

10  so I could understand what's going on.

11         **THE COURT:**  But it's all the same video.

12         **THE WITNESS:**  It came from the videos that I got from

13  my attorneys, who I understand got it from the police

14  department.

15         **THE COURT:**  Yeah, okay.  You didn't add anything?

16         **THE WITNESS:**  No, sir.

17         **THE COURT:**  Okay.  Is it fair to say that what this

18  is is the video in slow motion, so to speak?

19         **THE WITNESS:**  Yes, that would be fair to say.

20         **THE COURT:**  You are picking out specific frames.

21         **THE WITNESS:**  Correct.

22         **THE COURT:**  Okay.  You are manipulating -- I'm not

23  using that as a pejorative -- you are manipulating, what's it,

24  the disk?

25         **THE WITNESS:**  Yeah, you could say I'm manipulating

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 58

1    the disk so I can look at different parts of the video that's

2    on it.

3              **THE COURT:**  Okay.  Thank you.

4         The objection is overruled.

5         (Jury in at 10:57 a.m.)

6              **THE COURT:**  You can be seated.

7         Continue.

8    **BY MR. ERNST:**

9    **Q.**   All right, sir.  As a result of your forensic analysis,

10   were you able to conduct an analysis on this particular video?

11   **A.**   Correct, yes.

12   **Q.**   All right.  Now, what will that allow you to show us?

13   **A.**   Well, I think that the question is what transpired during

14   this -- the taping, the video that was made of this.

15   **Q.**   Okay.  And will you be able to stop each frame?

16   **A.**   Yes, sir.  Hopefully.

17   **Q.**   All right.  So if you could roll forward until Defendant

18   Fuller comes into the room.

19   **A.**   I don't know who Fuller is so you tell me where to stop,

20   okay?

21   **Q.**   Yeah, sure.

22   **A.**   All right.

23        (Video started and continued while the following

24        proceedings occurred.)

25

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 59

1    **BY MR. ERNST:**

2    **Q.**   Okay.  Now, go back to when he enters, please.

3    **A.**   Tell me when to stop.

4    **Q.**   All right.

5        Okay.  Can you stop it.  Can you back it up a little bit.

6        Okay.  In that frame, sir, based on your forensic analysis

7    of the video, does Mr. Jennings appear to have his hands on the

8    wall?

9    **A.**   I would say, yes, both hands are on the wall.

10   **Q.**   Okay.  Can you give us the next frame.

11   **A.**   I will try my best here.

12   **Q.**   All right.  And, incidentally, at the previous frame it

13   was still at, the timer was still at 12:04, correct?

14   **A.**   Correct.

15   **Q.**   All right.  And this frame is at 12:04, correct?

16   **A.**   Correct, yes.

17   **Q.**   Do you see Mr. -- do you see the officer with the dark

18   hair engaged with the man against the wall?

19   **A.**   Yes, sir.

20   **Q.**   All right.  Based on your forensic analysis, did you see

21   any aggressive turn by Mr. Jennings?

22       **MR. REISING:**   Objection, Your Honor.  This witness is

23   not in a position to make that kind of decision.

24       **THE COURT:**   The objection is overruled.

25

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 60

1   **BY MR. ERNST:**

2   **Q.**   You can answer the question.

3   **A.**   Yeah, I --

4   **Q.**   Did you see Mr. Jennings make any aggressive motion?

5   **A.**   No, and it would be impossible to do that within this

6   frame rate because look at the spread on his feet.  His feet

7   are all spread out, and in order to make a 180-degree turn --

8          **MR. REISING:**   Your Honor, I'm going to object.  This

9   calls for a corrections type analysis --

10         **THE COURT:**   The objection is overruled.  You can

11   cross-examine him.

12      Go ahead.

13   **BY MR. ERNST:**

14   **Q.**   All right.  At this point in time does it appear that

15   Mr. Jennings has both hands on the wall?

16   **A.**   Yes, sir, it does.

17   **Q.**   Okay.  Can you give us the next frame.

18   **A.**   All right.  Let's see here.

19   **Q.**   Okay.  That's good.

20   **A.**   All right.

21   **Q.**   All right.  So now we're at 12:05, correct, on the

22   counter?

23   **A.**   Correct.

24   **Q.**   And now it appears that the officer --

25          **THE COURT:**   No, you don't testify.  You ask him.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 61

1   **BY MR. ERNST:**

2   **Q.**   Okay.  Does it appear that the officer in the dark hair is

3   pushing the back of the head of the man against the wall?

4   **A.**   Yes.

5   **Q.**   Okay.  In that time lapse from the last frame did you see

6   any indication that the officer gave two commands to

7   Mr. Jennings or to the guy against the wall?

8           **MR. REISING:**  Objection.  There's no video audio

9   here, Your Honor.  How can this witness make that kind of

10  conclusion?

11          **THE COURT:**  No, wait, wait, wait, wait.  Can you tell

12  from the frame whether anyone is vocalizing or not?  Yes or no.

13          **THE WITNESS:**  No.

14          **THE COURT:**  Okay.  Go ahead, Mr. Ernst.

15          **MR. ERNST:**  Okay.

16  **BY MR. ERNST:**

17  **Q.**   And it was, according to the counter, there was

18  approximately one second between those two frames, from the

19  last one we saw, correct, from the last two we saw?

20  **A.**   Probably less than that because of the way the frame would

21  come over, the division of the second there.

22  **Q.**   Okay.  Can you give us the next frame.

23  **A.**   All right.  Let me see.

24  **Q.**   Okay.  Give us another one, please.

25  **A.**   Continue?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 62

1    **Q.**   Yes, please.

2         All right, sir.  In this frame can you see the head of the

3    man that's on the bench based on your forensic analysis?

4    **A.**   Yes.

5    **Q.**   Can you point to it?

6    **A.**   Yes.  Right in here.

7    **Q.**   Okay.  Will you give us the next couple frames.

8    **A.**   Yes.  Continue?

9    **Q.**   Yes.

10        All right.  Can you stop on that frame.  Can you now see

11   the head of the man on the bench?

12   **A.**   Yes, sir.

13   **Q.**   Can you point to it?

14   **A.**   Yes.  Right there.

15   **Q.**   And do you see anybody's hand pushing on the head or on

16   the head?

17   **A.**   Oh, yes, sir.

18   **Q.**   Okay.  And can you point to that?

19   **A.**   Yes.  It's kind of hard to point.  It's right in here.

20   Right there.

21   **Q.**   All right.  What happens next?  Can you give us the next

22   frame?

23   **A.**   Yes.

24   **Q.**   You can keep going.

25   **A.**   Okay.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 63

1   **Q.**   All right.  Can you go a little more?

2   **A.**   Uh-huh.

3   **Q.**   Keep going.

4   **A.**   Yes, it's advancing.

5   **Q.**   All right.  Can you possibly speed it up just a little.

6       Okay.  Can you back it up one?

7       That's good.  Can you see the man on the head of the man

8   on the bench in that one?

9   **A.**   Let me get my glasses.

10       Yes, I can, yep.

11   **Q.**   Can you point to it?

