UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**WILLIAM JENNINGS,**

         Plaintiff,

   v.

**PATRICK FULLER, et al.,**

         Defendants.
_____/

                         **HONORABLE AVERN COHN**

                         **No. 13-13308**


**JURY TRIAL - VOLUME 2**

**Thursday, October 20, 2016**


Appearances:

Kevin S. Ernst
Law Offices of Kevin Ernst
645 Griswold Street, #1808
Detroit, Michigan  48226
(313) 965-4822

Dean D. Elliott
321 South Williams Street
Royal Oak, Michigan  48067
(248) 543-9000
  On behalf of Plaintiff

H. William Reising
Christopher J. Scott
Plunkett & Cooney
111 E. Court Street, #1B
Flint, Michigan  48502
 (810) 232-5100
  On behalf of Defendants

-   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial – Volume 2*
*Thursday, October 20, 2016*

**I  N  D  E  X**

Plaintiff's Case in Chief                          Page   Vol.

  **Kenneth Glaza (Cont'd.)**

     Direct Examination By Mr. Ernst:          5      2

     Cross-Examination By Mr. Reising:        10      2

     Redirect Examination By Mr. Ernst:       27      2

  **Patrick Fuller**

     Direct Examination By Mr. Ernst:         37      2

     Cross-Examination By Mr. Reising:       109      2

     Redirect Examination By Mr. Ernst:      126      2

Certification of Reporter ......................135

- - -

Plaintiff's Exhibits

       Number                              Id'd  Vol.

        1       .................................85    2
        3       .................................9    2

- - -

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 2*
*Thursday, October 20, 2016*

V2-Page 3

1                              Detroit, Michigan

2                              Thursday, October 20, 2016

3                              9:06 a.m.

4                              -   -   -

5              **THE CLERK:**  The court calls the matter of *Jennings v.*

6    *Fuller*, Case Number 13-13308.

7                   **THE COURT:**  Thank you.  Is your witness here?

8                   **MR. ERNST:**  He's on his way up, Your Honor.  I saw

9    him going through the guard thing downstairs.

10                  **THE COURT:**  What?

11                  **MR. ERNST:**  He's on his way up.  He was going through

12   the guard thing downstairs.

13                  **THE COURT:**  He's still with the guards?

14                  **MR. ERNST:**  I was going through.  He just walked

15   through.  He was getting his stuff and on his way up.

16                  **THE COURT:**  Okay.  Be seated.

17         Well, we can take care of a bit of business before he gets

18   here.

19         You gave me a new witness list yesterday.  I mean exhibit

20   list.

21                  **MR. ERNST:**  Yeah.  It's just a different order

22   basically.

23                  **THE COURT:**  Yes, but that exhibit list is not -- the

24   numbering is inconsistent with the numbers of the exhibits or

25   the order in this notebook so I'm going to give you this

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 2*
*Thursday, October 20, 2016*

V2-Page 4

1   back --

2         **MR. ELLIOTT:**  May I approach?

3         **THE COURT:**  -- to be sure it's coordinated.

4         **MR. ELLIOTT:**  Do you have the notebook we gave you

5   yesterday, Your Honor?

6         **THE COURT:**  What?

7         **MR. ELLIOTT:**  We have a notebook for you that's

8   correctly organized.  Do you have it up there?

9         **THE COURT:**  Is that correct?

10        **MR. ELLIOTT:**  No.

11        **THE COURT:**  The exhibits in the notebook should be

12  numbered, et cetera, consistent with the list.

13        **MR. ELLIOTT:**  This is consistent, Your Honor.

14        **THE COURT:**  Okay.  Thank you.

15     Come in, folks.  Everybody stand.

16        **THE CLERK:**  All rise.

17     (Jury in at 9:08 a.m.)

18        **THE COURT:**  Be seated.

19     You may proceed, Mr. --

20     By the way, I apologize.  I should have given you a break

21  at 11:00.  When we broke at 10:30, that was not a break.  When

22  we broke that was because I wanted to talk to the lawyers out

23  of your hearing.  So we will have a regular break at 11:00.  If

24  anyone needs a break earlier, raise your hand.

25     You know what I'm going to do?  You are going to continue

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct Cont'd.*
*Thursday/October 20, 2016/Volume 2*

V2-Page 5

1    with this video for a while, aren't you?

2          **MR. ERNST:**  Yes.

3          **THE COURT:**  I'm going to turn some of the lights off.

4          **MR. ERNST:**  That would be helpful.

5          **THE COURT:**  Go ahead.

6                     -   -   -

7                                              (9:11 a.m.)

8                **DIRECT EXAMINATION CONTINUED**

9    **BY MR. ERNST:**

10   **Q.**   Okay.  Go ahead.

11        (Video started and continued while the following

12        proceedings occurred.)

13   **BY MR. ERNST:**

14   **Q.**   Back it up just a little bit.  Can you back it up just a

15   little bit.

16   **A.**   Okay.  Continue?

17   **Q.**   Please.

18        Mr. Glaza, can you explain --

19          **THE COURT:**  Keep your voice up.

20   **BY MR. ERNST:**

21   **Q.**   Can you explain what video or what disk you are playing?

22   **A.**   Yes.  It's disk number 05.

23   **Q.**   Okay.  And this is footage showing when Mr. Jennings was

24   wheeled back into cell 6 on the restraint bed; is that right?

25   **A.**   Correct.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct Cont'd.*
*Thursday/October 20, 2016/Volume 2*

V2-Page 6

1    **Q.**   Mr. Glaza, you have watched this entire video?

2    **A.**   Correct.

3    **Q.**   From beginning to end?

4    **A.**   Correct.

5    **Q.**   And did there ever come a time when somebody from the

6    sheriff's department entered the cell?

7    **A.**   Yes.

8    **Q.**   Okay.  Can you -- do you know approximately how long after

9    he was wheeled in there somebody came in?

10   **A.**   Yeah.  Roughly 20 minutes was the first time somebody came

11   in.

12        **THE COURT:**  Wait a minute.  Look at the jury when you

13   testify.

14        **THE WITNESS:**  Oh, sorry.  It was 20 minutes.  He laid

15   here for 20 minutes until somebody came into the room.

16   **BY MR. ERNST:**

17   **Q.**   Okay.  Can you forward it to that?

18   **A.**   Yes.

19        **THE COURT:**  Witness, is this video complete, I mean

20   is it continuous?

21        **THE WITNESS:**  Yes.

22        **THE COURT:**  Go ahead.

23   **BY MR. ERNST:**

24   **Q.**   Mr. Glaza, how long is this video, the total length of it?

25   **A.**   The total length is roughly 2 hours and 43 minutes.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct Cont'd.*
*Thursday/October 20, 2016/Volume 2*

V2-Page 7

1   **Q.**   Okay.  And please face the jury.

2   **A.**   2 hours and 43 minutes, I'm sorry.

3   **Q.**   Can you fast-forward to the first time someone comes in?

4   **A.**   The counter is at 24:25 is when they are standing at the

5   door.

6   **Q.**   Okay.  That's fine.

7   **A.**   I can make it so it goes a little bit faster.  This is

8   25 minutes into this video.

9   **Q.**   Okay.

10  **A.**   25 minutes into this video.

11  **Q.**   Can you stop it there.

12  **A.**   Yes.

13  **Q.**   Can you place the pointer on the deputy that's over the

14  bed?

15  **A.**   Okay.  Are you talking about this one here?

16  **Q.**   Yes.

17  **A.**   Uh-huh.

18  **Q.**   Is his leg off the floor?

19  **A.**   It appears as though his left leg is, yes, sir.

20  **Q.**   Okay.  Could you please resume.

21       Could you stop the video there.

22  **A.**   Yes.

23  **Q.**   Could you point to Mr. Jennings' head.  Does it appear he

24  still has his spit mask on?

25  **A.**   It appears that he still has the spit mask on, yes, sir.

*Kenneth Glaza - Direct Cont'd.*
*Thursday/October 20, 2016/Volume 2*

V2-Page 8

1   **Q.**   And does it appear that Mr. Jennings is laying face down?

2   **A.**   Yes, he's laying face down, correct.

3   **Q.**   Could you put your pointer on the tray that the woman in

4   the picture is carrying.

5   **A.**   Yes, right here.

6   **Q.**   Yeah.  Do you see any bottles of liquid or anything like

7   that in that tray?

8          **MR. REISING:**  Objection, Your Honor.  I don't know

9   how this witness can testify to that.

10         **THE COURT:**  Witness, does the tray display any

11  bottles or liquid or anything similar in the tray as far as he

12  can tell?

13         **THE WITNESS:**  I cannot recognize anything as being a

14  bottle of liquid.

15  **BY MR. ERNST:**

16  **Q.**   Okay.

17  **A.**   Continue?

18  **Q.**   Continue, please.

19         Okay.  Can you go to the -- well, first of all, can you

20  just stop it.  And, Mr. Glaza, could -- when you watched the

21  rest of this video, did Mr. Jennings remain in essentially the

22  same position?

23  **A.**   Yes, correct.

24  **Q.**   Did you see any jail personnel ever come in and loosen the

25  restraints momentarily at any time?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Direct Cont'd.*
*Thursday/October 20, 2016/Volume 2*

V2-Page 9

 1   **A.**   No, not at all.

 2   **Q.**   And when was the next time that you saw any jail personnel

 3   enter into the cell?

 4   **A.**   We're talking roughly two hours.

 5   **Q.**   Please face the jury.

 6   **A.**   Two hours and ten minutes from here is the next time

 7   somebody walks into the room.

 8   **Q.**   Okay.

 9   **A.**   Okay.

10   **Q.**   Can you flip forward to that?

11   **A.**   Yes.

12   **Q.**   Okay.

13        (Videotape concluded.)

14   **BY MR. ERNST:**

15   **Q.**   Mr. Glaza, I want to show you what's been marked as

16   Plaintiff's Exhibit 3 and ask you to identify what's contained

17   in Exhibit 3.

18   **A.**   Would that be all?

19   **Q.**   Yes.

20   **A.**   Yes.   These are photos that I extracted from the videos

21   that were provided me.   They are moments in time, and I have

22   the frame numbers for them so they can be accessed.

23   **Q.**   Okay.   And you created these still photos from the videos

24   that you showed at various times today and yesterday?

25   **A.**   Yes, sir.

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 10

1  **Q.**   All right.   Thank you, sir.   That's all I have.   I'm sure

2  Mr. Reising --

3          **THE COURT:**   Mr. Reising, do you want the lights on or

4  off?

5          **MR. REISING:**   I can make a comment, Your Honor, but I

6  won't.

7          **THE COURT:**   Pardon?

8          **MR. REISING:**   The lights can stay just like they are

9  right now.   I can see adequately.

10          **THE COURT:**   Fine.

11          **MR. REISING:**   Can I proceed from counsel table right

12  here, Your Honor?

13          **THE COURT:**   Your pleasure.   Just keep your voice up.

14          **MR. REISING:**   I will.   Thank you.

15                          **-   -   -**

16                                          (9:34 a.m.)

17                      **CROSS-EXAMINATION**

18  **BY MR. REISING:**

19  **Q.**   Mr. Glaza, as I understand it, sir, you are, according to

20  what you've told us, an expert in putting together videos?

21  That's what you do?

22  **A.**   That's what I do, yes.

23          **THE COURT:**   Excuse me.   Do you want him on the

24  witness stand or are you going to be using the videos?

25          **MR. REISING:**   He can go to the witness stand and we

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 11

1  can do it in the more traditional way if you would like to.

2  That would be fine.

3        **THE COURT:**  You take the witness stand, and then you

4  go from the lectern.

5        **MR. REISING:**  I understand, Your Honor.

6        **THE COURT:**  Point it at him.

7        **MR. REISING:**  He's got his materials here.  Let me

8  just give his materials to him.

9        **THE WITNESS:**  Thank you.

10  **BY MR. REISING:**

11  **Q.**   Again, sir, as I understand it, according to what you have

12  told us in your testimony, you are an expert in video analysis;

13  is that a fair statement?

14  **A.**   Correct.

15  **Q.**   All right.  That's what you did in this case?

16  **A.**   Correct.

17  **Q.**   And you took the various videos that were prepared or

18  recorded at the Genesee County Jail on September the 18th of

19  2010 and you have shown us portions of those videos yesterday

20  and today.  True?

21  **A.**   True.

22  **Q.**   The only thing you did was you created a frame-by-frame

23  analysis to get a better feel for what was going on?

24  **A.**   Correct.

25  **Q.**   But you didn't change anything?

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 12

1    **A.**   Correct.

2    **Q.**   All right.  Now, you have never been to the Genesee County

3    Jail, have you, sir?

4    **A.**   No, sir.

5    **Q.**   And I assume you don't have any knowledge as to the type

6    of video system which was in place on September the 18th of

7    2010, do you?

8    **A.**   I don't have knowledge of the specific brand of server

9    that was used to create these videos, no.

10   **Q.**   All right.  And in that regard, and I think you have

11   already indicated to us, each video camera could have a

12   different server, correct?

13   **A.**   I don't think so, not in this case.

14   **Q.**   You don't think so?

15   **A.**   No.

16   **Q.**   But you don't know because you have never seen the system

17   and you can't tell us one way or the other, true?

18   **A.**   That's true, I have never seen the system.

19   **Q.**   All right.  So you testified that you synced, if you will,

20   the video which came out of what we refer to as the sallyport

21   area and the video that was in the report-writing area, which

22   was the room that Mr. Jennings was initially brought to when he

23   came to the Genesee County Jail?

24   **A.**   Correct.

25   **Q.**   Now, do you know, were those two videos off the same

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 13

1  server; do you know?

2  **A.**  No, I do not know.

3  **Q.**  And do you know, had they been synced before you got them

4  such that their times lined up?

5  **A.**  The files you provided us were completely separated and

6  no.

7  **Q.**  So they didn't line up, correct?

8  **A.**  Incorrect.

9  **Q.**  They did line up?

10  **A.**  They did line up.  Let me explain how the film industry

11  works.  Everyone is familiar with the slate where you bring the

12  two pieces of wood together and it makes a click and it makes a

13  visual --

14  **Q.**  Sir, I only care about synchronization of the two servers

15  that we're talking about here, if there were two servers, at

16  the Genesee County Jail.  Do you know if there were in fact

17  two servers that were synced or not synced with respect to the

18  video in the report-writing room and the video/audio that came

19  out of the next room over?

20  **A.**  I would believe they were synchronized.

21  **Q.**  You believe, but you don't know?

22  **A.**  I don't know.

23  **Q.**  And in that same regard you have given some testimony

24  which would suggest to me that you think you know something

25  about police tactics and about how police officers and

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 14

1 corrections deputies or corrections officers may handle certain

2 situations; is that true?

3          **MR. ERNST:**  Objection, argumentative.

4          **THE COURT:**  No, it isn't.  It's rather repetitive,

5 but it's not argumentative.

6      Do you understand the question?

7          **THE WITNESS:**  Ask it again, please.

8 **BY MR. REISING:**

9 **Q.**   Sure, sure.  You gave some testimony yesterday concerning

10 a situation where Mr. Jennings was, if you will, had his hands

11 on the wall and his legs spread and you testified that he

12 couldn't in that circumstance move aggressively to the right.

13 Do you recall saying that?

14 **A.**   Yes, I do.

15 **Q.**   All right.  Do you have any police experience, sir?  Have

16 you been to a police academy?

17 **A.**   No.

18 **Q.**   Have you ever been to a corrections academy?

19 **A.**   No.

20 **Q.**   Have you had any police training whatsoever?

21 **A.**   Considerably.

22 **Q.**   Considerably.  In what regard, sir?

23 **A.**   I have a number of certificates of accomplishment.  In my

24 history I was a cage fighter at one time.

25 **Q.**   A cage fighter?

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 15

1  **A.**   Yes, sir, and I was trained with police.  I trained them.

2  I have had my own dojo, karate school, and --

3  **Q.**   All I care about -- first of all, do you know anything

4  about a reactionary gap?  Do you know what that is?

5  **A.**   Yes.

6  **Q.**   All right.  Do you know if Deputy Fuller was attempting to

7  create a reactionary gap at the time that he engaged with

8  Mr. Jennings in the report-writing room?

9  **A.**   No, I couldn't say.

10  **Q.**   All right.  Now, pulling away from the wall aggressively,

11  you weren't there, true?

12  **A.**   True.

13  **Q.**   And Deputy Fuller was, correct?

14  **A.**   I don't know who Fuller was.  I don't know my names.

15  **Q.**   The deputy who was dealing with Mr. Jennings initially on

16  the pat-down, his name was Fuller.

17  **A.**   Okay, thanks.

18  **Q.**   All right.  You have testified that you made some stills

19  off of the video.  Do you recall that question being asked of

20  you by plaintiff's counsel?

21  **A.**   Yes.

22  **Q.**   And there's a series of, if you will, photographs that you

23  made off of the video which depict certain situations as they

24  existed on September the 18th, 2010 at the jail?

25  **A.**   Yes, because they came from the video.

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 16

1  **Q.**   And included in that would be some photos of what

2  transpired at the report-writing room and the interaction

3  between Mr. Jennings and Deputy Fuller?

4  **A.**   The report-writing room is that initial, that first room?

5  **Q.**   That initial room, yes.

6  **A.**   Yes.

7  **Q.**   So there are such photos in there, okay?  All right?  Is

8  that true?

9  **A.**   Did I misunderstand the question?

10 **Q.**   Contained within the packet of photos that you reviewed

11 and said that you prepared and gave to plaintiff's counsel,

12 there are photos showing the interaction between Deputy Fuller

13 and Mr. Jennings in the report-writing room?

14 **A.**   Correct.

15 **Q.**   All right.  And those photos are accurate, aren't they?

16 **A.**   Correct.

17 **Q.**   Do you have any training, sir, in biomechanics?

18 **A.**   No, sir.

19 **Q.**   Do you know what biomechanics is?

20 **A.**   Yes, sir.

21 **Q.**   What is it?

22 **A.**   Biomechanics would be physical mechanical type movements.

23 **Q.**   And you don't have any training in that regard?

24 **A.**   Not beyond karate.

25 **Q.**   All right.  What about in human factors?  Do you have any

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 17

1  expertise in human factors?

2  **A.**   Not beyond karate.

3  **Q.**   I'm going to assume you are trying to tell me that you are

4  a karate expert?

5  **A.**   Yes, sir.

6  **Q.**   Now, you have given us considerable testimony about the

7  video.  Can we agree that the video shows what the video shows,

8  right?

9  **A.**   Yes.

10  **Q.**   In other words, these jurors, these eight jurors are

11  equally capable of looking at that video and seeing what the

12  video shows given how you prepared it?

13  **A.**   Correct.

14  **Q.**   All right.  You don't need to be a video expert to look at

15  the video and see what the video shows, true?

16  **A.**   Correct.

17  **Q.**   I want to make sure this is correct.  I believe it is.  I

18  think you already testified to this.  You agree that none of

19  the video that we're talking about here has been altered or

20  deleted and in fact it can't be, true?

21  **A.**   Correct.

22  **Q.**   All right.  In your analysis or your review of all of this

23  video did you see anybody punch or kick Mr. Jennings?

24  **A.**   Punch, yes.

25  **Q.**   Punch.  Who punched?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 18

1   **A.**   I don't know the name of the person.

2   **Q.**   All right.  What did you see that you believe is a punch,

3   sir?

4   **A.**   In that initial room when they went to the floor I have --

5   I saw one of the officers' fists come up and then come back

6   down.

7   **Q.**   And do you know what that fist was meant to do at that

8   point in time?  Do you have any idea?

