UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**WILLIAM JENNINGS,**

               Plaintiff,

      v.

**PATRICK FULLER, et al.,**

               Defendants.

_____/

                       **HONORABLE AVERN COHN**

                       **No. 13-13308**


**JURY TRIAL - VOLUME 5**

**Tuesday, October 25, 2016**


Appearances:

Kevin S. Ernst
Law Offices of Kevin Ernst
645 Griswold Street, #1808
Detroit, Michigan  48226
(313) 965-4822

Dean D. Elliott
321 South Williams Street
Royal Oak, Michigan  48067
(248) 543-9000
  On behalf of Plaintiff

H. William Reising
Christopher J. Scott
Plunkett & Cooney
111 E. Court Street, #1B
Flint, Michigan  48502
 (810) 232-5100
  On behalf of Defendants

-   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial – Volume 5*
*Tuesday, October 25, 2016*

## I  N  D  E  X

| Plaintiff's Case in Chief | Page | Vol. |
|---|---|---|
| **Jason White** | | |
| Cross-Examination By Mr. Reising: | 10 | 5 |
| Redirect Examination By Mr. Elliott: | 23 | 5 |
| **Francis Hartner** | | |
| Direct Examination By Mr. Ernst: | 29 | 5 |
| Cross-Examination By Mr. Scott: | 46 | 5 |
| Redirect Examination By Mr. Ernst: | 53 | 5 |
| **William Jennings** | | |
| Direct Examination By Mr. Ernst: | 64 | 5 |
| Cross-Examination By Mr. Reising: | 114 | 5 |
| Certification of Reporter ......................170 | | |

-   -   -

Plaintiff's Exhibits

| Number | | Id'd | Vol. |
|---|---|---|---|
| 1A | .................................. | 94 | 5 |
| 1B | .................................. | 95 | 5 |
| 1C | .................................. | 95 | 5 |
| 1D | .................................. | 96 | 5 |
| 1E | .................................. | 96 | 5 |
| 1F | .................................. | 97 | 5 |
| 1G | .................................. | 97 | 5 |
| 1H | .................................. | 97 | 5 |
| 1I | .................................. | 98 | 5 |
| 1J | .................................. | 98 | 5 |

*Jury Trial - Volume 5*
*Tuesday, October 25, 2016*

Plaintiff's Exhibits (Continued)

| Number | | Id'd | Vol. |
|--------|--|------|------|
| 1K | ...................................... | 98 | 5 |
| 1L | ...................................... | 98 | 5 |
| 1M | ...................................... | 98 | 5 |
| 1O | ...................................... | 98 | 5 |
| 1P | ...................................... | 99 | 5 |
| 1Q | ...................................... | 99 | 5 |
| 1R | ...................................... | 99 | 5 |
| 1S | ...................................... | 99 | 5 |
| 1T | ...................................... | 99 | 5 |
| 1U | ...................................... | 99 | 5 |
| 1V | ...................................... | 100 | 5 |
| 1W | ...................................... | 100 | 5 |
| 1X | ...................................... | 100 | 5 |
| 1Y | ...................................... | 100 | 5 |
| 1Z | ...................................... | 100 | 5 |
| 1AA | ...................................... | 100 | 5 |
| 1BB | ...................................... | 100 | 5 |
| 1CC | ...................................... | 100 | 5 |
| 1DD | ...................................... | 101 | 5 |
| 1EE | ...................................... | 101 | 5 |
| 14 | ...................................... | 105 | 5 |

Defendant's Exhibits

| Number | | Id'd | Vol. |
|--------|--|------|------|
| FF | ...................................... | 135 | 5 |
| L | ...................................... | 136 | 5 |
| M | ...................................... | 138 | 5 |

-   -   -

*Jury Trial – Volume 5*
*Tuesday, October 25, 2016*

V5-Page 4

 1                          Detroit, Michigan

 2                          Tuesday, October 25, 2016

 3                          8:58 a.m.

 4                      -    -    -

 5          **THE CLERK:**  The court calls the matter of *Jennings v.*

 6  *Fuller, et al.*, Case Number 13-13308.

 7          **THE COURT:**  Be seated.

 8      Are we going to wait for Mr. --

 9      **MR. ELLIOTT:**  He should be here in just a moment,

10  Your Honor, if we could wait until 9:00 a.m.

11          **THE COURT:**  Pardon?

12      **MR. ELLIOTT:**  He should be here in just a moment.

13          **THE COURT:**  Yeah, but you are handling this witness?

14      **MR. ELLIOTT:**  I am, correct.

15          **THE COURT:**  All right.  Yesterday was not a

16  particularly wholesome day in this courtroom.  It was

17  occasioned by three things.  One, Mr. Elliott's examination of

18  the witnesses was repetitive and argumentative and I felt the

19  obligation as the Court to have to admonish him, and I'm going

20  to caution you today.  You have a habit if you don't like the

21  answer to ask the question again or if you like the answer to

22  require the witness -- to ask it again so the witness has to

23  repeat it.  And I'm going to caution you because I don't like

24  to interrupt you, but your examination in that fashion isn't

25  wholesome.

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial - Volume 5*
*Tuesday, October 25, 2016*

V5-Page 5

1        The defendant officers obviously have not had much

2    experience testifying and began thinking that they should argue

3    their case to the jury by extending their answers beyond the

4    question, and I would urge you, Mr. Reising, to caution them to

5    confine their answers just to the question and not make

6    gratuitous comments.

7        Number three, I became impatient and perhaps said a couple

8    of things I should not have.  I am prepared, if either counsel

9    wants me, to explain to the jury that admonishments by the

10   Court are something they shouldn't really listen to or take

11   into consideration.  We can also just let it pass and hope that

12   the examination and the answers will improve, but that's up to

13   you fellas.  There is an instruction at the end.

14       With that, unless anyone has anything, I'm going to call

15   in the jury.

16            **MR. ERNST:**  Your Honor, we do have something with

17   regards to some of the other witnesses that are going to

18   testify today and so we're going to need some rulings on our

19   motions in limine that the Court took under advisement.

20            **THE COURT:**  What is that?

21            **MR. ERNST:**  Well, first of all, with regard to

22   Officer Hartner, who was the Flint Township officer, in his

23   police report he sets forth several events that occurred before

24   the arrest of --

25            **THE COURT:**  You are not going to examine him on

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 5*
*Tuesday, October 25, 2016*

V5-Page 6

1   those, are you?

2       **MR. ERNST:**  No, and I think they are highly

3   prejudicial.  There's like gunshots --

4       **THE COURT:**  Well, if you don't examine him on them, I

5   don't see that what preceded the arrest has any arguable

6   relevance to the liability aspects of this case and I don't

7   think they have any relevance to the damages.

8       **MR. REISING:**  Your Honor, the only thing I can say in

9   that regard is in association with this arrest what immediately

10  preceded the arrest I think does.

11      **THE COURT:**  What's that?

12      **MR. REISING:**  I think what immediately preceded the

13  arrest, that is to say, what Mr. Jennings was doing prior, just

14  prior to him being arrested for drunk driving --

15      **THE COURT:**  What the officer observed to occasion the

16  stop you can examine him on.  You don't have to start the

17  examination -- cross-examination, if he doesn't bring it out,

18  the cross-examination when he approaches the car.  If it's not

19  brought out on direct, you can bring out the reason for the

20  stop, what he observed.  He's on road patrol.

21      **MR. REISING:**  Correct.

22      **THE COURT:**  He sees an automobile that he believes

23  requires a stop.

24      **MR. SCOTT:**  Sobriety test, Your Honor?

25      **THE COURT:**  Yeah.

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial - Volume 5*
*Tuesday, October 25, 2016*

V5-Page 7

1      **MR. ERNST:**  Your Honor, what's the relevance of the

2  sobriety test?  We are not contesting that Mr. Jennings --

3      **THE COURT:**  Well, yeah, he can say he gave him a

4  sobriety test at the side of the road to determine that he was

5  drunk and that's why he arrested him and brought him to the

6  station house.

7      **MR. ERNST:**  Okay.  Can I make a point, Judge?  With

8  regard to one of the sobriety tests, there was a nystagmus test

9  and it has like this horizontal nystagmus and vertical

10  nystagmus.  He says in his report and in his deposition that

11  vertical nystagmus is signs of possible drug use, and that's

12  where they are trying to go with that.

13      **THE COURT:**  No, no.  He doesn't have to mention

14  possible drug use.  He stopped him because he was a drunk

15  driver.

16      **MR. REISING:**  He can mention the nystagmus.

17      **THE COURT:**  That's why he brought him in to the

18  station, and that's it.

19      **MR. SCOTT:**  And that he failed all of the tests

20  given.

21      **MR. ERNST:**  No, we are not even contesting that.

22      **THE COURT:**  He gave him the conventional tests that

23  are given when you stop a driver and he failed them so he

24  brought him into the station house, period.  You don't have to

25  make any reference to drugs.  No reference to drugs.

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial - Volume 5*
*Tuesday, October 25, 2016*

V5-Page 8

1          **MR. REISING:**  I hear what you're saying, Your Honor.

2          **THE COURT:**  Unless he brings out something that would

3    require it.  I'm going to only use this as an analogy, not as

4    an admonishment.  The same way that the fact that the expert

5    witness had a relationship with Geoff Feiger had no relevance,

6    narcotics has no relevance in connection with the stop.  That's

7    all.

8        Okay.  What else?

9          **MR. ERNST:**  Okay.  Then Mr. Jennings is going to

10   testify so then --

11         **THE COURT:**  What?

12         **MR. ERNST:**  Mr. Jennings is going to testify after

13   Officer Hartner so then his substance abuse history that the

14   Court reserved a ruling on is -- we need a ruling on it because

15   if you're going to say that it's coming in then I'm going to

16   ask him about it.  If you're saying it's not coming in, then

17   I'm not asking him about it.

18         **THE COURT:**  Well, he's going to testify that he was

19   emotionally shaken by all of this, right?

20         **MR. ERNST:**  Yeah, he's going to testify that he has

21   various -- he has basically PTSD, post-traumatic stress

22   disorder.

23         **THE COURT:**  I think the fact that he has -- what I

24   have heard so far, the fact that he had a substance abuse

25   problem --

*13-13308; Jennings v. Fuller, et al.*

*Jury Trial – Volume 5*
*Tuesday, October 25, 2016*

V5-Page 9

1          **MR. ERNST:**  In the past.

2          **THE COURT:**  -- in the past is substantially more

3    prejudicial than probative and therefore, if you don't bring it

4    out, the defendants cannot bring it out on cross-examination.

5          **MR. REISING:**  Your Honor, you will note my objection

6    to that because there will be testimony from the psychologist,

7    the neuropsychologist who evaluated Mr. Jennings at our request

8    that that's critical in terms of his analysis and what's going

9    on with respect to the emotional well-being of Mr. Jennings at

10   the time of the examination.

11         **THE COURT:**  Let me see the report.

12         **MR. ERNST:**  And, Your Honor, I would state that a

13   neuropsychologist tests for closed-head injuries and does those

14   types of assessments.

15         **THE COURT:**  Let me see the neuropsychologist's

16   report.  We don't have to do that now.  Before you call

17   Mr. Jennings on direct.

18         **MR. ERNST:**  Okay.

19         **THE COURT:**  We won't get to him today, will we?

20         **MR. ERNST:**  Yeah, I think so.

21         **THE COURT:**  Give me the report.  Let's call in the

22   jury.  Before he testifies I will have read the report and will

23   make a ruling.

24        I'm calling in the jury.

25        Will the witness take the stand, please.


*13-13308; Jennings v. Fuller, et al.*

*Jason White – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5–Page 10

1        (Jury in at 9:07 a.m.)

2            **THE COURT:**  Good morning.

3            **THE JURORS:**  Good morning.

4            **THE COURT:**  Everybody can be seated.

5        Go ahead, sir.

6        What are we waiting for?

7            **MR. ERNST:**  We were just trying to figure out if that

8    was a witness in the back.

9            **THE COURT:**  What?

10           **MR. ERNST:**  We were just trying to figure out if that

11   was a witness that walked in in the back, but it's not.

12           **THE COURT:**  All right.  You completed your direct,

13   didn't you?

14           **MR. ELLIOTT:**  I did.

15           **THE COURT:**  All right.  Go ahead.

16           **MR. REISING:**  Thank you, Your Honor.

17                          -   -   -

18                                        (9:08 a.m.)

19                    **CROSS-EXAMINATION**

20   **BY MR. REISING:**

21   **Q.**   Good morning, Deputy White.

22   **A.**   Good morning, sir.

23   **Q.**   You are presently an employee of the Office of the Genesee

24   County Sheriff; is that true?

25           **THE COURT:**  Mr. Wing, you are in the wrong seat.

*13-13308; Jennings v. Fuller, et al.*

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 11

1        **AUDIENCE MEMBER:**  I'm sorry, sir.

2          **THE COURT:**  I have got a seating chart for them.

3          **MR. REISING:**  Okay.  Can I proceed, Your Honor?

4          **THE COURT:**  Yeah.

5  **BY MR. REISING:**

6  **Q.**   Let's go back.  You are presently an employee of the

7  Office of the Genesee County Sheriff?

8  **A.**   Yes.

9  **Q.**   And how long approximately have you been so employed by

10 the Office of the Genesee County Sheriff?

11 **A.**   I began my 14th year in April.

12 **Q.**   And you are a certified police officer?

13 **A.**   Yes.

14 **Q.**   And that means you went to a police academy?

15 **A.**   Yes.

16 **Q.**   And what year did you go to a police academy, sir?

17 **A.**   2009.

18 **Q.**   So at the time that this incident took place on September

19 the 18th of 2010 you had completed the police academy?

20 **A.**   Yes.

21 **Q.**   And you were a certified police officer?

22 **A.**   Yes.

23 **Q.**   And in association with going to the police academy, had

24 you had training in the use-of-force continuum?

25 **A.**   Yes.

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 12

1  **Q.**   And beyond that are you familiar with what's known as

2  PPCT?

3  **A.**   Yes.

4  **Q.**   What is that, sir?

5  **A.**   Pressure point control tactics.  Techniques used to

6  control subjects.

7  **Q.**   All right.  And you had such training in PPCT when you

8  were at the police academy?

9  **A.**   Yes.

10 **Q.**   And beyond that, as I understand it, you became a trainer;

11 you actually taught PPCT to other police officers and other

12 corrections personnel?

13 **A.**   Yes.

14 **Q.**   When did you do that approximately?

15 **A.**   On two separate occasions.  I had been employed by the

16 Livingston County Sheriff's Department and was a trainer for

17 three years with them, and then again when I came to Genesee

18 County I was a trainer I believe it was 2006 to 2009.

19 **Q.**   Between 2006 and 2009 you were a trainer?

20 **A.**   Correct.

21 **Q.**   In Genesee County?

22 **A.**   Correct.

23 **Q.**   And before that Livingston County?

24 **A.**   Correct.

25 **Q.**   And the training that you were giving was training having

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 13

1    to do with how you go about using PPCT in relation to

2    controlling an individual who is noncompliant?

3    **A.**    Correct.

4    **Q.**    Because that's what we're talking about in this particular

5    case, are we not?  Mr. Jennings, based on your testimony, was

6    noncompliant --

7    **A.**    Correct.

8    **Q.**    -- true?

9        Now, going back, if we might, we saw video yesterday of

10   you entering the report-writing room when Mr. Jennings was on

11   the floor.  Do you recall that?

12   **A.**    Yes.

13   **Q.**    And that's the first time you had contact with

14   Mr. Jennings at the Genesee County Jail, true?

15   **A.**    True.

16   **Q.**    Now, in association with that circumstance, you assisted

17   Deputy Fuller and Deputy Kenamer and other deputies who came

18   into the report-writing room and attempted to control

19   Mr. Jennings at that point in time?

20   **A.**    Yes.

21        **MR. ELLIOTT:**  Your Honor, I would object to all the

22   leading.

23        **THE COURT:**  It's okay.  It's preliminary.

24        Go ahead.

25        **MR. REISING:**  Thank you, Your Honor.

*13-13308; Jennings v. Fuller, et al.*

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

1   **BY MR. REISING:**

2   **Q.**   Deputy White, you were shown yesterday a still, if you

3   will, of Mr. Jennings being on the floor and you had your hand

4   on his head.  Do you remember that?

5   **A.**   Yes.

6   **Q.**   And you were actually yourself at that point in time

7   kneeling down next to Mr. Jennings towards the lower part of

8   his body?

9   **A.**   Yes.

10   **Q.**   And why were you doing that, sir?

11   **A.**   Just to control his head at that point.

12   **Q.**   When you say control his head, were you trying to prevent

13   him from injuring himself?

14   **A.**   Yes.

15   **Q.**   Did you, in association with what's shown on the video,

16   apply pressure to Mr. Jennings' head such that you were pushing

17   his head into the cement or concrete floor he was on?

18   **A.**   No.

19   **Q.**   You are certain about that, sir?

20   **A.**   Yes.

21   **Q.**   All right.  So there came a point in time shortly after we

22   just talked about that you were involved with raising

23   Mr. Jennings from the floor up into a vertical position;

24   Mr. Jennings went from being horizontal to vertical?

25   **A.**   Yes.

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

1   **Q.**   On his feet, so to speak.  You were on one side of him?

2   **A.**   Yes.

3   **Q.**   And you told us that you used in that regard a technique

4   to bring him up off the floor?

5   **A.**   Yes.

6           **THE COURT:**  Keep your voice up, sir.

7           **THE WITNESS:**  All right.

8   **BY MR. REISING:**

9   **Q.**   And the technique that you used involved doing what

10  exactly?

11  **A.**   When I brought Mr. Jennings up from -- to his feet along

12  with Deputy Wing, I just had ahold of him above his arm and on

13  his forearm.  So, again, it's somewhat of a modified what we

14  call an escort hold.

15  **Q.**   All right.  So a modified escort move.  Is that something

16  that you learned through PPCT?

17  **A.**   Yes.

18  **Q.**   And in association with that circumstance, can you tell

19  us, if you know, is there pressure applied to the shoulder area

20  of the individual by using that particular maneuver?

21  **A.**   No, there isn't.

22  **Q.**   Is that why you use it?

23  **A.**   Yes.

24  **Q.**   Did you have any difficulty in relation to what we saw on

25  the video in raising Mr. Jennings up that day in combination

*13-13308; Jennings v. Fuller, et al.*

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 16

1    with what Deputy Wing did on the other side?

2    **A.**    No.

3    **Q.**    Did Mr. Jennings resist you in any way in bringing him up?

4    **A.**    No.

5    **Q.**    And after he got up, what happened next?

6    **A.**    At that point he attempted to pull away from Deputy Wing

7    and myself, and that's when he went into the wall.

8    **Q.**    Is that when he went like that over to the right?

9    **A.**    Correct.

10   **Q.**    Okay.  And he went into the wall of the report-writing

11   room?

12   **A.**    Correct.

13   **Q.**    You were asked a question yesterday, "You pushed him into

14   the wall, didn't you?"  Do you recall that question?

15   **A.**    Yes.

16   **Q.**    Did you do that?  Did you push him into the wall?

17   **A.**    No.

18   **Q.**    There came a point in time when you did in fact assist in

19   escorting Mr. Jennings from report writing over to the safety

20   cell hallway and into a safety cell?

21   **A.**    Yes.

22   **Q.**    I think he went into safety cell number 6.

23   **A.**    Yes.

24   **Q.**    From your standpoint, did Mr. Jennings ever become

25   compliant during that process?

*13-13308; Jennings v. Fuller, et al.*

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 17

1   **A.**   No.

2   **Q.**   And just so we understand, a noncompliant inmate or

3   prisoner needs to be brought under control; is that the idea?

4   **A.**   Yes.

5   **Q.**   You weren't the one in charge in the safety cell, true?

6   **A.**   True.

7   **Q.**   All right.  That was Lieutenant Nuckolls?

8   **A.**   Correct.

9   **Q.**   Did you assist in attempting to put Mr. Jennings into the

10  chair?

11  **A.**   Yes.

12  **Q.**   And that was unsuccessful?

13  **A.**   Yes.

14  **Q.**   Had you put inmates before September the 18th of 2010 into

15  the restraint chair?

16  **A.**   Yes.

17  **Q.**   On many occasions?

18  **A.**   Yes.

19  **Q.**   You knew the technique?

20  **A.**   Yes.

21  **Q.**   And in this particular circumstance it couldn't be done

22  apparently?

23  **A.**   Yes.

24  **Q.**   And why was that?  Why couldn't it be done?

25  **A.**   Just because of the amount of resistance that Mr. Jennings

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 18

1  was putting forth.  There was no good way to get ahold of him

2  or secure him in a reasonable fashion to put him into the

3  chair.

4  **Q.**   Now, as we know from watching the video, Mr. Jennings was

5  removed from the chair and placed back on the floor; is that

6  true?

7  **A.**   True.

8  **Q.**   And you assisted in association with holding Mr. Jennings

9  in that position on the floor while the restraint bed was

10  prepared?

11  **A.**   Correct.

12  **Q.**   Ultimately you were asked some questions about did you

13  recall Lieutenant Nuckolls using his taser in the drive stun

14  mode.  Do you remember that question?

15  **A.**   Yes.

16  **Q.**   And you indicated you didn't have recollection of that?

17  **A.**   Correct.

18  **Q.**   You have watched the video on more than one occasion, have

19  you not?

20  **A.**   Yes.

21  **Q.**   And do you see in the video the application of the taser

22  to Mr. Jennings by Lieutenant Nuckolls?

23  **A.**   Yes.

24  **Q.**   The same thing with respect to a nurse coming to look at

25  Mr. Jennings once he was in the restraint bed.  I believe you

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 19

1  indicated you had no recollection of that?

2  **A.**   At the time, no.

3  **Q.**   All right.  Did you see that occur on the video?

4  **A.**   Yes.

5  **Q.**   And did you see that there was in fact a nurse who came

6  and did something in association with Mr. Jennings?

7  **A.**   Yes.

8  **Q.**   Did you also see that right adjacent to her was Lieutenant

9  Nuckolls?

10  **A.**   Yes.

11  **Q.**   You were asked yesterday, sir, about the taser log.  Do

12  you recall that?

13  **A.**   Yes.

14  **Q.**   I believe plaintiff's counsel showed you Plaintiff's

15  Exhibit Number 12, which I'm going to show to you again right

16  now, and it says "Jail Taser" at the top.  Do you see that?

17  **A.**   Yes.

18  **Q.**   And if you turn to Page Number 2 of that log, there is a

19  line which says 9-18-10.  Do you see that?

20  **A.**   Yes.

21  **Q.**   And then it says there was a discharge of the taser on

22  5:21:54 of that date?

23  **A.**   Correct.

24  **Q.**   All right.  And it says it was for five seconds?

25  **A.**   Correct.

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 20

1    **Q.**   You were also asked questions concerning the fact that

2    there are additional entries contained in this two-page

3    document which are of one-second duration.  Do you see that?

4    **A.**   Correct.

5    **Q.**   Do you know what that one-second duration represents?

6    **A.**   It would be what's called a spark check, which is just

7    checking the unit to make sure it's functional.

8    **Q.**   So that's a circumstance where the unit is checked to make

9    sure it's functioning?

10   **A.**   Correct.

11   **Q.**   Is that something which is done on a daily basis; do you

12   know?

13   **A.**   Correct, yes.  Usually at the start of every shift.

14   **Q.**   So the fact that one second, maybe it was two seconds,

15   that would represent a spark check?

16   **A.**   Correct.

17   **Q.**   The actual cycle of the taser is five seconds?

18   **A.**   Yes.

19   **Q.**   You did use some PPCT techniques in association with

20   attempting to gain compliance from Mr. Jennings on the night

21   we're talking about?

22   **A.**   Yes.

23   **Q.**   How many different techniques did you use yourself, sir?

24   **A.**   Two.

25   **Q.**   And those techniques were what again?

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 21

1   **A.**   A mandibular angle and a wrist lock.

2   **Q.**   And the mandibular angle, could you just again refresh our

3   memories as to what that is?

4   **A.**   It's using the tip of the thumb, pointing behind the ear,

5   pressing in and up along the jaw line behind the ear at a

6   45-degree angle.

7   **Q.**   And that is a pain-compliance technique?

8   **A.**   Correct.

9   **Q.**   Did it have any effect on Mr. Jennings that you could

10  tell?