12   **A.**   Yep.  Again, it's right down here.

13   **Q.**   And is there, the deputy with the dark hair, does he have

14   his hand on that head?

15   **A.**   It appears as that, yes, sir.

16   **Q.**   All right.  And that's on the metal bench or on the bench

17   there?

18   **A.**   That looks like it's on the bench, yes, sir.

19   **Q.**   All right.  And can you advance it?

20   **A.**   Yes.

21   **Q.**   Do you see the deputy with the balding head?

22   **A.**   Yes.

23   **Q.**   Based on your forensic analysis, what does he appear to be

24   doing on that with the, with the arm or with the appendage of

25   the man on the back?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 64

1          **MR. REISING:**  Objection, Your Honor.  This witness is

2   not here as a corrections expert to testify as to what kind of

3   maneuver is taking part by this particular deputy.

4          **THE COURT:**  He can testify.  You can cross-examine.

5   **BY MR. ERNST:**

6   **Q.**   Go ahead.

7   **A.**   From what I get from this frame here without looking at a

8   previous frame or after frame, it looks like he was pulling him

9   to the floor.

10  **Q.**   All right.  Can you note anything from the posture of the

11  deputy with the appendage in his arm?

12  **A.**   Yeah, the arm appears to me to be as if his hand is on the

13  back of his elbow, and that's his right hand, the balding guy's

14  right hand is on the back of the elbow and his left hand is on

15  the wrist.

16  **Q.**   Okay.  Can you play it more, advance it, please.

17         All right.  Can you stop there.  Can you see the knee of

18  the man with the balding head?

19  **A.**   Yes.

20  **Q.**   Where does it appear to be?

21  **A.**   It looks at this point like it's into his backside here,

22  into his -- up at the top of his back at this point.

23  **Q.**   Okay.  And what's the time on the timer?

24  **A.**   12:19, 5:12:19.

25  **Q.**   At any point thus far in your analysis of the video did

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 65

1  you see Mr. Jennings, the guy that was on the bench, strike

2  one of the officers?

3  **A.**   No.

4  **Q.**   Did you see him kick any of the officers?

5  **A.**   No.

6  **Q.**   All right.  Did you see him make any aggressive moves at

7  any of the officers?

8  **A.**   No.

9  **Q.**   You can advance it.

10       At this point can you see the man with the bald head's

11  knee?

12  **A.**   The guy on the floor on the left?

13  **Q.**   Yes.

14  **A.**   Yeah, that's a much better picture that indicates to me

15  that his knee is on the guy on the ground's neck.

16  **Q.**   Okay.  Did you, up until this point in time did you ever

17  see Jennings turn towards any of these officers in an

18  aggressive manner?

19  **A.**   No.

20  **Q.**   Okay.  All right.  You can advance it.

21       Okay.  Can you stop it right there.

22       Can you see Mr. Jennings feet in this, first of all?

23  **A.**   Yeah.

24  **Q.**   Can you point to them?

25  **A.**   Yes.  Right there.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 66

1  **Q.**   Okay.  Based on your forensic analysis, did you see any

2  kicking while he was laying there?

3  **A.**   No kicking, no.

4  **Q.**   All right.  Go ahead.  Please advance it.

5  **A.**   Okay.

6          **THE COURT:**  Go ahead, Mr. Ernst.

7  **BY MR. ERNST:**

8  **Q.**   You can advance it.

9  **A.**   A little faster.  Let me move it up a little bit.

10  **Q.**   All right. Stop right there.

11      Can you see the, the -- can you see Mr. Jennings' feet in

12  that frame?

13  **A.**   Yes.

14  **Q.**   All right.  Can you point to them?

15  **A.**   Yes.  Right there.

16  **Q.**   All right.  And so does it appear that anybody is in

17  contact with his feet?

18  **A.**   Yes.

19  **Q.**   Okay.  Can you point to that?

20  **A.**   Yes.  Right there.

21  **Q.**   Okay.  All right.  Go ahead and advance it.

22      All right.  Stop right there.  Is there any way you can

23  get that video thing out of the picture?

24  **A.**   Yes.  It goes away.

25  **Q.**   Can you see the facial expressions of the man who is

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 67

1   standing by the doorway there?

2   **A.**   Yes.

3   **Q.**   Based on your forensic analysis, how would you describe

4   that facial expression?

5           **MR. REISING:**  Your Honor, the video speaks for

6   itself.

7           **THE COURT:**  The video speaks for itself on that

8   question.

9           **THE WITNESS:**  Okay.

10  **BY MR. ERNST:**

11  **Q.**   All right.  You can advance it.

12          **THE COURT:**  Go ahead.

13  **BY MR. ERNST:**

14  **Q.**   Okay.  Can you stop it.

15      Did it ever -- can you see Mr. Jennings' legs in those

16  frames?

17  **A.**   Not completely, no, not well.

18  **Q.**   All right.  Can you advance it a little further.

19      Oh, I'm sorry, before you do, can you see the officer with

20  the dark hair, can you see his elbow posture?

21  **A.**   You are referring to the one in the middle of the --

22  **Q.**   By the bench.

23  **A.**   Yeah, the one in the middle, right?

24  **Q.**   Yeah, okay.  Can you point to that?

25  **A.**   This is what you are looking for, I think, right there.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 68

1   **Q.**   Yes.  Please advance that.

2   **A.**   Okay.

3   **Q.**   Okay.  Stop it right there.  Can you back up one?

4   **A.**   Okay.  I'll try.

5   **Q.**   With regard to the man in the white-colored shirt or the

6   lighter-colored shirt, do you see anything in his right hand?

7   **A.**   Yes.

8   **Q.**   Can you point to it?

9   **A.**   (Witness indicates.)

10  **Q.**   All right.  Advance it.

11       All right, sir.  Do you see the man in the white shirt

12  bent down?

13  **A.**   Correct.

14  **Q.**   What's the timer on that?

15  **A.**   5:12:43.

16  **Q.**   All right.  Can you advance it.

17       Okay.  Can you stop right there.  Can you see the man on

18  the floor's head in that particular frame?

19  **A.**   Yes.

20  **Q.**   Can you point to it?

21  **A.**   Yes.  I believe this is it right here.

22  **Q.**   And does it appear that there's a hand on his head?

23  **A.**   Oh, definitely, yes, sir.

24  **Q.**   And does it appear that his head is facedown?

25           **MR. REISING:**  Well, Your Honor, I'm going to object.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 69

1    Again, the video speaks for itself, and he's leading the

2    witness on top of that.

3         **THE COURT:**  The objection is overruled.

4         **MR. REISING:**  He's also leading the witness, and I

5    object to that.

6         **THE COURT:**  No, he's not leading the witness.  The

7    objections are overruled.

8         Continue, Mr. Ernst.

9    **BY MR. ERNST:**

10   **Q.**   We can take your answer.

11   **A.**   Yes, his hand is on his head, pushing it to the floor.

12        **MR. REISING:**  Well, Your Honor, I'm going to object

13   to that, pushing it to the floor.