9   **A.**   No, sir.

10  **Q.**   Have you ever heard of a perineal strike?

11  **A.**   Yes, sir.

12  **Q.**   What is that?

13  **A.**   Striking key places for control.

14  **Q.**   But do you know -- in particular, the perineal nerve, do

15  you know where that's located?

16  **A.**   It's in the back.

17  **Q.**   In the back?

18  **A.**   Yeah, I think so.  Yes.

19  **Q.**   Okay.  Could it be in the leg?

20  **A.**   It could be.

21  **Q.**   It could be.

22  **A.**   I don't know where it is actually.

23  **Q.**   All right.  You don't know where it is.

24  **A.**   No.

25  **Q.**   All right.  So you saw that, and beyond that you can't

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 19

1  tell us what it was and what was going on with respect to that

2  circumstance, just that you saw it, true?

3  **A.**    True.

4  **Q.**    Other than that, anything else?  Did you see any other

5  punch or kick by any of those individuals seated in the room

6  here today as defendants?

7  **A.**    The only kick that I believe I saw was right at the end

8  there when the bed was being pushed into this room here.

9  **Q.**    All right.  They kicked the bed.  The bed got kicked?

10  **A.**    Yes.

11  **Q.**    All right.  You can't tell us that that kick was directed

12  at Mr. Jennings as opposed to the bed, can you?

13  **A.**    Correct.

14  **Q.**    Does the video at any time show the left hand of

15  Mr. Jennings coming off the wall in report writing?

16  **A.**    Yes.

17  **Q.**    And that's depicted in one of the photographs which you

18  gave to plaintiff's counsel, does it not or is it not?

19  **A.**    I would have to see the photos again to refresh my memory.

20  I'm not too sure which one you are referring to.

21  **Q.**    Okay.  Let me show you.

22  **A.**    Yes, sir.

23  **Q.**    Let me show you a particular photo and ask if that photo

24  shows the left arm and hand of Mr. Jennings off the wall?

25  **A.**    Correct.

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 20

1    **Q.**   All right.

2           **THE COURT:**  Wait a minute.  You've got -- do the

3    photos have numbers?

4           **THE WITNESS:**  Yes, sir.

5           **THE COURT:**  Identify the number.

6           **MR. REISING:**  That's what I'm going to do next,

7    Your Honor.

8           **THE COURT:**  All right.

9    **BY MR. REISING:**

10   **Q.**   Could you identify that photo for us, sir, for future

11   reference?

12   **A.**   Yeah, the time stamp on this is 5:12:04.  That's 5 hours

13   12 minutes and 4 seconds.

14   **Q.**   And if you look at the number of photos under Exhibit

15   Number 3, which is where the photos are located, it's really

16   the second photo down in the series of photos?  Just take a

17   look at them.  I think my math is correct.

18   **A.**   Yes.

19   **Q.**   Number 2 sheet?

20   **A.**   Number 2 sheet in your book.

21   **Q.**   Okay.  It's plaintiff's book, by the way.

22   **A.**   Okay.

23          **THE COURT:**  Scroll back for a minute.

24          Let's go ahead.

25

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 21

1   **BY MR. REISING:**

2   **Q.**   Sir, is there a photo in that same series of photos which

3   shows Mr. Jennings' head being turned to the right?

4   **A.**   Can I look at the photos again?

5   **Q.**   Sure, absolutely.

6   **A.**   Point out the one you are referring to.

7   **Q.**   There is the photo we just identified.  The next photo

8   down, does it show his head to the right, sir?

9   **A.**   Correct.

10  **Q.**   And that would be identified as photo what?

11  **A.**   5 hours 12 minutes and 5 seconds.

12  **Q.**   All right.  And that's based on the time stamp at the top

13  of the photo?

14  **A.**   Yes.

15  **Q.**   And that's how we know which photo it is.  It's actually

16  the third photo sheet down in this packet of photos, correct?

17  **A.**   Correct.

18  **Q.**   And that same photo, by the way, shows that the right arm

19  of Mr. Jennings at that point in time is at essentially a

20  90-degree angle in relation to the wall?

21  **A.**   Correct.

22  **Q.**   You also referenced in your testimony, sir, circumstances

23  where you see a deputy who has his hand on the head of the

24  plaintiff; do you recall that?

25  **A.**   Correct.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 22

1   **Q.**   Can we agree that that circumstance, that is to say, a

2   photo or a video showing someone's hand on the head of an

3   individual, does not mean that that individual is being injured

4   by that circumstance?

5   **A.**   Correct.

6   **Q.**   You don't have any knowledge of the amount of force being

7   used in association with those observations, correct?

8   **A.**   Well, the observations include the physical stance and the

9   positioning of the bodies and the weight distribution of the

10  bodies themselves.  That determines how much pressure is on the

11  hand.

12  **Q.**   But you don't know yourself how much pressure is on there?

13  **A.**   I don't know how much pressure except for body weight and

14  estimates.

15  **Q.**   The same thing is true with respect to the sequence where

16  Mr. Jennings is being brought up from the floor in the

17  report-writing area, brought up initially to his knees and then

18  to his feet; do you recall that?

19  **A.**   Yes, sir.

20  **Q.**   One deputy has ahold of an arm above where the handcuffs

21  are located, the other deputy has his hand above that on the

22  other side; do you recall that?

23  **A.**   Yes.

24  **Q.**   They didn't have, they didn't have ahold of him like this.

25  They were not jerking up like that with their hand right at his

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 23

1  wrists, were they?

2  **A.**   I disagree with you.

3  **Q.**   According to the video?

4  **A.**   I disagree with you.

5  **Q.**   You disagree?

6  **A.**   Yes, sir.

7  **Q.**   You think they were?

8  **A.**   Yes, sir.

9  **Q.**   The video speaks for itself, right?

10  **A.**   It does.

11  **Q.**   As to what they are doing?

12  **A.**   Yes.

13  **Q.**   Okay.  And lastly, sir, about that same kind of

14  circumstance, do you have any knowledge about what the

15  appropriate legal standard is as it relates to the use of force

16  in the context of dealing with an inmate who is not following

17  direction in a jail --

18         **THE COURT:**  Wait a second, wait a second.  Restate

19  that question.

20         **MR. ERNST:**  The witness can't comment on the proper

21  legal standard --

22         **THE COURT:**  No, he's cross-examining the witness.

23  Restate the question.

24         **MR. REISING:**  Thank you, Your Honor.

25

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 24

1   **BY MR. REISING:**

2   **Q.**   Mr. Glaza, do you have any knowledge as to what the

3   appropriate legal standard is with respect to the use of force?

4           **MR. ERNST:**  Your Honor, I object.  That's for the

5   Court to instruct the jury, about what the legal standards are.

6           **THE COURT:**  The witness can answer.  Are you familiar

7   with the concept of use of force?

8           **THE WITNESS:**  I'm familiar with it, yes, sir.

9           **THE COURT:**  Pardon?

10          **THE WITNESS:**  I'm familiar with it.  I don't know the

11  details, no, sir.

12          **THE COURT:**  Okay.  Go ahead.

13  **BY MR. REISING:**

14  **Q.**   And of course you have been retained by plaintiff's

15  counsel in this case, true, sir?

16  **A.**   Yes.

17  **Q.**   And getting paid by them, true?

18  **A.**   True.

19  **Q.**   And you charge what per hour?

20  **A.**   It's 250 for the first hour in their contract and 125 for

21  every hour thereafter.

22  **Q.**   Okay.  Can you tell us approximately how many hours you

23  have involved?

24          **THE COURT:**  Take your hand down.

25          **THE WITNESS:**  I don't know the hours exactly.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 25

1  **BY MR. REISING:**

2  **Q.**   Just give us your best estimate.

3  **A.**   Maybe about 60 to 80.

4  **Q.**   And I want to confirm something that I think is correct.

5  You already told us that gross motor movements would be picked

6  up on the video, true?

7  **A.**   Yes.

8  **Q.**   All right.  You made a comment, you know, you were asked a

9  question by plaintiff's counsel when you looked at the last

10  video we saw this morning concerning what was in that nurse's

11  little container that she had when she went in the safety cell;

12  do you recall that?

13  **A.**   Correct.

14  **Q.**   As you sit here today, you have no idea whatsoever what

15  was in that container, true?

16  **A.**   True.

17  **Q.**   And in association with the placement of Mr. Jennings on

18  that restraint bed, can we agree that his arms were down below

19  his shoulder level in terms of where they were placed on the

20  bed?

21  **A.**   Yes.

22  **Q.**   You told us that you watched the entire video concerning

23  the placement of Mr. Jennings in safety cell number 6 during

24  that last time period.  It runs a little more than two hours

25  all together?

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 26

 1  **A.**   Correct.

 2  **Q.**   Did he ever stop moving or ever stop -- I think you used

 3  the word flailing earlier during your testimony during that

 4  time?

 5  **A.**   Well, he wasn't flailing there because everything was

 6  anchored.

 7  **Q.**   He was just moving?

 8  **A.**   He was moving, yes.

 9  **Q.**   He would have been flailing if he hadn't been otherwise

10  secured?

11         **MR. ERNST:**   Objection, calls for speculation.

12         **THE COURT:**   That's speculation.  The objection is

13  sustained.

14  **BY MR. REISING:**

15  **Q.**   And just so I understand this, one last question, you

16  never hear a statement on the audio of put your hands on the

17  wall?

18  **A.**   No, I did not.

19  **Q.**   You didn't hear it, okay.  So if it's there, you just

20  didn't hear it, true?

21  **A.**   True.

22         **MR. REISING:**   Thank you.  Nothing further,

23  Your Honor.

24         **THE COURT:**   Redirect.

25         **MR. ERNST:**   Thank you, Your Honor.


*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 27

1                         -   -   -

2                                                (9:57 a.m.)

3                   **REDIRECT EXAMINATION**

4    **BY MR. ERNST:**

5    **Q.**   Sir, in Mr. Reising's cross-examination he asked you if

6    you were there at the jail, right?

7    **A.**   Correct.

8    **Q.**   And he said that you couldn't say whether Mr. Jennings

9    pulled away from the wall towards Mr. Fuller because you

10   weren't there, correct?

11   **A.**   Correct.

12   **Q.**   But you did see the video, correct?

13   **A.**   Correct.

14   **Q.**   Okay.  And in any video frame did you ever see

15   Mr. Jennings pull away from the wall when he was being patted

16   down?

17   **A.**   Just his left hand went down towards his crotch area.

18   **Q.**   Okay.  Did his body turn away from the wall?

19   **A.**   No.

20   **Q.**   Did you have an opportunity to notice Mr. Jennings' feet

21   when he was being patted down?

22   **A.**   Yes.

23   **Q.**   What direction were they pointed in?

24   **A.**   They were pointed toward the wall.

25   **Q.**   Okay.  And with regard to Mr. Jennings' body, was it

*Kenneth Glaza - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 28

1  leaning in any particular direction?

2  **A.**   Yes, it was leaning up against the wall.

3  **Q.**   Okay.  It was leaning toward the wall?

4  **A.**   Correct.

5  **Q.**   Okay.  And what about the distance between Mr. Jennings'

6  feet.  Did you happen to notice that?

7  **A.**   I noticed they were spread out, yes.

8  **Q.**   Okay.  And at any time before Mr. -- before Deputy Fuller,

9  who was the one who was patting down, at any time before he

10  made contact with Mr. Jennings did Mr. Jennings' feet ever turn

11  away from pointing at the wall?

12  **A.**   No.

13  **Q.**   Do you still have the exhibit book up there?

14  **A.**   No, sir.

15  **Q.**   Sir, I'm going to show you Exhibit 3.  If you can just

16  hold off, Mr. Elliott is going to broadcast it on the screen so

17  everybody can see it.

18       **MR. ELLIOTT:**  It's going to take me one minute.

19  **BY MR. ERNST:**

20  **Q.**   Okay.  First of all, I'll just ask you questions.  That's

21  the photo you identified as depicting Mr. Jennings' hand off

22  the wall, correct?

23  **A.**   Correct.

24  **Q.**   All right.  And that, again, can you tell us the time on

25  that frame?

*Kenneth Glaza – Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 29

1  **A.**   Yes, it's 5 hours 12 minutes and 4 seconds.

2  **Q.**   4 seconds?

3  **A.**   Correct.

4  **Q.**   Okay.

5  **A.**   Correct.

6  **Q.**   Okay.  Is the picture that you identified -- can you see

7  the screen from there?

8  **A.**   Yes, sir, I can.  Yep.

9  **Q.**   Okay.  Is that the one that you identified as showing

10  Mr. Jennings' hand off the wall?

11  **A.**   That would be 5:12:04.

12  **Q.**   Okay.

13  **A.**   The silver one, first front button.  Front button.

14  **Q.**   Is that Mr. Jennings' hand right there?

15  **A.**   Yes.

16  **Q.**   Okay.  And can you see Mr. Jennings' feet there?

17  **A.**   Correct.

18  **Q.**   Okay.  Which way are they facing?

19  **A.**   Pointing toward the wall.

20  **Q.**   So the next picture that you were shown where you were

21  asked about Mr. Jennings' head turning to the right, can you

22  find that in the book?

23  **A.**   Yes, that's at 5 hours 12 minutes 5 seconds.

24  **Q.**   5 seconds?

25  **A.**   Yes, the next picture.

*Kenneth Glaza - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 30

1   **Q.**   Okay.  So we're talking there's one second difference

2   between these two pictures?

3   **A.**   Correct.

4   **Q.**   But there's more than one frame per second, right?

5   **A.**   I would have to play the video to know for sure, yes.

6   **Q.**   Okay.  So, in other words, this picture is either a

7   second or less than a second after the previous one, right?

8           **MR. REISING:**  I object to that question based on the

9   witness's testimony.

10          **THE COURT:**  Well, the witness can answer.

11  **BY MR. ERNST:**

12  **Q.**   Is that right, sir?

13  **A.**   Yes.

14  **Q.**   Okay.  And in this one Deputy Fuller, the man with the

15  dark hair, is already in contact with Mr. Jennings, correct?

16  **A.**   Correct.

17  **Q.**   Okay.  And you see Mr. Jennings' head turning to the

18  right, correct?

19  **A.**   Correct.

20  **Q.**   And you see Mr. Fuller's forearm pushing on Mr. Jennings,

21  correct?

22  **A.**   Correct.

23  **Q.**   And he's pushing on the left shoulder area; is that

24  correct?

25  **A.**   Correct, yes.

*Kenneth Glaza - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 31

1   **Q.**   Okay.  And Mr. Jennings' head is turned to the right, but

2   what side of Mr. Jennings is Fuller on?

3   **A.**   I would have to say he's toward his left side.

4   **Q.**   Okay.  So Jennings' head turns to the right, but

5   Mr. Fuller is standing towards his left, correct?

6   **A.**   Correct.

7   **Q.**   And you indicated -- or Mr. Reising asked you if his arm

8   was cocked; do you see that?

9   **A.**   Yes, sir.

10  **Q.**   Okay.  But in the previous photo Mr. Jennings' arms were

11  straight out, correct?

12  **A.**   Correct.

13  **Q.**   His right arm was straight out?

14  **A.**   Correct.

15  **Q.**   And now he's being pushed and his arms are cocked,

16  correct?

17          **MR. REISING:**  I'm going to object.

18          **THE COURT:**  You are leading the witness.

19          **MR. REISING:**  He's in no position to make that

20  statement and --

21          **THE COURT:**  Please, I said -- if he answered the last

22  question, the jury will disregard it.

23      Start over, but stop leading him.

24          **MR. ERNST:**  Very well.

25

*Kenneth Glaza – Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 32

1  **BY MR. ERNST:**

2  **Q.**   In the previous frame can you describe how Mr. Jennings'

3  arms were?

4  **A.**   They were straight out.

5  **Q.**   Okay.  Were they like this?

6  **A.**   The left one was in the previous -- we're talking about

7  the previous picture.

8  **Q.**   Okay.

9  **A.**   The left one was -- I'm sorry, his right hand was straight

10  out and his left hand was reaching down toward his crotch.

11  **Q.**   Okay.  And then in the next photo when he's being pushed

12  can you describe what his right arm looks like?

13      **MR. REISING:**   Your Honor, I'm going to object to his

14  being pushed.  This witness can't testify to that based on this

15  video.

16      **THE COURT:**   Excuse me, excuse me.  The jury can see

17  the photos and the sequence, Mr. Ernst, so don't lead the

18  witness.

19      **MR. ERNST:**   Okay.

20      **THE COURT:**   You can argue your case at the end and

21  you can use these in final argument, but don't anticipate it

22  this early in the trial.

23      **MR. ERNST:**   Very well, Your Honor.

24  **BY MR. ERNST:**

25  **Q.**   Do you see Mr. Fuller's hand on Mr. Jennings in this

*Kenneth Glaza - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 33

1  photo?

2  **A.**   Yes.

3  **Q.**   And do you see a change in his arm position, in

4  Mr. Jennings' right arm position?

5  **A.**   Correct.

6          **THE COURT:**  I suggest, Mr. Ernst, we move on.

7          **MR. ERNST:**  Okay.

8  **BY MR. ERNST:**

9  **Q.**   Sir, you were asked about whether the photos that you

10 described when Mr. Jennings' head was being pushed, whether

11 that necessarily meant he was injured, he got injured from

12 that.  Do you remember that question?

13 **A.**   Yes.

14 **Q.**   Okay.  But could that, could that type of pressure cause

15 an injury to the head?

16         **MR. REISING:**  Objection, Your Honor.  This witness is

17 not an expert in being able to testify about that.  He's a

18 video expert only.

19         **MR. ERNST:**  He asked him the question.

20         **THE COURT:**  Wait a second.

21     I'm going to sustain the objection.

22 **BY MR. ERNST:**

23 **Q.**   Sir, you indicated that you could tell about relative

24 pressure given body weight, I mean given body positioning when

25 somebody is pushing on the head, right?

*Kenneth Glaza – Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 34

1  **A.**   Yes.

2  **Q.**   And in the photos that you described, can you describe the

3  body positioning that you pointed to the last couple days?

4  **A.**   If we can bring the photo up, I can show you what I'm

5  talking about.

6         **THE COURT:**  Mr. Ernst, the jury can see these photos,

7  and I think you are simply repeating questions that you have

8  already asked.

9         **MR. ERNST:**  Well, Your Honor, I'm following up on

10  points --

11         **THE COURT:**  I know, I know, I know.  I know what

12  you're following up on, but I suggest you move forward.

13         **MR. ERNST:**  I'll take that suggestion as a directive.

14         **THE COURT:**  That's why I became a judge.

15  **BY MR. ERNST:**

16  **Q.**   Sir, you indicated that you had between 60 and 80 hours in

17  this case, right?

18  **A.**   Correct.

19  **Q.**   Did you review every frame, frame by frame, of this video?

20  **A.**   Every frame of every video that I was provided, yes.

21  **Q.**   All right.  And you've reviewed them individually to form

22  your forensic opinion about this video, right?

23  **A.**   Correct.

24         **MR. ERNST:**  Thanks a lot, sir.

25         **THE COURT:**  You are excused.  Before you go just give

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 35

1   me the numbers of the five videos for the record.

2            **THE WITNESS:**  The disk numbers?

3            **THE COURT:**  Yeah, the disk numbers in sequence.

4            **MR. ERNST:**  Yes.  Well, they are numbered 01, 02, 03,

5   04 and 05, and then the sixth one is marked Picture Mix.  Let

6   me get them for you, and I can read them right off for you.

7            **A JUROR:**  That's an Amber Alert.