11  **A.**   No.

12  **Q.**   Did he change his -- or become compliant at that point in

13  time?

14  **A.**   No.

15  **Q.**   And the other technique you used was a so-called wrist

16  lock?

17  **A.**   Wrist lock, correct.

18  **Q.**   And you did demonstrate that yesterday?

19  **A.**   I did.

20  **Q.**   That is a downward pressure technique on the wrist?

21  **A.**   Correct.

22  **Q.**   Again, a pain technique?

23  **A.**   Correct.

24  **Q.**   Did you at any time punch Mr. Jennings with your wrist?

25  **A.**   No.

*Jason White - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 22

1   **Q.**   Did you at any time during the course of this scenario

2   that we're talking about here kick Mr. Jennings?

3   **A.**   No.

4   **Q.**   Did you see anybody else associated with the Office of the

5   Genesee County Sheriff punch Mr. Jennings?

6   **A.**   No.

7   **Q.**   You do know that at one point in time Deputy Fuller may

8   have tried to do a technique where you strike this area of the

9   leg that I'm pointing to.  Are you familiar with that

10  particular PPCT technique?

11  **A.**   Yes.

12  **Q.**   What's that called, sir?

13  **A.**   Well, the area that you are pointing to is called the

14  common peroneal nerve, which again is a nerve motor point, and

15  the technique that Deputy Fuller attempted to use was what we

16  call a hammer fist, which is where you clench the fist and use

17  the bottom, softer part of the fist and strike that nerve motor

18  point.

19  **Q.**   So you use the bottom of hand to strike the leg in the

20  area that I'm pointing to right now?

21  **A.**   Correct.

22  **Q.**   Not like that?

23  **A.**   No.

24  **Q.**   Like this?

25  **A.**   Correct.  You use the soft fleshy part, not any bone or

*Jason White - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 23

1   hard tissue.

2   **Q.**   Other than that, did you see any other indication of a

3   forceful strike, such as the use of a fist in relation to

4   Mr. Jennings on the night we're talking about?

5   **A.**   No.

6   **Q.**   The same thing with a kick.  Any kind of kick that you saw

7   to Mr. Jennings' body that night?

8   **A.**   No.

9           **MR. REISING:**  One second, Your Honor.

10      I have nothing further of this witness.

11          **THE COURT:**  Mr. Elliott.

12                           -   -   -

13                                              (9:25 a.m.)

14                    **REDIRECT EXAMINATION**

15  **BY MR. ELLIOTT:**

16  **Q.**   Deputy White, when you train officers -- when you trained

17  officers in use of force, did you train them to use force on

18  individuals who were restrained?

19  **A.**   Yes.

20  **Q.**   So you, one of the training techniques that you taught

21  officers in your pressure point control tactics was to use

22  pressure point control tactics on someone who has been

23  restrained?

24  **A.**   Yes.

25  **Q.**   And that's a pain-compliance technique, correct?

*13-13308; Jennings v. Fuller, et al.*

*Jason White - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 24

1    **A.**   Correct.

2    **Q.**   Why would you train someone to use pain-compliance

3    techniques on someone who was restrained?

4    **A.**   Again, if they are still resisting or noncompliant.

5    **Q.**   I just said they were restrained.

6    **A.**   Again, if they are still resisting or noncompliant.

7    **Q.**   You would agree with me that there's no need for the use

8    of force on someone who is not resisting and is restrained,

9    correct?

10   **A.**   I'm sorry, say that one more time.

11   **Q.**   You would disagree with me that there's no need for the

12   use of any force on someone who is restrained and compliant?

13   **A.**   If they are compliant, no.

14   **Q.**   There is no need, correct?

15   **A.**   Correct.

16   **Q.**   All right.  Now, you had all of this training in pressure

17   point control tactics so that you can control prisoners,

18   correct?

19   **A.**   Correct.

20   **Q.**   Okay.  And you don't know what the nurse did at the bed in

21   the restraint chair in the hallway, do you?

22   **A.**   Not specifically, no.

23   **Q.**   Okay.  With the taser, with regard to the taser and you

24   have described a spark check, you also described that a taser,

25   that you can stop it and it doesn't have to cycle the full five

*Jason White - Redirect*
*Tuesday/October 25, 2016/Volume 5*

1    seconds when you are applying it to a person, correct?

2    **A.**    Correct.

3    **Q.**    So it is the officer's choice when he is applying the

4    taser to cycle it for the full five seconds?

5    **A.**    Correct.

6    **Q.**    And you weren't trained to use a taser on a restrained

7    compliant individual, were you?

8    **A.**    No.

9    **Q.**    You would agree that would be improper, correct?

10   **A.**    Correct.

11   **Q.**    Now, you described using the two pressure point control

12   tactics, the mandibular and the wrist lock, correct?

13   **A.**    Correct.

14   **Q.**    And those cause pain, right?

15   **A.**    Correct.

16   **Q.**    And Mr. Jennings was handcuffed when you applied those,

17   correct?

18   **A.**    I don't recall specifically.  I believe so.

19   **Q.**    That was when he was facedown in the hallway?

20   **A.**    Correct.

21   **Q.**    And he was handcuffed in the hallway, correct?

22   **A.**    Again, I believe he was.

23   **Q.**    Well, Mr. Jennings was handcuffed on the floor in the

24   report-writing room, correct?

25   **A.**    In the report-writing room, yes.  Eventually, yes.

*13-13308; Jennings v. Fuller, et al.*

*Jason White - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 26

1   **Q.**   And then the handcuffs weren't removed until he was in the

2   restraint bed, correct?

3   **A.**   Again, I don't recall specifically.  I believe he was

4   handcuffed that time, yes.

5   **Q.**   Okay.  And you describe a hammer fist?

6   **A.**   Correct.

7   **Q.**   And that's essentially a punch to the nerve bundle on the

8   leg with the bottom part of your hand, correct?

9   **A.**   Correct.

10   **Q.**   Have you ever had that done to you?

11   **A.**   Yes.

12   **Q.**   What is the result?  What was the result on you?

13   **A.**   The results on me, I got it again in the common peroneal

14   as well, and it causes your -- typically it will cause your

15   legs, in my case anyways, it caused my leg to go numb.  You

16   have a feeling of I guess the best way to say it is a numbness

17   like if your leg is asleep.

18   **Q.**   Were you able to control your leg when that happened?

19   **A.**   I don't believe so, no.

20   **Q.**   It disables the leg, correct?

21   **A.**   Temporarily, yes.

22   **Q.**   It's also painful, right?

23   **A.**   Correct.

24   **Q.**   You would agree if that was done to Mr. Jennings it would

25   cause him pain?

*13-13308; Jennings v. Fuller, et al.*

*Jason White - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 27

1   **A.**   I would think so.

2   **Q.**   And it would also cause his leg to go numb, correct?

3   **A.**   It could, it could.

4   **Q.**   And cause him to lose control of his leg, correct?

5   **A.**   I don't think I can answer that yes or no.

6   **Q.**   Well, it caused you to lose control of your leg, correct?

7   **A.**   I don't know what you mean by "lose control."

8   **Q.**   Well, those are your words, aren't they?  You aren't able

9   to recall them?

10  **A.**   No.  They were not my words, counselor.  Those are your

11  words.  My words are that, when you say you "lose control," it

12  means you may not be able to move it.

13       Again, I would need a definition of "lose control."  If

14  you mean that it's going to uncontrollably move in a direction

15  that you don't want it to, then no.

16  **Q.**   So Mr. Jennings, if it was done correctly against him,

17  would not be able to move his leg?

18  **A.**   I would say yes.

19  **Q.**   All right.  And you said you didn't see anybody kick

20  Mr. Jennings, correct?

21  **A.**   Correct.

22  **Q.**   You saw an officer kick the bed, right?

23  **A.**   No.

24  **Q.**   You saw it on the video?

25  **A.**   I couldn't tell what occurred in that portion of the

*Jason White - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 28

1  video.

2  **Q.**   Do you know which officer that was?

3  **A.**   No, I couldn't see from where I was seated.

4  **Q.**   Okay.  And you also testified that when you provided or

5  applied the two pain-compliance techniques that they had no

6  result, correct?

7  **A.**   Correct.

8  **Q.**   Wasn't Mr. Jennings screaming when you did that?

9  **A.**   He was screaming the entire time, so yes.

10 **Q.**   And he also screamed after he had the pepper spray,

11 correct?

12 **A.**   Correct.

13 **Q.**   And he also screamed when he fell on the floor, correct?

14 **A.**   At which point?

15 **Q.**   In the hallway, in the sallyport.

16 **A.**   As we were going through the sallyport?  Yes.

17 **Q.**   And you also agree that you described holding his head

18 against the concrete in the beginning of the examination by

19 Mr. Reising, correct?

20 **A.**   I had my hands on his head, yes.

21 **Q.**   And you would agree it's not proper to press his head into

22 the concrete, correct?

23 **A.**   Correct.

24 **Q.**   And that would not be a legitimate use of force in your

25 mind, correct?

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 29

1   **A.**   Correct.

2         **MR. ELLIOTT:**  That's all, Your Honor.

3         **THE COURT:**  The witness is excused.

4      Call your next witness.

5         **MR. ERNST:**  I'm hoping he's in the hallway,

6   Your Honor.

7      Your Honor, plaintiff calls Officer Hartner or Sergeant

8   Hartner.

9         **THE COURT:**  In front of me, sir.  No, right up here.

10        **THE WITNESS:**  Yes.  Good morning, sir.

11        **THE COURT:**  Good morning.

12                     -   -   -

13                    **FRANCIS HARTNER,**

14        being first duly sworn by the Court to tell

15        the truth, was examined and testified upon his

16        oath as follows:

17        **THE COURT:**  Take that seat.

18                     -   -   -

19                                    (9:33 a.m.)

20                 **DIRECT EXAMINATION**

21   BY MR. ERNST:

22   **Q.**   Sir, could you please state your full name for the record.

23   **A.**   Yes, sir.  One second.

24   **Q.**   Oh, I'm sorry.  I wasn't looking up.

25        **THE COURT:**  Pull the mike close to you.

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 30

1      **THE WITNESS:**  How is that, sir?

2      **THE COURT:**  Okay.  Go ahead.  What's your full name,

3  sir?

4      **THE WITNESS:**  Yes, sir.  It's Francis, F-r-a-n-c-i-s.

5  The last is Hartner, H-a-r-t-n-e-r.

6  **BY MR. ERNST:**

7  **Q.**   And, sir, where are you currently employed?

8  **A.**   With the Flint Township Police Department.

9  **Q.**   And how long have you been so employed?

10 **A.**   Since 2009.

11 **Q.**   And were you working on the early morning hours on

12 September 18th, 2010?

13 **A.**   I was.

14 **Q.**   And did you come in contact with a man named

15 William Jennings?

16 **A.**   I did.

17 **Q.**   And you arrested Mr. Jennings for operating while impaired

18 or drunk driving?

19 **A.**   That's correct.

20 **Q.**   Okay.  And when you pulled him over he had no plate on his

21 car, correct?

22 **A.**   That's correct.

23 **Q.**   And when you pulled Mr. Jennings over, you believed that

24 he was possibly intoxicated, correct?

25 **A.**   That's correct.

*Francis Hartner – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 31

1   **Q.**   And you conducted various I guess they are called field

2   tests, correct, to see if he was intoxicated?

3   **A.**   That's correct.

4   **Q.**   And he basically failed them all and so you believe he was

5   drunk?

6   **A.**   Right, I --

7   **Q.**   Then you administered a PBT or preliminary breath test?

8   **A.**   On the roadside, yes.

9   **Q.**   And he blew over the legal limit?

10  **A.**   That's correct.

11  **Q.**   And then at that point you handcuffed Mr. Jennings and put

12  him in your patrol car, correct?

13  **A.**   No, he was handcuffed before.

14  **Q.**   Okay.  So he was already cuffed when you arrived?

15  **A.**   No.

16  **Q.**   Oh, okay.  Well, you handcuffed him before you put him in

17  your patrol car, correct?

18  **A.**   That's correct.

19  **Q.**   And after you handcuffed him, you searched him; is that

20  correct?

21  **A.**   Excuse me?

22  **Q.**   After you handcuffed him, you patted him down?

23  **A.**   That's correct.

24  **Q.**   Because you always pat somebody down before you put them

25  in your patrol car, correct?

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 32

1    **A.**    Right.

2    **Q.**    And then when you put Mr. Jennings in your patrol car,

3    then you transported him to the Genesee County Jail for

4    booking, correct?

5    **A.**    That's correct.

6    **Q.**    And when you transported Mr. Jennings, you didn't have any

7    problems with him, correct?

8    **A.**    During the --

9          **MR. REISING:**    I would object to that, Your Honor.

10   First of all, it's leading and suggestive, and I haven't

11   objected so far, but I am objecting now because we're getting

12   into substantive testimony.

13          **THE COURT:**    That's okay.  You can cross-examine him.

14          **THE WITNESS:**    During the transport --

15          **MR. REISING:**    This is not a witness, Your Honor, from

16   Genesee County.

17          **THE COURT:**    I know who he is, sir, and I know he is

18   not a defendant.

19       Go ahead.  What was your answer?

20          **THE WITNESS:**    He was not -- your question was

21   combative, I believe?

22   **BY MR. ERNST:**

23   **Q.**    No, I said he was cooperative during the transport?

24   **A.**    During the transport, yes, he was cooperative.

25          **THE COURT:**    All right.

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 33

 1  **BY MR. ERNST:**

 2  **Q.**   He was not kicking the backseat of your car, correct?

 3  **A.**   No, not that I can recall.

 4  **Q.**   It he was not punching the backseat of your car?

 5          **THE COURT:**  He already said he was cooperative.

 6          **MR. ERNST:**  I was just developing the point,

 7  Your Honor.

 8          **THE COURT:**  What?

 9          **MR. ERNST:**  I was just developing the point.

10          **THE COURT:**  You made your point with the question at

11  the beginning.

12          **MR. ERNST:**  Okay.

13  **BY MR. ERNST:**

14  **Q.**   And then when you got to the Genesee County Jail, you

15  entered into a garage area, correct?

16  **A.**   That's correct, sallyport.

17  **Q.**   I'm sorry, what was that?

18  **A.**   They refer to it as the sallyport/garage area.

19  **Q.**   And how do you get into that garage?

20  **A.**   You have to -- there's a speaker and a little buzzer

21  outside.  You push the buzzer and they see you on the camera

22  and they open the garage door for you.

23  **Q.**   And you hadn't called ahead or anything like that, right,

24  you just showed up at the garage?

25  **A.**   I had not.

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 34

1  **Q.**   And so when you press that buzzer the garage door opens

2  and then you pull in; is that right?

3  **A.**   Yep, that's correct.

4  **Q.**   And then the garage door closes behind you?

5  **A.**   Right.

6  **Q.**   Can you describe that garage --

7           **THE COURT:**  By the way, when you push the buzzer, do

8  you have to identify yourself to someone in the control center?

9           **THE WITNESS:**  Sometimes you do if they can't see your

10  car, if it's like not a marked car, but typically if they can

11  see it's a marked car they just open the door up for you.

12           **THE COURT:**  There's a camera?

13           **THE WITNESS:**  Yep, there's a camera outside.

14           **THE COURT:**  The car you were in was identifiable as a

15  police car?

16           **THE WITNESS:**  Yep.  We have fully marked black and

17  white patrol cars.

18           **THE COURT:**  All right.  Go ahead.

19  **BY MR. ERNST:**

20  **Q.**   All right.  And can you describe the inside of the garage?

21  **A.**   It's a large garage.  There's angled parking, and there's

22  a couple of doors that goes into the area where you bring in

23  prisoners to process.

24  **Q.**   All right.  And do you have to buzz into those doors?

25  **A.**   No, they are open.

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 35

1    **Q.**   Okay.  And then so you walked in with Mr. Jennings,
2    correct?
3    **A.**   Correct.  I escorted him in.
4    **Q.**   Okay.  And you didn't have hands on when you escorted him
5    in, correct?
6    **A.**   Typically when we escort prisoners, especially if they are
7    handcuffed, I always have my hand either on their elbow or
8    right next to them.  In case they trip or fall, I'm right there
9    to grab onto them.  They are my responsibility so I'm always
10   right there with them.
11   **Q.**   Okay.  And then when you brought Mr. Jennings in you took
12   some stuff out of his pockets, some personal effects, correct?
13   **A.**   This incident happened so long ago that everything that
14   I'm remembering is from my reports or from other videos and
15   stuff that you guys have showed me prior to here.
16        Typically what we normally do is that when I get to the
17   jail if I haven't removed the person's property, if they have
18   change or wallets or stuff that's going to go with them,
19   obviously weapons or anything, contraband is removed from their
20   pockets, not left in there.
21        So my typical procedure would be when I get inside the
22   jail I remove all of their items to property prior to the
23   deputies coming out and taking custody of the individual.
24   **Q.**   I'm sorry, your voice dropped off at the end there.
25   **A.**   I take everything out of their pockets prior to the

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 36

1   deputies coming out and taking custody of the individual.

2   **Q.**   All right.  And then Mr. Jennings was handcuffed when you

3   took the things out of his pockets, correct?

4   **A.**   Correct.

5   **Q.**   And then you sat him down and you started doing some

6   paperwork, correct?

7   **A.**   Correct.  He sat down.  There's a couple of benches.

8   Excuse me, there's a bench where the person sits at, and

9   there's like a long table where we complete what's a booking

10  card.  I had not completed that prior to our arrival so I began

11  completing that as he sat on the bench.

12  **Q.**   And you asked Mr. Jennings various questions to complete

13  that booking card, right?

14  **A.**   Yeah.  There's only a couple of questions I have to ask

15  him like where was he born at and if he's employed.  It's

16  minimal.

17  **Q.**   Okay.  And Mr. Jennings was cooperative and gave you the

18  information, correct?

19  **A.**   From what I can recall, yes.

20  **Q.**   And then Mr. Jennings also agreed to a chemical test,

21  right?  He consented to it?

22  **A.**   Correct.

23  **Q.**   And then, sir, when you get that consent that would give

24  you the right to, for example, do a blood draw, correct?

25  **A.**   Correct.

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 37

1   **Q.**   And that particular night you did have a, you did cause a

2   blood draw to be drawn, correct?

3   **A.**   Correct.  With all of our alcohol investigations, our

4   department policy is to do blood draws.  We don't do a breath

5   test or urine test.

6   **Q.**   All right.  And you used -- when your department does a

7   blood draw, do you use a private, a private contractor or

8   whatever to do that work, correct?

9   **A.**   Correct.  We hire a private firm.  I believe at this time

10  back in 2010 we used a company called Medlaw.  They are a

11  private nurse company that would actually come to the jail.

12  It's not affiliated with the jail or our department other than

13  our contract we have for them and all they do is blood draws.

14  So they would meet me at the jail to do the blood draw.

15          **THE COURT:**  You did not personally do the blood draw?

16          **THE WITNESS:**  Oh, absolutely not.

17          **THE COURT:**  It was done that night?

18          **THE WITNESS:**  It was done that night, correct.

19          **THE COURT:**  Somebody came to the jail?

20          **THE WITNESS:**  Yep.

21          **THE COURT:**  Talk into the mike.

22          **THE WITNESS:**  They took Mr. Jennings' blood, and I

23  take receipt of the blood and take it and return it to our

24  department where it's forwarded to the Michigan State Police

25  for testing.

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 38

1          **THE COURT:**  They don't test it?

2          **THE WITNESS:**  No, they do not test it.  All they do

3  is simply draw from the individual.

4          **THE COURT:**  Then put it in a tube and seal it?

5          **THE WITNESS:**  Correct.

6          **THE COURT:**  Okay.

7  BY MR. ERNST:

8  **Q.**   And that particular night there was a nurse by the name of

9  Sue Carnes who took the blood draw, correct?

10  **A.**   That's what my report reflects, yes.

11  **Q.**   Have you ever used her before?

12  **A.**   Yes.

13  **Q.**   Do you know who she is?

14  **A.**   I do.

15  **Q.**   Do you think you could identify her in a picture?

16  **A.**   It's been a while.

17  **Q.**   All right.  I'm going to pull something up on the video

18  real quick and ask you to do it so just bear with me.

19          But after you get the blood, after the blood is drawn,

20  then you take possession of the blood vials, correct?

21  **A.**   The kits are provided by the Michigan State Police.  They

22  are sealed kits prior to our receipt of them.  We open the kits

23  in front of the nurse, so we break the seal on it.  Once the

24  blood draw has been conducted, we reseal it and I take

25  possession of it.

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 39

1  **Q.**   Okay.  And then you eventually submit it to the Michigan

2  State Police lab for testing; is that correct?

3  **A.**   That's correct.

4  **Q.**   All right.  And when Ms. Carnes arrived, she has like a

5  little plastic box that she uses to pull the blood, correct?

6  **A.**   Yeah, it's like a little I guess her kit that she uses,

7  puts all of her stuff in.

8  **Q.**   All right.

9          **THE COURT:**  What were you looking for, Mr. Elliott?

10         **MR. ELLIOTT:**  We're trying to show Ms. Carnes.

11         **THE COURT:**  On the video?

12         **MR. ERNST:**  Yeah.  Okay.

13     (Video started and continued while the following

14     proceedings occurred.)

15 **BY MR. ERNST:**

16 **Q.**   Does that appear to be Ms. Carnes, the woman in the --

17 **A.**   It's a picture of somebody from behind.  I'm not sure who

18 that is.  I'm sorry.

19 **Q.**   But she's wearing like scrubs and a blue shirt.  Is that

20 how she appeared that evening; do you remember?

21 **A.**   Typically the nurses always wear scrubs.

22 **Q.**   Pardon me?

23 **A.**   Typically the nurses always wear scrubs.  I'm not sure

24 what the color of her shirt was.

25 **Q.**   I'm going to ask you if that looks approximately like the

*Francis Hartner – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 40

1  box, the little kit that she has.  Do you see she had a blue

2  kit in their hand?

3  **A.**    Like I said, they typically carry a kit around with them.

4  I'm not sure if they carry the same kit over and over.

5          **THE COURT:**  Okay.  Let's move forward.  Turn it off.

6      (Video ended.)

7  **BY MR. ERNST:**

8  **Q.**    Sir, you never told Deputy Fuller that Mr. Jennings was

9  kicking and punching in your squad car, correct?

10  **A.**    That's correct.

11  **Q.**    In fact, the only thing you said is that he was, that he

12  was arrested for drunk driving, correct?

13  **A.**    Right.  I reflected back in my reports.  I told him that

14  he was arrested for drunk driving.

15  **Q.**    Okay.  So, sir, you were in the report-writing room when

16  Deputy Fuller came out, correct?

17  **A.**    That's correct.

18  **Q.**    And he would typically take possession of your arrestee at

19  that point, correct?

20  **A.**    That's correct.

21  **Q.**    And then he would lodge him in the jail, correct?

22  **A.**    Correct.

23  **Q.**    So when you searched Mr. Jennings once you got into the

24  Genesee County Jail or when you took his personal effects off

25  him, did he remain handcuffed?

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 41

1  **A.**   Yes, he did.

2  **Q.**   Why didn't you take the handcuffs off him?

3  **A.**   We don't take the handcuffs off our arrestees.  The

4  deputies take them off.  What they ask us to do is leave the

5  individual in handcuffs until they come out and take control of

6  the subject.

7  **Q.**   And then Deputy Fuller came out and you basically handed

8  him over to Deputy Fuller, correct?

9  **A.**   Well, I didn't physically hand him over.  He was still

10  sitting on the bench.

11  **Q.**   I'm sorry?

12  **A.**   He was just sitting on the bench.  That's what their

13  procedure is.  Once they come out, it's their prisoner now.

14  **Q.**   All right.  And then Deputy Fuller eventually put

15  Mr. Jennings, leaned Mr. Jennings up against the wall, correct?

16  **A.**   Correct.  I guess what do you mean "leaned"?  He had him

17  up on the wall to pat him down, which is typical.

18  **Q.**   Is there anything that prevented Deputy Fuller from

19  patting him down while he remained handcuffed?

20  **A.**   I don't know what their policy is or how they go about

21  doing what they do.

22  **Q.**   Are you trained that you should cuff first and search

23  later?

24  **A.**   It depends on the situation.  We are not actually trained

25  on one way or the other.  Whatever way you can control the

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 42

1   subject.