14        **THE COURT:**  Please, please.  You can't object to an

15   answer.  Please sit down, sir.  There's no pending question.

16        Repeat the question and answer by Mr. Ernst, Reporter,

17   Line 11, 9 and 11.  Wait, go back.  Go back.

18        (The following record was then read:  "And does it appear

19        that his head is facedown?")

20        **THE COURT:**  And what is the answer?

21        (The following record was then read:  "Yes, his hand is on

22        his head, pushing it to the floor.")

23        **THE COURT:**  Okay.  Then we go into the colloquy,

24   right?

25        Ask your next question, Mr. Ernst.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 70

**BY MR. ERNST:**

**Q.**   Does it appear that his head is facedown and the hand on it?

**A.**   It could be angled toward the floor, but I don't think it's completely turned facedown.

**Q.**   All right.  Can you move it forward.

Okay.  Can you stop it there.

**THE COURT:**  Wait a second.  What's your question?

**BY MR. ERNST:**

**Q.**   I want to ask him does it appear, Mr. Jennings, his hand --

**THE COURT:**  No, ask him what does this frame appear to show.

**BY MR. ERNST:**

**Q.**   All right.  What does this frame appear to show with regard to Mr. Jennings' arms and hands?

**A.**   It appears as though the cuffs are on his hands and he's secured behind his back.

**Q.**   Okay.  All right.  And can you roll it to the next -- move it forward.

All right.  Can you stop there.  Can you see the hand of the balding gentleman toward Mr. Jennings' head?

**A.**   Yes.

**Q.**   Okay.  Can you point to it?

**A.**   Yes.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 71

1  **Q.**  Does it appear Mr. Jennings was facedown in that picture?

2  **A.**  In that frame, correct, yes.

3  **Q.**  All right.  Can you advance it.

4  **A.**  All right.

5  **Q.**  And can you give us the time on that frame?

6  **A.**  On this frame here it's 5:12:59.

7  **Q.**  All right.  Can you please advance it.

8  **A.**  Okay.

9  **Q.**  Can you stop and can you -- do you see the man in the

10  white shirt?

11  **A.**  Yes.

12  **Q.**  What does he appear to be doing?

13        **MR. REISING:**  Objection, Your Honor.  The video

14  speaks for itself.  How does he know what he's doing?

15        **THE COURT:**  What does this physical configuration

16  appear to be?

17        **THE WITNESS:**  It looks like he's carrying on a

18  conversation with somebody that is not connected with what's

19  going on.

20        **THE COURT:**  You mean is off the screen.

21        **MR. REISING:**  Your Honor, I'm going to --

22        **THE COURT:**  Wait a second, please.

23    You say appears to be carrying on a conversation with

24  somebody you can't see on the screen, is that what you are

25  saying?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 72

1     **THE WITNESS:**  No, you can see him on the screen.  You

2  can see him on the screen.  Maybe that board is blocking your

3  view, sir.

4     **THE COURT:**  Okay.  Go ahead.  Ask your next question.

5  **BY MR. ERNST:**

6  **Q.**  All right.  Can you advance it forward.

7     **THE COURT:**  Point to the person in the white screen.

8     **MR. ERNST:**  Point to the person in the white, please.

9     **THE COURT:**  And point to the person you think he's

10  appearing to talk to.

11     All right.  Go ahead.  Next question.

12  **BY MR. ERNST:**

13  **Q.**  Please advance it.

14     Okay.  Can you stop there.  Do you see Mr. Jennings' legs

15  in that frame?

16  **A.**  Yes.

17  **Q.**  And can you point to them?

18  **A.**  Yes.  One is right here, and I think this would be the

19  other one right here.

20  **Q.**  Okay.  Up to this time can you, based on your forensic

21  analysis of the video, did you ever see Mr. Jennings kick any

22  of the officers?

23  **A.**  No.

24  **Q.**  Okay.  Can you advance it, please.

25     All right.  Can you stop it there.  First of all, can you

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 73

1  tell me the time of that frame?

2  **A.**   Yes.  5:13:08.

3  **Q.**   All right.  And can you see anybody grabbing near the

4  handcuff area of Mr. Jennings?

5  **A.**   Yes.

6  **Q.**   Can you point to it?

7        **MR. REISING:**  Well, Your Honor, I'm going to object

8  to that because "near" is not defined and --

9        **THE COURT:**  The question is can you see anybody in

10 relationship to Mr. Jennings and handcuffs in that frame?

11       **THE WITNESS:**  Yes.

12       **THE COURT:**  What do you see?

13 **BY MR. ERNST:**

14 **Q.**   Can you point to it?

15 **A.**   Right in this area right here.

16 **Q.**   And describe what you see.

17 **A.**   It appears as though this person right now in this frame

18 is lifting him up by the cuffs.

19 **Q.**   Okay.  Can you advance it.

20       **THE COURT:**  Does that frame have an identity number?

21       **THE WITNESS:**  Yes, sir.

22       **THE COURT:**  What is the identity?

23       **THE WITNESS:**  This frame here is 5 hours 13:09,

24 13 minutes and 9 seconds.

25       Okay.  Let me continue.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 74

1   **BY MR. ERNST:**

2   **Q.**   Sir, can you back up just a frame?  Okay.  Right there.

3   With regard to the deputy that's closest to the door

4   opening there, can you, can you see where his hand, his left

5   hand is?

6   **A.**   Yes.

7   **Q.**   Can you point to it?

8   **A.**   Yes.  Right here.

9   **Q.**   Okay.  And can you, can you describe where that is?

10  **A.**   It looks like it's underneath the elbow of this guy here

11  that they are picking up from the ground, Mr. Jennings.

12  **Q.**   We'll assume he's Mr. Jennings, okay?

13  **A.**   Yeah.

14  **Q.**   All right.  Advance it.

15  Oh, I'm sorry, before you do, can you point to the feet

16  position and the hip position of the man closest to the door.

17  **A.**   Oh, you just want me to point it out.  Okay.  There is the

18  foot position right there and there.

19  **Q.**   All right.  Can you advance it.

20  **A.**   Yes.

21  **Q.**   All right.  Stop it right there.

22  Based on your forensic evaluation, was there any change in

23  the feet and hip position of the man closest to the door?

24  **A.**   Yes.

25  **Q.**   And can you explain what he did?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 75

1    **A.**    With his hand where it was positioned and stepping back

2    like that, it gave him the ability to control Mr. Jennings.

3    **Q.**    Okay.  And can you see his hand in that picture?

4    **A.**    Yes, I believe -- well, this is -- his right hand is near

5    the cuffs and I believe this is his hand on the backside of his

6    shoulder right there.

7    **Q.**    And had his shoulders pivoted all from that last frame

8    that we looked at?

9    **A.**    Yes.

10   **Q.**    Okay.  And what direction did they pivot?

11   **A.**    Who, the officer?

12   **Q.**    Yes.

13   **A.**    His left shoulder is moving toward the door.

14   **Q.**    All right.  Can we now advance it.

15        Okay.  Can you stop it there and read the time on the

16   frame.

17   **A.**    Yes.  5:13:11.