8            **THE COURT:**  Sometimes that goes off and it's a fire

9   alarm.  This is only Amber?

10           **A JUROR:**  This is only Amber.

11           **THE COURT:**  Go ahead.

12           **THE WITNESS:**  Yes, sir.  We showed 01, 02.

13           **THE COURT:**  Wait a minute.  Video 01, that's in the,

14   in the writing room?

15           **MR. REISING:**  Report writing, Your Honor.

16           **THE WITNESS:**  Report writing, correct.  You want a

17   description with --

18           **THE COURT:**  Yeah.

19           **THE WITNESS:**  Okay.  Let me get those notes.

20           **THE COURT:**  Go ahead.

21           **THE WITNESS:**  Number 2 is the hall front view.

22           **THE COURT:**  Hall?

23           **THE WITNESS:**  What I'm calling the hallway.  It's

24   that long corridor --

25           **THE COURT:**  Yeah, front view.

*13-13308; Jennings v. Fuller, et al.*

*Kenneth Glaza – Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 36

1      **THE WITNESS:** Okay. Number 3 is the hall, the rear

2  view. It's the rear camera in the same hallway.

3      **THE COURT:** Yeah.

4      **THE WITNESS:** Number 4 was the small room between the

5  entrance room and that hallway. There's a small like a

6  vestibule.

7      **THE COURT:** Yeah.

8      **THE WITNESS:** Okay. That's the one with sound.

9      **THE COURT:** Yeah.

10      **THE WITNESS:** Number 5 is the jail cell, and the

11  sixth one is labeled as 2 Cam Mix. 2, as number 2, C-a-m

12  M-i-x.

13      **THE COURT:** M-i-x?

14      **THE WITNESS:** M-i-x.

15      **THE COURT:** Thank you. You are excused.

16      **THE WITNESS:** Thank you.

17      **THE COURT:** Call your next witness.

18      **MR. ERNST:** I call Defendant Fuller.

19      **THE COURT:** Would you raise your right hand.

20                  -   -   -

21              **PATRICK FULLER,**

22      being first duly sworn by the Court to tell

23      the truth, was examined and testified upon his

24      oath as follows:

25      **THE COURT:** Thank you.


*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 37

1      Approach the bench just one minute, Mr. Reising.

2           **MR. REISING:**  Yes, Your Honor.

3           **THE COURT:**  You can just come up here.  This doesn't

4      have to be on the record.  Just I want to ask you two just

5      one question.

6           (Discussion at sidebar between court and counsel off the

7           record.)

8           **THE COURT:**  Go ahead, Mr. Ernst.

9           **MR. ERNST:**  All right, Your Honor.

10     Your Honor, Mr. Elliott is going to hand him some various

11     transcripts that he may need to refer to.

12          **THE COURT:**  Go ahead.

13                              -   -   -

14                                                    (10:14 a.m.)

15                          **DIRECT EXAMINATION**

16     BY MR. ERNST:

17     **Q.**   Sir, can you please state your full name for the record.

18     **A.**   Patrick Fuller, P-a-t-r-i-c-k F-u-l-l-e-r.

19     **Q.**   You are currently employed with the Genesee County

20     Sheriff's Department?

21     **A.**   I am.

22     **Q.**   How long have you been so employment?

23     **A.**   Just about 15 years.

24     **Q.**   Were you working on the night of September 18th, 2010?

25     **A.**   Yes, sir.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 38

1  **Q.**  Or the early morning hours?

2  **A.**  Yes, I was.

3  **Q.**  All right.  Sir, you heard your lawyer yesterday in his

4  opening statement say that this report-writing room that we

5  have been referring to is not a secure area and there was a

6  risk of escape.  Did you hear that?

7  **A.**  Yes.

8  **Q.**  Do you agree with that?

9  **A.**  I do.

10  **Q.**  Sir, how Mr. Jennings entered into that report-writing

11  area is he came in with a Flint Township police officer,

12  correct?

13  **A.**  That's correct.

14  **Q.**  And then the Flint Township police officer pulls up to a

15  locked garage, correct?

16  **A.**  That's correct.

17  **Q.**  And then somebody from the control center inside the jail

18  who monitors some cameras pushes a button to let them into the

19  garage, correct?

20  **A.**  That is correct.  The garage doors are locked.  There are

21  interior doors --

22  **Q.**  Just wait a minute.  Just answer my questions, please.

23      And so then after that car comes in the garage door is

24  closed back behind him, correct?

25  **A.**  That's correct.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 39

1  **Q.**   And that garage door is locked, correct?

2  **A.**   That's correct.

3  **Q.**   And then in between the garage and the report-writing room

4  there is another door, correct?

5  **A.**   There are several doors.

6  **Q.**   Okay.  Well, there's a door that you can enter into the

7  report-writing room from the garage, correct?

8  **A.**   Yes.

9  **Q.**   Okay.  And those doors have locks on them, don't they?  I

10  mean this is a jail.

11  **A.**   No.

12  **Q.**   So you're telling me that there is no locks on the doors

13  inside the jail?

14  **A.**   Those doors just -- they open by turn of a knob.

15  **Q.**   Okay.  So somebody can just walk into there from the

16  garage, into the report-writing room?

17  **A.**   If they are inside the garage, let in from the garage

18  door, yes, they can walk into report writing.

19  **Q.**   Okay.  And the only way that the garage door is opened is

20  if the control center opens it, correct?

21  **A.**   The garage door, that's true.

22  **Q.**   So somebody could get, according to you, they could get

23  outside of the report-writing room into a locked garage,

24  correct?

25  **A.**   Again, there are two doors on the side of the garage,

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 40

1    regular doors, that are not locked from the inside.  They are

2    locked from the outside but not locked from the inside.  So if

3    you were to walk out into the garage and go to that door and

4    turn the door handle, you could exit the garage.

5    **Q.**   So you are telling me that somebody could just, a prisoner

6    could just walk out of the report-writing room and never have

7    to pass through a locked door?

8    **A.**   That has happened.

9    **Q.**   After it happened, nobody did anything to fix it?

10   **A.**   Again, it's locked from the outside, not from the inside.

11   **Q.**   So you said it happened, so you mean somebody just walked

12   out, right?

13   **A.**   They have ran out.

14   **Q.**   And the sheriff has never taken any measures to try to fix

15   that, to try to correct that so somebody cannot just run out?

16   **A.**   I cannot say what maintenance has done with those doors.

17   **Q.**   Well, do you know if they lock now?

18   **A.**   To my knowledge, no, they do not lock.

19   **Q.**   All right.  Sir, you heard your attorney say that you

20   never claimed -- well, first, let me back up.

21        Officer Hartner, he's the Flint police officer that

22   brought Mr. Jennings into the jail that evening, correct?

23   **A.**   That's correct.

24   **Q.**   And you heard officer -- I mean you heard your attorney

25   claim that you never said Hartner told you that Jennings was

*Patrick Fuller – Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 41

1  kicking and punching in the back of the patrol car; is that

2  correct?

3  **A.**   I don't recall that.

4  **Q.**   Okay.  In fact, you said that he was doing that, correct?

5  **A.**   No, I --

6  **Q.**   You said Hartner told you Jennings was kicking and

7  punching in the backseat of the patrol car on the way to the

8  station, correct?

9  **A.**   I don't, again, recall saying that at all.

10  **Q.**   You don't.  Can you turn -- can you turn your -- can you

11  get your deposition --

12  **A.**   Sure.

13  **Q.**   -- from the thing.  Page 26, the top of it.  Can you --

14  the very first line.

15        **THE COURT:**  Hold on.  I think you should -- I'll

16  explain to the jury.

17       Prior to the trial witnesses, prospective witnesses can be

18  examined by the lawyers.  It's called a deposition.  It's in

19  discovery.  They answer questions under oath, okay.  So each

20  side is entitled to explore the witnesses from the other side,

21  what they are likely to say at trial, the information that they

22  may have that's relevant.

23       Mr. Ernst --

24        **MR. ERNST:**  Thank you.

25

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 42

1   **BY MR. ERNST:**

2   **Q.**   And, sir, on August 13th --

3                **THE COURT:**   Wait a minute.  Mr. Ernst is now asking

4   him about questions he may have answered earlier.  The evidence

5   in the case comes from the witness stand, okay?  I'm going to

6   explain to you about a thing called consistent and inconsistent

7   statements later, okay?  Go ahead.  Go ahead.

8                **MR. ERNST:**   Your Honor, but also with regard to a --

9                **THE COURT:**   What a party said in his deposition can

10  be considered evidence.

11               **MR. ERNST:**   Thank you.

12               **THE COURT:**   The rules are complicated.

13       Go ahead.

14  **BY MR. ERNST:**

15  **Q.**   On August 13th, 2014 you gave a deposition, correct?  You

16  testified at a deposition?

17  **A.**   Yes, I did.

18  **Q.**   Okay.  And in that deposition you were -- you swore that

19  you were going to tell the truth, just like you did here today,

20  correct?

21  **A.**   That's correct.

22  **Q.**   And on that date were you asked the following question and

23  did you give the following answer?

24       "Q.  What did the arresting officers tell you exactly?

25       "A.  That he was kicking and punching and being disruptive

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 43

1    in the back of the seat, failing to follow instructions."

2        Isn't that what you said?

3    **A.**   That was my answer.

4    **Q.**   Okay.  Is that what Officer Hartner told you, sir?

5    **A.**   If this is what I said, then that's what was revealed to

6    me.

7    **Q.**   Okay.  What -- if Officer Hartner testified that he didn't

8    call down there, that he didn't need any special assistance or

9    anything like that and that Jennings was compliant and not

10   combative, would he be lying?

11   **A.**   I can't, I can't comment on what Mr. Hartner says.

12   **Q.**   Do you know any reason why Officer Hartner would say that

13   Jennings was compliant and not combative and then tell you that

14   he was kicking and punching in the backseat of his patrol car?

15   **A.**   I can't answer that question, why he would do such a

16   thing.

17   **Q.**   He never told you that, did he, sir?

18   **A.**   He revealed that information to me.

19   **Q.**   You just testified today that you didn't recall hearing

20   it.

21   **A.**   I said I did not recall.  That didn't mean it didn't

22   happen.

23   **Q.**   The reason that you were saying that is you are trying to

24   justify the force you used against Mr. Jennings; isn't that

25   true, sir?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 44

1   **A.**    That is not true.

2   **Q.**    Sir, you also heard your lawyer in opening statement say

3   none of this stuff would have happened if Mr. Jennings wouldn't

4   have been drinking and driving that night.  Did you hear him

5   say that?

6   **A.**    I did hear him say that.

7   **Q.**    Okay.  Do you think you have a right to punish people in

8   the jail if they have been drinking and driving earlier that

9   night?

10  **A.**    That's not our job, to punish people.

11  **Q.**    Okay.  And so you wouldn't have a right to do that, would

12  you?

13  **A.**    Again, that's not our job to punish people for something

14  they are arrested for.

15  **Q.**    I'm sorry, I didn't mean to --

16  **A.**    It's not our job to punish people for something that they

17  are arrested for, that incident.

18  **Q.**    Okay.  And you would agree with me that the fact that

19  Mr. Jennings was drinking earlier that night would not justify

20  any use of force when he was brought into the jail, correct?

21  **A.**    I'm not going to agree with what Mr. Jennings does on his

22  own time.

23  **Q.**    No, my question was you would agree that if he was

24  drinking earlier that night that would not justify you using

25  force against him in the jail, right?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 45

1      **THE COURT:**  Pull the mike a little closer to you.

2      **THE WITNESS:**  Sure.

3      Repeat the question one more time, please.

4   **BY MR. ERNST:**

5   **Q.**   If Mr. Jennings was drinking earlier that night, that

6   would not justify you using force against him once he got to

7   the jail, right?

8   **A.**   It's a complicated question.

9   **Q.**   Why don't you just answer that one.

10  **A.**   Okay.  If his actions were in reference to his drinking

11  and his drinking inhibited his behavior --

12  **Q.**   I didn't ask you that, did I?  I asked you --

13      **THE COURT:**  Please, sir.  You can answer either yes,

14  no or I can't answer that yes or no or I don't understand the

15  question.

16      **THE WITNESS:**  I can't answer that yes or no.

17  **BY MR. ERNST:**

18  **Q.**   Let me ask you like this.  Does his drinking earlier that

19  night justify you using force against him in the jail?

20  **A.**   No.

21  **Q.**   You would agree with me that people that are brought to

22  the jail, they are presumed innocent, right?

23  **A.**   Yes.

24  **Q.**   Okay.  And Mr. Jennings, when he was brought to the jail

25  that night, he hadn't been convicted of the charge he had been

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 46

1  arrested for, correct?

2  **A.**   That's correct.

3  **Q.**   And you would agree that Mr. Jennings has Constitutional

4  rights even though he was arrested and brought to the jail,

5  correct?

6  **A.**   That is correct.

7  **Q.**   You would agree that he has the right to be free from the

8  use of excessive force, wouldn't you?

9  **A.**   That's correct.

10  **Q.**   You would agree that he had the right to be free from an

11  unlawful prosecution, correct?

12  **A.**   That's correct.

13  **Q.**   Do you think that people that are brought to the jail

14  should be treated with the same type of dignity that every

15  human being deserves?

16  **A.**   I think they should be treated as human beings, correct.

17  **Q.**   And you would agree that you don't have the right to treat

18  them like an animal, right?

19  **A.**   No, we do not.

20  **Q.**   On September 18th, 2010 you weighed about 280 pounds or

21  so, correct?

22  **A.**   Correct.

23  **Q.**   And, sir, have you ever received any other people at the

24  county jail?

25  **A.**   Yes.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 47

1  **Q.**   Okay.  That was your job that night, to receive people in?

2  **A.**   Yes.

3  **Q.**   And so I imagine that you've received hundreds of people

4  in during your experience, correct?

5  **A.**   At least.

6  **Q.**   Okay.  And you know, sir, that before somebody is placed

7  in the back of a patrol car they are patted down for weapons,

8  correct?

9  **A.**   I cannot say if they are or not.  I could presume that

10  they are.

11  **Q.**   Okay, because that's standard police procedure, correct?

12  **A.**   Right.

13  **Q.**   Nobody ever goes into a police car, especially in the

14  backseat, without being patted down for weapons according to

15  procedure, right?

16  **A.**   According to procedure, but you're --

17  **Q.**   That's all I asked.  And you would also agree that it's

18  standard procedure that people are handcuffed behind their back

19  when they are transported, correct?

20  **A.**   That is, that is our procedure.

21  **Q.**   I mean before they are transported in a police car,

22  correct?

23  **A.**   I don't know what other department's procedures are, but

24  that's our procedure.

25  **Q.**   Now, when you first became aware of Jennings in the jail,

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 48

1  he was sitting on a bench and Officer Hartner was standing at a

2  table, right, or standing near a table doing some paperwork,

3  correct?

4  **A.**   Yes.

5  **Q.**   And how did you become aware of them?

6  **A.**   How did I know that they were out there?

7  **Q.**   Yes.

8  **A.**   Is that your question?

9  **Q.**   Yes.

10 **A.**   We saw them through the sallyport window.

11 **Q.**   And at that point in time Mr. Jennings was just sitting

12 there like minding his own business, correct?

13 **A.**   I could not see Mr. Jennings from the windows.

14 **Q.**   Okay.  Well, when you walked in he was sitting on the

15 bench, correct?

16 **A.**   That's correct.

17 **Q.**   And he wasn't acting aggressively, correct?

18 **A.**   No.

19 **Q.**   Do you think Mr. Jennings was being disrespectful to you

20 that evening?

21       **THE COURT:**  Reframe that question because the evening

22 lasted a very long time.

23       **MR. ERNST:**  Good point.  Thank you, Your Honor.

24 **BY MR. ERNST:**

25 **Q.**   Do you think Mr. Jennings was being disrespectful to you

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 49

1   before you patted him down?

2   **A.**   I don't remember if he was or was not.

3   **Q.**   Did you previously testify that Mr. Jennings appeared

4   agitated to you?

5   **A.**   He did.

6   **Q.**   Okay.  And what exactly did he do that made him appear

7   agitated?

8   **A.**   He was fidgety.  I mean he was, even though he was sitting

9   down, he was still fidgety.  Even when I was patting him down

10  he was fidgety.

11  **Q.**   So fidgety to you means agitated?

12  **A.**   It can.

13  **Q.**   And, sir, if you were concerned about his agitation, why

14  is it you kept turning your back to him?

15  **A.**   Well, I was putting stuff on the table.  I had to take

16  stuff out of his pockets and put it on the table.  I couldn't

17  leave it in his pockets or in his possession.

18  **Q.**   So after -- well, let me back up.  Did you see

19  Officer Hartner search Mr. Jennings?

20  **A.**   No, I did not.

21          **THE COURT:**   Was Mr. Hartner the one sitting at the

22  table?

23          **MR. ERNST:**   He was the Flint police officer that

24  brought him in.

25          **THE COURT:**   Oh, that's right.  I'm sorry, go ahead.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 50

1   **BY MR. ERNST:**

2   **Q.**   And did you have any conversation with Officer Hartner at

3   that point?

4   **A.**   I did.

5   **Q.**   And he told you that he had arrested Mr. Jennings for

6   drunk driving, correct?

7   **A.**   Correct.

8   **Q.**   And is this when he supposedly told you about Jennings

9   punching and kicking in the backseat of the car?

10  **A.**   That's the only time I talked to him.

11  **Q.**   And did you ask Officer Hartner how Mr. Jennings was

12  punching in the back of his police car when he was handcuffed

13  behind his back?

14  **A.**   I didn't ask why.  I was just told.

15  **Q.**   Why did you take Mr. Jennings' handcuffs off if you were

16  concerned that he was agitated?

17  **A.**   Well, to conduct a pat-down search.

18  **Q.**   Well, you could conduct a pat-down with him handcuffed,

19  couldn't you?

20  **A.**   We can.

21  **Q.**   So then you came out and you took off Mr. Jennings'

22  handcuffs to conduct your pat-down and you ordered him to put

23  his hands on the wall, correct?

24  **A.**   I told him to put his hands on the wall.

25  **Q.**   And Mr. Jennings complied, correct?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 51

1   **A.**   He complied.

2   **Q.**   And then you ordered him to spread his feet apart,

3   correct?

4   **A.**   He did spread his feet apart.

5   **Q.**   So he complied with that order, correct?

6   **A.**   That's correct.

7   **Q.**   So if you previously testified that Mr. Jennings was out

8   of control the whole time he was there, that wouldn't be true,

9   would it?

10  **A.**   After the events started.

11  **Q.**   The whole time he was there includes the time before the

12  events started, correct?

13  **A.**   That's not -- no, that is not correct.

14  **Q.**   Okay.  So the whole time is a limited time.

15  **A.**   From when the event started he was out of control.

16  **Q.**   That includes every place he was, correct, every room he

17  was in?

18  **A.**   When we made contact with him, when he started resisting

19  is when the event started.

20  **Q.**   Okay.  And you say he was out of control the whole time

21  after that, right?

22  **A.**   Yes.

23  **Q.**   So that includes every single room he was in, the

24  report-writing room, the sallyport, safety cell 6, the hallway,

25  correct?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 52

1  **A.**   It took us 25 minutes to get him restrained.

2  **Q.**   Into a restraint bed, right?

3  **A.**   It took us 25 minutes.

4  **Q.**   Okay.  So my question was he was out of control in every

5  single one of those places, correct?

6  **A.**   That's what you're asking, yes.

7  **Q.**   I'm sorry?