2   **Q.**   Okay.  Well, you would agree with me that a subject would

3   pose less danger if he was handcuffed, correct?

4   **A.**   You are asking my opinion?

5   **Q.**   Yes.

6   **A.**   Yes.

7   **Q.**   Okay.  So, sir, after Deputy Fuller came out, did he have

8   any conversation with Mr. Jennings that you recall?

9   **A.**   Not that I can recall.  It's been so long, like I said.

10  Most of my reflection has been from the report.

11  **Q.**   Okay.  Do you recall there being any hostility between the

12  two like before the pat-down began?

13  **A.**   Not that I can remember.  Not that I can remember.

14  **Q.**   Did Mr. Jennings do anything to or say anything to Officer

15  Fuller that you observed prior to the pat-down?

16  **A.**   Again, I can't remember that specifically, whatever

17  conversation that they had.

18  **Q.**   So, sir, after -- did you witness Deputy Fuller pat down

19  Mr. Jennings?

20  **A.**   From what I can recall, after seeing the video from there,

21  I'm in the process of doing my paperwork.  Normally I'm paying

22  attention to my paperwork to get that done.

23       Their typical procedure is they come in, they take over,

24  they start patting the individual down.  From what I can

25  remember, I don't remember him taking handcuffs off of him or

*Francis Hartner – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 43

1  doing any of that.  Just all of a sudden there was a little bit

2  of a scuffle there.  Their normal procedure is to start patting

3  down so I assume he was just in the process of doing that.

4  **Q.**  Okay.  So you didn't actually observe what happened?  Even

5  after looking at the video, you don't believe you observed what

6  happened prior to the scuffle, as you call it, correct?

7  **A.**  That's correct.

8  **Q.**  All right.  So in fact this, if you look at the, the

9  screen right now, there's an image and the time is 05:10:18, is

10  that you in the background with your head down apparently

11  writing something?

12  **A.**  Yeah, I'm the gentleman with less hair.  That's me.

13  **Q.**  Okay.  And you are filling out the information that you

14  indicated previously?

15  **A.**  Correct.

16  **Q.**  Did you see -- did you hear anything between -- did you

17  hear any conversation at all between those men?

18  **A.**  From what I can remember, absolutely not, no.

19  **Q.**  Okay.  And so did you have a chance to look at this video

20  before you testified today?

21  **A.**  Yes, I have.

22  **Q.**  When did you do that?

23  **A.**  At the deposition and then prior to this.

24  **Q.**  Prior to this when?

25  **A.**  A couple weeks ago.

*Francis Hartner - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 44

1   **Q.**   All right.  And where did you review that?

2   **A.**   At my office, the Flint Township Police Department.

3   **Q.**   And were you, were you shown this by Mr. Reising or

4   Mr. Scott?

5   **A.**   That's correct, yeah.

6        (Video started and continued while the following

7        proceedings occurred.)

8   **BY MR. ERNST:**

9   **Q.**   So you didn't observe Mr. -- you were still writing your

10  report during this entire time, correct?

11  **A.**   The booking card, yeah.

12       **THE COURT:**  Ask your next question.

13  **BY MR. ERNST:**

14  **Q.**   When was the first time you looked up; do you remember?

15  **A.**   I mean, obviously there was a scuffle that caught my

16  attention.

17  **Q.**   Based on your review of this video, did you ever see

18  Mr. Jennings turn aggressively towards Mr. Fuller?

19       **MR. REISING:**  Objection, Your Honor, the witness has

20  already indicated he wasn't even watching.

21       **THE COURT:**  He prefaced it "based upon your review of

22  the video."

23       **THE WITNESS:**  That's correct, Your Honor.

24       **THE COURT:**  Did you ever see Mr. Jennings

25  aggressively -- turn aggressively towards Mr. Fuller?

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 45

1          **THE WITNESS:**  No.

2    **BY MR. ERNST:**

3    **Q.**   When you were reviewing this video with Mr. Reising a

4    couple weeks ago, did Mr. Reising impart any facts about the

5    case to you?

6    **A.**   Can you be more specific?  What do you mean by the facts?

7    **Q.**   Did he tell you anything about what was going to be said

8    or done or --

9    **A.**   What do you mean?

10   **Q.**   Did he give you any information about the case?

11   **A.**   I guess he advised me they are going to show the video and

12   where I was at.  He didn't specifically tell me to say

13   anything, if that's what you are implying.

14   **Q.**   No, I was just asking if he gave you any information.

15   **A.**   Information?

16   **Q.**   That you didn't already know.

17   **A.**   Since my review of the deposition or --

18   **Q.**   Right.

19   **A.**   No, nothing new, nothing different.

20          **MR. ERNST:**  All right.  Thank you, sir.

21          **THE COURT:**  Cross-examination.

22          **MR. REISING:**  Mr. Scott is going to do the

23   cross-examination, Your Honor.

24                    -  -  -

25

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 46

1                                                    (9:54 a.m.)

2                          **CROSS-EXAMINATION**

3    **BY MR. SCOTT:**

4    **Q.**    Good morning, Sergeant Hartner.

5    **A.**    Good morning, sir.

6    **Q.**    Do you recall why you stopped Mr. Jennings that evening?

7    **A.**    Yes.  It was --

8              **MR. ERNST:**  Your Honor, we just discussed this whole

9    scenario.

10             **THE COURT:**  He just said yes, he recalls why he

11   stopped him.

12   **BY MR. SCOTT:**

13   **Q.**    Can you explain to us why you stopped him?

14   **A.**    Yes.

15             **MR. ERNST:**  Judge, can we approach?

16        (The following sidebar conference was held:)

17             **MR. ERNST:**  Your Honor, he's trying to go into all of

18   those facts that you just told him --

19             **THE COURT:**  No, he's not going to go into it.

20             **MR. ERNST:**  Well, that's why he stopped him, because

21   he had these gunshots and --

22             **THE COURT:**  He already testified he stopped him

23   because he thought he was a drunk driver.  Let's move forward.

24   Let's move forward.

25        (End of discussion at sidebar.)

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 47

1  **BY MR. SCOTT:**

2  **Q.**   How many sobriety tests did you do on Mr. Jennings?

3  **A.**   One.

4  **Q.**   Did he fail it?

5  **A.**   He did.

6  **Q.**   Okay.

7         **THE COURT:**  Let's move forward, Mr. Scott.

8  **BY MR. SCOTT:**

9  **Q.**   On the road was Mr. Jennings noncompliant?

10 **A.**   In our initial contact he was not.

11        **MR. ERNST:**  Objection, Your Honor.

12        **THE COURT:**  Wait a minute.

13        **MR. ERNST:**  Your Honor, can we approach again?

14        **THE COURT:**  No, no.  Let's just move forward,

15 Mr. Scott.  That's a direction to you.

16 **BY MR. SCOTT:**

17 **Q.**   After you get to the jail, did you observe Mr. Jennings

18 being combative?

19 **A.**   He appeared to be noncompliant and fighting with the

20 deputies.

21 **Q.**   Did you document in your report that Mr. Jennings was

22 combative?

23 **A.**   I did.

24 **Q.**   And would you have documented "combative" if you didn't

25 see combative in your report?

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 48

1  **A.**   I would not.

2  **Q.**   Did you tell Deputy Fuller that Mr. Jennings was up and

3  down?

4  **A.**   I did.

5  **Q.**   What does that mean?

6  **A.**   His initial state at first contact was, like you asked,

7  not compliant.  He was intoxicated is my belief.  I found that

8  during the field sobriety test he was up and down, meaning that

9  one minute he was extremely compliant, having a conversation

10  with me, and the next minute he was, you know, noncompliant,

11  didn't want to talk.  It seemed to me like he was on the edge.

12  **Q.**   Okay.  Once this scuffle started in the jail there, you

13  observed it, correct?

14  **A.**   Correct.

15  **Q.**   Did you see anything in the interaction between the

16  deputies at the jail and Mr. Jennings that was excessive?

17  **A.**   From the review of the video --

18         **THE COURT:**  No, not from the review of the video.  Do

19  you recall seeing anything?

20         **THE WITNESS:**  From what I recall, no.

21  **BY MR. SCOTT:**

22  **Q.**   Did you report to anyone at the Genesee County Jail that

23  anything improper occurred that evening?

24  **A.**   I did not.

25  **Q.**   Had you seen anything improper, would you have reported

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 49

1    it?

2    **A.**    Absolutely.

3    **Q.**    I'm going to put some stills from the video up here and

4    ask you about them in just a second.

5    **A.**    Okay.

6    **Q.**    Sergeant Hartner, can you see that photograph?

7    **A.**    I can.

8    **Q.**    Can you tell us what Deputy Fuller is doing there?

9    **A.**    He appears to be patting him down.

10   **Q.**    Do you see Mr. Jennings' left arm in that photograph?

11   **A.**    I guess I cannot, no.

12   **Q.**    Do you see right there where the shoulder dropped?

13   **A.**    I guess.

14   **Q.**    Do you see Mr. Jennings is standing straight up right

15   there?

16            **MR. ERNST:**    Your Honor, Mr. Scott is testifying.

17            **THE COURT:**    Wait a second.  Do you have an objection?

18            **MR. ERNST:**    Yeah, I object to --

19            **THE COURT:**    Well, then you have to stand.

20            **MR. ERNST:**    I object because --

21            **THE COURT:**    What's the objection?

22            **MR. ERNST:**    That Mr. Scott is testifying.  He's not

23   asking this witness questions.

24            **THE COURT:**    No, he isn't.

25       Go ahead.

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 50

1          **MR. SCOTT:**  Thank you, Your Honor.

2   **BY MR. SCOTT:**

3   **Q.**   Do you see in that photograph right there his left arm in

4   front of him?

5   **A.**   Is it --

6          **THE COURT:**  Point to what you're talking about.

7   **BY MR. SCOTT:**

8   **Q.**   Right there in front of Mr. Jennings, do you see where the

9   red dot is at?

10  **A.**   So you're showing me that black strip right there?

11  **Q.**   Yeah.  Do you see that?

12  **A.**   Yes.

13  **Q.**   If that's been admitted through various people in this

14  trial as being Mr. Jennings' left hand, would you agree that

15  he's not being compliant with Deputy Fuller at this time?

16          **THE COURT:**  Hold on.

17          **MR. ERNST:**  I object to that.

18          **THE COURT:**  What's the objection?

19          **MR. ERNST:**  That he's offering testimony through his

20  question, Your Honor.

21          **THE COURT:**  Well, I don't understand what his opinion

22  of what the photograph shows is arguably relevant.  You can ask

23  him what he saw, but he's not here to interpret photographs.

24  You can ask him what he saw from where he was.

25          **MR. SCOTT:**  Your Honor, this is cross-examination

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 51

1  regarding --

2        **THE COURT:**  I understand it's cross-examination, but

3  this goes beyond the direct.

4        **MR. SCOTT:**  No, the specific --

5        **THE COURT:**  This witness is not a photographic

6  interpreter.

7        **MR. SCOTT:**  Exactly, Your Honor, but they showed him

8  the video and then they asked him a question about did

9  Mr. Jennings turn aggressively in the video.

10       **THE COURT:**  No, I don't think so.  In any event, I'm

11  telling the jury he's here to testify as to what he saw.  You

12  can use the photographs to refresh his recollection, but as to

13  his interpretation of them simply from him sitting in the

14  witness chair and looking at it, you can't examine him.

15  **BY MR. SCOTT:**

16  **Q.**   Sergeant Hartner, do you see the picture of what

17  Mr. Jennings is doing there?  Could you describe it?

18  **A.**   It looks like he's turning to the right.

19       **MR. ERNST:**  Your Honor, he's --

20       **THE COURT:**  You are doing just what I said you can't

21  do.  He can testify to anything he saw or heard.  That's

22  perfectly proper, but for him to testify -- it would be no

23  different than if I got on the witness stand and looked at the

24  photograph and tried to say what it displayed.

25       **MR. SCOTT:**  I understand, Your Honor.

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 52

1    **BY MR. SCOTT:**

2    **Q.**   Do you have any recollection specifically of what occurred

3    there beyond the scuffle?

4    **A.**   No.

5    **Q.**   Okay.  Did you testify in your deposition that

6    Mr. Jennings was noncompliant with the deputies?

7    **A.**   I did.

8    **Q.**   Why did you testify to that under oath?

9    **A.**   Because they were in a scuffle on the ground wrestling

10   with him is what I saw.

11          **THE COURT:**  That was the conclusion you drew?

12          **THE WITNESS:**  That's what I saw.

13          **THE COURT:**  That's what you saw, okay.

14          **THE WITNESS:**  Yeah.

15   **BY MR. SCOTT:**

16   **Q.**   And based on your experience, was Mr. Jennings following

17   orders in the jail that evening?

18   **A.**   Based on my experience or what I saw?

19   **Q.**   Both.

20   **A.**   It appeared that they were struggling with the individual

21   on the ground as they were -- it looked to me like they were

22   trying to rehandcuff him.

23          **THE COURT:**  I suggest, Mr. Scott, you move forward.

24          **MR. SCOTT:**  Thank you, Your Honor.

25

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 53

1    **BY MR. SCOTT:**

2    **Q.**   Hypothetically, if an inmate removed his hand from the

3    wall and turned his head to a deputy while doing a pat-down

4    search, would you question the deputy taking that as being an

5    aggressive movement?

6         **MR. ERNST:**   Objection, Your Honor.

7         **THE COURT:**   Objection sustained.

8         **MR. SCOTT:**   That's all I have.  Thank you,

9    Your Honor.

10        **THE COURT:**   Do you have any redirect?

11        **MR. ERNST:**   Yes, please, Your Honor.

12        **THE COURT:**   Now, I caution you not to open the door,

13   sir.

14       That's a legal phrase, by the way.

15                          -   -   -

16                                          (10:03 p.m.)

17               **REDIRECT EXAMINATION**

18   **BY MR. ERNST:**

19   **Q.**   Sir, you said you don't even remember what was said that

20   night, correct?

21   **A.**   That's correct.

22   **Q.**   So you can't say that Mr. Jennings was being noncompliant

23   with any verbal commands, correct?

24   **A.**   Not from what I can recall.

25   **Q.**   Okay.  And so your whole basis for saying that he was

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 54

1   noncompliant is because when you turned around there was a

2   scuffle on the floor, correct?

3   **A.**   That's correct.

4   **Q.**   Okay.  And you also indicated that you told -- that you

5   advised Deputy Fuller that Mr. Jennings was up and down,

6   correct?

7   **A.**   Correct, on initial contact.

8   **Q.**   And you said that he had been noncompliant with you,

9   correct?

10  **A.**   Correct.

11  **Q.**   But he was compliant with you the entire time, wasn't he?

12  **A.**   No.

13  **Q.**   Okay.  And can you turn to Page 27 of your deposition

14  transcript?

15  **A.**   Sure.

16  **Q.**   And at the bottom starting on Line 22 you were asked this

17  question and gave this answer:

18      "All right.  When you came into the jail did you provide

19  any special information about Mr. Jennings, warned that he was

20  combative or anything?"

21      And you said:  "Typical drunks are up and down.  If

22  anything, I advised him that he was intoxicated."

23      Isn't that what you testified to?

24  **A.**   That's what I testified to, yeah.

25  **Q.**   So what advised the jail personnel was that he was

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 55

1  intoxicated, right?

2  **A.**   And up and down, yeah.

3  **Q.**   But you didn't say you advised them he was up and down.

4  You just said typically drunks are, and I advised them he was

5  intoxicated, correct?

6  **A.**   I did not say that in my deposition, no.

7         **THE COURT:**   Well, the answers you find in the

8  transcript are what you said, correct?

9         **THE WITNESS:**   Correct.

10        **THE COURT:**   Okay.  He agrees with that.  Let's move

11  forward.

12        **MR. ERNST:**   I was moving forward, Judge.

13        **THE COURT:**   No, you are not.  You are sort of

14  standing in place.

15  **BY MR. ERNST:**

16  **Q.**   So the only basis for you maintaining that Mr. Jennings

17  was noncompliant at the jail was that he was on the floor when

18  you turned around struggling with the deputies, correct?

19  **A.**   That's correct.

20        **MR. ERNST:**   Okay.  Thanks a lot.

21        **THE COURT:**   You are excused, sir.  Have a safe trip

22  back to Flint.

23        **THE WITNESS:**   Thank you, sir.

24        **THE COURT:**   Call your next witness.

25        **MR. ERNST:**   I call the plaintiff, William Jennings.

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 56

 1          **THE COURT:**  Pardon?

 2          **MR. ERNST:**  Mr. Jennings, the plaintiff.

 3          **THE COURT:**  Okay.  Let's take a short recess.

 4      (Jury out at 10:06 a.m.)

 5          **THE COURT:**  Be seated.  As I read the evaluation of

 6  the psychologist, he says at Page 11:

 7              "Mr. Jennings does appear to be experiencing a number

 8              of ongoing emotional issues, but despite this he is

 9              able to work full time and live independently.  At

10              this time he perceives that the 2010 incident is the

11              primary cause of his problems.  However, it should be

12              noted that he has experienced a significant number of

13              other stressors before and after this event which are

14              also likely contributing to significant emotional

15              adjustment issues.  These include the development of

16              cancer, prior incarcerations, substance abuse, and

17              multiple losses.  He also appears to have a

18              personality dynamic in which he is prone to

19              developing cognitive and/or other physical symptoms

20              when emotionally distressed.  He does not currently

21              meet the full criteria for post-traumatic stress

22              disorder but does meet the criteria for adjustment

23              disorder with anxiety."

24      I think that the neuropsychologist testified -- if he

25  testifies that he's suffering emotional distress and that's an

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 57

1   element of his damages, I think the psychologist who the

2   defense calls may briefly mention, within the context of that

3   statement say that he has a history of substance abuse and that

4   could be a contributing factor to his emotional distress along

5   with the other factors.

6          **MR. ERNST:**  What about his prior detentions,

7   Your Honor?

8          **THE COURT:**  No, the prior detentions -- that's the

9   statement, that's the statement that he says is contributing to

10   his emotional distress.

11          **MR. SCOTT:**  Your Honor, Dr. Stucky has already been

12   deposed and provided testimony.

13          **MR. ERNST:**  Well, we can strike it.

14          **MR. SCOTT:**  He goes through all of these issues.  All

15   of these issues are outlined in his report.

16          **THE COURT:**  I understand that, but his opinion is

17   based upon what I have just said and you are limited to that.

18   The rest of it is more prejudicial than probative.

19          **MR. SCOTT:**  How about with respect to Mr. Jennings'

20   cross-examination as to what he told Dr. Stucky or didn't tell

21   Dr. Stucky or other doctors at this time?

22          **MR. ERNST:**  Like what?

23          **THE COURT:**  I don't know what you're talking about.

24   The issue was what this witness can testify to.  He can

25   testify, and if Mr., Mr. Ernst wants to bring it out, has he in

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 58

 1   the past had a history of substance abuse, he'll have to say

 2   yes.  If that's as far as he goes, that's as far as you can go.

 3           **MR. SCOTT:**  That issue is in other medical reports

 4   and records.

 5           **THE COURT:**  I don't know about other medical reports.

 6           **MR. SCOTT:**  But can we cross-examine him on those

 7   documents?

 8           **THE COURT:**  No.  I will have to wait and see.  My

 9   concern, sir, is that when I give you an inch you want to take

10   a mile so I have to be careful in order to assure that this is

11   a fair trial.  Okay?

12           **MR. SCOTT:**  I understand, Your Honor.  So we'll

13   approach before we ask those questions.

14           **THE COURT:**  Well, you will have to give me the

15   report, but that's the ruling of the Court on this issue and

16   this report.

17       Are you ready for the jury?

18           **MR. ERNST:**  I mean I think that they intend to ask

19   Mr. Jennings questions about his medical records as they refer

20   to substance abuse.

21           **THE COURT:**  Excuse me.  I think the defense

22   understands the Court's ruling.

23           **MR. ERNST:**  Okay.

24           **THE COURT:**  We are in treacherous waters, so to

25   speak.

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 59

1      Okay.  I'll be back in five minutes.

2      Mr. Reising, do you have any difficulty with the Court's

3  ruling?

4           **MR. REISING:**  I do, Your Honor.  I object because I

5  think, as the Court has indicated, that according to Dr. Stucky

6  at least, and the jury has a right to hear that, he believes

7  many factors entered into the picture he saw when he evaluated

8  this gentleman.

9           **THE COURT:**  Yeah, I understand that, and I have said

10  that one of the factors that he looked at in his evaluation of

11  the scope -- he distinguished between post-traumatic stress

12  syndrome and anxiety, and one of the factors that contributes

13  to his anxiety in his opinion perhaps is his history of

14  substance abuse.

15           **MR. REISING:**  Amongst other factors.

16           **THE COURT:**  Yeah, yeah, yeah, but the details of it

17  are irrelevant.

18           **MR. ERNST:**  So just so we're clear, the Court is not

19  going to let him go into detentions like prior jail terms.

20           **THE COURT:**  No, no.

21           **MR. SCOTT:**  Well, Your Honor --

22           **THE COURT:**  No, he was convicted, but that conviction

23  is not relevant as to his credibility.

24           **MR. REISING:**  It's not relevant to his credibility.

25  It's relevant to the conclusions of Dr. Stucky.

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 60

1          **THE COURT:**  But the doctor didn't say that his

2   detention contributed to it.  He said his substance abuse.

3          **MR. REISING:**  No, he said detention also, Your Honor.

4          **THE COURT:**  No, he said that the witness told him he

5   had been detained.

6          **MR. SCOTT:**  It says including prior incarcerations.

7          **MR. ERNST:**  That's not what the witness said.  That

8   was Dr. Stucky's way of trying to get into detentions.

9          **THE COURT:**  What page?

10          **MR. REISING:**  Page 11, Your Honor.

11          **THE COURT:**  Where?

12          **MR. REISING:**  "These include the development of

13   cancer, prior incarcerations, substance abuse and multiple

14   lawsuits."

15          **THE COURT:**  I said he can say prior incarceration as

16   a contributing factor, but the details of the incarceration

17   aren't relevant.

18          **MR. REISING:**  All right.

19          **THE COURT:**  It's within the scope of that sentence.

20   I haven't said he, if he believed -- if the doctor believes

21   that one of the contributing factors to his anxiety, as he

22   calls it, is prior incarceration, he can testify.

23          **MR. REISING:**  He did say that already.

24          **THE COURT:**  Yeah.  He can say that's a factor, but

25   the details of it, unless he opens the door, are unimportant.

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 61

1      This evidence is being admitted on the issue of damages

2   only.  It's not being admitted to blacken his name or create

3   prejudice in the jury's mind against him because he's served

4   time in jail.  You are an experienced lawyer, and you know what

5   this ruling is.

6           **MR. REISING:**  Your Honor, I did not say that I wanted

7   to use it for the purpose of what the Court just said.

8           **THE COURT:**  I know that.  I know you didn't say it.

9   Well, let's not go into that philosophical discussion, you

10  know, about scope of cross-examination.

11          **MR. ERNST:**  So, Your Honor, so we're clear, can we

12  get a ruling about what Mr. Jennings can be asked about his

13  prior incarcerations?

14          **THE COURT:**  You can ask him has he served -- if you

15  want to.

16          **MR. ERNST:**  I don't want to, but I want to know what

17  they intend to do.

18          **THE COURT:**  They intend to ask the doctor what his

19  diagnosis was and what the factors were, and I just read what

20  the doctor can testify to.

21          **MR. ERNST:**  So the Court is ruling they can't ask

22  Mr., they cannot ask Mr. Jennings about prior incarcerations.

23          **MR. REISING:**  Why not?  He told the doctor, and he

24  told their doctor.

25          **MR. ERNST:**  Your Honor, this is what happened.  The

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 62

1  doctor asked him have you ever been incarcerated in the past.

2  Mr. Jennings didn't volunteer this.  This is his little

3  deposition thing, and then when Mr. Jennings said yes, he said,

4  oh, that's affecting him, too.  Mr. Jennings didn't offer that

5  as something that's bothering him.

6      THE COURT:  Psychologists frequently make their

7  diagnosis on factors that the person being diagnosed thinks

8  irrelevant.  It's what the doctor thought was relevant.  I

9  don't know how else I can do this.

10      MR. ERNST:  Well, I want to know what Mr. --

11      THE COURT:  I don't think you are entitled to know

12  anything more than what I have just said.  Okay?