18   **Q.**    Okay.  With regard to the officer that's not the

19   one closest to the door but the next one that's engaged with

20   Mr. Jennings, can you point to his arms in that frame?

21   **A.**    You are talking about this guy here?

22   **Q.**    Yes.

23   **A.**    His arm is right here.

24   **Q.**    Okay.  What does that show you?

25   **A.**    It shows me that, well, his right hand is underneath his,

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 76

1  his -- Jennings' left shoulder as if he's pushing toward the

2  wall.

3  **Q.**   Okay.  Did you, based on your forensic evaluation of these

4  videos, did you ever see Mr. Jennings trip and fall backward

5  into the wall?

6  **A.**   No.

7  **Q.**   Okay.  You can roll it.

8      Okay.  Will you stop it there and get rid of that --

9  **A.**   It will go away on its own.  Just give it a second.

10  **Q.**   With regard to the deputy with his back to us with the

11  dark hair, can you see where his hand placement is in that

12  shot?

13  **A.**   Yes.

14  **Q.**   His right hand?

15  **A.**   Yes.

16  **Q.**   Can you point to it?

17  **A.**   Right here.

18  **Q.**   Okay.  Did you see Mr. Jennings' head in that shot?

19  **A.**   Yeah, right in here.

20  **Q.**   Okay.  And can you see the, can you see the top of the

21  door frame in that shot?

22  **A.**   Just barely.  Just in the corner, and that is I think

23  right here.

24  **Q.**   Okay.  And can you see the rest of the door frame in that

25  shot?  Any other --

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 77

1  **A.**   Well, yeah, there's the one side there, and the other side

2  is right here.

3  **Q.**   Okay.

4  **A.**   And then it goes across something like that.

5  **Q.**   Okay.  Will you please advance it.

6       Sir, I'm going to ask you a question.  Did you see any

7  pause between the time Jennings was lifted to his feet and the

8  time that he was -- the time that he hit the wall?  Was there

9  any pause in the action that you noticed?

10 **A.**   That would be hard to determine.  I would say probably

11 not.

12      (Video concluded.)

13 **BY MR. ERNST:**

14 **Q.**   Okay.  All right.  Now, there's a second video which shows

15 a different perspective of that hallway; is that correct?

16 **A.**   Correct.

17 **Q.**   Okay.  And did you do anything to synchronize that video

18 with the current one we are watching?

19 **A.**   Yes, I did.

20 **Q.**   What did you do?

21 **A.**   Well, what I did was I matched the time codes of the

22 two cameras so that you could see simultaneously what is going

23 on inside this room and then as it transitions into the other

24 room.

25 **Q.**   All right.  Do you have that particular video?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 78

1  **A.**   Yes.  I would have to load a disk, if you will give me a

2  second.  Yes?

3  **Q.**   Yes, please.

4       And, sir, while you are doing that, can I ask you whether

5  any of these videos had audio?

6  **A.**   Yes.

7  **Q.**   Which one was it?

8  **A.**   In particular, I think it was 2 Cam Mix was the title of

9  the camera.

10  **Q.**   Okay.  And is that, is that audio captured in this video

11  you are about to play?

12  **A.**   Yes.

13       (Video started and continued while the following

14       proceedings occurred.)

15  **BY MR. ERNST:**

16  **Q.**   All right.  Can you advance it a little further?

17  **A.**   Yes.

18  **Q.**   And when can we hear the audio?

19  **A.**   It's going really fast.  Let me back it up again and start

20  over.  It should start somewhere right about in here just

21  before.

22       (Video stopped.)

23       **MR. REISING:**  Your Honor, could we approach before we

24  get to this?

25       (The following sidebar conference was held:)

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 79

1          **MR. REISING:**  There has been no proper foundation

2    laid to show that this syncing is appropriate or is --

3          **THE COURT:**  What?

4          **MR. REISING:**  The syncing of the videos is

5    appropriate given the cameras and the --

6          **THE COURT:**  I don't know what you're talking about.

7          **MR. REISING:**  This witness has synced, so to speak,

8    has put together two videos apparently.

9          **THE COURT:**  I don't know that's --

10       (End of discussion at sidebar.)

11         **THE COURT:**  Sir?

12         **THE WITNESS:**  Yes, sir.

13         **THE COURT:**  This second video, is that from a

14   different camera?

15         **THE WITNESS:**  Correct, from a different camera.

16         **THE COURT:**  But it's what the camera's eye saw and

17   the sound picked up; you didn't manipulate anything on it, did

18   you?

19         **THE WITNESS:**  No.  All I did was combined two videos

20   based on the time code stamp that is impregnated on each frame

21   of picture.

22         **THE COURT:**  What does that mean?

23         **THE WITNESS:**  In other words, we have got two cameras

24   in here that are simultaneously taking pictures of us.  The

25   only common denominator they really have is the fact that that

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 80

1    time and that time is the same because they are all working at

2    the same time.

3              **THE COURT:**  Right.

4              **THE WITNESS:**  So all I did was I synchronized that

5    camera and this camera so that you can see the event that

6    happens at two different angles.

7              **THE COURT:**  Yeah, but you didn't change anything on

8    the image?

9              **THE WITNESS:**  No.

10             **THE COURT:**  And the sound came from the second

11   camera?

12             **THE WITNESS:**  2 Cam Mix.

13             **THE COURT:**  That's a different camera than the --

14             **THE WITNESS:**  No, no, that's one of the cameras that

15   was --

16             **THE COURT:**  Yeah, but it's not the camera that we saw

17   before.

18             **THE WITNESS:**  Before what?

19             **MR. ERNST:**  The first one we were looking at.

20             **THE WITNESS:**  Oh, no, it wasn't from that one.  No,

21   sir.

22             **THE COURT:**  So they had one camera that picked up

23   sound as it, as it saw what was going on and a different camera

24   on the wall that did not have a sound element?

25             **THE WITNESS:**  Correct.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 81

1        **THE COURT:**  Okay.  Go ahead.

2        **THE WITNESS:**  Do you want me to back it up a little

3   bit?

4   **BY MR. ERNST**

5   **Q.**   Yeah, just back it up a little bit.

6   **A.**   Play from here?

7   **Q.**   Sure.

8        (Video started and continued while the following

9        proceedings occurred.)

10  **BY MR. ERNST:**

11  **Q.**   Can you stop it there a second.  Based on your forensic

12  examination of this video, did you ever hear an officer in a

13  command voice tell anybody to put his hands back on the wall

14  before you saw that takedown?

15  **A.**   No, I didn't.  I can't say I did.

16  **Q.**   Okay.  Can you continue it?

17  **A.**   Yes.

18  **Q.**   Okay.  Can you stop it right there.

19       Okay.  Can you -- is a man depicted with his hand under

20  Mr. Jennings' chin at that point?

21  **A.**   Correct.

22  **Q.**   Can you point to that?

23  **A.**   Yes.

24  **Q.**   Okay.  All right.  Can you continue.

25       Can you stop it and then can you back it up a little bit

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 82

 1  to where they fell into the room.