8  **A.**   That's what you are asking, yes.  And that's what I'm

9  saying --

10  **Q.**   And I'm asking you if your answer is, yes, he was?

11  **A.**   My answer is it took us 25 minutes to restrain him.

12  **Q.**   I didn't ask you how long it took, did I?

13  **A.**   The answer is yes, he was out of control for 25 minutes.

14  **Q.**   In every single room?

15          **THE COURT:**  Wait a second.  You know, you go too fast

16  and he's not necessarily responsive to your question.

17      You are supposed to answer on cross-examination to the

18  question either yes, no, I can't answer yes or no, or I don't

19  recall.  You know, it's multiple choice.  If he asks you a

20  question that calls for a narrative answer, then you can give

21  him a narrative answer, but so far he's been asking you

22  questions that are typically yes, no, I can't answer yes or no

23  or I don't understand the question.  Four options.

24          **THE WITNESS:**  Yes, sir.

25          **THE COURT:**  Go ahead.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 53

1    And you be patient until he gets done with his questions.

2    **THE WITNESS:**  Very well, Your Honor.

3  **BY MR. ERNST:**

4  **Q.**  So my question again was your testimony or you are

5  claiming that Mr. Jennings was out of control in every single

6  room he was in in the jail that night, correct?

7  **A.**  Correct.

8  **Q.**  Now, after you told Mr. Jennings to spread his feet and he

9  complied with your directive, you then told him to remove his

10  sweatshirt, correct?

11  **A.**  That's correct.

12  **Q.**  And he did that, correct?

13  **A.**  Yes.

14  **Q.**  So he complied with that order then, correct?

15  **A.**  Yes.

16  **Q.**  And then you told him to remove his belt, correct?

17  **A.**  Correct.

18  **Q.**  And he complied with that order, correct?

19  **A.**  Yes, he did.

20  **Q.**  And then you told him to put his hands back on the wall,

21  correct?

22  **A.**  Yes.

23  **Q.**  And he complied with that order, correct?

24  **A.**  Yes.

25  **Q.**  Now, sir, you have training in how to pat down a prisoner

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 54

1   or a detainee, correct?

2   **A.**   Yes.

3   **Q.**   And one of the things that they train you is that you

4   should lean him forward, correct?

5   **A.**   To keep them off balance, yes.

6   **Q.**   Okay.  And one of the ways that you can increase your

7   control over him is to have him lean forward even more,

8   correct?  You are trained in that because then you have more

9   control over him, correct?

10  **A.**   Again, to keep them off balance, yes.

11  **Q.**   Okay.  And the other thing that you can do is you can

12  spread their feet wider, correct?

13  **A.**   Right.

14  **Q.**   That gives you more control and gives them less ability to

15  turn or move, correct?

16  **A.**   Correct.

17  **Q.**   And you had Mr. Jennings in that type of position when you

18  patted him down, correct?

19  **A.**   I had his arms on the wall, leaned against the wall and

20  had his legs spread apart, yes.

21  **Q.**   And so then you began to pat Mr. Jennings down, correct?

22  **A.**   Yes.

23  **Q.**   And then, according to you, Mr. Jennings pulled his hand

24  off the wall, correct?

25  **A.**   Yes.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 55

1    **Q.**   And then you ordered him to put it back on the wall,

2    correct?

3    **A.**   I did.

4    **Q.**   Okay.  And did you give him a chance to comply with that

5    order?

6    **A.**   I did.

7    **Q.**   Okay.  But then, according to you, Mr. Jennings, instead

8    of putting his hand back on the wall, he turned towards you in

9    an aggressive stance after that order, correct?

10   **A.**   That's correct.

11   **Q.**   Okay.  And you filled out a police report in this case,

12   correct?

13   **A.**   I filled out an incident report from our jail.

14   **Q.**   Incident report, okay.  And you wrote down -- you filled

15   it out the night it happened, correct?

16   **A.**   After the event happened, yes.

17   **Q.**   And you wrote down all of the important facts in your

18   police report, correct?

19   **A.**   I wrote down everything I could from recollection of the

20   event.

21   **Q.**   And your recollection was fresh then because it just

22   happened, right?

23   **A.**   It was about a half hour, 45 minutes after it happened.

24   **Q.**   And when you wrote this report, you knew that you were

25   going to turn it in to your supervisor, correct?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 56

1  **A.**   That's correct.

2  **Q.**   And you knew your supervisor would rely on that report,

3  correct?

4  **A.**   That is correct.

5  **Q.**   And you knew if there was a possibility of criminal

6  charges that this report would get forwarded up the chain of

7  command, correct?

8  **A.**   That's not my decision.

9  **Q.**   I'm not saying -- I'm not asking you if that's your

10 decision.  I'm asking you if you knew it would get --

11 **A.**   No, I don't know.

12 **Q.**   Okay.  You knew that if the prosecutor saw this report

13 they would rely on that whether to charge Mr. Jennings,

14 correct?

15 **A.**   I don't know.

16 **Q.**   You don't think that the prosecutor looks at reports?

17 **A.**   Again, I don't know.

18 **Q.**   Have you ever been involved in a criminal prosecution

19 before in your 18 years or whatever it is?

20 **A.**   My 15 years?

21 **Q.**   15 years.

22 **A.**   I can't remember if I have or have not.

23 **Q.**   So you also testified during a criminal prosecution

24 against Mr. Jennings, correct?

25 **A.**   I was at the preliminary exam.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 57

1   **Q.**   And you testified, correct?

2   **A.**   That is correct.

3   **Q.**   And, with regard to Mr. Jennings turning towards you in an

4   aggressive stance, can you stand up and demonstrate for the

5   jury how he turned towards you in an aggressive stance?

6   **A.**   I had the gentleman here, patted down.  I had him like

7   this.  He dropped his hand.  So I saw that, the elbow at my

8   face, his hand down, pushed him forward.  All he did was move

9   his elbow up, his shoulder towards me and looked back.  I

10  reacted to that.

11  **Q.**   Okay.  So you pushed him forward, and then he turned his

12  head, right?

13  **A.**   I pushed him forward, but he still had time to turn his

14  head and his elbow towards me.

15  **Q.**   His elbow went towards you?

16  **A.**   He picked his elbow up off the wall at a 90-degree angle

17  and he looked back over his shoulder.  I reacted to that.

18  **Q.**   And you were to his left, right?

19  **A.**   I was behind him.

20  **Q.**   To his left?

21  **A.**   I was behind him.

22          **MR. ERNST:**  Hold on one second.

23  **BY MR. ERNST:**

24  **Q.**   Sir, we're going to draw it up on the screen.

25  **A.**   Sure.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 58

1   **Q.**   And while he's doing that, how much time did you give

2   Mr. Jennings to comply with your order to put his hand back on

3   the wall before you pushed him forward?

4   **A.**   I don't know how much time I gave him.  I gave him enough

5   time to react.  If he didn't, I had to react to it.

6   **Q.**   How much time?  Give me an estimate.  How much time?

7   **A.**   Again, I don't know an exact time.  If he didn't comply,

8   you react to it.

9   **Q.**   Two seconds?  Did you give him two seconds?

10   **A.**   I gave you an answer.  I don't know how much time.

11   **Q.**   I'm asking you for an estimate.  Was it more than two

12   seconds?

13   **A.**   If he didn't react, my answer is --

14           **THE COURT:**   No, just -- the question was did you give

15   him more than two seconds.  You can either say yes, no --

16           **THE WITNESS:**   I don't know.

17           **THE COURT:**   Okay.  Your answer is you don't know.

18   Okay.  That's the answer.

19   **BY MR. ERNST:**

20   **Q.**   Did you give him less than two seconds?

21   **A.**   I don't know.

22   **Q.**   You didn't give him any time, did you?

23   **A.**   Sure, I did.

24           **THE COURT:**   That's argumentative, Mr. Ernst.

25

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 59

1  **BY MR. ERNST:**

2  **Q.**   You never even said that, did you, sir?

3  **A.**   Yes, I did.

4  **Q.**   Sir, when you are trained to give orders to a suspect or a

5  detainee, you are trained to use what's called a "command

6  voice," correct?

7  **A.**   Yes.

8  **Q.**   Okay.  And what is a "command voice"?  Tell the jury.

9  **A.**   It's loud verbal commands.

10 **Q.**   And can you demonstrate for us the command voice that you

11 used that night when you told Mr. Jennings to put his hand back

12 on the wall?

13 **A.**   I can't remember how I used my voice six years ago.

14 **Q.**   Well, demonstrate how you typically use a command voice

15 and say, "Put your hands on the wall."

16 **A.**   "Put your hands on the wall."

17 **Q.**   You don't yell it louder than that?

18 **A.**   You don't need to if they are right there.

19 **Q.**   Okay.  Sir, can you see that screen from where you are?

20 **A.**   Yes.

21      (Video started and continued while the following

22      proceedings occurred.)

23 **BY MR. ERNST:**

24 **Q.**   Okay.  That's you with Mr. Jennings, correct?  That's you?

25 **A.**   That is correct.

*Patrick Fuller – Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 60

1  **Q.**   So right there, sir, you are patting down Mr. Jennings in

2  the crotch area, correct?

3  **A.**   My hands are on his left leg.  I don't know exactly where

4  at.

5  **Q.**   Okay.  And Mr. Jennings is standing there with his hands

6  on the wall, right?

7  **A.**   I see his right hand.  I don't see his left hand right

8  now.

9         **MR. ERNST:**  All right.  Go back a little bit.

10     Okay.  Play it.

11  **BY MR. ERNST:**

12  **Q.**   You tell me when you tell him to put his hand back on the

13  wall.  You show us.  Point it out to us.

14  **A.**   I don't know exactly when I said it.

15  **Q.**   Well, you saw, you just saw the video.  How fast was it

16  before he took his hand off the wall and you pushed him?

17  **A.**   Two seconds.

18  **Q.**   Two seconds?

19         **MR. ERNST:**  Why don't you play it back.

20         **THE WITNESS:**  One second.  I'm not sure, sir.

21         **MR. ERNST:**  Okay.  Stop it there.

22  **BY MR. ERNST:**

23  **Q.**   All right.  Do you see Mr. Jennings' hand off the wall

24  there?

25  **A.**   I do.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 61

1   **Q.**   And is it -- when -- so as soon as you noticed it you said
2   put it back, right?

3   **A.**   Yes.

4   **Q.**   So you said it that fast, gave him a chance to comply, and
5   pushed him all in that instant, right?

6   **A.**   Again, I reacted to his --

7   **Q.**   I didn't ask you that.  I'm just asking you --

8   **A.**   Yes.

9   **Q.**   Okay.  And you considered --

10           **MR. ERNST:**  Back it up a little, please.

11  **BY MR. ERNST:**

12  **Q.**   So you considered Mr. Jennings' head turning away from
13  your direction to be an aggressive move?

14  **A.**   Back it up a little bit further.

15           **MR. ERNST:**  Back it up a little bit further.

16           **THE WITNESS:**  He's looking over his right shoulder
17  and his arm is cocked.

18  **BY MR. ERNST:**

19  **Q.**   But his arm is cocked because you are pushing him up
20  against the wall, sir.

21           **THE COURT:**  You are starting to argue with the
22  witness, Mr. Ernst.  You ask questions.

23  **BY MR. ERNST:**

24  **Q.**   Okay.  Isn't it true that his arm is cocked because you
25  are pushing him up against the wall?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 62

1   **A.**    That is not what I observed.

2   **Q.**    Okay.  So at that point Mr. Jennings' arm is bent, right?

3   **A.**    Are we talking about this frame or the frame that I

4   pointed out.

5   **Q.**    Well, I'm asking you for this frame.

6   **A.**    Okay.

7   **Q.**    His arm is bent, right?

8   **A.**    That's correct.

9         **MR. ERNST:**  All right.  Back it up.

10  **BY MR. ERNST:**

11  **Q.**    All right.  This is the frame where you said --

12        **MR. ERNST:**  Oops, you just had it.

13  **BY MR. ERNST:**

14  **Q.**    All right.  This is the frame that you said Mr. Jennings'

15  arm was cocked, right?

16  **A.**    Yes.

17  **Q.**    Do you see his head?  Do you see the direction that his

18  head is looking in, his eyes?

19  **A.**    Yes, he's looking over his right shoulder.

20  **Q.**    Okay.  It's not even all the way to his right shoulder, is

21  it?

22  **A.**    I think he's looking over his right shoulder.

23  **Q.**    There's his head, right?

24  **A.**    Yes.

25  **Q.**    Okay.  And your hand is already on him, right?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 63

1   **A.**   My forearm is on his back, yes.

2   **Q.**   Yeah, you are pushing on his back, right?

3   **A.**   I'm not pushing.  I'm holding against him so he's not

4   coming back towards me.  I'm pushing him away from me.

5   **Q.**   Well, you are putting pressure on his back, right?

6   **A.**   I'm pushing him away from me, yes.

7   **Q.**   And you are pushing him away from you and toward the wall,

8   correct?

9   **A.**   You could say that, yeah.

10  **Q.**   So, sir, wouldn't you agree with me that if you started

11  with your arms straight and somebody pushed you in it would

12  cause your elbow to bend?

13  **A.**   Again, I would say --

14  **Q.**   I'm just asking would you agree with that.

15  **A.**   I disagree.

16  **Q.**   So you think that if somebody pushed you and your body

17  moved towards the wall you could still keep your arms straight?

18  **A.**   You could.

19  **Q.**   But wouldn't that prevent your body from moving to the

20  wall?

21  **A.**   I disagree with what you are saying, yes.  You can resist

22  the pushing.

23            **THE COURT:**  Let's move forward, Mr. Ernst.

24            **MR. ERNST:**  I'm moving, Your Honor.

25

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 64

1   **BY MR. ERNST:**

2   **Q.**  Now, you testified, I'm sorry, you indicated in your

3   police report that you grabbed Jennings and that you placed him

4   on the bench, correct?

5   **A.**  That's right.  I placed him on the bench.

6   **Q.**  Oh, by the way, in this photo can you describe where

7   Mr. Jennings' feet are, the direction Mr. Jennings' feet are

8   facing?

9   **A.**  His right foot is quartering to his right facing the wall.

10   **Q.**  All right.  So if he turned aggressively towards you,

11   wouldn't you expect that his feet would turn towards you?

12   **A.**  If his feet were facing directly forward, they did turn to

13   the right.

14   **Q.**  Well, they were always spread out when you spread him out,

15   right?

16   **A.**  Right, if they are spread out, if his feet were facing

17   forward, he turned his foot to the right.

18   **Q.**  When you pushed him, right?

19   **A.**  No.

20       **MR. ERNST:**  All right.  Can you show -- can you roll

21   it?

22   **BY MR. ERNST:**

23   **Q.**  That's what you are referring to as placing him on the

24   bench?

25   **A.**  That's correct.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 65

1   **Q.**   In fact, you testified previously that you tried to make

2   it so he did not fall hard on the bench, right?

3   **A.**   That's correct.

4   **Q.**   But you've got your full weight on him, right?

5   **A.**   No.

6   **Q.**   And you testified that you did not press his face into the

7   bench, right?

8   **A.**   No, sir.

9   **Q.**   You did not testify or you never pressed his face into it?

10  **A.**   I did not press his face against the bench.

11  **Q.**   Do you see your two hands there, Officer Fuller?

12  **A.**   Yes.

13  **Q.**   Do you see Mr. Jennings' head right there?

14  **A.**   Yes.

15  **Q.**   So your testimony to this jury is you didn't press his

16  head into the bench?

17  **A.**   I don't believe I was pressing his head against the bench.

18  I was trying to control his head, but I did not press his head

19  against the bench.

20  **Q.**   I didn't ask you if you were trying.  I asked you if you

21  pressed his head against the bench.

22  **A.**   No, I did not press his head against the bench.  I was

23  controlling his head.

24  **Q.**   Okay.  And your testimony is -- oh, incidentally, can you

25  see Mr. Jennings in the courtroom today?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 66

1   **A.**   I do.  He's sitting directly behind you with the gray suit
2   and blue shirt, dark blue tie.
3         **MR. ERNST:**  Can you stand up.
4   **BY MR. ERNST:**
5   **Q.**   And Mr. Jennings is approximately 150 pounds, that would
6   be your guess, or less?
7   **A.**   My best guess, probably 150, 160.
8   **Q.**   So you are approximately twice his size, correct?
9   **A.**   I'm larger than he is, yes.
10  **Q.**   And then you claim that Mr. Jennings was resisting putting
11  his arms behind his back, correct?
12  **A.**   That's correct.
13  **Q.**   Can you tell me how in the world somebody could put their
14  arms behind their back when you have him like that?
15  **A.**   They have to put their hands behind their back.  They have
16  the opportunity to.
17  **Q.**   You have to give them a chance to put their hands behind
18  their back, don't you?
19  **A.**   He was not putting his hands behind his back.
20  **Q.**   Well, he couldn't given your position on --
21         **THE COURT:**  Mr. Ernst, please go forward.  You are
22  starting to argue with the witness.
23         **MR. ERNST:**  I'm trying to make some points, Your
24  Honor.
25         **THE COURT:**  I know you are trying to make a point,

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 67

1  but you are not supposed to make a point during questioning.

2  You are supposed to ask a question, he answers.  You go to the

3  next question.

4           **MR. ERNST:**  That's what I thought I was doing.

5           **THE COURT:**  And if you don't get a satisfactory

6  answer, you don't keep going back to the same question.  That's

7  a caution to you.  I'm sorry to have to do it, but move

8  forward.

9           **MR. ERNST:**  I'm moving forward.

10 **BY MR. ERNST:**

11 **Q.**  And you testified previously that Jennings was kicking

12 when he was on the bench, correct?

13 **A.**  I guess if that's in my testimony, then yes.

14 **Q.**  Okay.  Can you show us -- we're going to roll it, and you

15 show me where Jennings was kicking, okay?  You tell me when to

16 stop.  When was he kicking on the bench?

17 **A.**  I can't tell from that angle, but I know he was.  From my

18 recollection of the event, he was kicking.

19 **Q.**  Okay.  Well, can you show us where he was?

20 **A.**  Again, I can't tell.  My body is on top of his legs.  I

21 can't see them, but I know from my recollection that he was

22 kicking.

23 **Q.**  Well, if your body was on top, how could he kick you?

24 **A.**  He could still move his legs.

25 **Q.**  And you then indicate that you placed Mr. Jennings on the

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 68

1   concrete floor, correct?

2   **A.**   That's correct, we did.

3   **Q.**   And at this time Officer Kenamer -- Officer Kenamer is the

4   man who joined you in the, in dealing with Mr. Jennings,

5   correct?

6   **A.**   That's Officer Kenamer to my left in that video.

7   **Q.**   Okay.  And at this point Officer Kenamer has his knee on

8   the back of Jennings' head and neck, correct?

9   **A.**   I can't see that from here.

10  **Q.**   Right there.  Can you see the pointer?

11  **A.**   I can see the pointer, but I can't make out what that is

12  underneath his knee.

13  **Q.**   And at this point both you and Officer Kenamer are putting

14  weight on Mr. Jennings, correct?

15  **A.**   We were trying to control him, yes.

16  **Q.**   And Mr. Jennings began to scream that he couldn't breathe;

17  isn't that correct?

18  **A.**   I never heard him say that.

19  **Q.**   But he was screaming, right?  You heard him scream?

20  **A.**   Yeah, I heard him scream.

21  **Q.**   And when he was screaming you and Officer Kenamer were on

22  top of him, correct?

23  **A.**   That's correct.

24  **Q.**   And do you think what you were doing was causing him pain?