13      MR. ERNST:  But I'm going to have to stand up and

14  make an objection before the jury when they ask Mr. Jennings

15  have you been incarcerated before?

16      THE COURT:  He can answer yes, and then move on.

17      MR. ERNST:  Okay.

18      THE COURT:  I'll be right back.

19      (Recess from 10:16 a.m. to is 10:23 a.m.)

20      THE COURT:  Be seated.  I want to elaborate briefly

21  on my reasons for the ruling.  When a claim is made that an

22  element of damages is emotional distress, emotional

23  disturbance, that opens the door, not necessarily wide open,

24  but it opens the door to an examination of the stressors in a

25  person's life, and those stressors can be cumulative.  So you

*13-13308; Jennings v. Fuller, et al.*

*Francis Hartner - Redirect*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 63

1   pretty much lay your mental history or your past experiences

2   open to examination.

3       And I am sure that between *The Defense Journal*, *Trial*

4   *Magazine* and all of the other instructional material on how to

5   examine and cross-examine a witness there's ample discussion of

6   this point, and conventionally the way it's handled is take the

7   claim of emotional distress out and fairly limit the

8   examination of his prior history.

9       Since emotional distress is one of the factors that the

10  plaintiff claims is causally related to his experience in the

11  Genesee County Jail, the stressors in his life have some

12  arguable relevance.  And that also applies, for example, if he

13  did not disclose to Dr. Sheiner the fact that he has a history

14  of substance abuse.

15      Under those limitations we'll go question by question, and

16  I'll bring back the jury.

17      (Jury in at 10:26 a.m.)

18          **THE COURT:**  Come back in, folks.  Be seated.

19      Whether you know it or not, you have had your morning

20  break.  So if anyone needs a break before 1:00 o'clock, just

21  raise your hand.  Okay?  Thank you.

22      Call your witness.

23          **MR. ERNST:**  I call William Jennings.

24          **THE COURT:**  Raise your hand, sir.

25                          -   -   -

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 64

1              **WILLIAM JENNINGS,**

2        being first duly sworn by the Court to tell

3        the truth, was examined and testified upon his

4        oath as follows:

5          **THE COURT:**  Thank you.

6                    **-   -   -**

7                                              (10:26 a.m.)

8              **DIRECT EXAMINATION**

9   **BY MR. ERNST:**

10  **Q.**   Mr. Jennings, could you please state your full name for

11  the record.

12  **A.**   William Chandler Jennings.

13  **Q.**   And, Mr. Jennings, who do you live with currently?

14  **A.**   I live with my girl friend and my daughter.

15  **Q.**   And how many children do you have?

16  **A.**   I have two.

17  **Q.**   And where have you lived most of your life?

18  **A.**   Flint Township.

19  **Q.**   Can you keep your voice up?

20  **A.**   Flint Township.

21  **Q.**   Can you pull that microphone a little closer maybe.

22        Are you currently working?

23  **A.**   Yes, I am.

24  **Q.**   And where do you work?

25  **A.**   I work for Mata [sp] Corporation of America.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 65

1   **Q.**   And what do you do there?

2   **A.**   I am an installation engineer supervisor.

3   **Q.**   And how long have you been in that profession?

4   **A.**   Since 1992.

5   **Q.**   How old are you?

6   **A.**   I am 43.

7   **Q.**   Sir, I want to ask you a question about your medical

8   condition prior to September 18th, 2010.  Did you have any

9   problems or medical conditions?  Just answer yes or no.

10  **A.**   Yes.

11  **Q.**   Okay.  And then did you have any medical conditions

12  dealing with your lung capacity?

13  **A.**   Yes, I did.

14  **Q.**   What is it?

15  **A.**   Emphysema.

16          **THE COURT:**  Pull the mike just a little closer.  The

17  chair doesn't move.

18  **BY MR. ERNST:**

19  **Q.**   When were you diagnosed with emphysema?

20  **A.**   I believe it was 2008.

21  **Q.**   How does emphysema affect you?

22  **A.**   I have a hard time breathing.  There is sacs in my lungs

23  that are closed off so I have limited capacity in my lungs.

24  **Q.**   Do you take any medications for it?

25  **A.**   I do take an inhaler.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 66

1   **Q.**   Okay.  Do you have any -- did you have any medical

2   conditions regarding your legs prior to 2010?

3   **A.**   I did have two orthoscopic knee surgeries.

4   **Q.**   Okay.  Did you have any medical conditions concerning your

5   spine or neck prior to September 18th, 2010?

6   **A.**   Yes, I had a cervical fusion of my C-5 and C-6.

7   **Q.**   All right.  And when was that performed; do you remember?

8   **A.**   2004 or '5.

9   **Q.**   And how does that affect you?

10   **A.**   I just have limited movement in my neck as far as

11   rotation.

12   **Q.**   Is it ever painful?

13   **A.**   Not anymore.  Or after the surgery it wasn't.

14   **Q.**   Okay.  So did you -- do you have any conditions regarding

15   your eyesight?

16   **A.**   I had an astigmatism, which was corrected with LASIK

17   surgery.

18   **Q.**   When did you have the LASIK?

19   **A.**   2004 or '5.

20   **Q.**   And how was your vision after the LASIK?

21   **A.**   It was 20/25, I believe, and 20/20 in the other eye.

22   **Q.**   All right.  Sir, I'm going to direct your attention to

23   September 18th, 2010.  I'm sure you recall the events of that

24   day, correct?

25   **A.**   Oh, yes.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

1   **Q.**   What did you do during the daytime hours on that

2   particular -- well, actually it would be the daytime hours of

3   September 17th, 2010.

4   **A.**   We did some work at one of my properties.

5   **Q.**   Okay.  And September 17th, do you recall what day that

6   was, which day of the week?

7   **A.**   I believe it was a Friday.

8   **Q.**   All right.  And after you worked on your house, what did

9   you do?

10  **A.**   Then I went to go see a friend's band play at

11  Bubba O'Malley's Bar.

12  **Q.**   Okay.  And where is that in reference to where you live?

13  **A.**   Approximately seven, eight miles.

14  **Q.**   Did you see your friend's band play?

15  **A.**   Yes, I did.

16  **Q.**   And how long did you stay at Bubba O'Malley's?

17  **A.**   No more than an hour.

18  **Q.**   Did you have anything to drink at Bubba O'Malley's?

19  **A.**   I did drink a Coke.

20  **Q.**   Okay.  Nothing alcohol?

21  **A.**   No, I knew I was going to be driving.

22  **Q.**   All right.  And then where did you go after you went to

23  Bubba O'Malley's?

24  **A.**   I went to Down the Hatch bar on Corunna Road.

25  **Q.**   Down the Hatch bar what?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 68

1   **A.**   On Corunna Road near my house.

2   **Q.**   And how far is Down the Hatch from your house?

3   **A.**   Approximately two miles.

4   **Q.**   Did you drink at Down the Hatch?

5   **A.**   Yes, I did.

6   **Q.**   Okay.  Do you remember what you had?

7   **A.**   I believe it was some beers and some Johnny Vegas drinks.

8   **Q.**   Johnny Vegas is a particular kind of mixed drink?

9   **A.**   Yes, it is.

10  **Q.**   And as a result of drinking the beer and the mixed drinks,

11  did you become intoxicated?

12  **A.**   Yes, I did.

13  **Q.**   Did you drive a vehicle to Down the Hatch?

14  **A.**   Yes, I did.

15  **Q.**   What kind of vehicle was it?

16  **A.**   It was a Chevy truck.

17  **Q.**   And is that your truck?

18  **A.**   Yes, it is.

19  **Q.**   All right.  After you consumed the beers and the liquor,

20  what did you do?

21  **A.**   I slept in my truck in the parking lot.

22  **Q.**   And why did you do that?

23  **A.**   Because I was intoxicated and didn't want to drive.

24  **Q.**   Did you -- did there come a time when you woke up from

25  sleeping in your truck?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 69

1   **A.**   Yes, I did.

2   **Q.**   What did you do after you woke up?

3   **A.**   Walked home.

4   **Q.**   And did you make it all the way home?

5   **A.**   Yes, I did.

6   **Q.**   Did you discover anything unusual when you got home?

7   **A.**   Yes, my dogs were gone.

8   **Q.**   Did that concern you?

9   **A.**   Yes, it did.

10  **Q.**   Did you call anybody regarding that?

11  **A.**   Yes, I called my mom.

12  **Q.**   Okay.  What did you tell your mom?

13  **A.**   I asked her if she had picked my dogs up.  She told me no.

14  And I told her I had to go find them, they were gone, and she

15  said that she would come help me.

16  **Q.**   And did you try to look for your dogs?

17  **A.**   Yes, I did.

18  **Q.**   Did you do that on foot?

19  **A.**   No, I did not.

20  **Q.**   How did you look for them?

21  **A.**   I had a car for sale in my driveway, and I got the keys

22  for it and went to -- I took the car so that I would be able to

23  transport my dogs back.

24  **Q.**   And did that particular car -- was it plated?

25  **A.**   No, it was not.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 70

1   **Q.**   And then you got pulled over by the Flint Township police

2   officer; is that right?

3   **A.**   Yes, I did.

4   **Q.**   And you were given a PBT and a field sobriety test,

5   correct?

6   **A.**   Yes, I was.

7   **Q.**   And you failed those, didn't you?

8   **A.**   Yes, I did.

9   **Q.**   And you got arrested for drunk driving basically, OWI, as

10  they call it?

11  **A.**   That's correct.

12  **Q.**   And you are not contesting that you were drunk that night,

13  are you, Mr. Jennings?

14  **A.**   Not at all.

15  **Q.**   Did a Flint police officer handcuff you?

16  **A.**   Yes, he did.

17  **Q.**   Did he pat you down or search you?

18  **A.**   Yes, he did.

19  **Q.**   And do you recall seeing Officer Hartner, who testified

20  here today?

21  **A.**   Yes, I did.

22  **Q.**   Was he the officer that transported you to the --

23  **A.**   Yes, he was.

24  **Q.**   Did you have any issues with officer Hartner when he

25  transported you?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 71

1  **A.**   Not at all.

2  **Q.**   And then Officer Hartner arrived at the jail, correct?

3  **A.**   That's correct.

4  **Q.**   And then you went in the garage and then went into this

5  booking area that we have seen so many times on the video,

6  correct?

7  **A.**   That's correct.

8  **Q.**   When Officer Hartner brought you into that booking area or

9  report-writing room as they refer to it, did he kind of check

10  your pockets?

11  **A.**   Yes, he did.

12  **Q.**   Did he take any -- did he remove anything from them?

13  **A.**   I believe so.

14  **Q.**   All right.  Did you object to that?

15  **A.**   No.

16  **Q.**   Were you offended by it?  Were you mad because he was

17  taking your stuff out of your --

18  **A.**   I assumed he was just doing his job.

19  **Q.**   Did you comply with his orders?

20  **A.**   Yes, I did.

21  **Q.**   Then did he tell you to sit down on the bench?

22  **A.**   Yes, he did.

23  **Q.**   Did you sit there?

24  **A.**   Yes, I did.

25  **Q.**   Did he ask you any questions after you were sitting there?

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 72

1  **A.**   A couple.

2  **Q.**   All right.  Do you recall generally what he asked you

3  about?

4  **A.**   Date of birth, just basic information.

5  **Q.**   And did you refuse to give him that information or did

6  you --

7  **A.**   No.

8  **Q.**   Okay.  And did he ask you if you would submit to a

9  chemical test, a blood draw?

10  **A.**   Yes, he did.

11  **Q.**   And did you agree to do that?

12  **A.**   Yes, I did.

13  **Q.**   Okay.  Sir, you saw yourself sitting on the bench in those

14  videos, correct?

15  **A.**   That's correct.

16  **Q.**   I noticed a couple of times that you were like bending

17  forward.

18  **A.**   Yes, I did.

19  **Q.**   What were you doing there?

20  **A.**   Well, I have lower back problems, and being cuffed behind

21  my back, I was trying to kind of adjust the cuffs to where I

22  didn't have so much pressure towards the lower back.

23  **Q.**   Did there come a time when a deputy from the Genesee

24  County Sheriff's Department came into that report-writing room?

25  **A.**   Yes, he did.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 73

1   **Q.**   Do you recognize that person today in court?

2   **A.**   Yes, I do.

3   **Q.**   Can you point to him?

4   **A.**   He's the gentleman sitting on the end with the green tie.

5   **Q.**   Okay.  And did he say anything to you at that point?

6   **A.**   Yes.  He made a reference to -- I was, I was extremely

7   tired and I was falling asleep.  He made a reference to stay

8   awake.

9   **Q.**   Okay.  Did he -- can you describe Deputy Fuller's demeanor

10  towards you that day?

11  **A.**   He seemed agitated, not really friendly.

12  **Q.**   Did Deputy Fuller ask you any questions that day?

13  **A.**   Yes, he did.

14  **Q.**   Do you recall anything that he asked you?

15  **A.**   He told me to put my hands on the wall.

16  **Q.**   Well, before we get there, I'm asking you did he ask any

17  questions.

18  **A.**   I believe he did, general questions.

19  **Q.**   Okay.  Did you answer him?

20  **A.**   Yes, I did.

21  **Q.**   Did Deputy Fuller say anything else to you before he

22  started the pat-down procedure?

23  **A.**   Other than to keep my head up because I was kind of dozing

24  off.

25  **Q.**   Okay.  So, sir, did there come a time when Deputy Fuller

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 74

1   told you to stand up?

2   **A.**   Yes.

3   **Q.**   Did you comply?

4   **A.**   Yes, I did.

5   **Q.**   Did he tell you to turn around and face the wall?

6   **A.**   Yes, he did.

7   **Q.**   Did he -- you were handcuffed at that time, correct?

8   **A.**   I believe so, yes.

9   **Q.**   You were handcuffed -- well, let me ask you this.  The

10  Flint police officer, Officer Hartner, he never took your

11  handcuffs off, correct?

12  **A.**   No, he did not.

13  **Q.**   So when Deputy Fuller told you to stand up and turn

14  around, you were still cuffed then, right?

15  **A.**   That's correct.

16  **Q.**   And then after he asked you to stand up and turn around

17  and you complied, did he tell you to lean your head up against

18  the wall?

19  **A.**   Yes, he did.

20  **Q.**   Did you comply with that?

21  **A.**   Yes, I did.

22  **Q.**   Did he tell you that he was going to remove your cuffs?

23  **A.**   I believe he did.  I believe he told me that when he

24  removed the cuffs to place my hands on the wall.

25  **Q.**   Okay.  And after he removed your cuffs -- well, he removed

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 75

1   one cuff first, correct?

2   **A.**   That's correct.

3   **Q.**   And then did he tell you to put that hand on the wall?

4   **A.**   Yes, he did.

5   **Q.**   Did you do it?

6   **A.**   Yes, I did.

7   **Q.**   Did he remove the other cuff?

8   **A.**   Yes, he did.

9   **Q.**   Did he tell you to put your other hand on the wall?

10  **A.**   Yes.

11  **Q.**   And did you do that?

12  **A.**   Yes.

13  **Q.**   And then at some point in time did he ask you to remove

14  any articles of clothing?

15  **A.**   Yes, he told me to take my hoodie off and place it on the

16  bench and I did that.

17  **Q.**   Okay.  Did he tell you to remove anything else?

18  **A.**   My belt.

19  **Q.**   Did you comply?

20  **A.**   Yes, I did.

21  **Q.**   After he did that, did he tell you to put your hands back

22  on the wall?

23  **A.**   Yes, he did.

24  **Q.**   Did you comply with that?

25  **A.**   Yes, I did.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 76

1   **Q.**   And did Officer -- or Deputy Fuller then proceed to pat

2   you down?

3   **A.**   Yes, he did.

4   **Q.**   You saw in the video that it appears that you took your

5   hand off the wall.  Do you recall seeing that?

6   **A.**   Yes.

7   **Q.**   Okay.  Why did you do that?

8   **A.**   I was startled.

9   **Q.**   What startled you?

10  **A.**   It was kind of an abrupt motion on the lower end of my

11  groin.

12  **Q.**   Okay.  So he was patting down near your groin area?

13  **A.**   Yes.

14  **Q.**   Okay.  And after you were startled and pulled your hand

15  off the wall, what did you do with that hand?

16  **A.**   I put it right back.

17  **Q.**   Did Deputy Fuller ever command you to put your hand back

18  on the wall?

19  **A.**   No, he did not.

20  **Q.**   What happened next?

21  **A.**   I was taken by surprise.  The next thing I know I was

22  being shoved into the wall, and the only thing I could think to

23  do was turn my face so that I --

24  **Q.**   Let me stop you there.  Why did you turn your face?

25  **A.**   So I wouldn't go face first into the wall and smash my

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 77

1    nose.

2    **Q.**   And did you say anything at the time?

3    **A.**   Well, it happened very quickly, but I remember screaming

4    "what the fuck."

5    **Q.**   And after you said that, what happened?

6    **A.**   It escalated and I felt all kinds of pressure on my back

7    and head.

8    **Q.**   Okay.  And what happened next?

9    **A.**   I was sprayed in the face with --

10   **Q.**   Well, hold on.  Let me slow you down a little bit.  When

11   you say that you felt pressure, where was that pressure?

12   **A.**   It was on my head and back.

13   **Q.**   Okay.  And where were you at the time?

14   **A.**   Originally on the bench.

15   **Q.**   And did there come a time when you were removed from the

16   bench?

17   **A.**   Almost immediately after.

18   **Q.**   Were you trying to prevent the deputies from handcuffing

19   you at that point?

20   **A.**   No, not at all.

21   **Q.**   Did they ever tell you that they wanted you to -- that

22   they wanted to handcuff you?

23   **A.**   No, they did not.

24   **Q.**   All right.  So what happened after you went -- what

25   happened after you were on the bench?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 78

1  **A.**   I was immediately thrown to the floor.

2  **Q.**   And when you were on the floor, did anybody press on you?

3  **A.**   Oh, yes.

4  **Q.**   All right.  Where were they?

5  **A.**   On my head and my back.

6  **Q.**   Okay.  And where were the officers positioned with respect

7  to you on the floor?

8  **A.**   I couldn't really see where they were.  I could just feel

9  all the pressure on my face and on my back.

10 **Q.**   Did you ever indicate that you were -- did you ever tell

11 them anything about your condition at that point?

12 **A.**   I did scream that I have emphysema, I can't breathe.

13 **Q.**   And then what happened next?

14 **A.**   I was sprayed pretty much directly right in the mouth with

15 mace.

16 **Q.**   What affect did that have on you?

17 **A.**   I lost almost total ability to breathe, and I started

18 screaming and everything kind of went fuzzy and purple and I

19 don't remember anything after that.

20 **Q.**   Prior to you going fuzzy and purple, as you said, what

21 thoughts were going through your mind?

22 **A.**   That I was going to die.

23 **Q.**   Why?

24 **A.**   Because I couldn't breathe.

25 **Q.**   Okay.  Now, sir, what's the next thing that you remember

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 79

1  after you said that things went fuzzy and purple and you

2  couldn't remember much after that?

3  **A.**   I woke up strapped to a bench.

4         **MR. REISING:**  I'm sorry, I didn't hear the response.

5  **A.**   Waking up strapped to a bench.

6         **THE COURT:**  Have you got a bottle of water up there?

7         **THE WITNESS:**  Yes, I do.

8  **BY MR. ERNST:**

9  **Q.**   Mr. Jennings, are you ready to proceed or do you need a

10 couple of minutes?

11 **A.**   I'm okay.

12 **Q.**   I don't think that Mr. Reising heard your last answer when

13 I said what do you remember next?

14 **A.**   Well, by looking at the videos, I --

15 **Q.**   No, just tell me what you remember.

16 **A.**   I remember waking up or coming to in the security cell

17 strapped to the bench.

18 **Q.**   And were you experiencing any difficulties at that time?

19 **A.**   I couldn't breathe.

20 **Q.**   How did your face feel?

21 **A.**   Like it had been ran over by a truck.

22 **Q.**   Okay.  How did your throat feel?

23 **A.**   Swollen.

24 **Q.**   Did you, did you realize whether or not you had been

25 pepper-sprayed at that point?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 80

**A.**   That was the last thing that I had remembered up to that

point.

**Q.**   Okay.  When you woke up, could you feel the effects of it?

**A.**   Oh, yes.

**Q.**   Did you have anything over your head at that point?

**A.**   Yeah, I had some kind of mask.

**Q.**   Did that restrict your ability to breathe at all?

**A.**   All the blood from my face had filled the pores, it was

just stuck to my face, so I kept like passing back out.

**Q.**   Did you experience any anxiety at that point?

**A.**   Oh, God, yes.

**Q.**   I'm sorry, what?

**A.**   Yes, I did.

**Q.**   Okay.  And what was going through your mind at that point?

**A.**   I, I had no idea.  I didn't know where I was.  I could

hear voices in the background.  I was scared.

**Q.**   What were you scared of?

**A.**   I thought they were going to kill me.

**Q.**   Okay.  Were you concerned about your ability to breathe?

**A.**   Well, yes, I couldn't breathe, not really.

**Q.**   Did you have -- well, strike that.

       Sir, did you try to struggle while you were in that bed?

**A.**   Yes, I did.

**Q.**   And were you trying to escape?

**A.**   I was just trying to breathe.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 81

1   **Q.**   You mentioned that there was blood soaked into the mask,

2   and was your, was your -- when you woke up, was your head

3   touching the bed?

4   **A.**   Yes.

5   **Q.**   And did you do anything with regard to trying to breathe

6   better?

7   **A.**   I chewed a hole in the mask.

8   **Q.**   And did anything happen when you chewed that hole?

9   **A.**   I broke my tooth.

10  **Q.**   And do you know how long that you laid there for?

11  **A.**   It seemed like forever.  I don't know.

12  **Q.**   When is the first time that you saw anybody?

13  **A.**   It would have been a couple hours, I think.  I don't know.

14  **Q.**   You are not able to keep time though, correct?

15  **A.**   Correct.

16  **Q.**   Were you in any pain while you were laying there?

17  **A.**   Excruciating.

18  **Q.**   What part of you hurt?

19  **A.**   I think even my hair hurt.  Everything hurt.

20  **Q.**   Did your head hurt?

21  **A.**   Yes.

22  **Q.**   Did anybody ever come in and draw blood from you?

23  **A.**   Yes.

24  **Q.**   Was that the first time you saw anybody in that cell when

25  you woke up?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 82

1          **MR. REISING:**  I would object to that, Your Honor,

2   because the witness indicated he doesn't recall --

3          **THE COURT:**  Wait a minute.  You can cross-examine

4   him.

5       Go back a moment.  Don't lead the witness.

6          **MR. ERNST:**  I'm trying not to, Your Honor, but I want

7   to do it sequentially.

8          **THE COURT:**  Let's go back.  Start over.

9   BY MR. ERNST:

10  **Q.**   Did somebody come into your cell that you remember?

11  **A.**   I do know that there was presence there.

12  **Q.**   And did somebody draw blood from you that you remember?

13  **A.**   I did feel it.

14  **Q.**   And did that person put a bandage on your arm?

15  **A.**   Yes.

16  **Q.**   Did you have one before?

17  **A.**   No.

18  **Q.**   When that person was drawing blood, was there anybody

19  kneeling on you at the time?

20  **A.**   Yes.

21  **Q.**   Was anybody talking to you?

22  **A.**   Just I believe somebody said "stay still."

23  **Q.**   Okay.  Sir --

24          **THE COURT:**  Go ahead.

25       (Video started and continued while the following

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 83

1          proceedings occurred.)

2    **BY MR. ERNST:**

3    **Q.**   Sir, I'm going to show you this video and ask you if you

4    can identify the bandage that was placed on you after the blood

5    draw.

6    **A.**   I see it right there.

7    **Q.**   Right there?

8    **A.**   Yeah.

9    **Q.**   Okay.  That wasn't on your arm before that, right?

10   **A.**   That's correct.

11   **Q.**   Sir, when that nurse came in and did that blood draw, did

12   anybody wash your face off?

13   **A.**   No.

14   **Q.**   Did anybody perform any other medical procedure on you?

15   **A.**   No.

16   **Q.**   Did anybody even remove your spit hood?

17   **A.**   No.

18   **Q.**   And after they left, sir, did anybody else come in before

19   you -- the deputies came in the next morning?