 2      Q.   Can you stop it right there.  Did that appear -- can you

 3  back it up one frame.

 4  **A.**   Okay.  That's one frame.

 5  **Q.**   Okay.  A little bit farther.

 6  **A.**   Okay.

 7  **Q.**   Keep going.  Keep going, please.

 8  **A.**   Reverse?

 9  **Q.**   Yeah, reverse.

10      I need you to back it up a little faster.

11  **A.**   Okay.

12  **Q.**   And now can you advance it slowly.

13  **A.**   Forward?

14  **Q.**   Yes.  Okay.  Can you stop right there.

15      Prior to that did it appear -- did you see anything based

16  on your forensic examination of this video that Mr. Jennings

17  tripped?

18          **MR. REISING:**  Your Honor, again, I think the video

19  speaks for itself.  I don't know how this witness can

20  interpret --

21          **THE COURT:**  The objection is overruled.

22          **THE WITNESS:**  At this point he might have tripped

23  over the officer's feet.

24  **BY MR. ERNST:**

25  **Q.**   Okay.  Can you show it -- the officer that's pushing him

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 83

1  you mean?

2  **A.**   It's possible.  I couldn't tell by this frame.

3  **Q.**   All right.  Can you continue it forward.

4       Okay.  Right there can you stop it, and give me the

5  time -- or can you see Mr. Jennings' head there?

6  **A.**   Yes.

7  **Q.**   Can you point to it?

8  **A.**   Yes.  Right here.

9  **Q.**   All right.  Can you roll it forward.

10      All right.  Can you stop it there.

11      Can you see the deputy with the dark hair's hand, his left

12  hand?

13  **A.**   Yes.

14  **Q.**   Can you point to it and describe what it's doing.

15  **A.**   It appears as though he's pushing his head down.

16  **Q.**   All right.  Can you move forward, please.

17      Can you advance it a little faster.

18  **A.**   Yes, sir.

19  **Q.**   All right.  Can you stop it right there.

20      Can you go back one frame.  Another one, please.

21  **A.**   Yes.

22  **Q.**   All right.  Right there.  Can you see the -- can you see

23  Mr. Jennings -- the handcuffs in that frame?

24  **A.**   Yes.

25  **Q.**   Can you point to them?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 84

1    **A.**    Yep.  Right here.

2    **Q.**    Okay.  All right.  Can you advance it.

3           Can you stop it there.  Can you point to Mr. Jennings'

4    face?

5    **A.**    Right here.

6    **Q.**    Do you see any dark marks under Mr. Jennings' right eye?

7    **A.**    Well, I do see a mark there.

8    **Q.**    Okay.  All right.  Can you advance it, please.

9           Can you advance it at regular speed?

10   **A.**    Okay.

11          (Video completed.)

12   **BY MR. ERNST:**

13   **Q.**    All right.  Is there another video that depicts

14   Mr. Jennings after he was taken out of the picture in that

15   video?

16   **A.**    Yes.

17   **Q.**    Okay.  Could you play that one, please.

18   **A.**    Yes.

19              **THE COURT:**  Mr. Ernst, this is Exhibit 24?

20              **MR. ERNST:**  Yes.

21              **THE COURT:**  May I suggest that you have for tomorrow

22   a separate entity for Exhibit 24A, B, C, D, so we know which

23   disk is which?

24              **MR. ERNST:**  Sure.

25

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 85

**BY MR. ERNST:**

**Q.**   Sir, the one you were just referring to, you gave it a specific name, like camera 2 or something?

       **THE COURT:**   Well, each disk is separately identifiable, right?

       **THE WITNESS:**   Yes.  Yes, sir.  They are all marked.

       **THE COURT:**   So I think they should be separately identified for the record.

       **MR. ERNST:**   The one that you just played, could you identify what it is called?

       **THE WITNESS:**   It's marked 2 Cam Mix.

       **THE COURT:**   What was the first one?

       **THE WITNESS:**   The first one was just marked as 01.

       **THE COURT:**   Okay.  But you will have a piece of paper for me with all of them listed.

       **MR. ERNST:**   I will, Your Honor.

       **THE COURT:**   Go ahead.

**BY MR. ERNST:**

**Q.**   Please play the next one.

       **THE COURT:**   Let me ask you a question, Witness, as you are getting it.  There are a number of cameras in the Genesee County Jail; is that correct?

       **THE WITNESS:**   I'm sorry, sir.  I apologize.

       **THE COURT:**   There are a variety of cameras in various parts of the jail?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 86

1          **THE WITNESS:**  I would assume so, yes, sir.

2          **THE COURT:**  And they all can be viewed, they all tie

3    into a single screen?

4          **THE WITNESS:**  I don't know for sure if they all go

5    into one computer, one server.  They call them servers, but

6    they record them.

7          **THE COURT:**  Okay.  But they are numbered in various

8    parts?

9          **THE WITNESS:**  They have specific numbers, yes, sir.

10          **THE COURT:**  Okay.

11     (Video started and continued while the following

12     proceedings occurred.)

13          **THE WITNESS:**  I can make it go a little bit faster

14    for you, if you'd like.

15   **BY MR. ERNST:**

16   **Q.**  All right.  You can slow it down right there.

17       Okay.  Can you stop it right there.

18       Sir, can you see Mr. Jennings' head in that photo?

19   **A.**  Yes.

20   **Q.**  Can you point to it?

21   **A.**  Right here.

22   **Q.**  Okay.  Can you see his feet?

23   **A.**  No, I can't see his feet.

24       Well, yes, I'm sorry, I apologize.  In this frame, yes,

25    they are right here.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 87

1   **Q.**   Okay.  Do we have a time on that one?

2   **A.**   There were no times on this one.

3   **Q.**   Okay, all right.  Go ahead.

4        Okay.  Can you stop it again.

5        Can you see Mr. Jennings' head in that photo?

6   **A.**   Yes.

7   **Q.**   Can you point to it?

8   **A.**   Yes.

9   **Q.**   Can you see his feet?

10  **A.**   Yes.

11  **Q.**   Okay.  Have they changed materially from the last time we

12  stopped it?

13  **A.**   It looks like -- no.  I mean I can't say that it has

14  changed.

15  **Q.**   All right.  Can you advance it, please.

16  **A.**   Yep.

17  **Q.**   Okay.  Can you stop it right there.

18       Can you see which officers are in contact with

19  Mr. Jennings at that time and point to them?

20  **A.**   This one for sure is in contact.  I'm not too sure, I

21  don't think this one is, and I don't think this one is at this

22  point unless he's got a knee that's being covered by this guy

23  on Jennings.

24  **Q.**   Okay.  You can advance it.

25       Okay.  Can you stop it.  Do you see an officer with gloves

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 88

1   on now?

2   **A.**   Yes.

3   **Q.**   Can you point to it?

4   **A.**   Right here.

5   **Q.**   Okay.  Can you advance it.

6        I'm sorry, can you back it up a little bit?

7   **A.**   Sure.

8   **Q.**   I'm sorry.

9        A little bit further.  Right there.

10       Can you see anything in the right hand of the officer with

11  the white or light-colored shirt?