25  **A.**   I have no idea.  We were just trying to restrain him.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 69

1    We're not -- we gave -- let me rephrase that.  Let me change

2    that.

3    **Q.**   My question is do you think what you were doing was

4    causing him pain?

5    **A.**   We gave him common peroneal strikes --

6    **Q.**   No, no, no.

7            **THE COURT:**  Sir, yes, no, I can't answer that yes or

8    no, or I don't understand the question.

9            **THE WITNESS:**  Right there, no.

10   **BY MR. ERNST:**

11   **Q.**   And is it true that you were kneeing him when he was on

12   the floor?

13   **A.**   I did give him common peroneal strikes.

14   **Q.**   I asked you if you kneed him.  Did you knee him?

15   **A.**   I used my hands to give him common peroneal strikes.

16   **Q.**   So then the answer is no, you did not knee him?

17   **A.**   I did use my knees, yes.

18   **Q.**   Okay.  Thank you.  And you were also using -- you said you

19   were using common peroneal strikes.  You were using your elbow

20   or your forearm or your hand?

21   **A.**   I did use my hand on one.

22   **Q.**   Can you show us what you did?

23   **A.**   I just came down across the thigh with my hand.

24   **Q.**   With a fist?

25   **A.**   Yes.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 70

1  **Q.**   Okay.  And you also testified that Jennings was kicking

2  you and Deputy Kenamer while he was on the ground here,

3  correct?

4  **A.**   I would have to see my testimony on that.  I know he was

5  kicking.  Kicking us directly?  I don't know if that's exactly

6  what I stated in my testimony, but I know he was kicking.

7  **Q.**   Okay.  And when you say "kicking," you mean like flailing

8  your legs or do you mean like he was trying to strike you?

9  **A.**   He's kicking his legs.

10  **Q.**   All right.  Do you think he was trying to kick you is my

11  question.

12  **A.**   Sure.

13  **Q.**   Now, at this point Mr. Jennings, you would agree that he

14  doesn't pose a flight risk at this point, wouldn't you agree?

15  I don't think he could escape.

16  **A.**   We're trying to restrain him.  We're trying to restrain

17  him.  So I can't say that he's at an immediate risk right

18  there.

19  **Q.**   What's that?

20  **A.**   He's not at an immediate risk right there.

21  **Q.**   And you agree that Mr. Jennings in the position he's in

22  isn't a threat to you, is he?

23  **A.**   He's not in control yet so he's still a threat.

24  **Q.**   My question is, is he a threat to you in your mind?

25  **A.**   He's still a threat if he's not under control.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 71

1  **Q.**   You think you might get hurt by Mr. Jennings?

2  **A.**   He's not in control so --

3  **Q.**   That's not my question.

4         **THE COURT:**  Sir, how many times do I have to tell

5  you --

6         **THE WITNESS:**  I apologize.

7         **THE COURT:**  -- yes, no, I can't answer yes or no or I

8  don't understand the question.

9         **THE WITNESS:**  My apologies.

10     At that point he is not a direct threat to us.

11 **BY MR. ERNST:**

12 **Q.**   And you don't think you could get hurt by him at that

13 point, correct?

14 **A.**   My answer is I think he actually could with the way he was

15 kicking his legs, yes.

16 **Q.**   Okay.  And then --

17        **MR. ERNST:**  Roll it forward, please.

18     That's Officer -- stop, please.

19 **BY MR. ERNST:**

20 **Q.**   That's Officer Hartner, who now has ahold of Mr. Jennings'

21 leg or foot, I mean, right?

22 **A.**   I believe so.

23 **Q.**   And who is the officer that is bending forward --

24        **MR. ERNST:**  Right there.  Thank you.

25

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 72

1  **BY MR. ERNST:**

2  **Q.**   Who is that one?

3  **A.**   I would have to see them before they got in that position.

4           **MR. ERNST:**  Can you back it up a little bit.

5           **THE COURT:**  Point to the officer you are asking.

6           **THE WITNESS:**  I believe that to be Deputy White.

7  **BY MR. ERNST:**

8  **Q.**   All right.  So now one officer has Jennings' leg, and

9  incidentally, can you point to his hand, his right hand.  So

10 you are pressing down on Mr. Jennings' head at that point,

11 correct?

12 **A.**   I think that's his back, sir.

13 **Q.**   Well, do you see where his leg is on the one end, his foot

14 that --

15 **A.**   Again, I think that's his back.  I don't see his head.  I

16 can't see from this angle.

17 **Q.**   All right.

18 **A.**   Can you roll back?

19 **Q.**   Do you see it now?

20 **A.**   To me it looks like that's -- underneath my hand is his

21 pants and his shirt.

22          **MR. ERNST:**  Roll it forward.

23      All right.  So stop.

24 **BY MR. ERNST:**

25 **Q.**   All right.  So now there are four officers and one --

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 73

1   four officers in dark shirts, one officer in a lighter shirt,

2   correct?

3   **A.**   Yes.

4   **Q.**   And the officer in the lighter shirt has something in his

5   right hand; isn't that correct?

6   **A.**   Yeah, it looks like there's something in his hand.

7   **Q.**   And that's pepper spray, correct?

8   **A.**   I would assume so.  I can't see exactly.

9   **Q.**   All right.  And Mr. Jennings is on the ground and there's

10  three officers now over him, correct?

11  **A.**   Correct.

12  **Q.**   And can you point to the two other officers besides

13  yourself?  Can you identify them here in court today that are

14  involved?

15  **A.**   The two other officers that are behind Lieutenant Nuckolls

16  in the white shirt --

17  **Q.**   No, the officers over Mr. Jennings besides you.

18  **A.**   Oh, besides me is Dave Kenamer and Jason White.

19  **Q.**   Okay.  Can you tell me who they are, show me who they are

20  sitting there?

21  **A.**   Mr. Kenamer is sitting directly behind Attorney Reising.

22  **Q.**   He's on the far end of the bench?

23  **A.**   Yes.

24  **Q.**   Okay.

25  **A.**   And then Jason White is sitting directly behind

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 74

1  Chris Scott, the other attorney, in the yellow shirt, green

2  tie.

3  **Q.**   And the shaved head?

4  **A.**   Yes, sir.

5  **Q.**   So you three are over Mr. Jennings at that point, correct?

6  **A.**   That's correct.

7  **Q.**   Now, Lieutenant Nuckolls, he's the one in the white shirt,

8  correct?

9  **A.**   That's correct.

10  **Q.**   And he's the one sitting next to Mr. Scott, correct?

11  **A.**   Yes.

12      **MR. ERNST:**   So now he has some pepper spray, and can

13  you roll it.

14  **BY MR. ERNST:**

15  **Q.**   And he walked over and he sprayed Mr. Jennings directly in

16  the face, correct?

17  **A.**   Yes, he did.

18  **Q.**   And that's where Mr. Jennings' face was, right?   That

19  wasn't his back.   That was his face there, correct?

20  **A.**   He sprayed him in the face, yes.

21      **MR. ERNST:**   So -- all right.   Can you just roll it to

22  see.

23  **BY MR. ERNST:**

24  **Q.**   And Mr. Jennings was screaming this whole time, wasn't he?

25  **A.**   Yes.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 75

1  **Q.**   And during this incident that's when you used the -- you

2  punched him with your fist, right?

3  **A.**   You saw my hand come up.

4  **Q.**   I'm sorry, you said?

5  **A.**   You saw my hand come up.  Yes, I did strike him.

6  **Q.**   That was the strike you were referring to?

7  **A.**   Yes.

8  **Q.**   And you also have indicated that you used some brachial

9  stuns, correct?

10  **A.**   Brachial stuns were at the beginning.

11  **Q.**   Okay.  And what's a brachial stun?

12  **A.**   A brachial stun is accessed right here on the top of the

13  shoulder to create a nerve disorientation.

14  **Q.**   And you did that when you were on the bench or when you

15  first got on the floor?

16  **A.**   I attempted to do it when we were first on the bench.

17  **Q.**   Okay.  So at this point you have Mr. Jennings handcuffed,

18  correct?

19  **A.**   It appears to be, yes.

20  **Q.**   All right.  And who is the officer that has his head

21  pushing Mr. Jennings' face into the floor?

22  **A.**   I would say that's Jason White holding his head down.

23  **Q.**   Why do you have to hold his head, push his face into the

24  floor or hold his head down when he's handcuffed?

25  **A.**   I don't believe he's pressing his head down, like you say.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 76

1    He's controlling his head.

2    **Q.**    Why do you have to control his head when he's handcuffed?

3    **A.**    Well, he's been sprayed and so normally he does want to

4    spit.  So he's controlling the head so there's no projectile

5    spitting.

6    **Q.**    Did you see the posture of that officer?  I believe you

7    said it was White?

8    **A.**    I believe that's Deputy White.

9    **Q.**    Do you see Deputy White, the posture of his body?

10   **A.**    I do.

11   **Q.**    And he's leaning on his head, isn't he?

12   **A.**    I don't believe so, no.

13   **Q.**    Can you identify who Deputy White is?

14   **A.**    I already have.

15   **Q.**    Which one?  The one in the green?

16   **A.**    Yes.

17   **Q.**    Okay.  So do you think that that, pressing Mr. Jennings'

18   face into the floor like that, would cause pain?

19   **A.**    Again, I don't think he's pressing his face against the

20   floor, so no.

21   **Q.**    Do you think holding his face against the floor like that

22   would cause pain?

23   **A.**    If he's holding his head still, then no, I don't believe

24   so.

25   **Q.**    And Mr. Jennings continued to scream during this time,

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 77

1   correct?

2   **A.**   That's correct.

3   **Q.**   Now, you see, you see an officer pull Mr. Jennings up by

4   the handcuffs, correct?

5   **A.**   You would have to replay that.

6          **THE COURT:**   How much longer are you going to be with

7   this witness?

8          **MR. ERNST:**   A while.

9          **THE COURT:**   Well, then we'll take a short recess. Ten

10   minutes.

11         (Jury out at 11:07 a.m.)

12         **THE COURT:**   How much longer, Mr. Ernst, are you going

13   to be with this witness?

14         **MR. ERNST:**   At least an hour, I would guess.

15         **THE COURT:**   I'm going to give you an hour.

16         **MR. ERNST:**   I've got to finish him.

17         **THE COURT:**   I understand, but you keep repeating your

18   questions and you press him for answers because you are

19   dissatisfied with the prior answer, and that's not proper

20   cross-examination and it is not advancing your case.

21         **MR. ERNST:**   I'm exploring, Your Honor.

22         **THE COURT:**   No, you are not exploring.  You are

23   supposed to ask questions, but if you get an unsatisfactory

24   answer, you have got to go to the next question.

25         **MR. ERNST:**   I'm asking for more information about the

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 78

1   answer.

2          **THE COURT:**  Okay?

3          **MR. ERNST:**  I've got you.

4          **THE COURT:**  Ten minutes.

5       (Recess from 11:08 a.m. to 11:20 a.m.)

6          **THE COURT:**  The witness will take the stand again,

7   please.

8       (Jury in at 11:20 a.m.)

9          **THE COURT:**  Just take your seats, folks.  Everyone

10  will be seated.

11      Go ahead.

12  **BY MR. ERNST:**

13  **Q.**   I think we left off asking about the grabbing the

14  handcuffs; do you remember that?

15  **A.**   Yes.

16  **Q.**   Okay.  Is that how you are trained to lift a prisoner up

17  off the ground is to grab him by the handcuffs?

18  **A.**   No.

19          **THE COURT:**  Why don't you ask the witness to identify

20  the officers that can be seen in this scene again.

21  **BY MR. ERNST:**

22  **Q.**   Okay.  Can you identify the officers --

23          **THE COURT:**  No, start to the left.

24  **BY MR. ERNST:**

25  **Q.**   Can you identify that officer?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 79

1  **A.**   That's Lieutenant Nuckolls.

2  **Q.**   That's the man who administered the pepper spray?

3  **A.**   That's correct.

4  **Q.**   And are you trained with --

5         **THE COURT:**  I asked you to identify each of the

6  officers in the scene.

7         **MR. ERNST:**  Okay.

8  **BY MR. ERNST:**

9  **Q.**   Next?

10         **THE COURT:**  Put your laser on the second officer in

11  sequence.

12         **MR. ERNST:**  It is.

13         **THE WITNESS:**  That's Dave Kenamer, Officer Kenamer,

14  I'm sorry, Deputy Kenamer.

15      I believe that's Officer Hartner.

16  **BY MR. ERNST:**

17  **Q.**   The Flint Township police officer?

18  **A.**   Yes.  I believe that to be Sergeant Guest.

19  **Q.**   Okay.

20  **A.**   That's myself.  I believe that to be Deputy Wing and

21  Deputy White.

22  **Q.**   Okay.  And who has got ahold of the handcuffs?

23  **A.**   I don't see anybody holding the handcuffs.

24  **Q.**   Well, do you see that hand down there?  Whose hand is

25  that?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 80

1   **A.**   That's Deputy Wing's hand on the forearm.

2   **Q.**   All right.  Is that how you are trained to lift a prisoner

3   off the ground is to grab them back by the handcuffs there?  Is

4   that how you are trained?

5   **A.**   We are not trained to lift by the handcuffs.

6   **Q.**   Okay.  And in fact you are trained that you are supposed

7   to have one -- two people with one arm under each armpit,

8   correct?

9   **A.**   You control the subject -- well, you could have one hand

10   underneath the arm and one hand on the arm as long as --

11   **Q.**   And with regard to the use of the pepper spray, aren't you

12   trained that you are not supposed to shoot pepper spray in

13   somebody's face from point-blank range?

14   **A.**   I was not trained in pepper spray at that time.

15   **Q.**   But you've been trained since, correct?

16   **A.**   That's correct.

17   **Q.**   So I'm asking you based on your training now, isn't that

18   true?

19   **A.**   No, it's not true.

20   **Q.**   So you were trained that it's okay to shoot someone with

21   pepper spray from point-blank range?

22   **A.**   Yes.

23   **Q.**   Where did you get that training?

24   **A.**   Through the Genesee County Sheriff's Office.

25   **Q.**   And when did you get that training?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 81

 1 **A.**   I think we were recently recerted in the last six months.

 2 **Q.**   And who provided that training to you?

 3 **A.**   Scott Minaudo.

 4 **Q.**   Who?

 5 **A.**   Deputy Minaudo.

 6 **Q.**   Can you spell that for me?

 7 **A.**   I believe M-i-n-a-u-d-o.

 8 **Q.**   You would agree that getting pepper-sprayed in the face

 9 causes difficulty breathing, correct?

10 **A.**   Yes.

11 **Q.**   And you would agree that your own policies provide that

12 under no circumstances will any person sprayed with OC spray be

13 allowed to lie facedown after restraints are in place, correct?

14 **A.**   That is what our policy states.

15 **Q.**   And that's because doing that poses a danger of

16 asphyxiation, correct?

17 **A.**   In my opinion --

18 **Q.**   I'm asking you what you are trained.

19 **A.**   In my training?  That's what they train us.  That's what

20 they train us.

21 **Q.**   Now, can you identify who the two officers are who are

22 holding Mr. Jennings at this point starting with the one?

23 **A.**   That's Officer White.  That's Officer Wing.

24 **Q.**   And you are also trained that after you pepper-spray

25 somebody you are supposed to allow them to catch their breath,

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 82

1    correct?

2    **A.**    Correct.

3    **Q.**    And is it your testimony that you allowed Mr. Jennings to

4    catch his breath?

5    **A.**    Right now, yeah.

6         Yes, I believe, if he's standing up he's allowed to

7    breathe.  Nothing is constricting his airway.

8              **MR. ERNST:**  Can you just back it up slightly and then

9    roll it.

10        Okay.  All right.  Go forward.

11   **BY MR. ERNST:**

12   **Q.**    So as soon as he -- that's his opportunity to catch his

13   breath right there?

14   **A.**    Nothing is pressing against his chest, so yeah.

15   **Q.**    Okay.  All right.  So that split second was his chance,

16   right?

17   **A.**    Again, yes, that was my -- I would say.

18   **Q.**    Okay.  And would you agree that those deputies just threw

19   him into the wall?

20   **A.**    I would not.

21   **Q.**    Your testimony is Jennings tripped?

22   **A.**    No, my testimony is Jennings did that to himself.

23   **Q.**    He hurled himself into the wall?

24   **A.**    Yes, he did.

25   **Q.**    All right.  Do you see those two officers holding him?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 83

1   **A.**   Yes, I do.

2   **Q.**   And those officers are the ones who -- can you point to

3   them again?

4   **A.**   Deputy White is with the green suit with the yellow tie.

5   **Q.**   How big is Deputy White?  Just give me your estimate of

6   his height and weight.

7   **A.**   Probably 6'3", maybe 230.

8   **Q.**   And the other deputy?

9   **A.**   Deputy Wing, 6 feet, maybe 240.

10  **Q.**   So they couldn't hold Jennings back from hurling himself

11  into the wall even though they had ahold of him?

12  **A.**   I'm saying that Jennings did that.  He jumped into the

13  wall.

14  **Q.**   That's not my question.  My question is they couldn't hold

15  him back?

16  **A.**   If they were caught off guard, then no.

17          **MR. ERNST:**  All right.  Will you back it up and then

18  play it forward a little bit.

19  **BY MR. ERNST:**

20  **Q.**   Do you see Deputy White's body positioning?  Isn't he

21  leaning forward towards the wall?

22  **A.**   Where?

23  **Q.**   Right there when he's -- right there.

24  **A.**   Okay.  I think he's trying to pull him back.

25  **Q.**   Okay.  Now, at this point you grab Jennings by the face,

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 84

1    correct?

2    **A.**   I put my hand underneath his chin, correct.

3    **Q.**   Is that how you are trained to transport somebody from
4    one room to the next?

5    **A.**   I did that to protect him, so under my training, yes.

6    **Q.**   So your testimony is that you grabbed Mr. Jennings under
7    the chin there to protect him?

8    **A.**   That's correct.

9    **Q.**   Protect him from what?

10   **A.**   I just saw him hurl himself into the window.  I saw the
11   metal frame.  I did not want him to hit his head against that
12   metal frame.

13   **Q.**   So that's how you were protecting Mr. Jennings?

14   **A.**   We were in the process of falling at that point.

15        **MR. ERNST:**  All right.  Play it.

16   **BY MR. ERNST:**

17   **Q.**   You previously testified that you didn't do anything that
18   could have caused Mr. Jennings any injury, correct?

19   **A.**   We'll say yes.

20   **Q.**   All right.  Wouldn't you agree that that scene we just
21   showed could have caused Mr. Jennings an injury?

22   **A.**   I don't know.

23   **Q.**   And, sir, you also in this photo, you used Mr. Jennings'
24   head to push yourself up; isn't that correct?

25   **A.**   That's not correct.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 85

1   **Q.**   Well, you had your --

2          **MR. ERNST:**  Will you roll this.

3   **BY MR. ERNST:**

4   **Q.**   Right there.

5   **A.**   My weight is on my right hand on the table.

6   **Q.**   The table is high, right?

7   **A.**   And I'm using the table to lift up.  My left hand is

8   controlling his head on the floor.

9   **Q.**   Your left hand is controlling his head?

10  **A.**   Yes.

11  **Q.**   Mr. Jennings' head got a lot of control that night, didn't

12  it, sir?

13  **A.**   Well, he had been pepper-sprayed.

14         **THE COURT:**  That's argumentative.

15  **BY MR. ERNST:**

16  **Q.**   Sir, do you have the exhibit book in front of you?

17  **A.**   Yes, I do.