20   **A.**   I don't believe so.

21   **Q.**   Okay.  Did you ever hear anybody say anything to you that

22   night?

23   **A.**   They did.

24   **Q.**   What did they say?

25   **A.**   "You're going to die."

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 84

1    **Q.**   Okay.  So you heard a voice that said that?

2    **A.**   Yes, I did.

3    **Q.**   But you can't identify who did it?

4    **A.**   No, I cannot.

5    **Q.**   So, sir, the next time anybody came in was the -- you

6    mentioned there were several deputies that you hadn't seen

7    before, correct?

8    **A.**   That's correct.

9    **Q.**   All right.  If you will just bear with us, we have to play

10   this through, but when those deputies came in, how were you

11   feeling?

12   **A.**   Violated.

13   **Q.**   What do you mean "violated"?

14   **A.**   Well, I mean I didn't do anything that would even be

15   noncompliant to -- you know, I don't understand what happened

16   to me.

17   **Q.**   And were you in any pain at that time?

18   **A.**   Oh, yes.

19   **Q.**   Describe the pain that you were in.

20   **A.**   Well, my head felt like it was in a vice.  Every muscle in

21   my body pretty much hurt.  My lungs, my mouth, my face was on

22   fire.

23   **Q.**   Up until that time, sir, had anybody ever rinsed you off

24   that you know about?

25   **A.**   No.

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 85

1 **Q.**   So, sir, when the deputies came in, did they inform you

2 that they were going to unstrap you from the bed?

3 **A.**   Yes, they did.

4 **Q.**   Okay.  And did they subsequently do that?

5 **A.**   Yes, they did.

6 **Q.**   And did you still have the spit hood on at that time?

7 **A.**   Yes, I did.

8 **Q.**   All right.  And did you see the one man there with the

9 taser?

10 **A.**   Yes.  I couldn't see him at that point, but I see it on

11 the video.

12        **MR. ERNST:**   All right.  Will you roll it a little

13 bit.

14 **BY MR. ERNST:**

15 **Q.**   And did the deputies then tell you to stand up and go

16 stand in the corner?

17 **A.**   They asked if they were going to get any problem out of me

18 and I said no, then they told me to stand in the corner.

19        **MR. ERNST:**   All right.  Stop.

20 **BY MR. ERNST:**

21 **Q.**   Sir, did you comply with that order?

22 **A.**   Yes, I did.  Well, I tried.

23 **Q.**   You tried?

24 **A.**   I couldn't stand up.

25 **Q.**   So was that you attempting to stand up?

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 86

1  **A.**   Yes.

2  **Q.**   Did you inform the deputies that you were unable to stand

3  up?

4  **A.**   Yes, I did.

5  **Q.**   Did they then assist you to stand up?

6  **A.**   They did.

7  **Q.**   And how -- were you able to walk like you normally do?

8  **A.**   No.

9  **Q.**   What was different?

10  **A.**   Just everything was tight and sore.  I couldn't barely

11  move.

12  **Q.**   And did you have your normal strength?

13  **A.**   Absolutely not.

14  **Q.**   And did you stand in the corner as they told you to do?

15  **A.**   I did.

16  **Q.**   And then did they tell you to remove some articles of

17  clothing?

18  **A.**   I believe so, yes.  The spit mask.

19  **Q.**   Okay.  So they finally took the spit mask off at that

20  point?

21  **A.**   Yes.

22  **Q.**   All right.  Did they tell you to sit down on that slab at

23  some point?

24  **A.**   Yes.

25  **Q.**   And did you comply with that?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 87

1  **A.**   Yes, I did.

2  **Q.**   And did they tell you to take your socks off?

3  **A.**   Yes.

4  **Q.**   Did you comply with that?

5  **A.**   Yes, I did.

6  **Q.**   And then were you seen at that time by a medical person?

7  **A.**   Yes, a nurse.

8  **Q.**   All right.  Is that the nurse that you saw?

9  **A.**   Yes, it is.

10  **Q.**   And what did she do; do you remember?

11  **A.**   The first thing she said is that he didn't look like that

12  when I seen him last night.

13  **Q.**   Okay.  And then what did she do in terms of doing any kind

14  of medical procedure on you; do you remember?

15  **A.**   At this point or when I went to the medical floor?

16  **Q.**   No, right there.  At this point.

17  **A.**   I think she was just looking me over.

18  **Q.**   And then did she tell you to do or not do anything?

19  **A.**   I don't recall.

20  **Q.**   All right.  Do you see her manipulating your arm there?

21  Do you recall what she was doing there?

22  **A.**   She might have been taking my blood pressure.

23  **Q.**   Do you see you lift your arms there?

24  **A.**   Yeah, I think she might have been checking my motor

25  functions.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 88

1   **Q.**   Okay.  And how did it feel when you lifted your arms?

2   **A.**   It hurt.

3   **Q.**   What part of it hurt?

4   **A.**   Well, my shoulders, my hands, my back, my neck.

5   Everything pretty much hurt every time I moved.

6   **Q.**   Then did the deputies tell you that you could use the sink

7   there?

8   **A.**   Yes, they did ask.

9   **Q.**   What did you do when you went over there?

10  **A.**   I got a drink of water.

11  **Q.**   Did you rinse your mouth out?

12  **A.**   Yes.

13  **Q.**   How was your throat feeling at that point?

14  **A.**   Raw, sore.

15  **Q.**   Is that the first time that you had had water that you

16  know of since the first time you walked into the jail?

17  **A.**   Yes.

18  **Q.**   And did the deputies then inform you that you were going

19  to be moved from that cell?

20  **A.**   Yes.

21  **Q.**   Where were you going to be taken?

22  **A.**   The medical floor.

23  **Q.**   And did the deputies then tell you to lean up against the

24  wall so that they could handcuff you?

25  **A.**   Correct.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 89

1  **Q.**   And did you comply with their commands?

2  **A.**   I did.

3  **Q.**   Did they subsequently transport you to the medical floor?

4  **A.**   Yes, they did.

5  **Q.**   When you went to the medical floor, did they -- let me

6  just ask -- let me just finish watching this with you.

7       Do you recall anything else that they said to you?

8  **A.**   Not in particular.

9       **MR. ERNST:**   All right.   You can switch it off.

10      (Video stopped.)

11  **BY MR. ERNST:**

12  **Q.**   When you went to the medical floor, did you get any

13  medical testing done on you?

14  **A.**   I --

15  **Q.**   Just yes or no.

16  **A.**   Yes.

17  **Q.**   Okay.   And among the tests that were performed, did

18  anybody check your vitals?

19  **A.**   Yes.

20  **Q.**   And do you remember exactly what your vitals were at that

21  point?

22  **A.**   My diastolic was high.   I was -- my blood pressure, I

23  believe it was 130 over 112.

24  **Q.**   Okay.   And do you remember exactly what it was?

25  **A.**   It was --

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 90

1  **Q.**   If you don't, just say you don't remember.

2  **A.**   It was close to that.  It was about 110, 112 was the

3  diastolic.  It was over 100, which concerned me.

4  **Q.**   Okay.  And do you recall what your heart rate was?

5  **A.**   It was 108.

6  **Q.**   And did those things concern you?

7  **A.**   Extremely.

8  **Q.**   Why?

9  **A.**   My mom worked at a hospital for over 30 years at that

10 point so she used to talk to me a lot about the cardiac

11 patients and a-fib, things like that, and the diastolic being

12 over 100 and the numbers being close together, it was risk for

13 a stroke or cardiac arrest.

14 **Q.**   Were you concerned at that point about your health?

15 **A.**   I was concerned that I either was about to or had already

16 possibly even had a stroke or cardiac arrest during these

17 events.

18 **Q.**   Did they perform any other procedures on you there?

19 **A.**   She did rinse my face off at that point.  They cleaned me

20 up for court.

21 **Q.**   Okay.  And when you said they cleaned you up for court,

22 what do you mean?

23 **A.**   Well, I asked if I could go to the hospital when I seen my

24 blood pressure, and I was told no, I had to go to court first.

25 **Q.**   And where were you taken after the medical procedures on

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 91

1    the medical floor?

2    **A.**   I was put down in the drunk tank.

3    **Q.**   Was there anybody else in that drunk tank?

4    **A.**   About at least a dozen people.

5    **Q.**   Did anybody comment on your looks at that time?

6    **A.**   Oh, yes.

7    **Q.**   What did they say?

8    **A.**   A couple --

9           **MR. REISING:**  I object, Your Honor.  That's all

10   hearsay.

11          **MR. ERNST:**  It's not being offered for the truth of

12   the matter, Your Honor.

13          **THE COURT:**  Let's move on.

14          **MR. ERNST:**  Okay.

15   **BY MR. ERNST:**

16   **Q.**   Did anybody inform you that you had been tasered?

17   **A.**   Yes.

18   **Q.**   Who informed you of that?

19   **A.**   The guys in the drunk tank.

20   **Q.**   How did they know?

21   **A.**   They could hear it.

22          **MR. REISING:**  I'm sorry?

23          **MR. ERNST:**  They could hear it.

24          **MR. REISING:**  Hear?

25          **MR. ERNST:**  Hear.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 92

**BY MR. ERNST:**

**Q.**   All right.  And how did you get out of the jail that next morning?

**A.**   I had to go to court and then bond out.

**Q.**   So did you actually go over to a courthouse or how did that work?

**A.**   It was video court in the jail.

**Q.**   So they put you in front of some video mechanism?

**A.**   Right.

**Q.**   And the judge set a bond for you?

**A.**   Yes.

**Q.**   Who came and got you?

**A.**   My mother.

**Q.**   How did your mom know you were there?

**A.**   I called her when I was in the drunk tank.

**Q.**   Where did you go after you left, after your mom came and bailed you out?

**A.**   To McLaren Hospital.

**Q.**   And why did you go to McLaren?

**A.**   I was in a lot of pain.  I knew I had some injuries.  I wanted to find out how bad they were.

**Q.**   Did anybody at the jail, when you went to the medical, did they advise you to go to ER?

**A.**   The nurse did.

**Q.**   Okay.  And when you went to McLaren, what happened?  Did

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5–Page 93

1  you go to the ER, emergency room?

2  **A.**   Yes, I did.

3  **Q.**   How did you get from the car to there?

4  **A.**   My mom helped me.

5  **Q.**   Okay.  And when you got into the hospital, what happened?

6  **A.**   They put me in a wheelchair and took me back to be

7  examined.

8  **Q.**   Were any tests done at McLaren that you know of?

9  **A.**   Yes.  Yes, there was.

10  **Q.**   What kind of tests?

11  **A.**   I believe a CT scan and some basic checks, my eyes and

12  things of that nature.  I think they also drew blood, too.

13  **Q.**   Did you get, did you get admitted into the hospital or did

14  they discharge you?

15  **A.**   They discharged me.

16  **Q.**   Okay.  Did they give you any discharge instructions with

17  regard to any follow-up medical care?

18  **A.**   Follow up with my medical doctor.

19  **Q.**   How did you feel when you, how did you feel when you got

20  to McLaren Hospital?

21  **A.**   Horrible.

22  **Q.**   Can you be more specific?  Can you tell me what your chief

23  pain was?

24  **A.**   Well, I was having trouble seeing, still having trouble

25  breathing.  Severe headache.  My -- every muscle in my body

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 94

1  hurt.  I had no strength.  I could barely walk.

2  **Q.**   Okay.  All right, sir.  I'm going to show you a series of

3  pictures.  I believe there's a date on the bottom of this

4  one that says September 19th.  Do you know who took those

5  photos?

6  **A.**   My mom.

7  **Q.**   And that's what you looked like the next day?

8           **THE COURT:**  What exhibit number is that?

9           **MR. ERNST:**  I'm sorry, Your Honor, that would be

10  Exhibit Number 1.

11           **THE COURT:**  That's a series of photos?

12           **MR. ERNST:**  And I'll call that 1A, if the Court

13  please.

14           **THE COURT:**  Well, you have already had that photo

15  before, haven't you?

16           **MR. ELLIOTT:**  Yeah, we have seen it before.

17  **BY MR. ERNST:**

18  **Q.**   Okay.  And does that depict the condition of the front of

19  your face?

20  **A.**   Yes.

21  **Q.**   Okay.  Now I'm going to show you the next one.  Can you

22  tell us what that shows?

23  **A.**   I believe that was back behind my ear where Officer White

24  stated he was doing the pain technique.

25  **Q.**   And so --

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 95

1        **THE COURT:**  That was 1B?  You've got to --

2        **MR. ERNST:**  Yeah, 1B, I'm sorry.

3        **THE COURT:**  If you introduce a photo, give it a

4  number.

5        **MR. ERNST:**  Okay.  I'm sorry, Your Honor.

6  BY MR. ERNST:

7  **Q.**  Was that swollen or what?

8  **A.**  It was swollen.  It hurt.

9        **MR. REISING:**  I'm going to object, Your Honor.  He's

10  not a medical doctor.  He can describe what he recalls, but he

11  can't -- swollen is a medical term.

12        **MR. ERNST:**  Your Honor --

13        **THE COURT:**  Go ahead, Mr. Ernst.

14  BY MR. ERNST:

15  **Q.**  I'm going show you the next, which is 1C.  What does that

16  depict?

17  **A.**  I believe that's shoulder bruising.  I can't really see it

18  from this angle.

19  **Q.**  Okay.  Well, you have the -- you know what, you have the

20  copy of -- I can -- I'm sorry, I should have showed you this.

21  Can you see it better now?

22  **A.**  Yes, I can.

23  **Q.**  Okay.  Can you tell the jury now what that depicts?

24  **A.**  It looks like, for lack of better word from swollen --

25  **Q.**  Well, you can say swollen.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 96

1   **A.**   Swollen muscles and some bruising.

2   **Q.**   Is there anything wrong with your skin there?

3          **THE COURT:**  This is all self-diagnosis, right?

4          **MR. REISING:**  Right.

5   **BY MR. ERNST:**

6   **Q.**   I'm asking him what the picture depicts with regard to

7   your skin.

8   **A.**   It looks like a rug burn kind of.

9   **Q.**   All right.  And then can you turn to the next page, 1D?

10  **A.**   Yes.

11  **Q.**   Is that another picture of it?

12  **A.**   It appears to be.

13         **MR. REISING:**  Your Honor, I would just indicate these

14  photographs speak for themselves.  The photographs speak for

15  themselves.

16         **THE COURT:**  I think they do.  If you want to show a

17  series of photographs, show them.

18         **MR. ERNST:**  Okay.

19      Can you show us the next one.

20  **BY MR. ERNST:**

21  **Q.**   Is that how your face looked on -- this is 1E -- Is that

22  how your face looked on September 19th, the left side your

23  face?

24  **A.**   Yes, it is.

25  **Q.**   Was it swollen?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 97

1   **A.**   Yes.

2   **Q.**   Was it painful?

3   **A.**   Yes.

4   **Q.**   Okay.  The next one, 1F, is that the right side of your

5   face?

6   **A.**   Yes, it is.

7   **Q.**   Okay.  Was it swollen?

8   **A.**   Yes.

9   **Q.**   Was it painful?

10  **A.**   Oh, yes.

11  **Q.**   Okay.  Next, can you tell us what that depicts?

12  **A.**   That would be my left hip.

13  **Q.**   All right.  And was that bruised?

14  **A.**   Yes.

15  **Q.**   Okay.  The next one, do you recall what that is?

16          **THE COURT:**  What letter is that?

17          **MR. ERNST:**  1G.

18          **THE WITNESS:**  It looks like the front of my right

19  hip.

20  **BY MR. ERNST:**

21  **Q.**   Okay.  1H, do you see that?

22  **A.**   Yes.

23  **Q.**   And what does that depict?

24  **A.**   It shows a little bit of bruising, still red on the upper

25  shoulders and back of the neck.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 98

1   **Q.**   And was that area painful?

2   **A.**   Yes.

3   **Q.**   This is 1I, the next one.  What does that depict?

4   **A.**   It looks like the same picture.

5   **Q.**   1J, is that also your back?

6   **A.**   Yes.

7   **Q.**   All right.  Then 1K.  Is that your leg, your right leg?

8   **A.**   Well, it looks like my side.

9   **Q.**   This one, Bill.

10  **A.**   Oh, I'm sorry, I was on the wrong picture.

11  **Q.**   Is that your leg?

12  **A.**   Yes, it is.

13  **Q.**   Had you injured that that day?

14  **A.**   Yes.

15  **Q.**   1L, is that both your legs?

16  **A.**   Those are burns from the straps.

17  **Q.**   Okay.  And 1M, that's the one you just commented on?

18  **A.**   Yes.

19  **Q.**   What does that depict?

20  **A.**   Just the bruising and redness in the shoulders and neck.

21  It also kind of shows the backside of the jaw being swollen.

22  **Q.**   And 1N we just -- it's kind of hard to make out so I'm

23  going to go to O.  Can you tell us what that depicts?

24        Is that another picture of your shoulder?

25  **A.**   Yes.

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 99

1 **Q.**   Okay.  Now we're going to go to 1P.  It appears that you

2 are in a hospital gown.  Do you know where these pictures were

3 taken?

4 **A.**   I believe it was McLaren.

5 **Q.**   Okay.  And are those your wrists in the picture?

6 **A.**   Yes.

7 **Q.**   Do you have any abrasions or anything on your wrists?

8 **A.**   Yes, from the handcuffs.

9 **Q.**   Okay.  Go to Q.  Is that your leg, right, taken at

10 McLaren?

11 **A.**   Yes, it is.

12 **Q.**   R, does that depict your wrist and the handcuff injuries?

13 **A.**   Yes.

14 **Q.**   Okay.  S, those are additional pictures of your wrists and

15 the handcuff injuries?

16 **A.**   Yes, it is.

17 **Q.**   Okay.  Now we're going to go to T.  There appears to be

18 some type of bubbling on your skin there.  Do you know what

19 that is?

20 **A.**   Yeah.  I would assume just like rug burn.

21 **Q.**   Okay.  And do you see the bandage in this picture?

22 **A.**   Yes.  That was from the blood draw.

23 **Q.**   Then U, that appears to be your left shoulder this time;

24 is that right?

25 **A.**   That's correct.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 100

1    **Q.**    Then V, that's a picture of you from the same day that you

2    got out of jail, right?

3    **A.**    Yes, it is.

4    **Q.**    Then W, is that also from the same -- well, you appear to

5    be in a hospital gown.  Is that another picture from McLaren?

6    **A.**    I believe so, yes.

7    **Q.**    All right.  And then X?

8    **A.**    Yes.

9    **Q.**    Does that demonstrate the swelling under your right eye?

10   **A.**    Yes.  Yes, it is.

11   **Q.**    All right.  And Y?  Sorry that they are upside down.

12           That's further demonstrating your right eye, correct?

13   **A.**    Yes.  Showing a little bit of the blood in the eye and the

14   swelling underneath along with the cheek.

15   **Q.**    Then Z, the next one.  That's your left eye, right?

16   **A.**    Yes, it is.

17   **Q.**    AA, that's your left eye?

18   **A.**    That appears to be the right eye.

19   **Q.**    I'm sorry, right eye.  BB, what are you trying to show us

20   there?  What does that depict?

21   **A.**    The cut underneath my nose and the swelling of the cheek

22   underneath the eye.

23   **Q.**    Okay.  And then CC, there appears to be teeth in there.

24   **A.**    Yeah, it's where I chipped my tooth.

25   **Q.**    Which tooth is chipped?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 101

**A.**   It would be the --

**Q.**   Mr. Elliott will point to it.  Can you -- is it that one?

**A.**   No.

**Q.**   That one?

**A.**   Yes.

**Q.**   Then DD.  Is that the left side of your face?

**A.**   Yes.

**Q.**   All right.  And finally EE?

**A.**   That's showing a -- it's a few days later.  I had actually taken that picture myself just to show the blood in the eye and where the skin had burned and peeled away.

**Q.**   So underneath your left eye there is some skin that had pealed away and it's red; is that right?

**A.**   That's right.

**Q.**   Okay.  Mr. Elliott is indicating on the screen.  Is that what you're talking about?

**A.**   Yeah, it's basically from the dot up a couple inches, that whole area there.

**Q.**   Okay.  And did that particular portion of your face have any marks on it?

**A.**   Initially there were some lines on it.

**Q.**   Okay.  Did you follow up with your doctor at -- did you follow up with your doctor as you were instructed to do?

**A.**   Yes, I did.

**Q.**   And what day did you do that?  Do you remember what day of

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 102

1   the week it was?

2   **A.**   It was Monday.

3   **Q.**   And what did your doctor -- what happened when you went to

4   see your doctor?

5   **A.**   He told me I needed to go to the hospital.

6   **Q.**   And is he part of a certain hospital group or anything?

7   **A.**   He's affiliated with Genesys Health Group.

8   **Q.**   And is that where you went to the hospital?

9   **A.**   Yes, it is.

10  **Q.**   Were you diagnosed with any injuries that you know of?

11  **A.**   Yes, I was.

12  **Q.**   Okay.  Did you have any broken bones?

13  **A.**   Yes, I did.

14  **Q.**   Where?

15  **A.**   My orbital bone, my orbital spine and then my nose.

16  **Q.**   Okay.  When you say your orbital spine, you mean a bone on

17  your face?

18  **A.**   Yeah, the bone between my eyeballs.

19  **Q.**   Did you get any treatment when you went to Genesys?

20  **A.**   Pain medication.  I think they, I believe they gave me

21  some, some IV for my fluids.  It's kind of hard to remember

22  exactly.  I was -- I slept a lot while I was there.

23  **Q.**   Did you have any other pain that you developed or that you

24  noted following Genesys?

25  **A.**   Shoulder.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 103

**Q.**   Okay.  Which shoulder?

**A.**   My left shoulder.

**Q.**   Okay.  Did that hurt when you first got out of the jail?

**A.**   Yes, it did.

**Q.**   Okay.  Did that pain ever go away or resolve?

**A.**   No, it did not.

**Q.**   How is your shoulder today?

**A.**   It's, it's -- I don't have the movement that I should have in it.

**Q.**   Okay.  And what limitations of movement do you have?

**A.**   I can only move almost to a 90-degree angle from side motion.

**Q.**   Can you stand up and demonstrate?

**A.**   Yes.  With my right arm I can move up.  My left arm, that's as high as I can go.

**Q.**   Okay.  And if you try and go higher, what happens?

**A.**   I just can't.

**Q.**   And did you ever have a diagnosis about what's wrong with your shoulder?

**A.**   Torn rotator cuff.

**Q.**   Okay.  Did you ever have any -- you can take your seat.

Did you ever have any issues following this with your vision?

**A.**   Yes, I did.

**Q.**   When did you first start having them?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 104

1   **A.**    A couple weeks after.

2   **Q.**    Okay.  But what kind of vision changes did you notice?

3   **A.**    Blurry, and I was having problems, starting to have

4   problems with light.

5   **Q.**    Did you have those types of issues before?

6   **A.**    No.

7   **Q.**    Did you seek any treatment for that?

8   **A.**    Yes, I did.

9   **Q.**    Who did you go see?

10   **A.**    I called Dr. Waters.

11   **Q.**    Was he the physician who did your LASIK surgery?

12   **A.**    Yes, he was.

13   **Q.**    And how long has he been your doctor?

14   **A.**    Off and on since early '90s.

15   **Q.**    Since this incident and since you went and saw Dr. Waters,

16   has your vision improved?

17   **A.**    No.

18   **Q.**    Has it stayed the same?

19   **A.**    It's got worse.

20   **Q.**    Did Dr. Waters recommend any type of procedure with regard

21   to your vision?

22   **A.**    Told me once my vision stabilized that we could look into

23   cataract surgery.

24   **Q.**    Did you ever seek any treatment for your shoulder?

25   **A.**    Yes, I did.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 105

1  **Q.**    What kind of a treatment did you seek?

2  **A.**    I tried physical therapy.  I consulted about surgery, but

3  after being off work for a period of time, I really couldn't

4  afford to be off work for six weeks per surgery and I was told

5  it would take approximately three or four surgeries to get it

6  right.

7  **Q.**   Now, sir, you got charged with drunk driving that night,

8  correct?

9  **A.**    That's correct.

10  **Q.**   Did you plead guilty or not guilty?

11  **A.**    I pled guilty.

12  **Q.**   All right.  And then sometime later you got charged with

13  resisting and obstructing, correct?