12  **A.**   Yes, right here.

13  **Q.**   All right.  Please advance it.

14       All right.  Can you stop.

15       Up to this point since this new video was put in in this

16  little room, based on your forensic analysis did you see

17  anything that Jennings did that was resisting the officers in

18  any way?

19            **MR. REISING:**  Objection, Your Honor.  How can this

20  witness arrive at that conclusion?

21            **THE COURT:**  Wait a second.  Let me see the question.

22            **MR. ERNST:**  I asked him if he saw.

23            **THE COURT:**  Did you see any movement by Jennings?

24  **BY MR. ERNST:**

25  **Q.**   Did you see any movement by Jennings?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 89

1   **A.**   Not very much, no.

2   **Q.**   Okay.  All right.

3         (Video ended.)

4   **BY MR. ERNST:**

5   **Q.**   Now we have gotten to the end of this one.  Is there

6   another one that is sequential in order to this one?

7   **A.**   Yes.  I think it's on the same disk.

8   **Q.**   I think Mr. Elliott has the ...

9         **THE COURT:**  I'm a little confused.  Did we just see

10  them remove him from that room?

11        **MR. ERNST:**  Yes.

12        **THE COURT:**  And take him out of the room?

13        **MR. ERNST:**  Yeah, the safety cell.

14        **THE COURT:**  I'm not asking you.  You can't testify.

15     So what we're seeing is a sequence of events beginning in

16  the room and then after he's taken out of the room?

17        **THE WITNESS:**  Correct.

18        **THE COURT:**  Okay.  All right.

19     Is this a new disk?

20        **THE WITNESS:**  Yes.  The disk that I was playing was

21  marked 05.

22        **MR. ERNST:**  Okay.  Thank you.

23        **THE COURT:**  What disk are you going to play now?

24        **THE WITNESS:**  It's marked 02, 02.

25        (Video started and continued while the following

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 90

1      proceedings occurred.)

2  **BY MR. ERNST:**

3  **Q.**   Sir, does this disk have any audio?

4  **A.**   This does not.

5  **Q.**   All right, sir.  Can you stop it right there.

6  **A.**   Oops, sorry about that.

7  **Q.**   All right, sir.  I want you to assume that the room that

8  the officers went into was the room that we just saw on the

9  previous disk, okay?

10 **A.**   Okay.

11 **Q.**   So, assuming that, would you say that this video depicted

12 the men going in there from a different angle than the previous

13 camera?

14 **A.**   Correct.

15 **Q.**   All right.  Please continue.

16      All right.  Can you stop it there, sir.  Right there.

17      Can you see Mr. Jennings' legs in that picture?

18 **A.**   Yes.

19 **Q.**   Can you point to them?

20 **A.**   They are right here.

21 **Q.**   Okay.  Based on your forensic analysis of this video, did

22 Mr. Jennings ever kick any of the officers?

23          **MR. REISING:**   Objection, Your Honor.  The video

24 speaks for itself.

25              **THE COURT:**   Wait a second.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 91

1     Do you see Mr. Jennings in this picture, in this frame?

2          **THE WITNESS:**  Correct.  Yes, I do.

3          **THE COURT:**  Do you see any action by him?

4          **THE WITNESS:**  No.

5          **THE COURT:**  Go ahead.

6  **BY MR. ERNST:**

7  **Q.**   Please advance it.

8  **A.**   Okay.

9  **Q.**   Okay.  Can you stop there.

10     In that video did you see any movement from Mr. Jennings'

11  legs?

12  **A.**   Yes.

13  **Q.**   Did you see any officers getting struck by Mr. Jennings'

14  legs?

15  **A.**   No, sir.

16  **Q.**   Okay.  Did those appear to be kicking motions to you?

17  **A.**   No.

18  **Q.**   What kind of motions would you describe them to be?

19  **A.**   Flailing.

20  **Q.**   All right.  Please continue.

21     All right.  Can you stop.  Can you back up one.

22  **A.**   All right.

23  **Q.**   All right.  Right there.  Can you see the knee of the

24  officer that's in the center of the frame?

25  **A.**   We're talking about this right here?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 92

1    **Q.**    Yes.

2    **A.**    Yes.

3    **Q.**    Can you see Mr. Jennings in that picture?

4    **A.**    Yes, he's right under it.

5    **Q.**    Okay.  Could you stop it there.

6    **A.**    Yes.

7    **Q.**    Could you back up a little bit.

8          A little bit further.

9    **A.**    Okay.  It's still moving.

10   **Q.**    Okay.  So with regard to the -- can you see a Black female

11   officer in that frame?

12   **A.**    Yes.

13   **Q.**    Can you point to her?

14   **A.**    Right here.

15   **Q.**    Okay.  And does she appear to have anything in her hand?

16   **A.**    Yes.

17   **Q.**    Can you point to that?

18   **A.**    Here.

19   **Q.**    Okay.  And then can you advance it.

20   **A.**    Regular speed?

21   **Q.**    Yeah, for now.

22          Okay.  Stop it.

23          Did you see the Black female hand that object she had in

24   her hand to anybody else?

25   **A.**    Yes.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 93

1   **Q.**   Okay.  All right.  Please advance it.

2        Okay.  Can you stop it.

3        Can you see Mr. Jennings' foot in that frame near the

4   wall?

5   **A.**   Yes.

6   **Q.**   Can you point to it?

7   **A.**   Right here.

8   **Q.**   Okay.

9   **A.**   And here I think is the second one.

10  **Q.**   Okay.  Can you advance it.

11  **A.**   Yep.

12       Maybe that's a box.

13  **Q.**   All right.  Can you stop it there.

14       Back one, please.

15       Well, just leave it there.  Do you see the man in the

16  white uniform in this frame?

17  **A.**   Yes.

18  **Q.**   Does there appear to be something in his right hand?

19  **A.**   Right here, yes.

20  **Q.**   All right.  Can you advance it.

21       All right.  Can you go back one or a couple.

22  **A.**   Okay.  Let me see what I can do here.

23  **Q.**   All right.  Right there, stop it.

24       Can you see Mr. Jennings in that photo?

25  **A.**   Parts of him.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 94

1  **Q.**   Okay.  Can you point to the object in the hand of the man
2  in the white uniform?
3  **A.**   Right here.
4  **Q.**   Can you point to Mr. Jennings?
5  **A.**   He's right here.  I believe that's his feet.
6  **Q.**   All right.  And does it appear that his shirt has been
7  pulled up?
8  **A.**   Yes.
9  **Q.**   Okay.  Can you point to that?
10 **A.**   It's right here.
11 **Q.**   Okay.
12 **A.**   Play?
13 **Q.**   And can you see Mr. Jennings' hands in this video?
14 **A.**   Yes.
15 **Q.**   Can we point to them.
16 **A.**   They would be right here in this area.
17 **Q.**   Do they appear to be handcuffed?
18 **A.**   They do.
19 **Q.**   In fact, any time from the playing of the last video to
20 now did you see, based on your forensic evaluation, did you
21 ever see anybody remove the handcuffs from Mr. Jennings?
22 **A.**   No, not yet.
23 **Q.**   Okay.  All right.  Can you please continue.
24      Can you stop it there?  Can you go back a couple frames?
25      Okay.  Can you point to Mr. Jennings in this frame?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 95

1  **A.**  He's right here.