18         **MR. ERNST:**  Sorry, Judge.  The technology is a little

19  challenging.

20  **BY MR. ERNST:**

21  **Q.**   Sir, I want to turn your attention to Exhibit 1.

22         **THE COURT:**  What exhibit?

23         **MR. ERNST:**  Exhibit 1.

24         **MR. REISING:**  I'm sorry, what?

25         **MR. ERNST:**  Exhibit 1.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 86

1      **THE COURT:**  Plaintiff's Exhibit 1.

2      **MR. ERNST:**  Plaintiff's Exhibit, thank you.

3      **THE COURT:**  That's a photograph?

4      **MR. ERNST:**  Yes, Your Honor.  It's a series of them.

5      **THE COURT:**  Is that one photograph or a series of

6  photographs?

7      **MR. ERNST:**  It's a series in Exhibit 1.

8  **BY MR. ERNST:**

9  **Q.**  Do you see this first exhibit, sir?

10  **A.**  Yes.

11  **Q.**  Don't you think that throwing Mr. Jennings' head down like

12  that could possibly --

13      **THE COURT:**  Excuse me, sir.  Starting a question with

14  "don't you think" is not a proper question.  Does that?  It's

15  not what he thinks.  It's what he sees.

16      **MR. ERNST:**  Okay.

17  **BY MR. ERNST:**

18  **Q.**  Well, do you see --

19      **THE COURT:**  Properly phrase it.

20  **BY MR. ERNST:**

21  **Q.**  Do you see the injuries that are depicted in Exhibit 1?

22  **A.**  I do.

23  **Q.**  Do you think that the action that was just demonstrated on

24  the screen could have caused those injuries?

25  **A.**  I don't know.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 87

1              **MR. REISING:**  I would object, Your Honor.  This

2    witness is not allowed to make that statement one way or the

3    other.  It's not a medical witness.

4              **THE COURT:**  The objection is sustained.

5              **MR. ERNST:**  Your Honor, it's common sense.

6              **THE COURT:**  The jury will disregard that statement.

7    **BY MR. ERNST:**

8    **Q.**   Sir, after you -- that room area, do you have a specific

9    name for that where Mr. Jennings was taken down?

10   **A.**   The sallyport.

11             **MR. REISING:**  I would object to "taken down,"

12   Your Honor.

13             **MR. ERNST:**  The sallyport.  He already answered it.

14             **THE COURT:**  Is there a -- does the place in the jail

15   where these activities occurred have a name?

16             **THE WITNESS:**  Where we fell down at, sir, is called

17   the sallyport.

18             **THE COURT:**  Sally, S-a-l-l-e-y?

19             **THE WITNESS:**  S-a-l-l-y-p-o-r-t.

20             **THE COURT:**  Okay.  In the middle ages the sallyport

21   was the first room behind the gate to the castle.  Okay.  Then

22   from the sallyport you could get into the castle.  So they

23   would lower the door to the sallyport before they opened the

24   door to the castle.  Then when they opened the door to the

25   castle, you would enter the sallyport, and then that door would

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 88

1   be closed so they would be sure that only the people who

2   belonged in the castle were in the castle.

3       So it's now used today as the portion of a police station

4   or a jail, et cetera, that sort of divides the jail proper from

5   the outside.  So one door goes up, one door goes down.  This

6   door goes up, this door goes down.  That's the sallyport.

7       Go ahead.

8           **MR. ERNST:**  Thank you.

9       V(Video started and continued while the following

10      proceedings occurred.)

11  **BY MR. ERNST:**

12  **Q.**   From the sallyport Mr. Jennings was taken into cell 6,

13  correct?

14  **A.**   Yes.

15          **THE COURT:**  What cell was that?

16          **THE WITNESS:**  Safety cell 6, sir.  It would be cell

17  6.

18          **THE COURT:**  Okay.

19  **BY MR. ERNST:**

20  **Q.**   Now, you testified previously, sir, that Jennings

21  continued to resist while in safety cell 6, correct?

22  **A.**   That's correct.

23  **Q.**   Okay.  Will you show me where Jennings is resisting, sir?

24          **MR. ERNST:**  Stop it right there.

25          **MR. REISING:**  I'm sorry, I didn't hear the question.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 89

1   **BY MR. ERNST:**

2   **Q.**   Could you tell me where Jennings is resisting?

3   **A.**   No, I can't.  I can't see Jennings.

4   **Q.**   Okay.  Do you see his feet there?

5   **A.**   Yes.

6   **Q.**   Do you see his head there?

7   **A.**   Yes.

8   **Q.**   Okay.  What's he doing to resist?

9   **A.**   His head and feet show no resistance.  That doesn't mean

10   there's anything else that's resistant.

11   **Q.**   It doesn't mean what?

12   **A.**   He could be moving his arms and resisting away even though

13   they are handcuffed.

14   **Q.**   He's handcuffed, isn't he?

15   **A.**   But he still could be turning his body, he could still be

16   turning his arms.  He wasn't resist -- can I explain?

17   **Q.**   No.  I'll ask you a question.  In fact, what you testified

18   previously was that Mr. Jennings, that Mr. Jennings had the

19   handcuffs removed in safety cell 6 and that he was resisting

20   and then you had to put him in a restraint chair; isn't that

21   correct?

22   **A.**   If that's my previous testimony, that's what I testified

23   to.

24        **MR. ERNST:**  Can you roll it?

25

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 90

1   **BY MR. ERNST:**

2   **Q.**   Why don't you tell me to stop it when the handcuffs are

3   taken off Jennings.

4          **THE COURT:**   Stop it for a moment.  I think the

5   persons in the cell should be identified.

6   **BY MR. ERNST:**

7   **Q.**   Okay.  That's you, correct?

8   **A.**   That's correct.

9   **Q.**   Who is that?

10  **A.**   I believe that's White.  I'm not sure.

11  **Q.**   That?

12  **A.**   I think that's Wing.

13  **Q.**   And that's obviously Lieutenant Nuckolls, correct?

14  **A.**   That's correct.

15  **Q.**   And right now the only one in contact with Mr. Jennings is

16  you, right?

17  **A.**   That's correct.

18  **Q.**   All right.  And you can still see Mr. Jennings' body there

19  and his head there, right?

20  **A.**   That's correct.

21  **Q.**   And when is --

22          **MR. ERNST:**   Okay.  Go ahead and roll it.

23  **BY MR. ERNST:**

24  **Q.**   Tell me when his handcuffs come off.

25          **MR. ERNST:**   Stop it, please.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 91

1  **BY MR. ERNST:**

2  **Q.**   Now, at this point this officer is putting on gloves,

3  correct?

4  **A.**   Yeah.

5  **Q.**   There is -- okay.  You are still the only one in contact

6  with Mr. Jennings, right?

7  **A.**   It appears so.

8  **Q.**   And you have your hand around his -- close to his head or

9  his neck, correct?

10  **A.**   I would say close to his face, yes.

11  **Q.**   All right.

12         **MR. ERNST:**  Stop it.

13  **BY MR. ERNST:**

14  **Q.**   And Mr. Jennings is still handcuffed right there, isn't

15  he?

16  **A.**   Yes.

17  **Q.**   So that was not true when you testified to that, was it,

18  sir?

19  **A.**   I disagree.  When we --

20         **THE COURT:**  No, your answer is no.

21         **THE WITNESS:**  Okay.  I disagree.

22  **BY MR. ERNST:**

23  **Q.**   Okay.  We can continue to roll it, and you show me where

24  the handcuffs came off.

25  **A.**   I can't see that.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 92

1   **Q.**   You can't see the video?

2   **A.**   I can't see where his handcuffs came off, but I disagree.

3   **Q.**   Your testimony is they came off?

4   **A.**   My recollection is they came off.

5   **Q.**   And that they were reapplied before Mr. Jennings was taken

6   out the door?

7   **A.**   That's correct.

8   **Q.**   Okay.  And this happened, but somehow it didn't get

9   captured on the video?

10  **A.**   It did not.

11  **Q.**   And tell me how Jennings resisted in any way that's

12  depicted in that video?

13  **A.**   If the handcuffs didn't come off, he wasn't compliant.

14  **Q.**   But you said you took the handcuffs off.

15  **A.**   And they had to be reapplied.

16  **Q.**   But what did he do that was --

17          **THE COURT:**  You are arguing with the witness, sir.

18  You ask questions.  You don't argue.

19          **MR. ERNST:**  I'm sorry.  "What did he do" was the

20  beginning of my question.

21  **BY MR. ERNST:**

22  **Q.**   What did he do that constituted resistance?

23  **A.**   I can't see that.

24  **Q.**   Why didn't you just, when Mr. Jennings was laying there on

25  the bench, why didn't you just walk out and close the door?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 93

1   **A.**   Because that wasn't what we were -- the order that was

2   given.

3   **Q.**   Who gave an order then?

4   **A.**   I believe it was Sergeant Guest, but it could have been

5   Lieutenant Nuckolls that gave the order to put him in a

6   restraint chair.

7   **Q.**   So it was your judgment that you should have just walked

8   out and closed the door, but you didn't because you got an

9   order?

10  **A.**   No, that's not my judgment.

11  **Q.**   So you agreed with that, it was time for a restraint

12  chair?

13  **A.**   I agree.

14  **Q.**   Why didn't, in your opinion why didn't you just walk out

15  and close the door if you didn't have an order?

16  **A.**   Because he still wasn't compliant.  He still wasn't under

17  control.

18  **Q.**   Okay.

19          **THE COURT:**   Just so the record is complete, what

20  you're examining the witness on is displayed in this video disk

21  4?

22          **MR. ERNST:**   That's correct, Your Honor.  The

23  one dealing with --

24          **THE COURT:**   What?

25          **MR. ERNST:**   That's correct.  The one that deals with

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 94

1   safety cell 6.

2          **MR. ELLIOTT:**  It's actually disk 5, Your Honor.

3          **THE COURT:**  Go ahead.

4   **BY MR. ERNST:**

5   **Q.**   All right.  And, sir, the man that -- the man in the white

6   shirt, sir, that's Lieutenant Nuckolls, correct?

7   **A.**   That's correct.

8   **Q.**   And he's got a taser in his hand at this point, right?

9   **A.**   Yes, I see it now.

10  **Q.**   Okay.

11         (Video concluded.)

12         **THE COURT:**  What disk is this?

13         **MR. ELLIOTT:**  Your Honor, this is disk 2, the hall

14  front view.

15         **THE COURT:**  This is after he was in cell 6?

16         **MR. ERNST:**  No, that showed him going in there and

17  now it will show him coming out.

18         **THE COURT:**  I see.  So this video precedes the action

19  in cell 6?

20         **MR. ERNST:**  It precedes and is subsequent to.  It

21  shows the hallway so it shows him going in and coming out.

22         **THE COURT:**  Okay.

23      (Video started and continued while the following

24      proceedings occurred.)

25

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 95

1  **BY MR. ERNST:**

2  **Q.**   All right, sir.  You saw a restraint chair wheeled up to

3  the area of safety cell 6, out front of it, correct?

4  **A.**   Yes.

5  **Q.**   And can you identify the officers that are depicted in

6  this current photo starting with this female, if you could?

7  **A.**   I think that's Nurse Stephanie.

8  **Q.**   Okay.

9  **A.**   Sergeant Guest.  I don't know who that is.  That's myself.

10  Lieutenant Nuckolls.  That's Dave Camman [sp].

11  **Q.**   And who is Mr. Camman?

12  **A.**   He's a former deputy.

13  **Q.**   And so Mr. Jennings is -- at that time he's in the

14  restraint chair, correct?

15  **A.**   We are attempting to put him in there, yes.

16  **Q.**   I mean he's sitting in it, the restraints aren't fastened?

17  **A.**   I wouldn't say he's sitting in it.

18  **Q.**   Well, you see his legs sticking out there?

19  **A.**   Yes.

20  **Q.**   So something is supporting his weight, right?

21  **A.**   Yes.

22  **Q.**   And that's the chair, right?

23  **A.**   Yes.

24  **Q.**   And Mr. Jennings is still handcuffed at this point,

25  correct?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 96

1  **A.**    That's correct.

2  **Q.**    And at this time you put your hand over Mr. Jennings'

3  mouth, correct?

4  **A.**    That's correct.

5  **Q.**    And you knew that he had been pepper-sprayed in the face,

6  correct?

7  **A.**    I knew that, yes.

8  **Q.**    And you knew that his face had been smashed into a wall,

9  either he did it himself or somebody else did it, right?

10  **A.**    Into a wall, no.

11  **Q.**    Well, into a window, is that what you call it, when you

12  are coming out of the report-writing room?

13  **A.**    I saw him hit the window.  I didn't see his face directly

14  hit it at the time.

15  **Q.**    And then you saw his face hit the ground in the sallyport,

16  correct?

17  **A.**    Yes.

18  **Q.**    And did Mr. Jennings' face get smashed anywhere after

19  that?

20  **A.**    I don't recall.

21  **Q.**    So, assuming that it didn't, any facial injury or trauma

22  he would have had would have occurred before that, correct?

23  **A.**    I don't know.

24  **Q.**    And so don't you think putting your hand over his mouth

25  would make it more difficult for him to breathe?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 97

1  **A.**   Not the way I was covering it, no.

2  **Q.**   Well, why don't you demonstrate --

3  **A.**   I had my hand cupped.  It wasn't covering his mouth.  It

4  was cupped like that.

5  **Q.**   Okay.  But that would make it more difficult to breathe,

6  wouldn't it?

7  **A.**   I disagree.

8  **Q.**   And the reason that you put your hand over Jennings' mouth

9  was what?

10  **A.**   He was spitting.

11  **Q.**   Was that the first time he started spitting?

12  **A.**   No, he was spitting after he had been pepper-sprayed.

13  **Q.**   And that's because pepper spray causes people to spit if

14  they get hit in the nose and mouth area, right?

15  **A.**   It causes you to have saliva, yes.

16  **Q.**   And why didn't you put your hand over his mouth before

17  then?

18  **A.**   I put my hand over his mouth when we were coming through

19  the sallyport door.

20  **Q.**   You put your hand under his chin, didn't you?

21  **A.**   Underneath his chin, yes.

22  **Q.**   That wasn't to stop him from spitting, was it?

23  **A.**   No, I explained why I did that.

24  **Q.**   Okay.  My question was, if he was spitting, why didn't you

25  put your hand over his mouth before then?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 98

1   **A.**   I didn't think about it.  I didn't have time.

2   **Q.**   Were you trying to torture Mr. Jennings, sir?

3   **A.**   Not at all, sir.

4   **Q.**   Did he ever spit on you?

5   **A.**   He spit in the direction of me.

6   **Q.**   When?

7   **A.**   During this altercation right here.

8   **Q.**   Sir, can you tell me why at your -- during your deposition

9   you denied that you ever put your hand over Mr. Jennings'

10  mouth?

11       Do you want to look at Page 192?

12  **A.**   Sure.

13  **Q.**   One second, sir.

14       And you were asked:  "That's because you put your hand

15  over his mouth; isn't that true?"

16           **THE COURT:**   You are reading from what?

17           **MR. ERNST:**   I'm sorry, his deposition, August 13,

18  2014 deposition --

19           **THE COURT:**   Slower.

20           **MR. ERNST:**   -- Page 192.

21           **THE COURT:**   Ms. Ward has to take all of that down.

22           **MR. ERNST:**   Sorry.

23       Sorry, Sheri.

24           **THE COURT:**   I'm her protector.

25

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 99

1  **BY MR. ERNST:**

2  **Q.**   "And that's because you put your hand over his mouth;

3  isn't that true?

4        "No, it's not true."

5        Isn't that right, sir?

6  **A.**   That is what I said.

7  **Q.**   Okay.  And you indicated that Mr. Jennings bit your hand,

8  too, correct?

9  **A.**   Yes, he did.

10  **Q.**   And he bit your hand when you had it over his mouth,

11  correct?

12  **A.**   That's correct.

13  **Q.**   And when you had your hand over his mouth, other deputies

14  were pressing down on him, correct, trying to hold him in that

15  chair?

16  **A.**   They were trying to restrain him in that chair.

17  **Q.**   And so other people pressing down on you, like on the

18  front of you or on the back of you would make it more difficult

19  for you to breathe, don't you think?

20  **A.**   I don't know.

21  **Q.**   And you see Mr. Jennings' leg sticking out there, correct?

22  **A.**   Yes.

23  **Q.**   No deputy is about to get kicked, right; they are all off

24  to the side of it, right?

25  **A.**   I don't see anybody in the direct path of the leg, no.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller – Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 100

1  **Q.**   And you're not claiming Mr. Jennings was trying to kick

2  anybody there, are you?

3  **A.**   Are you asking me if I'm claiming right now?

4  **Q.**   I'm asking if you're, yeah, if you were claiming he's

5  going to kick anybody.

6  **A.**   I can't say that he is.

7  **Q.**   Okay.  So don't you think it would be a normal reaction to

8  try to bite a hand if somebody is holding it over your mouth

9  and you are having difficulty breathing?

10  **A.**   No, I don't believe so.

11  **Q.**   Did Mr. Jennings ever spit on you that night?

12  **A.**   I answered that question already.  I said he spit directly

13  towards me.

14  **Q.**   No, I mean --

15  **A.**   Did he spit directly on me?  No.

16  **Q.**   As far as you know, did he spit on any other deputies?

17  **A.**   I don't know.

18      **MR. ERNST:**   Freeze it.

19  **BY MR. ERNST:**

20  **Q.**   By the way, is part of the resisting that Mr. Jennings was

21  doing, was that spitting?  Did you include that as part of the

22  resisting?

23  **A.**   I guess you could, yeah.

24  **Q.**   Okay.  When you were in the, in the sallyport and you fell

25  on top of Mr. Jennings, you thought that was Mr. Jennings

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 101

1    resisting, too, didn't you?

2    **A.**    No, I thought that was an accident.

3    **Q.**    Just one second, sir.

4        Could you turn to Page 67 of your deposition.

5    **A.**    Yes, sir.

6    **Q.**    Okay.  If you start on Line 10, and you're talking about

7    the incident, I should say, in the sallyport.  "It looks like

8    my hand --

9        "Q.  Did you see your hand on his right cheekbone as he

10   landed on the ground?

11       "A.  It looks like my hand is above his head.  I can't

12   tell you if my hand is directly on his face or not.

13       "Q.  Did his head make a sound like a coconut falling on

14   the ground when it hit the ground?

15       "A.  No, sir.

16       "Q.  Were you hurt when you fell?

17       "A.  No.

18       "Q.  And you considered this to be resisting?

19       "A.  Yeah, if he's trying to pull away and causes us to

20   fall on the ground, absolutely."

21       Did you remember that testimony, sir?

22   **A.**    Yes, my testimony was that he was trying to pull away.

23   **Q.**    Right, but now you admit that it was an accident so it

24   wouldn't be resisting then, right?

25   **A.**    If the trip was an accident, but if he's pulling away,

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

1   he's still resisting.  There's two separate answers to that

2   question.

3             **MR. ERNST:**  All right.  Roll it.

4        All right.  Stop it.

5             **THE COURT:**  Is there a pending question?

6             **MR. ERNST:**  No, Your Honor.  I'm trying to locate a

7   place on the DVD, but the remote is acting squirrely.

8   **BY MR. ERNST:**

9   **Q.**   So Mr. Jennings was then taken to the ground after he

10  was -- after you tried to put him in the restraint chair,

11  correct?

12  **A.**   He was placed on the ground, yes.

13            **THE COURT:**  Ask your next question, please.