14  **A.**    That's correct.

15  **Q.**   And do you know approximately how much later those charges

16  came?

17  **A.**    About a year.

18  **Q.**   Okay.  Sir, I'm going to ask you to look at Exhibit 14

19  right here and ask you if you can see the date of what's called

20  the complaint, the criminal complaint for resisting and

21  obstructing.  Do you see that date?

22  **A.**    Yes, I do.

23  **Q.**   Okay.  What's the date?

24  **A.**    11-29, 2010.

25  **Q.**   So does that sound about right when that case started

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 106

1    against you?

2    **A.**   No, it -- that's not the way I recall it, but ...

3    **Q.**   Okay.  Well, did it occur in the year 2010 that you had to

4    go to court for the first time on that charge?

5    **A.**   I don't believe I went to court on this until 2011.

6    **Q.**   Okay.  And did you hire a lawyer for -- to represent you

7    on those charges?

8    **A.**   Yes, I did.

9    **Q.**   And what was the first lawyer you hired?

10   **A.**   The first attorney that I hired was Sam Terry.

11   **Q.**   Okay.  And did you pay Mr. Terry money?

12   **A.**   Yes, I did.

13   **Q.**   How much did you pay him?

14   **A.**   $2,000.

15   **Q.**   Okay.  Did you subsequently hire a different lawyer?

16   **A.**   Yes, I did.

17   **Q.**   And what happened to Mr. Terry?

18   **A.**   Mr. Terry's practice moved to Dallas, Texas so he couldn't

19   officially represent me.

20   **Q.**   Okay.  Who was the second lawyer you hired?

21   **A.**   Well, with Sam Terry I also hired Jonathan Buffet [sp],

22   and his practice -- he went to a private practice where he

23   couldn't take outside cases anymore, they were all through the

24   firm, and then after that I hired Patrick Kirby.

25   **Q.**   Okay.  Where was Mr. Kirby's office at the time?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 107

1   **A.**   I believe it was downtown Flint.

2   **Q.**   How much did you pay Mr. Kirby?

3   **A.**   7500.

4   **Q.**   Did Mr. Kirby see your case through its conclusion?

5   **A.**   He did not.

6   **Q.**   Do you know why?

7   **A.**   He died.

8   **Q.**   And, sir, what happened to the charges against you in this

9   case, with the resisting and obstructing charge?

10   **A.**   They were dismissed.

11   **Q.**   Okay.  Do you remember the exact date?

12   **A.**   I do not.

13   **Q.**   Okay.  Would looking at Exhibit 14 refresh your memory on

14   this dismissal order?

15   **A.**   10-10, 2012.

16   **Q.**   Sir, how old is your youngest daughter?

17   **A.**   She's three.

18   **Q.**   So your wife -- I'm sorry, your girl friend, when was she

19   pregnant with your daughter?

20   **A.**   During the time of this.

21   **Q.**   During the time, when you say "this," what do you mean?

22   **A.**   Oh, when I was going to court for this, for this resisting

23   charge, she was pregnant.

24   **Q.**   Okay.  Did anything else stressful happen to you in 2012?

25   **A.**   I was diagnosed with cancer.

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

1  **Q.**  And how did that happen?  Like how did you find out about
2  it?

3  **A.**  I had a swollen lymph node on my neck.

4  **Q.**  Okay.  And where did you seek treatment for it?

5  **A.**  Originally through my family doctor and then through
6  Genesys Hurley.

7  **Q.**  All right.  When was the first time that you learned that
8  you were diagnosed with cancer?

9  **A.**  It would have been May, I believe, of 2012.

10  **Q.**  So at that time your girl friend was pregnant, right?

11  **A.**  That's correct.

12  **Q.**  And you were facing this felony charge, correct?

13  **A.**  That's correct.

14  **Q.**  Did the fact that you had those charges against you
15  concern you in any way?

16  **A.**  Of course it did.

17  **Q.**  Why?

18  **A.**  Well, my girl friend was pregnant.  I was told I was
19  Stage IV and possibly had three months to live and was now
20  looking at being incarcerated with no ability to try to fight
21  my cancer.

22  **Q.**  Sir, did you have any change in your mental health after
23  the incident on September 18th, 2010?

24  **A.**  Yes, I did.

25  **Q.**  Did you have any issues with sleeping?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 109

1   **A.**   Yes, I did.

2   **Q.**   Can you tell the jury what they were?

3   **A.**   I was extremely restless.  I would have nightmares.  They

4   would wake me up in the middle of the night.  Cold sweats.

5   **Q.**   Had you ever had anything like that prior to

6   September 18th, 2010?

7   **A.**   No.

8   **Q.**   Do you know what a flashback is, sir?

9   **A.**   Yes, I do.

10   **Q.**   What's your understanding of it?

11   **A.**   A flashback is when you see something that reminds you of

12   an event and then you basically relive it in your mind.

13   **Q.**   Did you ever experience any of that kind of phenomena

14   after September 18th, 2010?

15   **A.**   Yes, I did.

16   **Q.**   How often did that occur?

17   **A.**   At first it was once, maybe twice a week.

18   **Q.**   Okay.  Did it -- did those events get less frequent?

19   **A.**   Yes, they did.

20   **Q.**   And have you had one recently?

21   **A.**   Just since this started.

22   **Q.**   When you say "this," you mean the trial?

23   **A.**   The trial, yes.

24   **Q.**   Sir, do you have any type of anxiety disorder?

25   **A.**   Yes, I do.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 110

1   **Q.**   And when was the first time you had that type of
2   condition?

3   **A.**   Since my late teens.

4   **Q.**   And did that -- did this -- did the events of
5   September 18th, 2010 have any affect on that anxiety disorder?

6   **A.**   My anxiety was under control for years prior to that
7   event, and it's probably tenfold now what it used to be or at
8   that point.  It is getting better.

9   **Q.**   Did you experience any changes after this incident with
10   regard to your behavior?

11   **A.**   Yes.

12   **Q.**   All right.  Can you tell the jury, like let's start with
13   one the most relevant to you.  What changed?

14   **A.**   I have a three-year-old daughter, as you mentioned, and
15   when she was making noise and playing, I didn't ... I get
16   agitated with her.  I know I shouldn't.

17   **Q.**   So what about -- I'm sorry.

18            **THE COURT:**  Do you want a recess?

19            **MR. ERNST:**  Yeah, could we have a few minutes,
20   Your Honor?

21            **THE COURT:**  We'll take a short recess.

22       (Jury out at 11:33 a.m.)

23            **THE COURT:**  You can step down.  How much longer have
24   you got?

25            **MR. ERNST:**  I would say 20 minutes.  20, maybe less.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 111

1   15, 20.

2           **THE COURT:**  All right.

3           **MR. ERNST:**  I've got to go to the men's room.

4           **THE COURT:**  Ten minutes.

5           **MR. SCOTT:**  Ten-minute break, Your Honor?

6           **THE COURT:**  Yeah.

7       (Recess from 11:33 a.m. to 11:44 a.m.)

8       (Jury in at 11:44 a.m.)

9           **THE COURT:**  You may be seated.

10          **A JUROR:**  Thank you, Your Honor.

11          **THE COURT:**  Continue.

12  BY MR. ERNST:

13  **Q.**   Sir, when we left off, you indicated that your daughter's

14  play caused you agitation?

15  **A.**   Yes.

16  **Q.**   Is your other daughter older or younger than your

17  three-year-old?

18  **A.**   She's 19.

19  **Q.**   Okay.  Did you ever have those kinds of issues with her

20  before?

21  **A.**   No, not at all.

22  **Q.**   And what is it about her play that makes you agitated?

23  **A.**   Just the noise.  I can't focus and concentrate.

24  **Q.**   Did you ever have concentration issues before this

25  incident?

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 112

1    **A.**   No, that was actually one of my strong points.

2    **Q.**   How are your feelings about your overall security?

3    **A.**   I, I, I feel like I've -- I feel like less of a man.  I

4    feel scared a lot.

5    **Q.**   Okay.  Has that resulted in any -- have you taken any

6    measures because you feel scared?

7    **A.**   Yes.

8    **Q.**   What?

9    **A.**   I built a safe room in my house, and I have moved out of

10   Genesee County.

11   **Q.**   Okay.  Anything else?

12   **A.**   I have dogs.  Well, when I lived in Genesee County I had a

13   16-camera surveillance system installed around my property.

14   **Q.**   What were you afraid of?

15   **A.**   Any kind of retaliation.

16   **Q.**   Okay.  Has -- did your sleep patterns change after this

17   incident?

18   **A.**   Yes.

19   **Q.**   In which way?

20   **A.**   Well, for the first couple of years I barely slept.

21   **Q.**   Okay.  What about in the last couple of years?

22   **A.**   The last couple of years it's not as bad.  Every so often

23   I'll, you know, have a bad dream.  Nothing like it was in the

24   beginning.  I have muscle spasms in my neck and shoulder that

25   sometimes will jar me awake.

*William Jennings - Direct*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 113

1  **Q.**   And what about your emotional condition, that has changed
2  at all since September 18, 2010?
3  **A.**   Yes, it has.
4  **Q.**   In what way?
5  **A.**   I'm numb to a lot of things, and then my emotions are
6  uncontrollable in others.
7  **Q.**   Have you noticed any change in your relations with
8  significant others?
9  **A.**   I have intimacy issues.
10  **Q.**   Okay.  Did you have those before this incident?
11  **A.**   No, not at all.
12  **Q.**   What form do those intimacy issues take?
13  **A.**   I have a very hard time trusting anybody, and then I have
14  trouble being intimate in a sexual manner.
15  **Q.**   Sir, when you walked in to the Genesee County Jail on
16  September 18th, 2010, did you have any injuries to your face?
17  **A.**   None.
18  **Q.**   Did you have any injuries to your shoulder?
19  **A.**   None.
20  **Q.**   Did you have any blurry vision?
21  **A.**   No.
22  **Q.**   Did you have a chipped tooth?
23  **A.**   No.
24  **Q.**   Did you have any fractures to your nose or your --
25  **A.**   No.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 114

1   **Q.**   -- eye socket areas?

2   **A.**   No.

3   **Q.**   Okay.  Did you have any injuries at all when you walked in

4   there?

5   **A.**   None.

6           **MR. ERNST:**  Thank you, sir.

7        Oh, wait one second.

8   **BY MR. ERNST:**

9   **Q.**   Sir, you have been incarcerated previously, haven't you?

10  **A.**   Yes, I have.

11          **MR. ERNST:**  All right.  Thank you.  Nothing else.

12          **THE COURT:**  Cross-examine.

13          **MR. REISING:**  Thank you, Your Honor.

14                    **-   -   -**

15                                        (11:49 a.m.)

16                  **CROSS-EXAMINATION**

17  **BY MR. REISING:**

18  **Q.**   Good morning, Mr. Jennings.

19  **A.**   Good morning.

20  **Q.**   As you probably know, my name is Bill Reising, and I

21  represent the defendants in this matter.  Are you aware of

22  that?

23  **A.**   Yes, I am.

24  **Q.**   I took your deposition some time ago?

25  **A.**   Yes, you did.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 115

1   **Q.**   And we're here today talking about what happened on

2   September the 18th of 2010, correct?

3   **A.**   That's correct.

4   **Q.**   All right.  Earlier that particular evening -- because it

5   was early in the morning or late at night when you went to the

6   Genesee County Jail, true?

7   **A.**   That's true.

8   **Q.**   Do you recall what time approximately it was when you

9   arrived at the jail that day?

10  **A.**   I'm not sure.  By the video it was around 5:00 a.m.

11  **Q.**   5:00 a.m.  And before that you had been at the Down the

12  Hatch bar on Corunna Road, you told us that?

13  **A.**   Correct.

14  **Q.**   And you weren't there by yourself, were you, at the Down

15  the Hatch bar?

16          **MR. ERNST:**   Objection to relevance.

17          **THE COURT:**   Objection overruled.

18          **THE WITNESS:**   No, I was not up.

19  **BY MR. REISING:**

20  **Q.**   You were there with a friend of yours, weren't you?

21  **A.**   Yes, I was.

22  **Q.**   Jack Smith?

23  **A.**   Yes.

24  **Q.**   He was your neighbor, he lived right next door to you?

25  **A.**   His dad did.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

1  **Q.**  His dad did.  Didn't he live there, too?

2  **A.**  No.

3  **Q.**  Oh, he was living with you at the time?

4  **A.**  He was staying me at the time, yes.

5  **Q.**  And you had a spat, did you not, at Down the Hatch?

6  **A.**  Yes.

7  **Q.**  And you struck him?

8  **A.**  Yes, I did.

9  **Q.**  Did he strike you?

10  **A.**  No.

11  **Q.**  You are sure about that?

12  **A.**  Positive.

13  **Q.**  And then that spat was over about him taking --

14         **THE COURT:**  Let's move on.

15         **MR. REISING:**  Yes, Your Honor.  I am moving on.

16         **THE COURT:**  No, you're not.  You are still in the

17  bar.

18         **MR. REISING:**  That's true, I'm still in the bar.

19         **THE COURT:**  Let's leave the bar.

20  **BY MR. REISING:**

21  **Q.**  What I want to know, sir, is --

22         **THE COURT:**  I said let's leave the bar and the spat

23  behind.

24         **MR. REISING:**  Yes, Your Honor.

25

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 117

1    **BY MR. REISING:**

2    **Q.**    You were driving an unlicensed vehicle that got stopped

3    when you -- by Officer Hartner, true?

4    **A.**    That's correct.

5    **Q.**    You knew you shouldn't have been out there, right?

6    **A.**    Yes, I did.

7    **Q.**    And you got stopped -- and by the way, you told us earlier

8    that you had a few beers and Johnny Vegas.  Do you remember

9    that?

10   **A.**    Yes, I do.

11   **Q.**    And if I suggested you had six beers and four Johnny Vegas

12   that night at the Down the Hatch, does that sound about right

13   to you?

14   **A.**    Yes, it does.

15   **Q.**    Could it have been more than that maybe?

16   **A.**    Possibly.

17   **Q.**    How tall are you, sir?

18   **A.**    Maybe 5'6" and-a-half.

19   **Q.**    And how much did you weigh back in September of 2010?

20   **A.**    Approximately 160, 155.

21   **Q.**    155, 160?

22   **A.**    Yes.

23   **Q.**    You have lost weight since that time?

24   **A.**    Well, I was down to 104 pounds due to my cancer, and I,

25   I'm about 155 now.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 118

1  **Q.**   All right.  You lost weight in a dramatic fashion related

2  to your cancer and the treatment you had for your cancer?

3  **A.**   Which I have gained back, yes.

4  **Q.**   That's what I'm getting to.  After the treatment stopped,

5  you have gradually been gaining that weight back?

6  **A.**   I'm the same size now as I was then, yes.

7  **Q.**   All right.  Did you have any problem with your hearing

8  when you came to the Genesee County Jail that night?

9  **A.**   No, I did not.

10  **Q.**   Today you are wearing prescriptive lens glasses, true?

11  **A.**   Yes, I am.

12  **Q.**   Were you wearing glasses of a corrective nature back in

13  September of 2010?

14  **A.**   No, I was not.

15  **Q.**   Earlier, prior to September of 2010, you had LASIK

16  surgery?

17  **A.**   That's correct.

18  **Q.**   On both eyes?

19  **A.**   Yes.

20  **Q.**   And that LASIK surgery was meant to correct a vision

21  deficiency that you had when you had the surgery?

22  **A.**   That's correct.

23  **Q.**   Before you had the LASIK you were wearing corrective

24  lenses?

25  **A.**   That's correct.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 119

1  **Q.**   And you didn't choose to wear corrective lenses after you

2  had the LASIK?

3  **A.**   I didn't need them.

4  **Q.**   You didn't need them, okay.  You were able to function

5  without glasses -- without corrective lenses?

6  **A.**   Yes.

7  **Q.**   And you were working up to the time that you were arrested

8  on September the 18th of 2010 for what company, sir?

9  **A.**   For myself.

10  **Q.**   For yourself at that time.  All right.

11  **A.**   I was working on one of my properties.

12  **Q.**   No, I know on that particular day.  Is that what you are

13  telling us?

14  **A.**   Yes.

15  **Q.**   Well, how many properties did you have?

16         **MR. ERNST:**  Judge, we don't have a wage loss claim

17  here so what's the relevance of any of this?

18         **MR. REISING:**  It's the first time I heard that,

19  Your Honor.

20         **THE COURT:**  The first time you heard what I said or

21  what Mr. Ernst said?

22         **MR. REISING:**  No, what Mr. Ernst said, he's not

23  making a wage loss claim in this case.

24         **MR. ERNST:**  We never did.

25         **THE COURT:**  They never did.  If he did, it was

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 120

1  withdrawn a long time ago.

2  　　　　**MR. ERNST:**  It was.

3  　　　　**THE COURT:**  Let's go ahead.

4  **BY MR. REISING:**

5  **Q.**  Your employment, sir, was something that you learned on

6  the job, true?  Pretty much?

7  **A.**  Yes.

8  **Q.**  And that employment involves the installation of

9  automotive automation equipment, that's what you supervise the

10  installation of?

11  **A.**  Currently, yes.

12  **Q.**  And how long is currently?  Over how many years have you

13  been doing that kind of work?

14  **A.**  I have been in the machine tool trade since 1992.

15  **Q.**  Okay.  And so you were in it in September of 2010, true?

16  **A.**  Not exactly.

17  **Q.**  I'm sorry, sir?

18  **A.**  At that particular moment I was not employed.

19  **Q.**  You were -- was that because business was slow?

20  **A.**  That's correct.

21  **Q.**  All right.  That kind of business is cyclical?

22  **A.**  Yes, it is.

23  **Q.**  All right.  And what I want to find out is after September

24  the 18th of 2010 you returned to that same occupation, did you

25  not?

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

1  **A.**   On and off.

2  **Q.**   On and off?

3  **A.**   Yeah.

4  **Q.**   Well, the nature of the business is on and off, is it not?

5  **A.**   That's correct.

6  **Q.**   And you've -- I'm going to assume you have taken all of

7  the work that's come your way?

8  **A.**   That's not true.

9  **Q.**   That's not true.  Okay.  Is there some work you didn't

10 take because of anything to do with this case?

11        **MR. ERNST:**  Judge, we're not making a wage loss

12 claim.

13        **THE COURT:**  I understand that, Mr. Ernst.  Go ahead

14 if he can answer the question.

15        **THE WITNESS:**  I don't believe so.

16 **BY MR. REISING:**

17 **Q.**   All right.  So my understanding is that you normally, when

18 you are working and doing that work you are working 50, 60,

19 70 hours a week kind of thing, true?

20 **A.**   That's true.

21 **Q.**   And but for the fact that you are here in this courtroom

22 and have been here for the last number of days because of the

23 trial of this case, would you be working now?

24 **A.**   That's correct.

25 **Q.**   Has anybody indicated to you that the work that you're

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 122

1    doing is in some manner deficient because of anything you have

2    told us about related to whatever happened to you on

3    September 18th of 2010?

4    **A.**   Well, my doctor has.

5    **Q.**   No, I said anybody at work, sir.

6    **A.**   Oh, I didn't hear you say at work.  I apologize.

7    **Q.**   That's okay.

8    **A.**   No.

9    **Q.**   So as far as you know, they are all satisfied with what

10   you do and your work product?

11   **A.**   I'm a supervisor.  I don't physically work.

12   **Q.**   Well, you are doing a critical job, are you not?

13   **A.**   Yes.

14   **Q.**   You're assembling automation equipment?

15   **A.**   Yes, I am.

16   **Q.**   If it doesn't work, that's a real problem?

17   **A.**   That's correct.

18   **Q.**   Okay.  You just mentioned your doctor just now.  Which

19   doctor are you speaking to, sir?

20   **A.**   Dr. Hanson.

21   **Q.**   Dr. Hanson.  He's your primary care physician?

22   **A.**   He is.

23   **Q.**   When is the last time you have seen him for anything

24   having to do with this particular case, sir?

25   **A.**   It's been some time ago.  Six months maybe.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 123

1  **Q.**   Six months.  Can you tell me, what do you recall -- why

2  did you go see him six months ago if you think you did see him

3  six months ago?

4  **A.**   I -- just in reference to my shoulder.

5  **Q.**   Your left shoulder?

6  **A.**   Yes.

7  **Q.**   And he's not an orthopedic surgeon, true?

8  **A.**   That is correct.

9  **Q.**   Okay.  Did he refer you to an orthopedic surgeon, by the

10  way?

11  **A.**   No, he did not.

12  **Q.**   Have you, aside from anything having to do with this

13  lawsuit, seen an orthopedic surgeon related to anything to do

14  with your left shoulder?

15  **A.**   I believe -- yes, I believe so.

16  **Q.**   Who did you see, sir?  What doctor?

17  **A.**   He was your doctor.  I'm not sure of his name.

18  **Q.**   Oh, Dr. Kohen.  You saw Dr. Kohen at my request?

19  **A.**   Yes.

20  **Q.**   He's an orthopedic surgeon?

21  **A.**   I believe so.

22  **Q.**   Okay.  Leaving him aside, anybody -- have you seen any

23  other orthopedic surgeon having anything to do with your left

24  shoulder since September the 18th of 2010?

25  **A.**   No.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 124

1   **Q.**   Let's go to the jail that night.  You come into the jail

2   with officer Hartner, true?

3   **A.**   That's correct.

4   **Q.**   You are placed on a bench in the so-called report-writing

5   room.  That's your understanding?  That's what it's called?

6   **A.**   Yes, it is.

7   **Q.**   You come in contact with Deputy Fuller.  He was the first

8   deputy that you come in contact with that particular night?

9   **A.**   Yes.

10  **Q.**   There is some conversation.  He has you put your hand up

11  on the wall and spread your legs, like I'm doing right now,

12  right?

13  **A.**   Correct.

14  **Q.**   And he's going to do a pat-down search, you understood

15  that?

16  **A.**   Yes.

17  **Q.**   And you had already had a couple of those that night,

18  right?

19  **A.**   Right.

20  **Q.**   You indicated that you were startled when Deputy Fuller

21  patted you down lower on your leg in the area of your groin.

22  Do you recall making that statement?

23  **A.**   Yes, I do.

24  **Q.**   All right.  Well, did you have a pat-down that was done by

25  Officer Hartner of a similar nature; do you remember?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

1   **A.**   Similar, but not as hard.

2   **Q.**   Not as hard?

3   **A.**   Yes.

4   **Q.**   When you say hard, you mean that he's actually feeling

5   very closely to make sure there's nothing in the pockets that

6   you've got on you?

7          **MR. ERNST:**   Your Honor, he's asking him to speculate

8   about Deputy Fuller's intentions.

9          **THE WITNESS:**   My groin was not struck before.

10  **BY MR. REISING:**

11  **Q.**   Your groin was not struck before.  So you're telling me

12  that Deputy Fuller struck your groin?

13  **A.**   That's correct.

14  **Q.**   How did he strike your groin?

15  **A.**   When he came up my leg, it was kind of like a side hand

16  motion abrupt into the bottom of my groin.

17  **Q.**   He comes up your leg on the inside of your leg apparently?

18  **A.**   I believe so, yes.

19  **Q.**   You believe so.  Well, you either know or you don't know.

20  **A.**   Yes, he did.

21  **Q.**   Up the inside of your leg?

22  **A.**   Yeah.

23  **Q.**   All right.  So you are spread eagle.  He comes up the

24  inside of your leg and does what?

25  **A.**   Came up kind of fast.  I'm not saying that it was

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 126

1    intentional, but it hurt.

2    **Q.**   It hurt?

3    **A.**   Yes.

4    **Q.**   Did he strike your penis?

5    **A.**   No.

6    **Q.**   Did he strike your testicles?

7    **A.**   Yes.

8    **Q.**   And that hurt?

9    **A.**   Yes.  Have you ever been struck there?

10           **THE COURT:**  You are not supposed to ask questions.

11           **THE WITNESS:**  I'm sorry, Your Honor.

12   **BY MR. REISING:**

13   **Q.**   So that's what you are telling me startled you?

14   **A.**   Yes, I am.

15   **Q.**   And that's why you took your arm down?

16   **A.**   Yes.

17   **Q.**   Are you sure about that?

18   **A.**   I'm positive.

19   **Q.**   You think so.

20           **MR. ERNST:**  Your Honor, he's arguing with the

21   witness.