2  **Q.**  Can you point to his head?

3  **A.**  I believe that's his head right there.

4  **Q.**  Okay.  Does there appear to be some object over his head

5  in that frame?

6  **A.**  Yes, it does.

7  **Q.**  And can you point to where the officers are holding

8  Mr. Jennings, if you can see that?

9  **A.**  This officer appears to be holding onto his arm, and this

10  one is supporting his shoulder but holding onto his arm.  And I

11  can't really tell where these guys are holding on back here.

12  **Q.**  Okay.  Can you advance it.

13  **A.**  Yeah.

14  **Q.**  Okay.  Can you --

15  **A.**  Pause?

16  **Q.**  No, go ahead.  Keep going.

17      Okay.  Can you stop it right there.

18  **A.**  Yes.

19  **Q.**  With regard to the officer that has his back to us that's

20  to our right of the bed, can you put the pointer on him?

21  **A.**  Right here.

22  **Q.**  Can you tell me where his knee is, his left knee?

23  **A.**  You are talking about this area right in here?

24  **Q.**  Right.

25  **A.**  I can't determine that with just this one frame.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 96

1   **Q.**   Okay.  Can you advance it or back it up, whatever you need

2   to do.

3   **A.**   Okay.

4   **Q.**   Okay.  Can you see it there?

5   **A.**   It's a little clearer.  I think his, yeah, it looks like

6   his whole foot is up on top of -- I'm sorry.  Let me move it

7   the other way here.  See, the foot is coming up.  Then the next

8   frame I'll advance.

9   **Q.**   Okay.

10  **A.**   And then his leg is coming down somewhere in here.

11  **Q.**   Okay.  And now what about that?

12  **A.**   That's his bottom of his foot so his knee is possibly on

13  Jennings.  I don't know exactly.  I can't see.

14  **Q.**   Okay.  Advance it slowly.

15  **A.**   Regular play?

16  **Q.**   Slower.

17      You can do it regular.

18  **A.**   Regular play?

19  **Q.**   Yes, please.

20      Can you see his knee there, or foot, I should say?

21  **A.**   I can see the heel of his foot right there.  Where his

22  knee is I don't know at this point.

23  **Q.**   Okay.

24      Okay.  Can you stop it there?

25  **A.**   Yes.  Oops.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 97

1   **Q.**   With regard to the officer whose bald head is kind of

2   facing us, can you point to him?

3   **A.**   Are we talking about this one right here?

4   **Q.**   No, the one --

5   **A.**   Oh, this one?

6   **Q.**   Yes.  Can you see whether one of his legs is off the

7   ground?

8   **A.**   I would say by this frame, yes.

9   **Q.**   All right.  Can you advance it.

10   Could you stop it.

11   **A.**   Yes.

12   **Q.**   Could you point to the man in the orange jumpsuit.

13   **A.**   Right here.

14   **Q.**   Can you make out what's printed on the back of his

15   jumpsuit.

16   **A.**   Not at this point, no.

17   **Q.**   All right.  Please continue.

18   (Video concluded.)

19   **BY MR. ERNST:**

20   **Q.**   All right.  And is there one more beyond this?

21   **A.**   Yes.  Let's see.

22   Do you want to see the reverse hallway?

23   **Q.**   Yes.

24   **A.**   Okay.

25   (Video started and continued while the following

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 98

1     proceedings occurred.)

2          **THE COURT:**  This is a different camera than the

3   one before?

4          **THE WITNESS:**  Yes, sir.

5          **THE COURT:**  So this is a different corridor?

6          **THE WITNESS:**  No, it's the same corridor we were just

7   looking at, just a different angle.  It's like two cameras in

8   the same hallway.

9          **THE COURT:**  Same hallway but different camera?

10         **THE WITNESS:**  Correct.

11  **BY MR. ERNST:**

12  **Q.**  Does that one have a marking of some kind?

13  **A.**  Yes.  I believe it's 03.

14  **Q.**  Okay.

15      Sir, can you stop it there.  Can you see the deputy that's

16  closest to us?

17         **THE COURT:**  Keep your voice up, Mr. Ernst.

18         **MR. ERNST:**  I'm sorry.

19  **BY MR. ERNST:**

20  **Q.**  Sir, can you see the deputy that's closest to us and point

21  to him.

22  **A.**  Yes.

23  **Q.**  Does he appear to have one leg off the ground?

24  **A.**  Yes.

25  **Q.**  Okay.  Can you point to his leg?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 99

1   **A.**   Right here.

2   **Q.**   All right.

3   **A.**   Play?

4   **Q.**   Please.

5      Okay.  Can you stop it there.

6      Can you see the deputy that's to the left, the first

7  deputy that's like to the left?

8   **A.**   Are you talking about this one right here?

9   **Q.**   Yes.

10   **A.**   Okay.

11   **Q.**   Did he appear to lift his legs off the ground?

12   **A.**   I would have to do the --

13   **Q.**   Can you back it up?

14   **A.**   Yes, sir.

15   **Q.**   Okay.

16      Okay.  Now can you move it forward and then you can --

17   **A.**   Yes.

18   **Q.**   Okay.

19      Can you stop it right there, sir.

20   **A.**   Yep.

21   **Q.**   Can you point to Jennings' head in this photo?

22   **A.**   Yes.  I believe it's right in here.

23   **Q.**   Does the device that you saw earlier still appear to be on

24  his head?

25   **A.**   Yes.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 100

1    **Q.**   Okay.  Please go ahead.

2          Can you stop it.

3          Can you back it up just a little bit.  A little further.

4    **A.**   It is moving.

5    **Q.**   Can you go a little faster.

6    **A.**   Okay.

7    **Q.**   Okay.  Can you stop it there.  Can you see the right hand

8    of the officer with the white shirt?

9    **A.**   Yes.

10   **Q.**   Can you point to it.

11   **A.**   Right here.

12   **Q.**   You can see Mr. Jennings' head?

13   **A.**   It's right here.

14   **Q.**   All right.  Can you advance it.

15         Can you stop it, sir.  Can you point to Jennings' head?

16   **A.**   Right here.

17   **Q.**   Does he still appear to have the device over his head?

18   **A.**   Yes.

19   **Q.**   All right.  Can you advance it, please.

20         Can you stop it right there.  Based on your view can

21   you --

22   **A.**   Oops, sorry.

23   **Q.**   Can you tell if Jennings is face down or face up?

24   **A.**   By the looks of his body, I would say his chest is down.

25   I don't know whether his face is off to the left side or the

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 101

1  right side or straight down.

2  **Q.**  Okay.  Can you advance it.

3      Can you stop it right there.  Can you again point to

4  Jennings' head?

5  **A.**  Yes.  Right here.

6  **Q.**  And that white device is still on it?