14  **BY MR. ERNST:**

15  **Q.**   All right.  And, sir, when you had Mr. Jennings on the

16  ground in this hallway, did you place your knee on his head?

17  **A.**   I don't see my knee on his head, no.

18  **Q.**   Do you see any other officers' knees on his head?

19  **A.**   Not that I can tell.

20  **Q.**   And at this time how many officers are in the area, are in

21  this -- are dealing with Mr. Jennings?

22  **A.**   Three, four maybe.  I can't really tell.

23  **Q.**   All right, sir.  I want to show you your knee and

24  Mr. Jennings' head.  Are you claiming that you didn't put your

25  knee on his head?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 103

1  **A.**   I can't tell if that's me or not.

2  **Q.**   Okay.  You can't tell if that's you?

3  **A.**   No, I can't see if that's my head or not.

4  **Q.**   But you would agree that one officer certainly has his

5  knee on his head, correct?

6  **A.**   It looks like, if it would be on his head, it would be

7  covering his head.  It looks like it's on the back of his

8  shoulder.

9       I'm entering there so I don't believe that could be me.

10  **Q.**   Okay.  Now, Jennings is still handcuffed when he's on the

11  ground, correct?

12  **A.**   I'll say yes.

13  **Q.**   Okay.  And this is Nuckolls, Lieutenant Nuckolls

14  implementing a taser drive stun to Mr. Jennings while he's

15  laying on the ground handcuffed, correct?

16  **A.**   I don't know if that's the moment he dry-stunned him, but

17  I know that he did.

18  **Q.**   And you know when he did he was laying on the ground and

19  he was handcuffed, right?

20  **A.**   Correct.

21  **Q.**   And at this point why don't you just drag Mr. Jennings

22  into that safety cell and close the door?

23  **A.**   That wasn't the order given.

24  **Q.**   And who gave an order?

25  **A.**   I believe the next order was to put him in a restraint

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 104

1    bed.  I believe that to be by Lieutenant Nuckolls.

2            **MR. ERNST:**  All right.  Okay.  You can roll it.

3    **BY MR. ERNST:**

4    **Q.**   Was Mr. Jennings resisting at this point?

5    **A.**   Yes, sir.

6    **Q.**   How?

7    **A.**   Sir, if he wasn't resisting, he would be calm and --

8    **Q.**   I didn't ask you if he was.  How was he resisting?

9    **A.**   He's not complying with the orders.

10   **Q.**   What were the orders, to go walk into the restraint bed by

11   himself?

12   **A.**   No, sir.

13   **Q.**   What were the orders that he was not complying with?

14   **A.**   If he's not, if he's not, if he's not calmed down, if his

15   legs are not still --

16   **Q.**   No, sir.  That's not my question.  What were the orders

17   that he didn't comply with at that point?

18   **A.**   I don't know what the orders would be.

19   **Q.**   All right.  Now, you would agree you just helped walk

20   Mr. Jennings over to that restraint bed and placed him

21   facedown?

22   **A.**   That's correct.

23   **Q.**   Again, sir, your own policy says under no circumstances

24   will any person sprayed with OC spray be allowed to lie

25   facedown after restraints are in place, correct?

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 105

1   **A.**   That's correct.

2   **Q.**   And that's from General Order 2, Page 7 of 16, Paragraph

3   B4.

4         And then you proceeded to restrain Mr. Jennings in that

5   bed facedown, didn't you?

6   **A.**   Yes, sir.

7   **Q.**   In fact, several officers kneeled on top of him at various

8   points while those restraints were being implemented, correct?

9   **A.**   That is correct.

10  **Q.**   Were you trying to torture Mr. Jennings then?

11  **A.**   No, sir.

12  **Q.**   Why would you disregard your own policy and place a man

13  who has been pepper-sprayed facedown?

14         **MR. REISING:**   Objection, Your Honor.  He wasn't the

15  individual who made the decision to do that.

16         **THE COURT:**   Excuse me.  You object to the question as

17  asked.  I sustain the objection.

18  **BY MR. ERNST:**

19  **Q.**   Why did you participate in placing a man on a restraint

20  bed facedown when it was against your own policy?

21  **A.**   Because I was, I was part of the whole situation, and the

22  order was to put him in a restraint bed.  I followed orders.

23  **Q.**   Well, isn't one of your written policies an order also?

24  **A.**   Also our orders are to follow command.

25  **Q.**   Okay.  And in fact Paragraph 5 of the same order, of the

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 106

1  same general order says, "Abuses of this policy will subject

2  the employee to discipline and/or criminal law violations

3  depending on the circumstances."

4        You are aware of that policy, too; correct, sir?

5  **A.**   Correct, sir.

6  **Q.**   You were never subjected to any discipline for this

7  action, were you, sir?

8  **A.**   No, sir, I was not.

9              **THE COURT:**  Sir, did anybody particularly issue an

10  order or express an order or direction to place him on the --

11  in these restraints?

12              **THE WITNESS:**  Yes, sir.

13              **THE COURT:**  Who?

14              **THE WITNESS:**  My supervisors there at the time gave

15  us direct orders to put him in the chair and put him in the

16  bed.

17              **THE COURT:**  What was that?

18              **THE WITNESS:**  Sergeant Guest and Lieutenant Nuckolls.

19              **THE COURT:**  Pardon?

20              **THE WITNESS:**  Sergeant Guest and Lieutenant Nuckolls.

21              **THE COURT:**  Two of them?

22              **THE WITNESS:**  Yes, I believe the chair was by

23  Sergeant Guest, and I believe the bed was by Lieutenant

24  Nuckolls.

25              **THE COURT:**  Okay.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 107

1  **BY MR. ERNST:**

2  **Q.**   Sir, don't you have an obligation to object to illegal

3  orders?

4  **THE COURT:**  Sir, let's go on.  Let's go on.

5  **BY MR. ERNST:**

6  **Q.**   And, sir, after all of this happened you testified against

7  Mr. Jennings in a criminal proceeding, correct?

8  **A.**   That's correct.

9  **Q.**   And you said he resisted and obstructed you, correct?

10  **A.**   Yes, sir.

11  **Q.**   And you testified to that effect at it's called a

12  preliminary examination, correct?

13  **A.**   That's correct.

14  **Q.**   And what you testified to was that Mr. Jennings was told

15  to keep his hand on the wall -- I'm sorry, let me make this

16  more clear.

17      What you testified to at the preliminary examination was

18  that Mr. Jennings was told to keep his hand on the wall and he

19  removed them; that you told him to put them back on the wall

20  and that he then turned towards you in an aggressive fashion,

21  correct?

22  **A.**   That's what I testified to, yes.

23  **Q.**   Okay.  And, sir, you denied doing anything that could

24  cause Mr. Jennings to have facial fractures, correct?

25  **A.**   That's correct.

*Patrick Fuller - Direct*
*Thursday/October 20, 2016/Volume 2*

V2-Page 108

1  **Q.**   And you denied doing anything that could cause

2  Mr. Jennings to have an eye injury, correct?

3  **A.**   I don't -- yes.

4  **Q.**   And you denied doing anything to Mr. Jennings that could

5  cause a shoulder injury, correct?

6  **A.**   That's correct.

7  **Q.**   And you denied that you used excessive force against

8  Mr. Jennings, correct?

9  **A.**   That's correct.

10  **Q.**   And you denied that you inflicted any pain on

11  Mr. Jennings, correct?

12  **A.**   That's not correct.

13  **Q.**   Can you turn to Page 36 and 37 of your deposition.

14        It's actually Page 37.  There were some objections about

15  your testimony.  "No, I'm not here to hurt him.  No, I'm not

16  inflicting pain on him."

17        Is that correct?

18  **A.**   That's what I testified.  That's what my deposition answer

19  was, yes.

20  **Q.**   Okay.  And you didn't do anything wrong that night, did

21  you, sir?

22  **A.**   I don't believe so, no, sir.

23  **Q.**   And if you had to do it all over again, you would do the

24  same thing over again, wouldn't you?

25  **A.**   Yes, I would.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 109

1          **MR. ERNST:**  Thank you, Your Honor.  That's all I

2   have.

3          **THE COURT:**  Cross -- do you want to cross-examine him

4   now just on his testimony or is this going to be a general

5   cross-examination?

6          **MR. REISING:**  I'm going to cross-examine him,

7   Your Honor, based on what we have already heard today and

8   also --

9          **THE COURT:**  All right.  You are reserving the right

10  to call him in your case for anything that wasn't covered

11  today?

12         **MR. REISING:**  Correct.

13         **THE COURT:**  Go ahead.

14                         -   -   -

15                                         (12:15 p.m.)

16                    **CROSS-EXAMINATION**

17  BY MR. REISING:

18  **Q.**   Good afternoon.

19  **A.**   Good afternoon.

20  **Q.**   Deputy Fuller -- and actually now it's Sergeant Fuller,

21  correct?

22  **A.**   That's correct.

23  **Q.**   More recently in terms of your employment with the Office

24  of the Genesee County Sheriff you were promoted to sergeant,

25  true?

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 110

1    **A.**    True.

2    **Q.**    And in the recent past you also attended the police

3    academy and became a certified police officer, correct?

4    **A.**    That's correct.

5    **Q.**    So, as you sit here today and give this testimony, you are

6    in fact a certified police officer?

7    **A.**    That is correct.

8    **Q.**    Your current slot, so to speak, at the Office of the

9    Genesee County Sheriff is you are acting as a supervisor in

10   what's referred to as the lockup; is that true?

11   **A.**    Yes, that is true.

12           **MR. ERNST:**  I just want to say that this is not

13   responsive to my cross so if he's going to do it --

14           **MR. REISING:**  I just wanted to get some background

15   out, Your Honor, then I'm going to go ahead.

16           **THE COURT:**  That's okay.

17   **BY MR. REISING:**

18   **Q.**    So let's go back to the situation as it existed in

19   September of 2010 and before that.  How long approximately

20   prior to September the 18th of 2010, sir, had you been with the

21   Office of the Genesee County --

22           **THE COURT:**  Mr. Reising, I don't -- you are going

23   into a substantive examination of him because I don't think

24   that was covered in the cross.

25           **MR. REISING:**  Your Honor, I'll withdraw that

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 111

1   question.

2   **THE COURT:**  No, you can ask it, but I just want to

3   caution you that when you get to your turn at bat you are not

4   going to be able to repeat all of this.

5   **MR. REISING:**  I understand.

6   **THE COURT:**  That's all.

7   **BY MR. REISING:**

8   **Q.**  Let me ask it in this way, Sergeant Fuller.  In terms of

9   your employment with the Office of the Genesee County Sheriff,

10  how long had you worked as a corrections deputy prior to

11  September the 18th of 2010 approximately?

12  **A.**  I'd say eight years.

13  **Q.**  And you had already indicated that you had handled, that

14  is to say, you had brought into the jail and processed into the

15  jail literally hundreds of people, if not more?

16  **A.**  If not more.

17  **Q.**  At the time we're talking about, September the 18th of

18  2010, you were working the third shift, true?

19  **A.**  That's true.

20  **Q.**  And during the third shift you get a lot of people coming

21  into the jail that are possibly intoxicated, true?

22  **A.**  True.

23  **MR. ERNST:**  Your Honor, this is leading.

24  **MR. REISING:**  I get to lead the witness, Your Honor.

25  **THE COURT:**  No, not -- no, no, sir.  Only with those

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 112

1   questions that are responsive to his.  I'm not going to let you

2   do that.  It's at the discretion of the Court, Mr. Reising.

3   **BY MR. REISING:**

4   **Q.**   Let me ask it in this way, Sergeant Fuller.  In the

5   processing of individuals being brought into the Genesee County

6   Jail is there a protocol that you normally follow?

7   **A.**   Yes.

8   **Q.**   And could you briefly explain that protocol, what would

9   you do when somebody comes into the report-writing room?

10  **A.**   Yeah.  Real quick we observe when we walk through what

11  they are like.  Go to the officer, ask him what they are there

12  for.  Get a real quick brief.  Go up to the individual.  You

13  tell them you are taking their hands out of the cuffs.  You are

14  like, "Put your hands on the wall.  I'm going to pat you down

15  real quick.  Is there anything in your pockets going to poke

16  me, any weapons on you, any drugs, any type of contraband that

17  I need to know about right now?"  So we warn them that we are

18  going to pat them down.

19  **Q.**   When somebody comes into the Genesee County Jail to be

20  housed, there is always a pat-down?

21  **A.**   Always.

22  **Q.**   Does it matter that perhaps this person has been patted

23  down by some officer in some different police agency first?

24  **A.**   Not at all.

25  **Q.**   Why is that?

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 113

1   **A.**   Because people miss things.

2   **Q.**   So in this particular case Mr. Jennings comes into the

3   Genesee County Jail at about, what, 5:00 a.m. or thereabouts?

4   **A.**   Roughly, yes.

5   **Q.**   Maybe a little later than that?

6   **A.**   Yes.

7   **Q.**   He was brought in, as you understand it, for essentially

8   drunk driving?

9   **A.**   Yes.

10         **MR. ERNST:**   Your Honor, this is leading.

11         **THE COURT:**   Go ahead.

12  **BY MR. REISING:**

13  **Q.**   You were the individual in charge of doing the pat-down of

14  Mr. Jennings that evening?

15  **A.**   Yes.

16  **Q.**   Is there a protocol for that with respect to who gets to

17  do what at a particular time?

18  **A.**   No.

19         **THE COURT:**   Why don't you move the mike a little more

20  to the center so you're talking into it.

21         **MR. REISING:**   Yes, Your Honor.   How is that?

22         **THE COURT:**   That's better.

23  **BY MR. REISING:**

24  **Q.**   In this particular case did you follow your usual

25  protocol?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 114

1   **A.**   Yes.

2   **Q.**   As it relates to Mr. Jennings initially?

3   **A.**   Yes, sir.

4   **Q.**   And tell us what you did in association with Mr. Jennings.

5   You watched the video in the report writing.  What did you do?

6   **A.**   I came out there.  I looked at him.  I went to the officer

7   real quick.  He told me what he was there for.  I came up to

8   him.  He was already out of his handcuffs so I had him stand up

9   and take his sweatshirt off and take his belt off.  I pat him

10  down.  I told him I was patting him down.  He was already -- he

11  had stuff in his pockets.  I put it back on the table and

12  continued my pat-down search.

13  **Q.**   Did you, in association with that process, have any issues

14  at that point in time with Mr. Jennings?

15  **A.**   No, sir.

16  **Q.**   You told us, and you testified in your deposition that

17  there apparently had been some conversation with the arresting

18  officer from Flint Township, true?

19  **A.**   That's true.

20  **Q.**   And there's some -- there's a statement there about being

21  in and out?

22  **A.**   Yes.

23  **Q.**   Do you know what that means?

24  **A.**   He told me that he was 50/50 in and out, like up and down.

25  **Q.**   What does 50/50 in and out or up and down mean from your

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 115

1   standpoint?

2   **A.**   It just means that he could go one way or the other.  He

3   could be calm or he could go -- I mean just be combative.  It

4   just means heads up, he's not right, you know, he could go one

5   way or the other.

6   **Q.**   All right.  You were aware of that in association with

7   your contact with Mr. Jennings on that night or the early

8   morning in question, correct?

9   **A.**   That's what Officer Hartner told me, yes.

10  **Q.**   You already testified that you had Mr. Jennings up on the

11  wall, hands up, feet spread, true?

12  **A.**   True.

13  **Q.**   You are doing a pat-down.  He drops his left shoulder,

14  does he, first?

15           **MR. ERNST:**  Your Honor, this is leading.

16           **THE WITNESS:**  He dropped his left shoulder, his left

17  hand out.

18  **BY MR. REISING:**

19  **Q.**   And his left hand came down off the wall?

20  **A.**   That's correct.

21  **Q.**   And his arm?

22  **A.**   That's correct.

23  **Q.**   All right.  That caused you to do something?

24  **A.**   Yes, it did.

25  **Q.**   Now, per the video you had your head down that way at the

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 116

1  point in time he did that; do you recall that?

2  **A.**   Yes, sir.

3  **Q.**   All right.  So you saw that directly and reacted to it?

4  **A.**   Yes, sir.

5  **Q.**   And is there something known as a reaction gap in the

6  business of corrections or police work?

7  **A.**   Yes, sir.

8  **Q.**   What is that?

9  **A.**   It's just a gap in which you feel that you safely proceed

10 with your position.

11 **Q.**   Did what you observed on that particular evening or early

12 morning of September 18th of 2010 concern you with respect to

13 what were the intentions of Mr. Jennings?

14 **A.**   Repeat the question.

15 **Q.**   Sure.  Were you concerned when that arm came off the wall

16 down by your head adjacent to Mr. Jennings --

17 **A.**   Yes.

18 **Q.**   -- in terms of what he was going to do?

19 **A.**   Yes.

20        **MR. ERNST:**  Object.  This is testimony.  This isn't a

21 question.

22        **THE COURT:**  Proceed, Mr. Reising.

23        **THE WITNESS:**  Yes, I do. I felt it was a direct

24 threat to me.

25

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 117

1   **BY MR. REISING:**

2   **Q.**   You hadn't finished your pat-down search at that point in

3   time?

4   **A.**   No, sir.

5   **Q.**   There was the possibility of a weapon?

6   **A.**   Right, I didn't finish my pat-down search.

7   **Q.**   So you reacted and you did what?

8   **A.**   I pushed him forward to create the gap.

9   **Q.**   All right.  To create the reactionary gap?

10  **A.**   Yes, sir.

11  **Q.**   All right.  And is that when he turned his head to the

12  right?

13  **A.**   That's when I saw him turn his head to the right, he

14  looked over his right shoulder and cocked his right elbow

15  towards me.

16  **Q.**   All right.  That caused you to be concerned?

17  **A.**   Yes, sir.

18  **Q.**   Once you observed what we have now described, left arm

19  down, head turns, right arm cocked, you decided to do what?

20  **A.**   Take him down to the bench.

21  **Q.**   And why did you decide to do that?

22  **A.**   We had to get him restrained.

23  **Q.**   Restrained means what, handcuffs?

24  **A.**   It would be handcuffs and in control.

25  **Q.**   Okay.  And the reason for that is you can't have somebody

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 118

1  not following orders and doing what they want to do in the jail

2  circumstance?

3  　　　　**THE COURT:**  Now you're going --

4  　　　　**THE WITNESS:**  We restrained him because I didn't want

5  him to be any more combative than he already was.  I felt that

6  he was a direct threat to me.  If he continued doing what he

7  was doing, he would be a direct threat to others.

8  **BY MR. REISING:**

9  **Q.**  And so you moved him from a standing position to the

10  bench?

11  **A.**  Correct.

12  **Q.**  And then Deputy Kenamer came to assist you?

13  **A.**  That's correct.

14  **Q.**  And it went from there, so to speak?

15  **A.**  That's correct.

16  **Q.**  Okay.  A lot has been made of what happened when

17  Mr. Jennings was brought back up from the floor in report

18  writing.  He is handcuffed at that point in time?

19  **A.**  Yes, sir.

20  **Q.**  You weren't the individual who did that, true?  You didn't

21  bring him back up?

22  **A.**  No, I did not lift him up.

23  **Q.**  But you've told us what you observed on the video in terms

24  of other deputies lifting him up?

25  **A.**  Yes, sir.

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 119

1      **THE COURT:**  Who was the deputy who picked him up?

2      **THE WITNESS:**  I believe, if I recall, it was Deputy

3   Wing and Deputy White, sir.

4   **BY MR. REISING:**

5   **Q.**   One deputy on each side?

6   **A.**   Yes.

7   **Q.**   All right.  And then that's when he projected himself

8   toward the window or wall?