22           **THE COURT:**  You are arguing with the witness.

23           **MR. REISING:**  I'm not going to argue with the

24   witness.

25           **THE COURT:**  Well, the questions are argumentative.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 127

1   **BY MR. REISING:**

2   **Q.**   Let me ask you this, Mr. Jennings.  We know, and we have

3   with already seen on the video, you do take your left arm off

4   the wall, true?

5   **A.**   Yes.

6   **Q.**   And bring it down?

7   **A.**   Yes.

8   **Q.**   At the time that that occurred, do you remember that

9   Deputy Fuller was right down in this area like this?

10  **A.**   I do.

11  **Q.**   He was close to where your hand and arm was; do you

12  remember that?

13  **A.**   Yes.

14  **Q.**   And apparently he reacted to that; do you recall that?

15  **A.**   Oh, yes.

16  **Q.**   Okay.  Because then he pushed back up on the wall again,

17  did he not?

18  **A.**   Yes.

19  **Q.**   Is that what happened?

20  **A.**   Yes.

21  **Q.**   Now, this is all taking place in real time; do you

22  understand?

23  **A.**   Uh-huh.

24  **Q.**   We have been looking at a lot of video here, but it's been

25  slowed down.  Do you understand that?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 128

1    **A.**   I do.

2            **MR. ERNST:**  Objection, Your Honor.  Most of it's in

3    real time.

4            **THE COURT:**  Mr. Ernst, sit down.

5            **MR. REISING:**  As a matter of fact, it has not been in

6    real time, Your Honor.  It's been --

7            **THE COURT:**  I haven't said anything that calls for

8    any lawyers to address me.  I just told Mr. Ernst to sit down.

9    Now, do you object to that?

10           **MR. REISING:**  No.

11           **THE COURT:**  Okay.  So we agree on something.  Go

12   ahead.

13   **BY MR. REISING:**

14   **Q.**   So, Mr. Jennings, you saw on the video your arm comes

15   down?

16   **A.**   Yes.

17   **Q.**   On the left side?

18   **A.**   For a brief second.

19   **Q.**   Right.  Do you recall, did your left shoulder drop first?

20   **A.**   I don't know.

21   **Q.**   You don't know?

22   **A.**   We could watch the video.  I could tell you for sure, but

23   it happened pretty quick.  I couldn't tell you if my shoulder

24   dropped or my hand dropped or not.

25   **Q.**   Well, we have watched that video on numerous occasions.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 129

**A.**   I wasn't looking for that specific thing so if you would

like to replay it I could tell you for sure.

          **THE COURT:**  No, no comment.  No comment.

**BY MR. REISING:**

**Q.**   In any event, do you recall turning your head to the right

like I'm doing right now?  Do you recall seeing that in the

video?

**A.**   Yes.

**Q.**   And do you recall seeing your right arm cocked at a

90-degree angle like I have got my right arm cocked right now?

**A.**   As I was being shoved, yes.

**Q.**   Do you recall Deputy Fuller saying he reacted to that?

**A.**   I do.

**Q.**   Okay.  And initially -- strike that, I'm sorry.

          All during this time, of course, you are not handcuffed,

true?

**A.**   That's correct.

**Q.**   You were initially put back on the bench that you had been

sitting on earlier briefly?

**A.**   Yes.

**Q.**   And at some point shortly after that a second deputy

assisted Deputy Fuller; do you recall that?

**A.**   Yes, yes.

**Q.**   And then ultimately you end up being on the floor of the

report-writing room?

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 130

1    **A.**   Yes.

2    **Q.**   All right.  Now, in and around that sequence of events,

3    that's when you received the OC spray; do you recall?

4    **A.**   Yes, I do.

5    **Q.**   And I want to make sure it's clear on the record.  When

6    that OC spray occurred, in other words, when you were sprayed,

7    at that point in time you became amnesic; you have no memory

8    from that point forward until you woke up in that restraint bed

9    some two hours plus later, correct?

10   **A.**   I don't know how long it was, but that's correct.

11   **Q.**   Regardless of the length of time, from that time to the

12   time you woke up in that restraint bed you have no recollection

13   whatsoever?

14   **A.**   To this day, no.

15   **Q.**   So when you testified that you remembered getting a blood

16   draw, you saw it on video apparently, but you don't have a

17   recollection of that?

18   **A.**   I believe I came to right in that time frame.

19   **Q.**   Well, if I told you that the time frame that we're talking

20   about shows that that nurse came about 20 minutes after you

21   were placed in safety cell number 6 in the bed, you would be

22   out at that point in time, right?  You have no memory?

23   **A.**   No, that's not true.

24   **Q.**   That's not true?

25   **A.**   No, it's not.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 131

1   **Q.**   Well, if you had no memory until you woke up in that

2   bed --

3   **A.**   I believe I was in the bed when she drew my blood.

4   **Q.**   You think so.  Was that at the end of the time that you

5   were in the bed to your knowledge?

6   **A.**   I don't know how long I was in the bed before I came to,

7   but I do remember getting poked with a needle while I was in

8   the bed.

9   **Q.**   So you think you have some recollection of being poked by

10  a needle?

11  **A.**   Yes.

12  **Q.**   After -- I just want to make sure about this.  After the

13  OC spray until the point in time that you again began to

14  remember things in the restraint bed, anything in between those

15  two points you have no recollection of?

16  **A.**   That's correct.

17  **Q.**   In your deposition you said you were unconscious, but we

18  know that when you look at the video you certainly were not

19  unconscious.  Do you understand that?

20  **A.**   I don't understand why my body is moving, but -- the

21  lights were on, but nobody was home, I guess.

22  **Q.**   All right.  Well, all I'm saying is if a person is

23  unconscious that means they are laying out, they are not able

24  to move or anything?

25  **A.**   I disagree.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 132

1    **Q.**   You disagree with that?  That's not being unconscious?

2           **THE COURT:**  I don't think we should get into a debate

3    on the meaning of the word "unconscious."  He's described his

4    condition.  I'll take -- "unconscious" is a technical term.

5           **MR. REISING:**  Well, I'm not asking for a technical

6    definition.  I'm asking for his definition.

7           **THE COURT:**  He's explained.  Go ahead.  Just go

8    ahead.

9    **BY MR. REISING:**

10   **Q.**   By the way, you told us about a blood draw, and I took

11   your deposition.  Do you remember that?

12   **A.**   Yes, I do.

13   **Q.**   I took your deposition back on April the 29th of 2014 at

14   Mr. Elliott's office, and on Page Number 62 I asked you a

15   question:

16        "And do you have any recollection of a blood draw that

17   night?"

18        That was the question to you, all right?

19   **A.**   Yes.

20   **Q.**   Your response was:  "No, I do not."

21   **A.**   That's correct.

22   **Q.**   So at least at your deposition you had no recollection?

23   **A.**   I did not.

24   **Q.**   All right.  How do you have a recollection today and

25   didn't have one then?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 133

1   **A.**   Well, after thinking about it, maybe from seeing the video

2   refreshing my memory, I'm not sure, but I do remember being

3   poked.

4   **Q.**   The point being, it's on the video, that's one thing, but

5   you have no recollection?

6   **A.**   Having seen that on the video, I knew that I was poked.  I

7   didn't know exactly what the poke was.  After seeing the video,

8   I realized it was the blood draw.

9   **Q.**   Well, you knew you had a blood draw that night because of

10   the charge you were in the jail for?

11   **A.**   Yes.  I also suffered a closed injury to my head and had

12   trouble putting the events together.  It took some time.

13   **Q.**   Well, we took your deposition April the 29, 2014.  That's

14   quite some time after September the 18th of 2010, sir.

15   **A.**   I hadn't reviewed all the videos at that point to help put

16   things together.

17   **Q.**   So, in any event, you get out of the restraint bed that

18   same day, but it's different people than you had come in

19   contact with earlier that were dealing with you at that point

20   in time; is that true?

21   **A.**   I'm sorry, could you ask the question again?

22   **Q.**   Sure.  We saw on the video, and you've seen that video, I

23   assume, that you were released from the restraint bed later

24   that same day?

25   **A.**   Right.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 134

1  **Q.**   And the people who were involved with that were different

2  than the people who had been involved with you when you first

3  came to the jail?

4  **A.**   Oh, yes, that's correct.

5  **Q.**   All right.  Do you have any recollection of having any

6  contact with any of those people that you could now identify?

7  **A.**   I just remember Deputy Gould was the one that was mainly

8  talking to me.

9  **Q.**   All right.  So Deputy Gould, actually Sergeant Gould was

10 talking to you?

11 **A.**   Yes.

12 **Q.**   He seemed to be in charge?

13 **A.**   Yes, he did.

14 **Q.**   Do you recall seeing on his uniform shirt that he was a

15 paramedic?

16 **A.**   I don't recall.

17 **Q.**   And then was he the person who said you should go to

18 medical?

19 **A.**   No, it was the nurse.  Oh, to medical from the safety

20 cell?

21 **Q.**   Yes, sir.

22 **A.**   I can't remember.  I'm not sure.

23 **Q.**   All right.  And by that point in time or in association

24 with that process, that's when they took the spit mask off?

25 **A.**   Yes.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 135

1   **Q.**   Let me show you something, sir.  Take a look at this and

2   see if you recognize what this is.

3            **THE COURT:**  Is that an exhibit?

4            **MR. SCOTT:**  Yes.

5            **THE COURT:**  What number?

6            **MR. SCOTT:**  FF.

7            **THE COURT:**  What?

8            **MR. REISING:**  FF, Your Honor.

9   **BY MR. REISING:**

10  **Q.**   Take a look at that, Mr. Jennings, and tell me if you

11  recognize what that is.

12  **A.**   It appears to be a spit mask.

13  **Q.**   Does it appear to be similar to the spit mask that was put

14  on you that night; do you know?

15  **A.**   It looks different.

16  **Q.**   How does it look different, sir?

17  **A.**   The one that was on me seemed like it was more black than

18  white but similar.

19  **Q.**   It's very similar?

20  **A.**   Yeah.

21  **Q.**   Do you see the mesh at the top?

22  **A.**   Uh-huh.

23  **Q.**   Was there mesh on the spit mask that you also had placed

24  on your head that night?

25  **A.**   There was.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 136

1  **Q.**   All right.  So if I were to suggest to you that this was a

2  similar spit mask to what you wore or what was placed on your

3  face, you would not dispute that?

4  **A.**   That's correct.

5         **THE COURT:**  I'm sorry, did you say SS?

6         **MR. SCOTT:**  F as in frank, F as in frank.

7         **THE COURT:**  Oh, FF, okay.

8  **BY MR. REISING:**

9  **Q.**   And you told us, of course, that you had to go to court

10  before you could be released from jail?

11  **A.**   That's correct.

12  **Q.**   All right.  And that happened all on the same day?

13  **A.**   Yes, it did.

14  **Q.**   Do you recall, did they take your booking photo, also?

15  **A.**   I believe so.

16  **Q.**   And do you recall that the booking photo does show that

17  you have some injuries to your face?

18  **A.**   I would imagine it does.

19  **Q.**   All right.  Have you seen that booking photo before?

20  **A.**   No, I have not.

21  **Q.**   Let me show you a copy of it, sir, and ask you if that

22  represents --

23         **MR. REISING:**  We are going put it on the screen,

24  Your Honor, the September 18th, 2010 booking photo.

25         **THE COURT:**  Exhibit L.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5–Page 137

1    **BY MR. REISING:**

2    **Q.**   Do you see that photograph right there, sir?

3    **A.**   I do.

4    **Q.**   And it says 9-18-10, does it not?  Just down below in the

5    middle.

6    **A.**   Yes, it does.

7    **Q.**   And --

8              **THE COURT:**  That's Exhibit L?

9              **MR. SCOTT:**  Yes, Your Honor.

10             **MR. REISING:**  Can we put up the October 10th photo?

11             **MR. SCOTT:**  Yeah.

12             **MR. ERNST:**  Your Honor, could we approach for a

13   minute?

14        (The following sidebar conference was held:)

15             **MR. ERNST:**  With regard to this --

16             **THE COURT:**  I can't hear you.

17             **MR. ERNST:**  So can the jury.

18             **MR. REISING:**  That's right.  I agree.

19             **THE COURT:**  The jury knows they are not supposed to

20   be paying any attention to what you are telling me.  What's the

21   objection?

22             **MR. ERNST:**  The objection is they are trying to put

23   like this other --

24             **THE COURT:**  Speak up.

25             **MR. ERNST:**  Okay.  I withdraw it.  Forget it.


*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 138

1        (End of discussion at side bar.)

2            **THE COURT:**  Go ahead.

3    **BY MR. REISING:**

4    **Q.**    This is another photo on October 10, 2010; do you

5    see that?

6    **A.**    Yes, I do.

7            **THE COURT:**  Is that the photo of 9-18 or 10-10?

8            **MR. REISING:**  10-10, Your Honor.

9            **MR. SCOTT:**  This is Exhibit M, Your Honor.

10           **MR. REISING:**  Exhibit M.

11           **THE COURT:**  Okay.  You have also introduced

12   Exhibit L, have you not?

13           **MR. REISING:**  Yes.

14           **THE COURT:**  Okay.  This exhibit is already in

15   evidence.

16           **MR. REISING:**  Yes.  I want to show it to the witness.

17           **THE COURT:**  It's not a booking photo.  What happened

18   on October 10 that's relevant other than the photo?

19           **MR. REISING:**  The court has already ruled that the

20   photo in its current configuration is what should be placed in

21   front of the jury.

22           **THE COURT:**  Well, there's also a photo of

23   September 18th.

24           **MR. REISING:**  Correct.

25           **THE COURT:**  All right.  Yeah, okay.  So what's the

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 139

1   big deal?

2            **MR. REISING:**  I just want to confirm with this

3   witness, Mr. Jennings, that that's him.

4            **THE WITNESS:**  It is.

5   **BY MR. REISING:**

6   **Q.**   Okay.  And can you tell me when you look at that photo, do

7   you see any indication of any blood in either eye in that photo

8   on October 10?

9   **A.**   My eyes are pretty shaded in that picture.  I can't really

10  see.

11  **Q.**   Do you want to come and take a closer look, sir?

12  **A.**   Sure.

13       No, the blood appears to be gone at that point.

14  **Q.**   Is there any indication that you can see from that

15  particular photo, either the frontal view or the side view, of

16  any injury that you would attribute to whatever happened to you

17  back on September 18th of 2010?

18  **A.**   As part of what?

19  **Q.**   Anything you see in that photo that you think is due to

20  whatever happened to you on September the 18th of 2010, sir.

21  **A.**   No.

22  **Q.**   That photo looks pretty good in terms of your face healed

23  up is what I'm saying to you?

24  **A.**   Yeah.

25  **Q.**   Okay.  So by October the 10th of 2010 your face was all

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 140

1  healed up essentially?

2  **A.**   Yeah, yes.  Well, as far as you can see anyways.

3  **Q.**   I'm sorry?

4  **A.**   From what you could see anyways.

5  **Q.**   From what you can see, I understand that, but do you have

6  a recollection of anything different?

7          **THE COURT:**  Wait a second.  Let's move forward.

8          **MR. REISING:**  I want to pursue that question,

9  Your Honor, just to make sure we get the answer on the record.

10         **THE COURT:**  You've got the answer on the record.  The

11 photo speaks for itself.

12         **MR. REISING:**  I agree.

13         **THE COURT:**  All right.  Then let's go to the next

14 question.

15 **BY MR. REISING:**

16 **Q.**   We went through a series of photos today on your direct

17 examination; do you recall that?

18 **A.**   Yes.

19 **Q.**   Showing your face and other parts of your body, true?

20 **A.**   True.

21 **Q.**   In terms of any bruising or abrasion or residual from skin

22 being in some manner abraded, how long did it take for that to

23 heal?

24 **A.**   I'm not a doctor, but --

25 **Q.**   You tell me.  You are the guy that had it.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 141

1   **A.**   The external injuries only, I don't know, two or

2   three weeks.

3   **Q.**   Okay.  Two or three weeks, and they were pretty much all

4   gone then?

5   **A.**   That's correct.

6   **Q.**   Okay.  Now -- and when in relation to September 18th of

7   2010 did you return to your chosen occupation?

8   **A.**   I'm not sure.

9   **Q.**   Okay.  Was it days?  Was it weeks?  Was it months?  What

10  do you remember about that?

11  **A.**   It was, I would say, within a few months.

12  **Q.**   Within two months you were back to work?

13  **A.**   Somewhere in there, two or three months.  I can't remember

14  for sure.

15  **Q.**   Well, two or three months.  Were you not working because

16  you couldn't work or were you not working because there was no

17  work available for you at that time?

18  **A.**   I was not working because there was, there was a lack of

19  work and I had work on my own properties that I needed to

20  finish at the time.

21  **Q.**   All right.  Work on your own properties.  Have you got

22  more than one property?

23  **A.**   Yes.

24  **Q.**   All right.  You told us in direct examination here today

25  that you apparently no longer live in Genesee County?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 142

1    **A.**    That's correct.

2    **Q.**    Where have you moved to, sir?

3    **A.**    I really don't want to tell you that.

4         **MR. ERNST:**    Objection to relevance.

5    **BY MR. REISING:**

6    **Q.**    All right.  Is it someplace that's within 30 miles of

7    Genesee County?

8    **A.**    It's not in Genesee County, I'll tell you that.

9    **Q.**    You don't reside at all in Genesee County?

10   **A.**    That's correct.

11   **Q.**    But beyond that you don't want to give any information?

12   **A.**    That is also correct.

13   **Q.**    What about the house on Lodge, do you still own that home?

14        **MR. ERNST:**    What is the relevance of any of this?

15        **THE COURT:**    It's cross-examination.

16   **BY MR. REISING:**

17   **Q.**    Do you still own that home?

18   **A.**    Currently, yes.

19   **Q.**    Is it for sale?

20   **A.**    No.

21   **Q.**    Do you have a motorcycle?

22   **A.**    Yes.

23   **Q.**    What kind of motorcycle do you have?

24   **A.**    A Harley.

25   **Q.**    When is the last time you rode your Harley?

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 143

1  **A.**    The last time I rode my Harley?  I would say a few months.

2  **Q.**    A few months ago, okay.  Are you driving a motor vehicle

3  these days?

4            **MR. ERNST:**  Objection to relevance, Judge.

5            **THE COURT:**  The objection is overruled.

6            **THE WITNESS:**  On occasion when I have to.

7  **BY MR. REISING:**

8  **Q.**    Do you drive at night, by the way?

9  **A.**    Not unless I have to.

10  **Q.**    You told us that you left the jail and you went -- your

11  mom picked you up, correct?

12  **A.**    That's correct.

13  **Q.**    And you went to the emergency room of McLaren General

14  Hospital, true?

15  **A.**    That's true.

16  **Q.**    To the main hospital there in Flint?

17  **A.**    Yes.

18  **Q.**    Okay.  And you went to the emergency room?

19  **A.**    Yes.

20  **Q.**    And were you examined by a physician?

21  **A.**    A nurse.

22  **Q.**    Initially a nurse?

23  **A.**    Yeah.  By a physician, too, yes.

24  **Q.**    And do you remember that you had CT scans of multiple

25  parts of your body, like your face, head, chest, things of that

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 144

1   nature?

2   **A.**    Yes.

3   **Q.**    The records would suggest that you had six different CT

4   scans that day.  Does that sound about right?

5   **A.**    I guess, yes.

6   **Q.**    And after having those tests done, you were physically

7   examined, I assume?

8   **A.**    Yes.

9   **Q.**    And then you were discharged from the emergency room

10  without being placed in the hospital, true?

11  **A.**    That is true.

12  **Q.**    And you were told to follow up with your primary care

13  doctor?

14  **A.**    That's correct.

15  **Q.**    Did you have any complaints that you can tell me about

16  here today when you went to McLaren concerning your left

17  shoulder?

18  **A.**    Not particularly, no.

19  **Q.**    So if I told you that the record is it devoid of anything

20  from you indicating I have got a left shoulder issue because of

21  what happened on September 18 of 2010, you wouldn't deny that?

22  **A.**    That's correct.

23  **Q.**    You took some photos showing you -- or apparently at the

24  hospital even in a hospital gown; is that right?

25  **A.**    That's correct.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 145

1   **Q.**   Were those photos taken by you?

2   **A.**   My mother.

3   **Q.**   Your mother, all right.  Is there a reason why you wanted

4   to be taken in a hospital gown?  Something to do with what you

5   were going to do with that situation?

6   **A.**   My mother thought it was a good idea to document the

7   pictures or document my injuries.

8   **Q.**   Okay.  Well, you've got other photos that we have looked

9   at that aren't taken at the hospital, correct?

10   **A.**   That's correct.

11   **Q.**   All right.  What I'm curious about is why were some of

12   those photos taken at the hospital with you in a hospital gown.

13   Any rationale for that?

14   **A.**   That's what I was wearing at the time.

15   **Q.**   You didn't do it because you wanted to make sure you could

16   use those photos in this case, did you?

17   **A.**   Not at that time, no.

18   **Q.**   Do you remember when you left the hospital that day did

19   you walk out?

20   **A.**   I was assisted out, yes.

21   **Q.**   All right.  But did you walk out?

22   **A.**   With help, yes.

23   **Q.**   Okay.  But you were able to walk out of the hospital

24   emergency room.  Who assisted you?

25   **A.**   My mother.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 146

1   **Q.**   Your mother, okay.  Your mother, by the way, how old is

2   she?

3   **A.**   Currently?

4   **Q.**   Yes.

5   **A.**   72.

6   **Q.**   72 years old, okay.  So you leave the hospital.  Where did

7   you go after that?

8   **A.**   I believe I went to my mother's house.

9   **Q.**   To your mother's house.

10  **A.**   Yes.

11  **Q.**   And she doesn't live over on Lodge in Flint Township, does

12  she?

13  **A.**   Does not.

14  **Q.**   She lives over in Schwartz Creek?

15  **A.**   That's correct.

16  **Q.**   Some distance away?

17  **A.**   10 miles.

18  **Q.**   10, 12 miles away.  Did you have a significant other at

19  that point in time, September of 2010?

20  **A.**   I did not.

21  **Q.**   Did you spend some time at your mother's house?

22  **A.**   I did.

23  **Q.**   How long?

24  **A.**   A day or two.

25  **Q.**   Then you came back to the Lodge address?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 147

1  **A.**   I believe I went to Genesys first.

2  **Q.**   All right.  But you -- a day or two, Genesys, and then you

3  went back to Lodge, to your home?

4  **A.**   I'm not positive on that.

5  **Q.**   Okay.  You go to Genesys.  You have some further testing

6  done, true?

7  **A.**   That's correct.

8  **Q.**   And, by the way, did you know that the CT scan of your

9  face and your facial bones at McLaren was interpreted as being

10  normal or negative?

11          **MR. ERNST:**   Objection, Your Honor.  He's not a

12  radiologist.

13          **MR. REISING:**   I'm just asking him if he knew.

14          **THE COURT:**   He's asking him if he knew.

15          **MR. ERNST:**   But he's asking him to assume facts not

16  in evidence.

17          **THE COURT:**   Sir, he -- the objection is overruled.

18  Go ahead.

19  **BY MR. REISING:**

20  **Q.**   Sir, do you know if what I just said is correct, that

21  there was no fracture found at McLaren?

22  **A.**   Yes, I do.

23  **Q.**   All right.  And then you went to Genesys, and when was

24  Genesys in relation to when you were at McLaren?  How many days

25  later?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 148

1   **A.**   Two.

2   **Q.**   And then you had further tests done there?

3   **A.**   Yes, I did.

4   **Q.**   And it was during the testing that they did at Genesys

5   that you were advised of certain fractures?

6   **A.**   Yes, I was.

7   **Q.**   In the area of your face?

8   **A.**   That's correct.

9   **Q.**   All right.  And these fractures, by the way -- are you

10  familiar with what's meant, what is the -- what is meant by

11  nondisplaced fracture; do you know what that is?

12  **A.**   No, I don't.

13  **Q.**   You told him about fractures in the area of your nose and

14  which eye?

15  **A.**   My left eye.

16  **Q.**   Your left eye.  Did you have any treatment directed to

17  either your nose or your left eye designed to correct or fix

18  whatever fracture you had?

19  **A.**   They told me there was nothing they could do for that.

20  **Q.**   It's just going to heal on its own?