7  **A.**  It appears as that.  Yes, sir.

8      (Video started and continued while the following

9      proceedings occurred.)

10  **BY MR. ERNST:**

11  **Q.**  All right.  Start the video.

12      Deputy Fuller, Deputy White, Sergeant Guest, Lieutenant

13  Nuckolls.

14      Can you stop it.  All right.  Can you advance it slowly.

15  **A.**  Yes.

16  **Q.**  Can you stop it right there.  Can you see the left leg of

17  the officer that's standing more in the hall.  Not the white

18  uniform but the other one?

19  **A.**  Are you talking about this guy right here?

20  **Q.**  Yes.

21  **A.**  Yes.

22  **Q.**  Can you point to his left foot.

23  **A.**  Yes.

24  **Q.**  Can you point to the bed.

25  **A.**  The bed is right there.

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 102

1   **Q.**   Based on your forensic analysis, what did you conclude

2   happened there?

3            **MR. REISING:**  I'm going to object.

4            **THE COURT:**  Wait a second.  Mr. Ernst, you ought to

5   stand up when you're asking questions.

6        Do you have an opinion as to what that officer is doing?

7            **THE WITNESS:**  Yes, I do.

8            **THE COURT:**  What is it?

9            **THE WITNESS:**  In the next frame you will see that he

10  kicks the bed.

11           **THE COURT:**  Go ahead.

12           **THE WITNESS:**  Let me advance it here.

13           **THE COURT:**  Go ahead.

14           **THE WITNESS:**  Yes, sir.  It is.  It is.

15       The follow-through motion leads me to believe that he

16  kicks the bed.

17           **MR. REISING:**  I'm going to object.  There is no frame

18  that shows it.  He says it's a follow through.

19           **THE COURT:**  Sir --

20           **MR. REISING:**  I object.

21           **THE COURT:**  First of all, there is no pending

22  question, and you know that.  There is no pending question.

23       If you want to start that whole sequence over, you may.

24  **BY MR. ERNST:**

25  **Q.**   Why don't you show the sequence from which you formed your

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 103

1    opinion that he kicked the bed.

2         Okay.  Now go.  Okay.  You see his leg -- back up a little

3    bit.  Do you see his leg up in the air there?

4    **A.**   Right there.

5    **Q.**   Can you point to it?

6    **A.**   Yes.

7    **Q.**   Okay.  And can you give us the next frame.

8         Okay.  And where was his leg in the next frame.

9    **A.**   Well, it was back on the floor.

10           **THE COURT:**  Sir, let it just move forward.

11   **BY MR. ERNST:**

12   **Q.**   Sir, can you stop it at this time.

13   **A.**   Uh-huh.

14   **Q.**   Up to this point in the video did you ever --

15           **THE COURT:**  Stand up, Mr. Ernst.

16           **MR. ERNST:**  I'm sorry, Your Honor.

17           **THE COURT:**  Look at the jury when you are asking?

18           **MR. ERNST:**  Okay.

19   **BY MR. ERNST:**

20   **Q.**   Up to this point in the video did you ever see the spit

21   mask removed from Mr. Jennings' head?

22   **A.**   No, sir.

23   **Q.**   All right.

24        (Video concluded.)

25           **MR. ERNST:**  Just one second.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 104

1       All right, Your Honor.  We have some brief footage from

2    the safety cell 6 that occurs after he's placed back in there.

3           **THE COURT:**  I don't understand what you're saying.

4    You have another disk?

5           **MR. ERNST:**  It's the same disk, but it's advanced

6    farther in time that we haven't seen yet.

7           **THE COURT:**  How much time?

8           **MR. ERNST:**  It's just two minutes that we want to

9    show.

10          **THE COURT:**  All right.  Go ahead.  And then we'll

11   call a recess.  Is this the last disk?

12          **MR. ERNST:**  Yes, Your Honor.  Yes, sir.

13          **THE COURT:**  Okay.

14      He's showing a different disk.

15          **MR. ERNST:**  But we have seen it previously.

16          **THE COURT:**  No, sir, we're going to call a recess.

17   We'll start tomorrow morning at 9:00 o'clock, okay?

18      Between now and then keep your mouths closed, your ears

19   plugged and your eyes open.  Don't talk about this case to

20   anyone.  Don't let anyone talk to you about it.  Okay?  See you

21   at 9:00 o'clock tomorrow morning.  Thank you.

22      Everybody rise.

23      (Jury out at 12:55 p.m.)

24          **THE COURT:**  You may be seated.

25      As I understand it, there are five disks?

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 105

1              **MR. ERNST:**  Right.

2              **THE COURT:**  I want a list tomorrow -- I see that

3    you've got on your exhibit list three as videos, and 24 is

4    ARIDE Policy NHTS.  What's that?

5              **MR. REISING:**  That was stricken, Your Honor.

6              **THE COURT:**  What?

7              **MR. REISING:**  That particular document was stricken.

8              **MR. ERNST:**  It wasn't stricken.  He just said it

9    wasn't coming in yet.

10             **THE COURT:**  What exhibit numbers are the disks for

11   the record?  Is it three or four?

12             **MR. ERNST:**  It's 24.  This is a list of our videos

13   that was updated after that April 20 one.

14             **THE COURT:**  Well, then what's this ARIDE policy?

15             **MR. ERNST:**  That's the National Highway Safety

16   Administration policy.

17             **THE COURT:**  That's not an exhibit anymore.

18             **MR. ERNST:**  It may be.  You just said it's --

19             **THE COURT:**  Sir, I have a list here that I have to

20   follow so the record is clear.

21             **MR. ERNST:**  Right.  Can I give you our updated list,

22   Your Honor?

23             **THE COURT:**  Tomorrow?

24             **MR. ERNST:**  I'll give it to you right now.

25             **THE COURT:**  Well, give me an updated list.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct*
*Wednesday/October 19, 2016/Volume 1*

V1-Page 106

1     I have been working with the wrong list.  Okay, okay.

2     There are five videos, right?

3          **THE WITNESS:**  Correct.

4          **THE COURT:**  What?

5          **THE WITNESS:**  Correct, sir, yes.

6          **THE COURT:**  All right.  We'll start at 9:00 o'clock

7     tomorrow morning.

8          **MR. ERNST:**  Very well.  Thank you, Your Honor.

9     Your Honor, can we leave this equipment in your courtroom?

10         **THE COURT:**  Yeah.  There's nothing going to happen

11    this afternoon.

12         **MR. ERNST:**  Okay, great.  Thank you.

13         **THE COURT:**  We're not using it this afternoon.

14    Okay.  Thank you.

15         **MR. ERNST:**  Thank you.

16    (Proceedings adjourned at 12:57 p.m.)

17                        -   -   -

18

19                **C E R T I F I C A T I O N**

20    I certify that the foregoing is a correct transcription of

21    the record of proceedings in the above-entitled matter.

22

23    s/ Sheri K. Ward_____                11/11/2016
      Sheri K. Ward                          Date
24    Official Court Reporter

25                        -   -   -


                *13-13308; Jennings v. Fuller, et al.*