9   **A.**   That's correct.

10  **Q.**   After that occurred you were going to move him from report

11  writing through the sallyport into a safety cell?

12  **A.**   That's correct.

13  **Q.**   And you have already told us you put your hand under his

14  chin?

15  **A.**   That is correct, I did.

16  **Q.**   Because there was a doorway that you had to go through for

17  the sallyport?

18  **A.**   Yes, sir.

19  **Q.**   There was a doorway right adjacent to you, a standard kind

20  doorway.  Was the doorway we're talking about a standard kind

21  of doorway, so to speak?

22  **A.**   Yes.

23  **Q.**   Metal?

24  **A.**   It had a metal door frame, metal door.

25  **Q.**   And you did what you did to protect Mr. Jennings from

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 120

1    hitting his head on that metal --

2                **THE COURT:**  Are you testifying or is he testifying?

3                **MR. REISING:**  I'll rephrase the question, Your Honor.

4    Thanks.  I'll withdraw that question.

5                **THE COURT:**  Thank you.

6    **BY MR. REISING:**

7    **Q.**   Why did you put your hand under his chin at that point in

8    time, Sergeant?

9    **A.**   Again, I put my hand under his chin to move his head back

10   away from that door frame.  I put my body as best I could

11   between him and the door frame when we walked through the door.

12   I did not want him to hit his head or his face against that

13   metal door frame.

14   **Q.**   And you were coming through the sallyport?

15   **A.**   That's true.

16   **Q.**   Just as you came through the doorway, what happened?

17   **A.**   We tripped and fell down to the floor.

18   **Q.**   Did you trip him?

19   **A.**   No, sir.

20   **Q.**   Did you do anything on an intentional basis to take him to

21   the floor?

22   **A.**   Not at all.

23   **Q.**   The video at least shows you putting your hand, your right

24   hand on a table or bench in that room.

25   **A.**   That's correct.  I tried to catch my weight on the bench

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 121

1    because I knew we were falling.

2    **Q.**   Did you land on top of Mr. Jennings?

3    **A.**   Part of me did, yes.

4    **Q.**   Did you intend to hurt him by virtue of that?

5    **A.**   No, sir.

6    **Q.**   Did you try to elbow him or kick him or anything like that

7    when he was on the floor and you were down there with him?

8    **A.**   No, sir.

9    **Q.**   You got back up, I assume?

10   **A.**   Yes, sir.

11   **Q.**   And then you moved him to the safety cell?

12   **A.**   That's correct.

13   **Q.**   Now, let's back up.  After the initial circumstance in

14   report writing, several other deputies came in to include

15   Lieutenant Nuckolls, true?

16   **A.**   True.

17   **Q.**   And Lieutenant Nuckolls, he would have been in charge?

18   **A.**   Yes.

19   **Q.**   He was the senior officer?

20   **A.**   He's the highest-ranked officer.

21   **Q.**   All right.  He, so to speak, was giving the orders?

22   **A.**   Yes.

23   **Q.**   He's the guy who gave the pepper spray, true?

24   **A.**   Yes.

25   **Q.**   And he's also the guy who gave the taser, true?

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 122

1   **A.**   True.

2   **Q.**   And the taser that we're talking about, the taser

3   application was to the low back area of Mr. Jennings?

4   **A.**   Yes.

5   **Q.**   Okay.  You're aware of that yourself, you saw that?

6   **A.**   I remember seeing that.

7   **Q.**   All right.  You are one of several deputies attempting to

8   control Mr. Jennings, right?

9   **A.**   Yes.

10  **Q.**   And, as you said, this whole thing went on about

11  25 minutes?

12  **A.**   Yes.

13  **Q.**   In terms of how you would --

14          **THE COURT:**  Wait, let's go back one minute.  When

15  exactly was the taser applied, do you recall, in that cell or

16  in the hallway?

17          **THE WITNESS:**  Sir, I remember this being in the

18  hallway.

19          **THE COURT:**  Okay.

20          **THE WITNESS:**  I couldn't tell you exactly the minute

21  or time.

22          **THE COURT:**  I understand.  Okay.

23          **MR. REISING:**  Maybe I can clarify it, Your Honor.

24          **THE COURT:**  Pardon?

25          **MR. REISING:**  Maybe I can clarify.

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 123

1      **THE COURT:**  He's just explained.  Go ahead.  Go ahead

2  with whatever.

3  **BY MR. REISING:**

4  **Q.**   When Mr. Jennings was first put in safety cell number 6,

5  you were one of the officers in there with him?

6  **A.**   Yes.

7  **Q.**   You have seen on the video that Lieutenant Nuckolls took

8  his taser out even in that safety cell?

9  **A.**   That's correct.

10  **Q.**   Did you see that?

11  **A.**   Yes.

12  **Q.**   Did he ever use it, to your knowledge?

13  **A.**   No, he did not.

14  **Q.**   In the safety cell?

15  **A.**   Not in the safety cell.

16  **Q.**   All right.  Was he the person who made the decision to

17  take Mr. Jennings back out of the safety cell and attempt to

18  put him in the restraint chair?

19  **A.**   Yes.  Again, I would say Sergeant Guest or Lieutenant

20  Nuckolls.  I can't remember which one.

21  **Q.**   But he was overall in charge and he was in the safety

22  cell, wasn't he?

23  **A.**   That's correct.

24  **Q.**   Okay.  You had nothing to do with determining whether or

25  not Mr. Jennings should remain or not remain in the safety cell

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 124

1   at that point in time, true?

2   **A.**   That's true.

3   **Q.**   While you are back out in the safety cell hallway after

4   you attempted to put him in the chair unsuccessfully, that's

5   when the bite occurred?

6   **A.**   That's correct.

7   **Q.**   And was that also when the spit mask was applied?

8   **A.**   I don't recall if that was exactly the moment or not.

9   **Q.**   And in association with that bite -- Mr. Jennings bit your

10  hand?

11  **A.**   Yes.

12  **Q.**   Which hand?

13  **A.**   He bit my right hand.

14  **Q.**   Could you see a mark on your hand from where he bit you?

15  **A.**   At the time there was a red mark on my hand.

16  **Q.**   There's been some testimony concerning unlawful

17  prosecution.  To your knowledge was the unlawful -- was this

18  prosecution related to the bite to your hand?

19  **A.**   Resisting and obstructing, and I guess, yes, part of it

20  was assaulting an officer.

21  **Q.**   You testified --

22  **A.**   Yes.

23  **Q.**   -- at the preliminary examination?

24  **A.**   Yes, I did, sir.

25  **Q.**   All right.  And to your knowledge was that charge bound

*Patrick Fuller - Cross*
*Thursday/October 20, 2016/Volume 2*

V2-Page 125

1   over to circuit court for trial?

2              **MR. ERNST:**  Objection to relevance.

3              **THE COURT:**  You can answer.

4              **MR. REISING:**  I'm sorry, Judge?

5              **THE COURT:**  I said he can answer.

6              **MR. REISING:**  Thank you.

7              **THE WITNESS:**  I believe it was.

8   **BY MR. REISING:**

9   **Q.**   Now, in association with the placement of Mr. Jennings in

10  the restraint bed, you also assisted in that regard?

11  **A.**   Yes, sir.

12  **Q.**   Did you do anything in that regard from the standpoint of

13  the application of pressure to Mr. Jennings over and above what

14  was required to get those restraints in place?

15  **A.**   I believe my knee was on him at one point, but it was only

16  to, it was to get the straps down tight enough to where he was

17  properly secured.

18  **Q.**   And were those straps then checked by a medical person?

19  **A.**   That's correct.

20  **Q.**   And then Mr. Jennings was put in the cell?

21  **A.**   That's correct.

22  **Q.**   You had nothing further to do with the whole situation

23  after that?

24  **A.**   No, sir, I did not.

25              **THE COURT:**  You dropped your voice.

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 126

1   **BY MR. REISING:**

2   **Q.**   You had nothing further to do with the situation after he

3   was placed on the restraint bed and then placed in the cell?

4   **A.**   No, I did not.

5   **Q.**   It was over from your standpoint?

6   **A.**   Yes, sir.

7   **Q.**   Okay.  From your standpoint, sir, did you get to a point

8   during this process that you became upset with Mr. Jennings and

9   therefore took it out on him?

10  **A.**   No.

11  **Q.**   Were you just doing your job?

12  **A.**   Yes, sir.

13  **Q.**   And in terms of whatever happened with the criminal case,

14  you had no involvement with that after you testified?

15  **A.**   None at all.

16          **MR. REISING:**  Thank you.  Nothing further.

17          **THE COURT:**  Any redirect?

18          **MR. ERNST:**  Yes, please, Your Honor.

19          **THE COURT:**  Go ahead.

20                     -   -   -

21                                          (12:36 p.m.)

22                  **REDIRECT EXAMINATION**

23  **BY MR. ERNST:**

24  **Q.**   Sir, at the preliminary exam that you mentioned where you

25  testified, they didn't have the video, did they?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 127

1  **A.**   I don't think so.  I don't remember.

2  **Q.**   So the bindover was based on your testimony, correct?

3  **A.**   I don't know.

4  **Q.**   Well, you were the only one that offered any evidence

5  there, right?  You were the only witness?

6  **A.**   I don't know the answer to that question.

7  **Q.**   Okay.  And the charges were later dismissed when the video

8  was available, correct?

9  **A.**   I don't know.

10       **MR. REISING:**  I would object to that, Your Honor.

11       **THE COURT:**  Well, I -- wait a second.  We're getting

12  complicated.

13       Do you know of your own knowledge that the charges were

14  dismissed?

15       **MR. ERNST:**  I only know they were dismissed.  I don't

16  know why.

17       **THE COURT:**  But you know they were dismissed?

18       **THE WITNESS:**  Yes, sir.

19       **THE COURT:**  Okay.

20  **BY MR. ERNST:**

21  **Q.**   Now, sir, you said you didn't have anything to do with

22  Mr. Jennings being taken out of safety cell 6 or placed in the

23  restraint bed, right?

24       **MR. REISING:**  Objection.  That's not the testimony of

25  the witness.

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 128

1      **THE COURT:**  Well, he can, he can correct him.

2      **THE WITNESS:**  Will you re-ask the question, please.

3   **BY MR. ERNST:**

4   **Q.**   You said you didn't have anything to do with or any

5   involvement with Jennings being placed in the restraint chair

6   or placed in the restraint bed, right?

7      **THE COURT:**  Let's do it differently.  He was

8   originally in cell 6?

9      **THE WITNESS:**  Yes, sir.

10     **THE COURT:**  And then it was decided to put him in a

11  restraint chair?

12     **THE WITNESS:**  Yes, sir.

13     **THE COURT:**  You participated in the effort to put him

14  in the restraint chair?

15     **THE WITNESS:**  Yes, sir.

16     **THE COURT:**  Who directed that he be removed from the

17  cell and put in the restraint chair?

18     **THE WITNESS:**  Again, I believe it to be Lieutenant

19  Nuckolls.

20     **THE COURT:**  Who?

21     **THE WITNESS:**  I believe it to be Lieutenant Nuckolls

22  or Sergeant Guest.

23  **BY MR. ERNST:**

24  **Q.**   And you also participated in putting him in the restraint

25  bed, right?

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 129

1   **A.**   Yes.

2   **Q.**   And then you kneeled on him because you said you had to

3   make sure that the restraints were tight enough, correct?

4   **A.**   I wanted to make sure that the restraints were tightened

5   appropriately.

6   **Q.**   But what you said was tight enough to ensure he was

7   properly secured.

8   **A.**   That is correct.  That's what I said.

9   **Q.**   So you and some other deputies actually kneeled on him

10   while you torqued down the restraints, right, so you could get

11   them tighter, right?

12   **A.**   If that's what it took to make sure that they were

13   properly secured, then that's what we did.

14   **Q.**   That's not what I asked.  I asked --

15         **THE COURT:**  He answered the question.  Go to your

16   next question.

17   **BY MR. ERNST:**

18   **Q.**   Sir, if you didn't intend to hurt Mr. Jennings when you

19   took him into the sallyport, why did you push up off of his

20   head?

21   **A.**   Where are you at?

22   **Q.**   In the sallyport.

23   **A.**   I didn't push off his head.  I pushed off the table.

24   **Q.**   But you also had your hand on his head.

25   **A.**   And I answered your question.  I said I was holding his

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 130

1    head still.

2    **Q.**   Okay.  But you pushed up and then you stood up and nobody

3    was holding his head.

4    **A.**   My weight was distributed on my right hand and my legs --

5            **THE COURT:**  Again, Mr. Ernst, you are arguing with

6    the witness.

7         When I use the word "arguing," that's a special -- it's a

8    legal word.  He understands what I'm saying and I understand

9    what I'm saying, but I don't mean to express an opinion one way

10   or the other when I use the word "argue."

11   **BY MR. ERNST:**

12   **Q.**   But, sir, if your purpose was to restrain Mr. Jennings'

13   head, why would you stand up and let go of his head?

14   **A.**   Because then he was secured when we were taking him

15   through.  I'm not going to hold his head still as we're

16   walking.

17   **Q.**   So you only need to hold his head still when he's on the

18   ground in handcuffs?

19   **A.**   Again, he was spitting so we wanted to make sure he wasn't

20   going to spit towards anybody.

21   **Q.**   But wouldn't he be able to spit while he was walking, too?

22   **A.**   That's true, he probably could have.

23   **Q.**   So, sir, at the time of this incident and actually at the

24   time of your deposition you still had not been promoted, right?

25   **A.**   That's correct.

*13-13308; Jennings v. Fuller, et al.*

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 131

1   **Q.**   So you got promoted after this incident?

2   **A.**   I got promoted this year.

3   **Q.**   You said that when you were patting Mr. Jennings down -- I

4   was confused by this -- you said in the report-writing room,

5   you said when you started patting him down, he already had his

6   cuffs off, right?

7   **A.**   Maybe he did.  I don't remember the video.  I would have

8   to see the video to make sure.

9   **Q.**   But you were the one that took his cuffs off, right?

10  **A.**   If I did, then I took his handcuffs off.  I don't

11  remember.

12  **Q.**   Sir, you testified shortly after this incident at a

13  preliminary exam, correct?

14  **A.**   I don't know the time frame.

15  **Q.**   Okay.  And then you also gave a deposition, correct?

16  **A.**   Yeah, I did give a deposition.  Yeah.

17  **Q.**   And in the course of this lawsuit you had to answer what

18  are called discovery requests, and you answered those about

19  things that happened in this incident?

20  **A.**   I have answered a lot of questions in regards to this.

21  **Q.**   Okay.  And you were asked to explain what you did various

22  times when you were patting down Mr. Jennings, correct?

23  **A.**   Yes.

24  **Q.**   Okay.  And you never once used this word "reaction gap"

25  until today.

*Patrick Fuller – Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 132

1  **A.**   Okay.

2  **Q.**   Is that true?

3  **A.**   Okay, that's true.

4  **Q.**   So who told you to say that?

5  **A.**   Nobody.

6         **MR. ERNST:**  That's all I have.  Thank you, sir.

7         **THE COURT:**  Thank you.  The witness is excused.

8  We'll start with the next witness.  We've got about 15 minutes.

9  Well --

10        **MR. ERNST:**  Your Honor, could we approach because

11  I've got an issue with that.  Could we approach for a minute?

12        **THE COURT:**  I don't know what you've got.  Do you

13  want to call the next witness?

14        **MR. ERNST:**  No, I want to wait because I've got a guy

15  coming in -- my expert is coming in from out of town and I have

16  got to get him in first thing so I'm asking can we recess for

17  today?

18        **THE COURT:**  Yeah.  That's what I said.

19        **MR. ERNST:**  Okay, cool.  Thank you.

20        **THE COURT:**  Listen to me first before you talk.  It

21  would help, I've got to tell you, it would help both of us.

22    I'll see you folks at 9:00 o'clock tomorrow morning.  Keep

23  your mouths closed, your ears plugged, your eyes open.  Don't

24  talk about this case to anyone.  Don't let anyone talk to you

25  about it.

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 133

1          **THE JURORS:**  Yes, sir.

2      (Jury out at 12:43 a.m.)

3          **THE COURT:**  I want to ask a question.  Sit down.

4      We have heard substantive testimony about Defendant

5  Nuckolls, Kenamer, Wing and White.  What was Sergeant Guest's

6  role in all of this, just so I can understand what's going on.

7          **MR. ERNST:**  Primarily supervisory.

8          **THE COURT:**  The only order that this officer has

9  testified to with regard to Guest was in the -- not cell 6.

10 What's the other cell where he --

11         **MR. ERNST:**  No, it was cell 6.  It was cell 6 and the

12 restraint chair.  From cell 6 to the restraint chair.  His

13 other involvement is he has a duty to stop it.

14         **MR. REISING:**  Those claims aren't pled, Your Honor.

15         **THE COURT:**  Wait a minute.  You are as bad as he is.

16         **MR. REISING:**  I'm sorry, Your Honor.

17         **THE COURT:**  What, are you getting infected?

18         **MR. ERNST:**  It's contagious, Your Honor.

19         **THE COURT:**  What?

20         **MR. ERNST:**  It's contagious.

21         **THE COURT:**  He was taken out of cell 6 into the

22 hallway again in the restraint chair and then when he decided

23 to tie him down it was back in cell 6, right?

24         **MR. ERNST:**  He was taken, yeah, he was taken out of

25 cell 6, put in a restraint chair, then put on the ground, then

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 134

1   put in a restraint bed, then taken back into cell 6.

2        **THE COURT:**   The restraint bed was in cell 6?

3        **MR. ERNST:**   Right.   He was restrained out in the hall

4   and then taken into cell 6.

5        **THE COURT:**   Into cell 6?

6        **MR. ERNST:**   Yes.

7        **THE COURT:**   And the testimony was in cell 6 Sergeant

8   Guest gave some sort of order.   Remember, he said Guest did

9   one thing and Nuckolls did something else.

10        **MR. ERNST:**   Right.

11        **THE COURT:**   And otherwise Sergeant Guest was more or

12   less a spectator?

13        **MR. ERNST:**   A supervisor, a supervisor, but he had no

14   physical contact with Mr. Jennings.

15        **MR. REISING:**   I believe that's correct, Your Honor.

16        **THE COURT:**   In any of the activities?

17        **MR. ERNST:**   I believe that's correct.

18        **THE COURT:**   Is that correct?

19        **MR. REISING:**   I believe it is correct, yes.

20        **THE COURT:**   Okay, all right.   Thank you.

21      Okay.   We're in recess until 9:00 o'clock.

22        **MR. ERNST:**   Thank you, Your Honor.

23        **THE COURT:**   Mr. Reising, it would be helpful tomorrow

24   morning if you again identified each of the defendants and had

25   them stand up separately so that it's clear to this jury.   I

*Patrick Fuller - Redirect*
*Thursday/October 20, 2016/Volume 2*

V2-Page 135

1   assume that was done at the time of the voir dire, but it would

2   be helpful.

3          **MR. REISING:**  Okay.

4          **THE COURT:**  Because they don't have name tags,

5   all right?

6          **MR. REISING:**  Okay, sure.  Will do.

7      (Proceedings adjourned at 12:47 p.m.)

8                        -   -   -

9

10              **C E R T I F I C A T I O N**

11     I certify that the foregoing is a correct transcription of

12   the record of proceedings in the above-entitled matter.

13

14   s/ Sheri K. Ward_____        11/12/2016
     Sheri K. Ward                   Date
15   Official Court Reporter

16                        -   -   -

17

18

19

20

21

22

23

24

25