21  **A.**   Pretty much.  They can't put your head in a cast.

22  **Q.**   To your knowledge as you sit here today, some six years

23  plus later, is that what happened?  They healed on their own,

24  those fractures?

25  **A.**   That's correct.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 149

1   **Q.**   Do you have any complications today with respect to your

2   nose or your left eye that you can describe to me related to

3   those fractures?

4   **A.**   Related to the fractures?  Well, the cortical cataract in

5   my eye was trauma.  I'm not sure if it was the fractures or the

6   smashing of my head.  I'm not positive which trauma.

7   **Q.**   But I'm asking you, in terms of the fractures, do you have

8   any issues with the fracture healing as you sit here today in

9   this courtroom in association with your lawsuit?

10   **A.**   One of the fractures was to my nasal cavity, and I get

11   sinus infections often and headaches.

12   **Q.**   Sinus infections, headaches, and you had, of course, nasal

13   pharyngeal cancer, did you not?

14   **A.**   Yes, I did.

15   **Q.**   And you had extensive treatment which was based on not

16   only chemotherapy, but radiation therapy directed at that part

17   of your body?

18   **A.**   That is correct.

19   **Q.**   Okay.  And that was all done in 2012?

20   **A.**   Yes, it was.

21   **Q.**   The radiation was directed where, sir?

22   **A.**   In my nasal pharynx.

23   **Q.**   Okay.  And where is that on your body so that we

24   understand?

25   **A.**   It's in the middle of my head.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 150

1  **Q.**   The middle of your head, okay.  And do you understand that

2  radiation therapy has certain side effects?

3  **A.**   Yes, I do.

4  **Q.**   Okay.  The same thing with chemotherapy has certain side

5  effects.

6  **A.**   Yes, it does.

7  **Q.**   As a matter of fact, you have had some side effects from

8  that intensive course of therapy related to your lower back,

9  have you not?

10  **A.**   Yes, I have.

11  **Q.**   You have actually -- I don't like the word shrunk, but you

12  are not as tall as you used to be because of that treatment

13  protocol?

14  **A.**   Yes.

15  **Q.**   You have lost how much height approximately?

16  **A.**   About an inch.

17  **Q.**   That's due to what you understand to be disk degeneration

18  in your lower back?

19  **A.**   That's correct.

20  **Q.**   Chipped tooth.  We saw a picture of a -- video of a

21  chipped tooth, true?

22  **A.**   That's true.

23  **Q.**   The lower part of your jaw, from my understanding,

24  correct?

25  **A.**   No, the upper.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 151

1    **Q.**   The upper?

2    **A.**   Yes.

3    **Q.**   Okay.  And which tooth was it?

4    **A.**   It's my front -- the tooth right here.

5    **Q.**   I'm sorry?

6    **A.**   That one.

7    **Q.**   Which front tooth are you pointing to?  Right there?

8    **A.**   Yep.

9    **Q.**   And you are saying it's chipped?

10   **A.**   Yes, the front of it's chipped off.

11   **Q.**   Well, it was already a replacement tooth?

12   **A.**   Yes, it had bonding.

13   **Q.**   So it was the bonding that chipped off?

14   **A.**   Correct.

15   **Q.**   All right.  And you have not had that fixed?

16   **A.**   No, I have not.

17   **Q.**   And it's not something which really bothers you

18   apparently?

19   **A.**   Not to extreme.

20   **Q.**   Well, I mean, does bother you with eating?

21   **A.**   No.

22   **Q.**   Does it bother you if you go out socially and somebody

23   says, oh, my God, what happened to your tooth there, Jennings?

24   **A.**   I don't go out socially anymore.

25   **Q.**   Never?

1   **A.**   On occasion, but I don't really smile much.

2   **Q.**   Do you go on Facebook once in a while with some of your

3   friends?

4   **A.**   Sure.

5   **Q.**   Okay.  At a bar or a party or anything like that that you

6   can tell me about?

7   **A.**   I rarely go out anymore.

8   **Q.**   But you do go out?

9   **A.**   Oh, yes.

10   **Q.**   Okay.  Your relationship with your significant other,

11   she's been with you every day down here, has she not?

12   **A.**   Yes, she has.

13   **Q.**   It seems to me -- of course, you can correct me if I'm

14   wrong -- you have a very good relationship with her?

15   **A.**   That's correct.

16   **Q.**   She's very supportive of you?

17   **A.**   Yes, she is.

18   **Q.**   And she's the mother of your daughter?

19   **A.**   She is.

20   **Q.**   Of your second daughter because you have an older

21   daughter?

22   **A.**   That's correct.

23   **Q.**   That you never see, true?

24   **A.**   That's correct.

25   **Q.**   I think you characterized it as being she's out of my

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 153

1   life.

2           MR. ERNST:  Objection, Your Honor.  What's the

3   relevance of that, his family relationships?

4           THE COURT:  I don't know what the objection is.  He's

5   already answered the question.

6           MR. ERNST:  The objection is to relevance.

7           THE COURT:  Well, he's already answered the question.

8   Mr. Reising is going to move on.

9           MR. REISING:  I am, Your Honor.

10  BY MR. REISING:

11  Q.   Your daughter, young daughter, okay, she's three?

12  A.   Yes, she is.

13  Q.   I'm sorry, sir?

14  A.   Yes, she is.

15  Q.   All right.  Three-year-olds can be tempestuous, I mean

16  they can try anybody's nerves, right?

17  A.   I suppose.

18  Q.   Well, I assume you have gone through it twice now, you

19  have two daughters, true?

20  A.   That's correct.

21  Q.   And three-year-olds can make a lot of demands?

22  A.   Oh, yes.

23  Q.   And sometimes people might think those demands are more

24  than they want to deal with at that point in time?

25          MR. ERNST:  Your Honor, now he's going to comment on

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 154

1   what some people consider --

2            **THE COURT:**  I didn't find a question mark at the end

3   of that.

4            **MR. REISING:**  There's a question mark there.

5   **BY MR. REISING:**

6   **Q.**   Is that true, sir?

7   **A.**   Can you repeat that?

8   **Q.**   Oh, sure.  All I'm trying find out is can we agree that

9   three-year-olds can try your nerves?

10  **A.**   Of course they can.

11  **Q.**   And you've told us that maybe you get agitated and you

12  shouldn't?

13  **A.**   That's correct.

14  **Q.**   I'm going to assume that that agitation goes away quickly

15  because you love your daughter, true?

16  **A.**   Yes.

17  **Q.**   And you wouldn't want to do anything to hurt her?

18  **A.**   No.

19  **Q.**   Okay.  You told us that you think you saw Dr. Hanson about

20  six months ago.  Did you see Dr. Hanson when you got out of the

21  emergency room at McLaren and before you went to Genesys?

22  **A.**   Yes, I did.

23  **Q.**   How many times do you think you've seen Dr. Hanson all

24  together between that initial visit and the visit six months

25  ago related to what we're talking about here today?

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 155

1  **A.**    Maybe a dozen.

2  **Q.**    A dozen times?

3  **A.**    Yeah.  It wasn't always an appointment made to go over

4  specifically injuries resulting from this.  It was -- I was

5  seeing him quite a bit due to my cancer, and we would cover

6  other issues all in the same visit.

7  **Q.**    Because you had ongoing issues with your cancer condition,

8  true?

9  **A.**    That's correct.

10  **Q.**    You are taking medication even today because of residuals

11  from your cancer condition?

12  **A.**    That's also correct.

13  **Q.**    Is that Vicodin you are taking?

14  **A.**    Yes, it is.

15  **Q.**    And you don't take as much as you used to, but you still

16  take it?

17  **A.**    Yes.

18  **Q.**    What other medications do you currently take, sir?

19  **A.**    Tramadol, Prilosec, a multivitamin, glucosamine.

20  **Q.**    Okay.  Glucosamine is for your joints?

21  **A.**    Yes.

22  **Q.**    And the multivitamin, you are just trying to stay healthy?

23  **A.**    That's correct.  I have an altered immune system.

24  **Q.**    Give me the name of the first one that you said you take.

25  **A.**    Tramadol.

*13-13308; Jennings v. Fuller, et al.*

1   **Q.**   What's that for?

2   **A.**   It's a mild narcotic pain killer.

3   **Q.**   Okay.  Do you take that for your cancer condition, too?

4   **A.**   No, I take it for pain.

5   **Q.**   Just for pain?

6   **A.**   Yes.

7   **Q.**   Okay.  Well, as you sit here today, are you having any

8   pain that you can attribute to whatever happened to you on

9   September 18th, 2010?

10   **A.**   Yes, I do.

11   **Q.**   In what part of your body are you currently having pain,

12   sir?

13   **A.**   My left shoulder.

14   **Q.**   Your left shoulder?

15   **A.**   Yes.

16   **Q.**   Aside from your left shoulder, any other part of your

17   body?

18   **A.**   Not necessarily, no.

19   **Q.**   Okay.  You described to us earlier that you can only lift

20   your left arm up like that.

21   **A.**   Yes.

22   **Q.**   That's as high as you can go?

23   **A.**   Yes, it is.

24   **Q.**   Can you move your left arm behind you like I'm doing now?

25   **A.**   I don't know.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 157

1    **Q.**    Well, do you use your left arm in association with your

2    employment activity?

3    **A.**    Yes, I do.

4    **Q.**    Are you right-hand dominant?

5    **A.**    Yes, I am.

6    **Q.**    Has that left shoulder condition improved at all from when

7    it first manifested itself until today's date?

8    **A.**    A little.

9    **Q.**    A little, okay.  Do you do any kind of -- you told us, by

10   the way, I think, you took some physical therapy?

11   **A.**    Yes, I did.

12   **Q.**    And who prescribed that for you?

13   **A.**    Dr. Hanson.

14   **Q.**    Dr. Hanson prescribed a course of physical therapy

15   directed to your left shoulder?

16   **A.**    That's correct.

17   **Q.**    And when was that approximately that you had that physical

18   therapy, sir?

19   **A.**    About a year and-a-half ago.

20   **Q.**    A year and-a-half ago.  So it was sometime after your

21   deposition of April 29th of 2014?

22   **A.**    Yes.

23   **Q.**    Because you hadn't undergone any physical therapy at that

24   point in time.

25   **A.**    We had attempted to.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 158

1    **Q.**   But you didn't do it, right?

2    **A.**   My insurance wouldn't pay for it.

3    **Q.**   Well, you say your insurance wouldn't pay for it.  As I

4    understand it, during that course of time --

5    **A.**   I didn't have insurance.

6    **Q.**   -- you were making $100,000 a year, weren't you?

7    **A.**   Later, yes.

8    **Q.**   Okay.  So it isn't as if you didn't have any money coming

9    in to pay for some treatment if you wanted to, right?

10   **A.**   It's kind of hard to do when you're on the road.

11   **Q.**   That's a different issue.  When you're on the road because

12   of your job, you mean?

13   **A.**   Yes.

14   **Q.**   Okay.  Well, the same thing applies to taking physical

15   therapy.  If you're on the road with your job, you can't go to

16   a physical therapy office to get treatment, right?

17   **A.**   That was my point.

18   **Q.**   Now, your vision issues.  Do you happen to know what your

19   current visual acuity is with the glasses you are now wearing,

20   sir?

21   **A.**   I know the last time that I was told a number was 2600 and

22   that I was legally blind in my left eye.

23   **Q.**   2600.  Who told you that?

24   **A.**   Dr. Waters.

25   **Q.**   Dr. Waters?

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 159

1   **A.**   Yes.

2   **Q.**   Did you -- Dr. Waters testified in this courtroom; do you

3   remember that?

4   **A.**   Yes, I do.

5   **Q.**   Did you hear him say that your vision in your left eye was

6   2600?

7   **A.**   I don't believe he was asked, but, yes.  I don't remember

8   that.

9   **Q.**   You don't remember that, okay.  What about your right eye?

10  **A.**   My right eye is -- I believe it was 20/40 or something

11  like that.  I wasn't so concerned with my right eye.

12  **Q.**   As your left eye?

13  **A.**   Yes.

14  **Q.**   And you are concerned about your left eye, as I understand

15  at least, initially because you thought you got tasered in that

16  area of your body?

17  **A.**   I did.

18  **Q.**   But you didn't get tasered there, did you?

19  **A.**   I know that now, but --

20  **Q.**   But that's initially what you thought?

21  **A.**   It is.

22  **Q.**   Okay.  And then I have also read that perhaps you thought

23  that the cataract on your left eye was because you got

24  OC-sprayed.  Do you remember that?

25  **A.**   No, I don't.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 160

1    **Q.**   Now you think it's because of trauma?

2              **MR. ERNST:**  Judge, why is this witness being asked

3    about what causes a cataract?  He's not a medical professional.

4              **MR. REISING:**  I'm just asking what he understands,

5    Your Honor.

6              **THE COURT:**  This is cross-examination.  Go ahead.

7    **BY MR. REISING:**

8    **Q.**   Do you know, sir?

9    **A.**   My understanding from Dr. Waters is that it was caused

10   from the trauma.

11   **Q.**   All right.  Do you know if that trauma has to be right to

12   the eye, that is to say, a punch right to the eye?

13   **A.**   I didn't get that in depth with it.

14   **Q.**   Okay.  Were you told by Dr. Waters that you couldn't --

15   strike that.

16        You know that you have what's referred to as a cortical

17   cataract.  Does that sound familiar to you?

18   **A.**   Yes.

19   **Q.**   You have been told that?

20   **A.**   Yes.

21   **Q.**   Do you have a cortical cataract on both sides?

22   **A.**   Yes.

23   **Q.**   On both the left side and the right side?

24   **A.**   Yes.  It's trace, I believe, on the right.

25   **Q.**   And you have chosen not to have any corrective surgery for

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 161

1  the cataract removal?

2  **A.**   That would make me disabled, and I'm afraid of not being

3  able to work at this time.

4  **Q.**   That would make you disabled.  How long do you think you

5  would be disabled for, sir?

6  **A.**   The rest of my life.

7  **Q.**   The rest of your life if you had that surgery?

8  **A.**   That's what I was told.

9  **Q.**   Do you know that that surgery is probably the

10  most-performed surgery of any surgery of any type in this

11  country?

12  **A.**   Primarily to retired people, yes.

13  **Q.**   Because, what, they are in the scrap heap of life so they

14  don't matter; is that what you're telling me?

15  **A.**   They are not worried about working.

16  **Q.**   Oh, okay.  But you really haven't investigated doing that

17  anyway?

18  **A.**   Yes, I have.

19  **Q.**   You have?

20  **A.**   Yes.

21  **Q.**   And you have just ruled that out because you are not going

22  to do it?

23  **A.**   That's not the case.

24  **Q.**   But you are still working?

25  **A.**   Yes.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 162

1   **Q.**   So in spite of whatever is going on with your vision, as

2   we sit here today in this courtroom, you are able to function

3   and do your job, true?

4   **A.**   Mostly, yes.

5   **Q.**   Well, are there any what were referred to as activities of

6   daily living that you can't do because of a vision

7   insufficiency that you can describe to me?

8   **A.**   Yes.

9   **Q.**   What's that, sir?

10  **A.**   I can only read for limited amounts of time without

11  getting headaches.  Computer screens give me headaches.  So I

12  can only do parts of work at a time.

13      My job has been very helpful.  They allow me free reign to

14  where I can sit down and do paperwork for 20, 30 minutes,

15  branch off to something else.  Since I am supervising nine

16  aspects of the company, I can juggle my work around to where

17  various lighting and things like that that give me headaches, I

18  can adjust what I'm doing to compensate my injuries.

19  **Q.**   All right.  So you understand that you can -- you have

20  made some adjustments in terms of how you do your job and you

21  are able to do it?

22  **A.**   That's correct.

23  **Q.**   Now, you were asked about the felony complaint against you

24  known as R and O; do you understand?

25  **A.**   No.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 163

1   **Q.**   Do you recall that?

2   **A.**   Oh, yes.  Yes, I do.

3   **Q.**   Resisting and obstructing a police officer?

4   **A.**   Yes.

5   **Q.**   And ultimately that criminal complaint against you was

6   dismissed?

7   **A.**   Yes, it was.

8   **Q.**   Were you aware that prior to its dismissal by -- well,

9   strike that.

10        Do you know what judge dismissed that particular complaint

11   in Genesee County?

12   **A.**   Judge Judith Fullerton.

13   **Q.**   And do you understand that she's a circuit judge in

14   Genesee County?

15   **A.**   I was.

16   **Q.**   Were you also aware that prior to that there's what's

17   referred to as a preliminary examination?

18             **THE COURT:**  Wait a second.  Go ahead.

19             **THE WITNESS:**  Yes.

20   **BY MR. REISING:**

21   **Q.**   Were you there?

22   **A.**   I was.

23   **Q.**   And did you understand that you were bound over for trial

24   by that district judge?

25             **MR. ERNST:**  Objection, relevance.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5–Page 164

1    **THE COURT:**  No, let him answer.

2    **BY MR. REISING:**

3    **Q.**   Do you understand that, sir?

4    **A.**   Yes.

5    **Q.**   And then ultimately it was dismissed by Judge Fullerton?

6    **A.**   That's correct.

7    **Q.**   Okay.  And when was it dismissed approximately; do you

8    know?

9    **A.**   I'm not sure of the date, if that's what you're looking

10   for.

11   **Q.**   If I told you in October of 2012, does that sound about

12   right?

13   **A.**   That sounds about right.

14   **Q.**   Okay.  And that was just sort of at the end of your

15   intensive course of radiation and chemotherapy for your cancer

16   condition?

17   **A.**   I was finishing up my last course of chemo, yes.

18   **Q.**   And that was a tough road to hoe, wasn't it?

19   **A.**   Very.

20   **Q.**   I think you told us that you weren't sure if you were

21   going live or die.

22   **A.**   I was actually told that I wasn't going to live.

23   **Q.**   But fortunately you lived, right?

24   **A.**   Yep.

25   **Q.**   Now, today, in terms of your emotional well-being,

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 165

1   Mr. Jennings, are you presently receiving any counseling or

2   treatment with respect to what you've described to us?

3   **A.**   No, I'm not.

4   **Q.**   Have you ever received any such counseling or treatment

5   since September the 18th of 2010 through the present time?

6   **A.**   Yes.

7   **Q.**   And where was that, Genesys?

8   **A.**   Catholic Charities.

9   **Q.**   Catholic Charities of Genesee County?

10   **A.**   Yes.

11   **Q.**   And when did you go there, sir?

12   **A.**   I'm not sure of the dates.

13   **Q.**   Okay.  What year was it in?  Maybe you can tell us that.

14   **A.**   I believe it was 2011.

15   **Q.**   2011?

16   **A.**   I believe so.

17   **Q.**   And how long did you go to Catholic Charities for some

18   sort of counseling?  Is that what it was?

19   **A.**   It was grievance counseling, yes.

20   **Q.**   I'm sorry?

21   **A.**   Grievance counseling.

22   **Q.**   Grievance counseling?

23   **A.**   Yes.

24   **Q.**   Were you having issues with what at that point in time?

25   **A.**   Well, at that point in time I had lost a lot of family

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 166

1   members and best friends, and I also had a lot of anxiety over

2   various issues and just -- I was recommended to try grievance

3   counseling, and it helped me to get things off my chest.

4   **Q.**   Was that a group counseling kind of circumstance?

5   **A.**   No, it was one on one.

6   **Q.**   One on one, and for how long did you do it approximately?

7   **A.**   Four or five months.

8   **Q.**   All right.  Once a month or once a week or what was it?

9   **A.**   Once a week.

10  **Q.**   All right.  Once an week.  And at the end of the process

11  did that help you?

12  **A.**   It did.

13  **Q.**   All right.  And you had no other counseling of any type

14  since that time?

15  **A.**   No, I have not.

16  **Q.**   You haven't returned to Catholic Charities again?

17  **A.**   No, I do go to AA and Narcotics Anonymous.

18  **Q.**   Okay.  You are participating in two separate 12-step

19  programs?

20  **A.**   That's correct.

21  **Q.**   AA stands for Alcoholics Anonymous?

22          **MR. ERNST:**   Judge, I'm objecting to this line of

23  questioning.

24          **THE COURT:**   No, he can ask one more question after

25  this.

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 167

1    **BY MR. REISING:**

2    **Q.**   I just want to make sure.  AA stands for Alcoholics

3    Anonymous?

4    **A.**   Yes.

5    **Q.**   And the other one is Narcotics Anonymous?

6    **A.**   That's correct.

7    **Q.**   Do you go on a regular basis to those meetings?

8    **A.**   Not as much anymore, but at least once a month.

9    **Q.**   All right.  Helpful to you?

10   **A.**   Yes, fellowship.

11   **Q.**   You told us in terms of flashbacks that initially you had

12   flashbacks once or twice a week.  Do you remember that, making

13   that statement?

14   **A.**   Yes.

15   **Q.**   Now, you told us in your earlier testimony that as of the

16   time you were pepper-sprayed you have no recollection of what

17   happened to you from that point until you woke up on the

18   restraint bed, true?

19   **A.**   That's correct.

20   **Q.**   So any flashback you had, was it related to what happened

21   initially when you went to the jail that night?

22   **A.**   It would be, yes.

23   **Q.**   Well, I'm asking you.  What are the flashbacks about?

24   **A.**   Well, I guess there's a little something to getting beaten

25   to where you believe you are going to die and then waking up

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 168

1    strapped down to a bench with a bag over your head that seems

2    to kind of stick in your conscience, at least for me anyways.

3    **Q.**    A bag over your head.  You are talking about the spit

4    mask?

5    **A.**    That's correct.

6    **Q.**    Okay.  And beaten?

7    **A.**    Yes, beaten.

8    **Q.**    All right.  Did you see anybody in the videos we looked at

9    beat you, sir?

10   **A.**    Oh, yes.

11   **Q.**    You did?

12   **A.**    Of course I did.

13   **Q.**    You did.  Who punched you in those videos according to

14   what you saw?

15   **A.**    You might have different terms for them, but your

16   technical moves, as they call them, are definitely pain

17   inflicting.

18   **Q.**    Okay.  Well, they are -- all right.  There are various

19   maneuvers that are used to gain compliance from a

20   noncooperative individual.  Is that what you're talking about?

21           **MR. ELLIOTT:**  Your Honor, this is testimony.  That's

22   not a question.

23           **THE COURT:**  Wait a second.  Your question doesn't

24   need a preface.

25           **MR. REISING:**  Yes, Your Honor.

*William Jennings - Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 169

1    **BY MR. REISING:**

2    **Q.**    In terms of these flashbacks -- a flashback, as I

3    understand it at least, is something which refers directly back

4    to what you recall?

5              **MR. ERNST:**   This is testimony --

6              **THE COURT:**   Wait a second.  You are not going to

7    finish in the next two minutes, are you?

8              **MR. REISING:**   That's probably true, Your Honor, I am

9    not.

10             **THE COURT:**   Then we'll start tomorrow morning at

11   9:00 o'clock so you can collect your thoughts.

12             **MR. REISING:**   I will.  I always do, Your Honor.

13             **THE COURT:**   Thank you.  See you tomorrow morning at

14   9:00 o'clock.  Think about who is going to win between the Cubs

15   and Cleveland today.

16             **MR. REISING:**   What's your choice, Judge?

17             **THE COURT:**   I'm a neutral.

18        (Jury out at 12:54 p.m.)

19             **THE WITNESS:**   The Cubs are looking pretty good

20   though.

21             **MR. REISING:**   It would be nice to see either one of

22   those teams win.

23             **THE COURT:**   I would like to see the Cubs win.

24             **MR. REISING:**   Well, it's been so long.

25             **THE COURT:**   That's right.

*13-13308; Jennings v. Fuller, et al.*

*William Jennings – Cross*
*Tuesday/October 25, 2016/Volume 5*

V5-Page 170

1      **THE WITNESS:**  They have a better chance now than they

2  have in a long time.

3      **THE COURT:**  Okay.  9:00 o'clock tomorrow morning.

4      (Proceedings concluded at 12:54 p.m.)

5                       -   -   -

6

7           **C E R T I F I C A T I O N**

8      I certify that the foregoing is a correct transcription of

9  the record of proceedings in the above-entitled matter.

10

11  s/ Sheri K. Ward                      11/13/2016
    Sheri K. Ward                        Date
12  Official Court Reporter

13                       -   -   -

14

15

16

17

18

19

20

21

22

23

24

25