UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**WILLIAM JENNINGS,**

              Plaintiff,

        v.                                **HONORABLE AVERN COHN**

                                          **No. 13-13308**
**PATRICK FULLER, et al.,**

              Defendants.
_____/


**JURY TRIAL - VOLUME 9**

**Monday, October 31, 2016**


Appearances:

Kevin S. Ernst                      H. William Reising
Law Offices of Kevin Ernst          Christopher J. Scott
645 Griswold Street, #1808          Plunkett & Cooney
Detroit, Michigan  48226            111 E. Court Street, #1B
(313) 965-4822                      Flint, Michigan  48502
                                    (810) 232-5100
                                      On behalf of Defendants
Dean D. Elliott
321 South Williams Street
Royal Oak, Michigan  48067
(248) 543-9000
  On behalf of Plaintiff


                        -   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial - Volume 9*
*Monday, October 31, 2016*

**I N D E X**

Plaintiff's Case in Chief                                    Page    Vol.

   **Robert Nuckolls**

      Redirect Examination By Mr. Ernst:        3       9

Plaintiff Rests ...................................9      9

Motion for Judgment as a Matter of Law .........11

Motion to Strike or Limit Testimony ............21

Defendant's Case in Chief

   **Darrell Ross, Ph.D.**

      Direct Examination By Mr. Reising:      32       9

      Cross-Examination By Mr. Ernst:        67       9

Certification of Reporter .....................124

-   -   -

Plaintiff's Exhibits

           Number                                    Id'd  Vol.

      25       ..................................8      9

-   -   -

*13-13308; Jennings v. Fuller, et al.*

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 3

1          Detroit, Michigan

2          Monday, October 31, 2016

3          9:00 a.m.

4          -   -   -

5          **THE CLERK:**  The court now calls the matter of

6  *Jennings v. Fuller, et al.*, Case Number 13-13308.

7          **THE COURT:**  Everybody can be seated.

8     The witness take the stand.

9     (Jury in at 9:01 a.m.)

10          **THE COURT:**  You can be seated.

11     Redirect.

12          **-   -   -**

13                              (9:02 a.m.)

14                    **REDIRECT EXAMINATION**

15  **BY MR. ERNST:**

16  **Q.**  Sir, on Friday you testified that you saw Nurse Stephanie

17  decontaminate Mr. Jennings while he was in the hall, correct?

18  **A.**  That is correct.

19  **Q.**  And you said that she did it by wiping him with a 4x4

20  cloth?

21  **A.**  That is my recollection, yes.

22  **Q.**  And in fact you testified that that was why you

23  disregarded the policy which states that under no circumstances

24  can you place a prisoner who has been pepper-sprayed facedown,

25  correct?

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 4

1          **MR. REISING:**  Objection.  I'm sorry, I thought you

2  were done.  Please finish.

3          **MR. ERNST:**  That was it.

4  **BY MR. ERNST:**

5  **Q.**  Correct?

6          **MR. REISING:**  Now I have an objection.  I object

7  because he didn't say he disregarded --

8          **THE COURT:**  Pardon?

9          **MR. REISING:**  I object to the question.  It's

10  argumentative in nature, and the witness specifically didn't

11  testify previously that he disregarded the policy.

12          **THE COURT:**  Change the word "disregard" to "follow."

13  **BY MR. ERNST:**

14  **Q.**  Okay.  That's why you didn't follow the policy, correct,

15  because he had been decontaminated?

16          **MR. REISING:**  That's a better explanation.

17  Thank you.

18          **THE WITNESS:**  That is correct.

19  **BY MR. ERNST:**

20  **Q.**  Sir, that's just a baldfaced lie, isn't it?

21          **THE COURT:**  That is not a proper question.

22  **BY MR. ERNST:**

23  **Q.**  Sir, could you turn to Page 101 of your deposition.

24  Line 6:

25          "Q.  What's your protocol for cleaning someone with pepper

*13-13308; Jennings v. Fuller, et al.*

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 5

1   spray?  Who is responsible for that?

2       "A.  We allow them access to soap and water if they are

3   not otherwise in a restraint bed like that.  Otherwise, the

4   nurse would put a little saline on him.

5       "Q.  Did she do that?

6       "A.  I don't know.  I don't recall if she did or not, to

7   be honest with you."

8       Is that your testimony, sir?

9   **A.**   It is.

10  **Q.**   Do you want to change your testimony about whether you

11  witnessed her decontaminate Mr. Jennings, sir?

12  **A.**   Absolutely not.

13  **Q.**   And you also heard Nurse Stephanie watch that tape and say

14  she didn't decontaminate him then, she did it in safety cell 6,

15  correct?

16  **A.**   She said she decontaminated him, correct.  She said she

17  did it in the safety cell, that is also correct.  However, she

18  is mistaken.

19          **THE COURT:**  No --

20          **MR. ERNST:**  Sir, sir, I asked you a yes-or-no

21  question.

22          **THE COURT:**  You know something?  I have already told

23  him to stop.  I don't need any assistance.

24          **MR. ERNST:**  Thank you, Your Honor.

25

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 6

**BY MR. ERNST:**

**Q.** And, as you indicated in your testimony at Page 101, you don't decontaminate somebody by wiping them with a 4x4 cloth, correct?

**A.** Negative.

**Q.** You pour copious amounts of water or soap and water, correct?

**A.** Incorrect.

**Q.** Okay. And then you change their clothes, correct?

**A.** Not necessarily.

**Q.** Now, you said you didn't leave Mr. Jennings in safety cell 6 because he hadn't been searched, correct?

**A.** The search process had not been completed, yes.

**Q.** You never completed the search process that night, correct?

**A.** Incorrect.

**Q.** So you searched him in safety cell 6, correct?

**A.** Incorrect.

**Q.** You searched him when he was laying on the bed then, correct?

**A.** In the hallway.

**Q.** And that was done after he had been in the restraint bed, correct?

**A.** That is correct.

**Q.** And is that one of those scenes that we can't see on the

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 7

1   video, correct?

2   **A.**   You might be able to.

3   **Q.**   Sir, you -- could I see the spit hood?

4        Sir, you placed the spit hood on your face the other day

5   and said this is just how that you put it on Mr. Jennings,

6   correct, on Friday?

7   **A.**   Yes.

8   **Q.**   Okay.  And isn't it true, sir, that you placed this white

9   portion of the spit hood, the middle white portion over your

10  face, correct, this part?

11  **A.**   Yes.  I did not place it on him, however, but, yes, that's

12  basically how it goes on.

13  **Q.**   Okay.  And you would agree with me, sir, that the part

14  that you had over your face is designed to prevent somebody

15  from spitting, correct?

16  **A.**   Correct.

17  **Q.**   And it's designed to prevent bodily fluids from passing

18  through that, correct?

19  **A.**   Ideally, yes.

20  **Q.**   So that means, sir, if somebody vomited in the spit hood,

21  especially if they were facedown, the volume would just stay in

22  that spit hood, correct?

23  **A.**   If that would have happened.

24  **Q.**   Okay.

25           **MR. ERNST:**  That's all I have, Your Honor.

*13-13308; Jennings v. Fuller, et al.*

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 8

1        **THE COURT:**  Thank you.  You're excused.

2            Do you have any further witnesses?

3        **MR. ERNST:**  No, Your Honor, but I do have one other

4    matter, and that is I would ask the Court to take judicial

5    notice that Mr. -- may I approach?

6        **THE COURT:**  Yeah.

7        **MR. ERNST:**  That Mr. Jennings, who is 43 years old,

8    has a life expectancy of --

9        **MR. REISING:**  Your Honor, excuse me, this argument

10   should not be in front of the jury, I don't believe.

11       **THE COURT:**  Well, he wants to introduce this table.

12   What exhibit number is it?

13       **MR. ERNST:**  That would be Exhibit 25.

14       **THE COURT:**  Do you have any objection to Exhibit 25?

15       **MR. REISING:**  Your Honor, I would object only because

16   there's no foundation for this document whatsoever.

17       **THE COURT:**  Well, it's a public document.

18       **MR. REISING:**  I understand that.

19       **THE COURT:**  Do you want someone to come and

20   authenticate it?

21       **MR. REISING:**  No, I'm not saying that.  I'm saying

22   there's nothing in this record to authenticate whether or not

23   the criteria in this document would otherwise be applicable to

24   Mr. Jennings.

25       **THE COURT:**  It's applicable generally, you would

*13-13308; Jennings v. Fuller, et al.*

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 9

1   agree?

2              **MR. REISING:**  It's applicable generally to the

3   population.

4                 **THE COURT:**  Okay.  That's all it's being offered for.

5              **MR. REISING:**  All right.  Then I have no objection.

6              **THE COURT:**  Okay.  Ladies and gentlemen, Exhibit 25

7   is the Social Security Actuarial Life Table based upon the

8   mortality experience of a population during a relatively short

9   period of time.  It states:

10                 "Here we present the 2013 period life table for the

11                 Social Security area population.  For this table the

12                 period of life expectancy at a given age is the

13                 average remaining number of years expected prior to

14                 the death of a person at that exact age born on

15                 January 1 using the mortality rates for 2013 over the

16                 course of his or her remaining life."

17       What age is the plaintiff?

18           **MR. ERNST:**  43.

19           **THE COURT:**  For a 43-year-old person, the table reads

20   age 43, probability 0.002629, lives 95,262, expectancy 35.78

21   years.  Thank you.

22           **MR. ERNST:**  With that, Your Honor, the plaintiff

23   rests their case in chief.

24           **THE COURT:**  Thank you.  The plaintiff has rested its

25   case.  We now turn to the defendant, but before that we excuse

*Robert Nuckolls - Redirect*
*Monday/October 31, 2016/Volume 9*

V9-Page 10

1    you for a few minutes.  Thank you.

2         (Jury out at 9:12 a.m.)

3         Sit down, please.

4         Mr. Ernst?

5              **MR. ERNST:**  Yes, sir.

6              **THE COURT:**  I appreciate the sincerity and the vigor

7    with which you are presenting your client's case.  If between

8    now and the end of the case you ask the a question again,

9    "That's a baldfaced lie, sir, isn't it," I'm going to sanction

10   you right then and there, not in front of the jury, but I'm

11   going to sanction you.  That's a highly improper question, and

12   before the end of the case I will give you authority for the

13   fact that it's a highly improper question to accuse somebody of

14   lying.  As being mistaken or that isn't the way it happened or

15   some other neutral form of questioning, but to accuse somebody

16   of lying is a very dangerous thing.  Now you may sit down --

17             **MR. ERNST:**  Yes, sir.

18             **THE COURT:**  -- but you are on notice.

19        Do you have anything for the Court, Mr. Reising?

20             **MR. REISING:**  Well, Your Honor, I have a witness to

21   present, but I think before we get to the witness --

22             **THE COURT:**  Well, I mean do you have anything for the

23   Court at the conclusion of the plaintiff's case?  I understand

24   you have witnesses.

25             **MR. REISING:**  I have a directed verdict motion, also,

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 11

1   Your Honor.

2           **THE COURT:**  We don't use directed verdict in Federal

3   Court.  We use judgment as a matter of law.

4           **MR. REISING:**  It's a Rule 50(a) motion, Your Honor.

5           **THE COURT:**  Okay.  Go ahead and state your motion.

6           **MR. REISING:**  May I approach, Your Honor?

7           **THE COURT:**  Yeah.

8           **MR. REISING:**  Here is a copy.

9           **THE COURT:**  Just drop it.

10       Let me read it first.

11       All right.  The motion is in three parts?

12           **MR. REISING:**  Correct, Your Honor.

13           **THE COURT:**  Okay.  And what you're going to do is

14   orally argue to me the three parts of the motion?

15           **MR. REISING:**  Very good, Your Honor.

16           **THE COURT:**  And the substance of your argument is

17   contained in the motion?

18           **MR. REISING:**  Correct.

19           **THE COURT:**  Okay.  So let's proceed with the motion.

20   Wait a minute, not the argument.

21       The Court is familiar with the record.  The Court is

22   familiar with the standard for JMOL at the conclusion of the

23   plaintiff's case.

24           **MR. REISING:**  I'm going to start, Your Honor, at the

25   bottom of Page Number 3.

*13-13308; Jennings v. Fuller, et al.*

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 12

1          **THE COURT:**  What?

2          **MR. REISING:**  I'll start at the bottom of Page Number

3  3, Roman Numeral I.

4          **THE COURT:**  No, you don't have to do anything.

5          **MR. REISING:**  All right.  I understand.

6          **THE COURT:**  What is the evidence that Officer Guest

7  used excessive force?

8      Now, I understand in a case typically where there is a

9  multitude of officers involved in an incident in which the

10  accusation is that they used excessive force and you are unable

11  to parse out exactly what officer did what because it's a

12  collective action the burden then shifts to the defendant to

13  establish that one or more of the officers did not participate

14  in, we'll use the word loosely, the melee.

15      In this case the verdict form at the end of the case calls

16  for a separate consideration by the jury of the actions of each

17  of the officers.  Part I, Unlawful Force; A, Liability;

18  Question 4:  "Was Kyle Guest's use of force against

19  William Jennings unlawful?"

20      And what you're saying is no reasonable jury could find

21  based upon the proofs presented by the plaintiff in his case

22  that there's any evidence that Kyle Guest used force against

23  William Jennings?

24          **MR. REISING:**  Correct, Your Honor.

25          **THE COURT:**  That's a fair statement?

*13-13308; Jennings v. Fuller, et al.*

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 13

1      Now, you tell me what the evidence is against Kyle Guest,

2    not the rest, but Kyle Guest individually.

3          **MR. ERNST:**  Well, Your Honor, a Fourth Amendment

4    excessive force claim has three components.  You can show that

5    the officer himself used force, that the officer supervised

6    somebody or ordered them to use force or that the officer had

7    an opportunity to intervene and he failed to.  That's what

8    every excessive force claim alleges.

9      So -- and I disagreed with the Court's verdict form in the

10   first place, that it's narrow, it's that narrowly tailored.  In

11   this case we allege that there's a concert of action between

12   these defendants.  For example, if Mr., if Mr. Elliott held me

13   down while Mr. Reising punched me, Mr. Reising is not the only

14   person liable, Mr. Elliott is, too.

15         **THE COURT:**  I would agree.  Now, I simply asked you

16   what evidence there is that Kyle Guest used excessive force

17   either directly or indirectly.  That's the easiest way.

18         **MR. ERNST:**  So my response is he participated in it.

19   He obtained the restraint chair that they threw Jennings in.

20         **THE COURT:**  That's a neutral act.

21         **MR. ERNST:**  Well, I --

22         **THE COURT:**  That's a neutral act.

23         **MR. ERNST:**  But it's part of the assault --

24         **THE COURT:**  No, it's a neutral act.  It's a neutral

25   act.

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 14

1      **MR. ERNST:**  And he had an opportunity to intervene

2  and he failed to do so.

3      **THE COURT:**  Under the circumstances here he was under

4  the command of the lieutenant.  He was a subordinate.  He could

5  not willfully disregard an order of his superior.  His superior

6  ordered him to obtain the chair.  That, in itself, is, again,

7  neutral and does not implicate him in anything.

8      **MR. ERNST:**  Your Honor, as that case that I cited to

9  the Court --

10     **THE COURT:**  No, I asked you a very direct question,

11  sir, about Kyle Guest only, and all that you've told me so far

12  is that Kyle Guest was present, observed the events in

13  question, and the only affirmative act that he took,

14  affirmative act, positive act was to obtain the restraint

15  chair.  Anything more?

16     **MR. ERNST:**  Nothing more other than that, Your Honor.

17     **THE COURT:**  All right.  Kyle Guest is dismissed as a

18  defendant, and he may leave.  There is insufficient evidence to

19  go to the jury to implicate Kyle Guest in the events in

20  question.

21     The second ground you have -- and you will keep your mouth

22  closed, sir, about this case --

23     **MR. GUEST:**  Yes, sir.

24     **THE COURT:**  -- until it's over.  Then you are free to

25  talk.

*13-13308; Jennings v. Fuller, et al.*

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 15

 1     No evidence to support unlawful prosecution claim.  What

 2  are the exhibits, the exhibits that support that claim?

 3          **MR. ERNST:**  You are asking me, Your Honor?

 4          **THE COURT:**  Yes.

 5          **MR. ERNST:**  Well, I have the report of Officer

 6  Kennamer and then --

 7          **THE COURT:**  No, I'm talking about -- okay.  His

 8  report.

 9          **MR. ERNST:**  Right.

10          **THE COURT:**  His report was done in the ordinary

11  course of business.  It related the events of the evening as he

12  perceived them.  Now, he could have been incorrect in his

13  perception, but every officer typically that's involved in an

14  incident during the course of performing official duties

15  presents a report typically.  Sometimes they don't because they

16  rely on the report of others, but that's all --

17     So we've got that report.  What else?

18          **MR. ERNST:**  Well, we have the -- I guess the exam

19  testimony of Officer Fuller is not an exhibit, but he testified

20  to it.  It was read into the record.  So technically that's not

21  an exhibit, so as far as --

22          **THE COURT:**  What other exhibits are there?  We'll get

23  to testimony later.

24          **MR. ERNST:**  There's the criminal complaint and

25  information.

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 16

1      **THE COURT:**  Neither officer prepared the criminal

2  complaint or the information nor were consulted on the

3  complaint and the information.  The complaint was -- the

4  complaining witness was a lieutenant presumably in the

5  detective bureau.

6      It's not unreasonable for the Court to conclude and the

7  finder of fact to conclude that the several reports were

8  gathered and there is some testimony they were presented to the

9  detective bureau and that the detective bureau then prepared a

10  report, I'm not sure that report is in evidence, to the

11  prosecutor.  But, in any event, the prosecutor had all of the

12  reports, came to the conclusion that a criminal complaint

13  should be filed, which then was -- there was a preliminary

14  examination.  Lieutenant --

15      **MR. ERNST:**  Deputy Fuller.

16      **THE COURT:**  Officer Fuller testified, but it would

17  appear, again, that it's fair to conclude that that's who the

18  prosecutor chose to present as a witness to explain the events

19  of the evening from his perception and there was no opposition,

20  no evidence to the contrary introduced before the examining

21  magistrate and the examining magistrate concluded that there

22  was probable cause to bind over --

23      Is that the expression they use?

24      **MR. ERNST:**  Yes, Your Honor.

25      **THE COURT:**  -- bind over the defendant based upon the

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 17

1   preliminary examination and therefore an information was filed.

2   The information was prepared by the prosecuting attorney.

3   There's no evidence that he used anything other than the

4   preliminary examination and the record that had been made

5   before the examining magistrate and that the case was

6   eventually dismissed by the circuit judge on the motion of the

7   prosecutor because of the -- well, for whatever reason it was

8   dismissed, not adjudicated.

9            **MR. REISING:**  Correct, Your Honor.

10           **THE COURT:**  That's it.  I don't find anything when I

11  look at the definition of unlawful prosecution as expressed in

12  the instructions --

13           **MR. ERNST:**  Judge, may I respond to that?

14           **THE COURT:**  Yeah.  Let me finish.

15           **MR. ERNST:**  The Court's rendition is contrary to the

16  clear dictates of *Sykes*, the controlling case, and it says that

17  the officers cannot hide behind the decisions of a prosecutor

18  or a judge that binds over when they present materially false

19  information, and whether that's materially false, whether there

20  is sufficient evidence is a jury question.

21           **THE COURT:**  No, it's not in this case.

22           **MR. ERNST:**  Your Honor, they testified at -- they

23  testified at the exam, or Fuller did, that Jennings turned

24  around towards him and took an aggressive stance.  That clearly

25  didn't happen and the judge at the bindover did not have the

*13-13308; Jennings v. Fuller, et al.*

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 18

1    benefit of the videotape, and when the prosecutor and the judge

2    saw the videotape sometime after, the case was dismissed.

3         So there's clearly enough evidence for it to go to the

4    jury, and the *Sykes* case said, it says:

5                   "It is absolutely clear, however, that an officer

6                   will not be deemed to have commenced a criminal

7                   proceeding against a person when the claim is

8                   predicated on the mere fact that the officer turned

9                   over to the prosecution the officer's truthful

10                  materials."

11        However, the court said, in *Sykes* it said Sergeant

12   Anderson, the defendant, was responsible "for all reasonably

13   foreseeable consequences of his initial misdeeds," which

14   included submitting materially false investigatory materials or

15   reports to the prosecutor.  There's no requirement that they be

16   the complaining witness, that they be named in the information

17   or the complaint.  It's only if they present materially false

18   information.  And Deputy Kennamer indicated he knew that his

19   report would go up the chain of command to the prosecutor so he

20   initiated the --

21        **THE COURT:**  He knew that his report would be

22   reviewed.  He did not know necessarily that it would go to a

23   prosecutor or he didn't testify that he knew that the

24   prosecutor was going to rely on his report.

25        **MR. ERNST:**  Well, that's an argument for a jury,

*Motion for Judgment as a Matter of Law*
*Monday/October 31, 2016/Volume 9*

V9-Page 19

1    Your Honor.  It's not --

2            **THE COURT:**  No, it's not.  No, it's not.  No, it's

3    not.

4        You don't have to answer this question.  If I don't

5    dismiss the unlawful prosecution claim now, is it your

6    intention to ever offer evidence or are you going to rely on

7    the record?

8            **MR. REISING:**  I'm going to rely on the record,

9    Your Honor.

10           **THE COURT:**  You are not going to introduce anything?

11           **MR. REISING:**  I don't believe so.

12           **THE COURT:**  Okay.  I'm just going to wait until the

13   end of the case to deal with it on the basis of your

14   representation that you don't intend to offer -- I'm satisfied

15   more likely than not it should be dismissed, and I'm also

16   satisfied that dismissal observed objectively will enhance the

17   plaintiff's opportunity to persuade the jury that excessive

18   force was used.  I think that the -- it comes close to

19   inadequate representation to present the malicious prosecution

20   claim along with the excessive force claim, okay?

21       So we'll proceed.  Is there a third one?  Qualified

22   immunity.  That's denied.  That's already, that's already been

23   adjudicated.

24           **MR. REISING:**  I understand, Your Honor.

25           **THE COURT:**  Do you have anything more you want to

1  tell me?

2          **MR. REISING:**  Well, there is one further component to

3  the directed verdict motion, and it's the plaintiff's claim for

4  punitive damages.

5          **THE COURT:**  I'm going to reserve decision on that

6  until the end of the case.

7          **MR. REISING:**  Then, Your Honor, that's --

8          **THE COURT:**  There's a problem in dismissing the claim

9  of punitive damages against all five of the defendants.  I'm

10  satisfied that punitive damages should go forward at this point

11  against the lieutenant, okay?  As a matter of fact, I'm almost

12  satisfied that he's the only one that should have been sued,

13  but if I'm selective, the Court is selective in dismissing some

14  of the claims of punitive damages against some of the

15  defendants, the jury can gain the impression that the Court has

16  an opinion on the outcome of the case.  Do you understand what

17  I'm saying?

18          **MR. REISING:**  I do, Your Honor.

19          **THE COURT:**  That only two out of the five are being

20  charged with malicious -- with the definition of punitive

21  damages and the other three are not.  A smart jury -- a

22  not-so-smart jury, a jury that thinks it's smart, can draw a

23  conclusion that the Court has passed some sort of judgment on

24  the quality of the evidence and found that it's higher quality

25  plaintiff-oriented evidence on those defendants that are left

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 21

1   in on punitive damages than those who are not so it is better

2   to sort that out on a motion JMOL at the end of the case after

3   the jury's verdict is in.

4              **MR. REISING:**  I understand, Your Honor.

5              **THE COURT:**  Do you understand my reasoning?

6              **MR. REISING:**  I do.

7              **THE COURT:**  You can disagree with it, but ...

8              **MR. REISING:**  I really don't disagree with the

9   analysis that the Court just set forth on the record.

10             **THE COURT:**  I have been thinking about this through

11  the whole case.  So it's time to call the jury back.

12             **MR. ERNST:**  No, Your Honor.

13             **MR. REISING:**  We have another matter to take up with

14  the Court first.

15             **THE COURT:**  I assume there's depositions?

16             **MR. REISING:**  No, it has to do with the testimony

17  that we are going to present to the Court this morning from

18  Dr. Darrell Ross.  Plaintiff filed a motion last night at

19  9:31 p.m. seeking to either strike his testimony or limit his

20  testimony.

21             **THE COURT:**  It's a little late in the day.  Is his

22  testimony personally or by deposition?

23             **MR. REISING:**  Personally, Your Honor.

24             **THE COURT:**  But it's based upon what he said in

25  discovery?

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 22

1          **MR. ERNST:**  Based on his report.

2          **MR. REISING:**  Based on his report.

3          **THE COURT:**  Well, it's a little late in the day to

4     object.

5          **MR. ERNST:**  Well, Your Honor --

6          **THE COURT:**  You had ample opportunity before trial to

7     file your motion.

8          **MR. ERNST:**  Well, Your Honor, I wanted to see how the

9     proofs came out with regard to Mr. Katsaris, and Your Honor,

10    there's no deadlines imposed by the Court and what this deals

11    with --

12         **THE COURT:**  Mr. Ernst, your arguments are frequently

13    self-defeating.  I'll listen to what you have to say.

14         **MR. ERNST:**  Okay.

15         **THE COURT:**  Is it a written motion?

16         **MR. ERNST:**  Yes.

17         **THE COURT:**  Let me see the motion.  You filed it with

18    the defendant, but you didn't file it with the Court.

19         **MR. ERNST:**  We uploaded it yesterday, Your Honor.

20         **THE COURT:**  What time?

21         **MR. ERNST:**  Last night.

22         **THE COURT:**  Do you think I look at Pacer at night at

23    home to see what's been filed?

24         **MR. ERNST:**  No, but I just wondered if maybe you got

25    it this morning.  Your Honor, it deals with --

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 23

1        **THE COURT:**  Let me read it first.

2        **MR. ERNST:**  Okay.

3        **THE COURT:**  Who is Mr. Ross?

4        **MR. REISING:**  Darrell Ross, Your Honor, is the

5   defendants' corrections expert.

6        **THE COURT:**  What?

7        **MR. REISING:**  Corrections expert that's been retained

8   by the defendants, Your Honor.

9        **THE COURT:**  As I open this, it says that in a 1999

10  case I struck his opinion and precluded him from testifying.

11       **MR. REISING:**  I understand that's what it says, but

12  unfortunately because it's a 1999 case, first of all, it isn't

13  on Pacer and, second of all, of course that case isn't attached

14  so we can't reference it.

15       **THE COURT:**  And we don't know whether or not it's

16  available.

17       **MR. SCOTT:**  Pacer shows the case, but there's no

18  order in the docket on that case showing that the Court granted

19  a motion --

20       **THE COURT:**  You didn't look at the court file.

21       **MR. REISING:**  Not last night at 10:00 o'clock,

22  Your Honor, but Dr. Ross testified in that case.  Unbeknownst

23  to him.  Nothing was stricken.

24       **MR. ERNST:**  Your Honor, he testified via video dep

25  and so he wasn't live so he wouldn't know, and the case settled

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 24

1    after that.

2              **THE COURT:**  Well, what's the difference between

3    Katsaris' testimony and your expert's testimony?

4              **MR. REISING:**  There really isn't any.  Mr. Katsaris

5    testified as to what he thought occurred and if it was

6    appropriate or not appropriate in terms of the question before

7    this Court.

8              **THE COURT:**  And he found it inappropriate.

9              **MR. REISING:**  He found it to be inappropriate across

10   the board, yes.

11             **MR. ERNST:**  But I was careful to ask Mr. Katsaris

12   questions so as not to elicit testimony that the conduct was

13   unreasonable, excessive, the legal conclusions that the Sixth

14   Circuit and all of the district courts in this circuit

15   repeatedly say that an expert cannot testify to.  He cannot be

16   a liability expert, and Mr. Ross' report is full of those types

17   of references.  The force was reasonable, it was necessary, and

18   that's precisely what the Sixth Circuit says you cannot do and

19   I was --

20             **THE COURT:**  Do you have a copy of those cases?

21             **MR. ERNST:**  I cited them to the Court.

22             **THE COURT:**  Do you have a copy of the cases?

23             **MR. ERNST:**  I'm sorry, I don't have copies.

24             **THE COURT:**  The motion will be taken under

25   advisement.  He will be allowed to testify.  If after I get a

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 25

1    chance to review this I find it inappropriate, I will strike

2    his testimony in front of the jury.

3            **MR. REISING:**  Your Honor, we would also like a chance

4    to respond to that motion obviously.

5            **THE COURT:**  Of course you can have a chance, of

6    course you can have a chance, but when a lawyer files a brief

7    at 10:00 o'clock at night before the witness is going to

8    testify and cites cases to the Court and the next morning when

9    we come into the courtroom and the Court has to review it he

10   doesn't have copies of the cases available for the Court,

11   that's almost sanctionable.

12           **MR. ERNST:**  Well, if you give --

13           **THE COURT:**  Because I don't intend to take the time

14   now to ask my clerk to get me a copy of the cases and start

15   reading the cases while the jury is waiting for the witness to

16   testify.

17           **MR. REISING:**  Just one last thing, Your Honor.

18           **THE COURT:**  Wait a minute.

19           **MR. REISING:**  Yes.

20           **THE COURT:**  Hold on one minute.  Hold on just

21   one minute.

22       Well, the only time "excessive" was used in Katsaris'

23   testimony was in cross-examination:

24       "Q.  Also, by the way, you told us about the use of OC

25   spray in a circumstance where there are multiple deputies in a

*13-13308; Jennings v. Fuller, et al.*

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 26

 1   small area, such as we see in report writing, and there can be

 2   a circumstance where deputies get also sprayed, true?

 3        "A.  Correct.

 4        "Q.  That hasn't -- that's nothing to do with excessive

 5   force.  That has to do with what happens in a closed small area

 6   and there's an application of OC spray, true?

 7        "A.  Yes, it affects the officers and then their ability."

 8        That's the only time "excessive" was used in his

 9   testimony, and it was used by Mr. Reising and there was no

10   objection to the way the question was put.

11        Let me see something else here.  So plaintiff's expert

12   never opined that the use of force was excessive.

13        **MR. REISING:**  Your Honor, he opined that the

14   plaintiff --

15        **THE COURT:**  Wait a minute, please.

16        I haven't had a chance to read the questions and answers,

17   but the word "force" was used multiple times in his testimony.

18        Now, the question is you are going to ask him in his

19   opinion was the force used excessive and these cases say that

20   calls for a legal conclusion and Mr. Ernst is correct and you

21   use that word and I find it was improper, I'm going to have to

22   strike his testimony.  That's the danger you face, given the

23   way this has come up.

24        Do you understand what I'm saying?

25        **MR. REISING:**  I hear what you're saying, Your Honor.

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 27

1          **THE COURT:**  What?

2          **MR. REISING:**  I hear what you're saying, yes.

3          **THE COURT:**  That's happened to me before, where I've

4    stricken an expert's testimony, where after review I came to

5    the conclusion it was improper and I struck it.  That will

6    leave you without an expert.

7          **MR. REISING:**  That's why I would like to argue this

8    motion before we --

9          **THE COURT:**  No, no, it doesn't make any difference.

10   I'm not going to say it's proper or improper at this point

11   because you arguing it right now -- I'll recess if you want to.

12   It will give me a chance to look at these cases.

13       He's saying you are going to ask the witness directly in

14   his opinion was the force used as displayed in the videos

15   excessive or unreasonable.  That's the ultimate question the

16   jury has to decide.

17         **MR. REISING:**  Your Honor, can we use appropriate or

18   inappropriate?  I think we can use those terms.

19         **MR. SCOTT:**  That's what Mr. Katsaris did.

20         **THE COURT:**  Wait a minute.

21       Well, first of all, *Torres v. County of Oakland* is an

22   employment case.

23       A quick read of *Berry* has this:

24             "The expert can testify, if a proper foundation

25         is laid, that the discipline in the Detroit Police

*13-13308; Jennings v. Fuller, et al.*

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 28

1   Department was lax.  He also could testify regarding

2   what he believed to be the consequences of lax

3   discipline.  He may not testify, however, that the

4   lax discipline policies of the Detroit Police

5   Department indicated that the City was deliberately

6   indifferent to the welfare of its citizens.

7        "It would have been easy enough for the drafters

8   of the [Rules] to have said that a properly qualified

9   expert may opine on the ultimate question of

10  liability.  They did not do so.  When the rules speak

11  of an expert's testimony embracing the ultimate

12  issue, the reference must be to stating opinions that

13  suggest the answer to the ultimate issue or that give

14  the jury all the information from which it can draw

15  inferences ...

16       "We would not allow a fingerprint expert ... to

17  opine that a defendant was guilty ...

18       "Furthermore, 'deliberate indifference' is a

19  legal term, as the questioning of Postill indicated.

20  It is the responsibility of the court ... to define

21  legal terms.  The expert's testimony ... invaded the

22  province of the court.

23       "The courts have addressed this issue, and

24  typical of their holdings is that reached in *Hygh v.*

25  *Jacobs*.  *Jacobs* was an excessive force police case.

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 29

1   The expert was allowed to testify that 'in his

2   opinion, the use of a baton or flashlight to strike a

3   person in the head would constitute 'deadly physical

4   force' that would not be 'justified under the

5   circumstances.'

6        "In condemning this line of testimony, the court

7   stated:  'This circuit is in accord with other

8   circuits in requiring exclusion of expert testimony

9   that expresses a legal conclusion.'  In concluding on

10  this issue the court held:

11       "Even if a jury were not misled into adopting

12  outright a legal conclusion proffered by an expert

13  witness, the testimony would remain objectionable by

14  communicating a legal standard -- explicit or

15  implicit -- to the jury.  Whereas an expert may be

16  uniquely qualified by experience to assist the trier

17  of fact, he is not qualified to compete with the

18  judge in the function of instructing the jury..."

19  That should be sufficient guidance to you, Mr. Reising, as

20  to the extent to which -- sufficient guidance to you as to how

21  to frame your questions to your witness.

22       **MR. REISING:**  I understand, Your Honor.

23       **THE COURT:**  With that, we call the jury back in.  You

24  are at risk.  You are at risk, sir, if you exceed the standard

25  established by the cases.

*13-13308; Jennings v. Fuller, et al.*

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 30

1          **MR. REISING:**  Your Honor, may we have a couple

2    minutes to talk to the expert, take a five-minute recess?

3          **THE COURT:**  Sure, sure.  That's okay.

4          **MR. REISING:**  Thank you.

5        (Recess from 9:49 a.m. to 10:03 a.m.)

6          **THE COURT:**  You can be seated.

7          **MR. ERNST:**  I just have one more thing, Judge.  How

8    are we going to treat the fact that Sergeant Guest is no longer

9    at counsel table but he's sitting in the back.

10         **THE COURT:**  Pardon?

11         **MR. ERNST:**  How are we going to treat the fact with

12   the jury that Sergeant Guest is no --

13         **THE COURT:**  I'm going to tell them -- is he a

14   sergeant?

15         **MR. REISING:**  Yes.

16         **THE COURT:**  That Sergeant Guest is no longer a party

17   to this case, and you don't speculate on why.  That's number

18   one.

19       Number two, I'm not going to go into it now, but you cited

20   to me a prior ruling of this Court in *Scott v. City of*

21   *Ferndale*, and I have here the docket and the docket shows:

22       Docket 70, Motion by plaintiff to preclude the de bene

23   esse deposition of defendant's proposed expert.

24       Docket 71, response.

25       A motion hearing was heard.  The motion was granted.

*Motion to Strike or Limit Testimony*
*Monday/October 31, 2016/Volume 9*

V9-Page 31

1    Then there was another motion in limine to exclude

2   evidence, and the case was dismissed by stipulation.

3    I would suggest that when the judge is confronted with a

4   prior decision as precedent to assure the judge that the judge

5   is being consistent something more than a bald statement in a

6   brief is necessary.  That's number one.

7    Number two, this applies to the judge.  In *MacKenzie v.*

8   *MacKay*, 2016 PECA 16, that's Prince Edward Island Court of

9   Appeals, in a very recent decision the Court said:

10           "The trial record did not support the finding that a

11           party and his wife and sons all lied under oath.

12           Judges must exercise great care in branding evidence

13           of a witness a lie.  Such a harsh determination

14           should be supported by a rational explanation

15           comprised of more than observation of a witness's

16           misdemeanor."

17    Now, it's not directly on point, but if you read the

18   discussion in the case.  And I have a copy for you, Mr. Ernst.

19   I don't have one for you, Mr. Reising, but I will have

20   one later.

21           **MR. REISING:**  Thank you, Your Honor.

22           **MR. ERNST:**  Thank you, Your Honor.  I have never read

23   a case from Prince Edward Island.

24           **THE COURT:**  Now I will call in the jury.

25    (Jury in at 10:07 a.m.)

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 32

1    **THE COURT:**  Come on in, folks.  You can be seated.

2  We are now going to proceed with the defendants' proofs.

3  Sergeant Guest is no longer a party to the case.  Don't

4  speculate on why he is no longer a party.  Thank you.

5      Call your witness.

6      **MR. REISING:**  Thank you, Your Honor.  I would like to

7  call Dr. Darrell Ross.

8      **THE COURT:**  Raise your right hand, sir.

9                    **-   -   -**

10                **DARRELL ROSS, PH.D.,**

11      being first duly sworn by the Court to tell

12      the truth, was examined and testified upon his

13      oath as follows:

14                    **-   -   -**

15                                        (10:08 a.m.)

16                **DIRECT EXAMINATION**

17  BY MR. REISING:

18  **Q.**  Could you give us your complete name, please.

19  **A.**  Darrell Lee Ross.

20  **Q.**  And --

21      **THE COURT:**  Hold on one minute.

22  BY MR. REISING:

23  **Q.**  And, as I understand it, it's Darrell Ross, Ph.D.?

24  **A.**  That's correct.

25  **Q.**  All right.  Could you tell us, first of all, in what year

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 33

1   did you obtain your Ph.D., sir?

2   **A.**   1992 from Michigan State University.

3   **Q.**   And that Ph.D. is in what specific area?

4   **A.**   Higher Education Administration.

5   **Q.**   And what does that mean in terms of the type of work which

6   you currently do?

7   **A.**   It provides background and training and education to be an

8   administrator of a university, departments, provost, president,

9   chancellor, that type of thing.

10   **Q.**   I understand your dissertation was an analysis of citizen

11   resisting in policing; is that true?

12   **A.**   That's correct.

13   **Q.**   Can you explain briefly to the jury what that means?

14   **A.**   Yes.  I did about a year-long study with, as I recall,

15   about 20 police departments across the United States to look at

16   the various types of resistance that police officers would

17   encounter during an arrest confrontation and began to analyze

18   those to enhance the training of officers, to look at the

19   behaviors, the type of conduct, of resistance behaviors that

20   they might encounter on traffic stops, on altercations of all

21   sort out in the street.

22        It was a study that was not done in the jail, it was

23   outside of the jail, outside the confines of a prison, but it

24   was with confrontations with police officers and citizens and

25   examined the resistance so we could enhance their training in

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 34

1    the future.

2    **Q.**   And prior to the attainment of your Ph.D., sir, did you

3    obtain a Master's degree?

4    **A.**   Yes, I did.

5    **Q.**   At what institution?

6    **A.**   Michigan State University in Criminal Justice.

7    **Q.**   And could you tell us, did you write a Master's

8    dissertation?

9    **A.**   Yes, I did.  I did that on the type of resistance again in

10   prisons and jails, to look at the common types of assaults on

11   officers, types of resistance they may encounter again with the

12   idea of analyzing those so that officers could provide better

13   training and we could enhance their curriculum for training.

14   **Q.**   And you also have a Bachelor's degree in Criminal Justice?

15   **A.**   Right, from Michigan State University.

16   **Q.**   Currently, sir, what is your position?

17   **A.**   I'm the Department Head of Sociology, Anthropology, and

18   Criminal Justice at Valdosta State University in Valdosta,

19   Georgia.

20   **Q.**   And just so the jury understands and the Court

21   understands, where is Valdosta located?  I think everybody in

22   the world knows where Atlanta is.  Where is Valdosta in

23   association with --

24   **A.**   We are 22 miles just north of the Florida line.  We are

25   halfway between Orlando and Atlanta.

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 35

1  **Q.**  And how long have you been there, sir, at that particular
2  higher education institution?

3  **A.**  For six years, since 2010.

4  **Q.**  And in terms of your responsibilities there, do you have
5  any responsibilities as it relates to the training of future
6  police officers?

7  **A.**  Yes.  Our curriculum is geared towards a four-year degree,
8  and we also have a Master's degree for students that are
9  preparing or aspiring to be in the criminal justice system or
10  go on to grad school or go on to law school.  I'm in charge of
11  the whole curriculum and the faculty and staff that work there.

12  **Q.**  Approximately how many students are engaged in that
13  program at the present time?

14  **A.**  A little over 700, almost 800 students at the present time
15  in all of those programs that I have mentioned.

16  **Q.**  And in association with that circumstance, are you the
17  person who set that program up?

18  **A.**  I did not set it up, no.  This started back in the 1970's.

19  **Q.**  Okay.  You took it over?

20  **A.**  Yes, I did.

21  **Q.**  All right.  And you've been running it since you took it
22  over?

23  **A.**  Yes, sir.

24  **Q.**  Since 2010?

25  **A.**  Correct.

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 36

1      What you might be alluding to, I did start a Center of

2  Research there in 2011 that does research for public entities,

3  governmental entities, private industry, as well as public

4  institutions, and as well as the military.

5  **Q.**   Prior to Valdosta State University have you had any other

6  university experience, sir?

7  **A.**   Yes, I have.  I worked for Western Illinois University for

8  the School of Law Enforcement and Justice Administration.  I

9  was the director of that particular program for four years.

10      Prior to that I worked at East Carolina University for

11  14 years.  Again, the Criminal Justice program.  I helped

12  design the Master's program there at the time as well as the

13  Forensic Science program that was developed in the early

14  2000's.

15      Prior to that I worked from 1985 to 1992 at Ferris State

16  University here in Michigan and taught in that program as well

17  as taught in the police academy there at Ferris State

18  University.

19  **Q.**   Briefly, in relation to when you were associated with

20  Western Illinois University, were you associated with their

21  Criminal Justice program?

22  **A.**   Say again?

23  **Q.**   Were you associated with the Criminal Justice program at

24  that university?

25  **A.**   Yes, sir.  I was the director of that particular program.

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 37

1  **Q.**  Approximately how many students were in that program, sir?

2  **A.**  We had 2100 students at five extension sites.  It was

3  ranked at that time as the second or the third largest program

4  in the United States.

5  **Q.**  And you essentially ran that program?

6  **A.**  Yes, sir.  Yes.

7  **Q.**  You also told us that you were associated with East

8  Carolina University in Greenville, is it?

9  **A.**  Greenville, North Carolina.

10  **Q.**  And did you also teach Criminal Justice there?

11  **A.**  Yes, I did.

12  **Q.**  And you -- would your first assignment in higher education

13  have been at Ferris State?

14  **A.**  Yes.

15  **Q.**  And Ferris State is up in Big Rapids?

16  **A.**  Yes.  Yes, it is.

17  **Q.**  All right.  And what did you do there, sir?

18  **A.**  I was the Technical Assistant Coordinator for their

19  Research and Training Institute, as well as I taught academic

20  courses, and I also was certified by the State of Michigan to

21  teach in the police academy that they have there at Ferris.

22  **Q.**  And did you in fact teach in the police academy?

23  **A.**  Yes, I did.

24  **Q.**  What types of topics did you teach at the police academy?

25  **A.**  I taught use of force, subject control tactics, defensive

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 38

1  tactics, how to respond to the mentally impaired, arrest,

2  control and subject tactics and cover, crisis intervention

3  techniques for those officers who again were ascribing to be or

4  aspiring to be police officers in Michigan.

5  **Q.**  All right.  So between 1985 and the present time you have

6  been, as I understand your testimony, very involved with the

7  training and teaching of future police officers?

8  **A.**  Yes, I have.

9  **Q.**  In addition to those academic appointments you have told

10  us about, have you had field experience in the area of criminal

11  justice and in prisons?

12  **A.**  Yes, I worked 13 years for the Michigan Department of

13  Corrections.  I started out as a corrections officer at Jackson

14  Prison in Jackson, Michigan.  For several years I worked there,

15  and then I was promoted to a supervisor of a mentally impaired

16  cell block of 500 mentally impaired prisoners.  And after that

17  I got into parole and probation for about a year and-a-half or

18  so, and then I ended my career after four years working in the

19  corrections training academy that developed after a series of

20  riots back in the 1979-1980 era.

21  **Q.**  You told us that you supervised a circumstance or a cell

22  block at Jackson Prison that was involved with mentally

23  impaired patients or prisoners?

24  **A.**  Yes.

25  **Q.**  How many prisoners approximately were in that cell block,

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 39

1  sir?

2  **A.**   There were 500.  At the time it was considered the largest

3  cell block in the Michigan penal system.

4  **Q.**   And in association with that supervision did you have to

5  become involved with issues concerning on occasion restraint of

6  a prisoner?

7  **A.**   Oh, yes, absolutely.

8  **Q.**   Are you familiar with restraining prisoners in the context

9  of both mental health and also in a general prison kind of

10  circumstance?

11  **A.**   Yes.

12  **Q.**   Have you taught in that regard, sir?

13  **A.**   Oh, absolutely, yes, sir.  Until today I still teach, yes.

14  **Q.**   Now, in addition to what you've told us about in terms of

15  your academic experience and your other employment experience,

16  have you published articles in the area of corrections and

17  police work?

18  **A.**   Yes, I have.  I have over, a total of over 90

19  publications, either books, book chapters, monographs and

20  peer-review journal articles since, well, since the middle

21  1980's until the current.

22  **Q.**   Have any of those articles dealt with the issue of

23  excessive force, sir?

24  **A.**   Yes, they have.

25  **Q.**   Have you been qualified as an expert in excessive force in

1   other courts?

2   **A.**   To render opinions about excessive force, yes, sir.

3   **Q.**   And, in addition to the publications you've told us about,

4   have you also spoken before police groups and similar types of

5   organizations concerning the use of force?

6   **A.**   Yes, I have.  I do that on a quite routine basis and have

7   since the early 1980's.  The last chance or the last count I

8   looked at I have over 600 seminars, conferences and

9   presentations I have made to various criminal justice groups,

10  including police officers, chiefs, military, private, public,

11  corrections, jails, sheriffs, attorneys.  You name it, just

12  about everybody in the criminal justice system I think I have

13  trained or had occasion to speak or train or be at a conference

14  with.

15  **Q.**   And, in particular, what about training with respect to

16  the use of force?  Have you had groups that you have trained

17  for the purpose of telling them, teaching them, showing them

18  the appropriate use of force in a given circumstance?

19  **A.**   Yes.  Starting back in my days with corrections, I was an

20  instructor in the academy for the Michigan Department of

21  Corrections.  I left there and went to Ferris.  I also taught

22  in the police academy certified by the State.

23       And I have also since 1987-'88 been certified -- I serve

24  on the advisory board for the pressure point control tactics

25  company that trains subject control and defensive tactics and

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 41

1  how to use force appropriately in the United States as well as

2  internationally.  I have been associated with them since 1987.

3  We make instructors.  I certify instructors probably almost in

4  every state in the United States as well as in international

5  countries as well how to actually teach and how to go back to

6  their departments and apply these particular control techniques

7  when faced with a violent confrontation.

8  **Q.**   And we have heard throughout the course of this trial the

9  anacronym PPCT.  Is that what you are speaking to right now?

10 **A.**   Right, pressure point control tactics.

11 **Q.**   And you sit or you advise that company with respect to

12 appropriate techniques?

13 **A.**   Correct.

14 **Q.**   And you have taught those techniques to officers

15 throughout this country?

16 **A.**   Yes, I have, since 1987.

17 **Q.**   You received some materials from me in association with

18 this case, did you?

19 **A.**   That's correct.

20 **Q.**   And I asked you to take a look at these materials and then

21 render an opinion concerning what you thought was going on with

22 respect to this case?

23 **A.**   Yes, sir.

24 **Q.**   And the materials that you reviewed, did that include the

25 complaint, the depositions, the usual materials that you would

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 42

1   receive in a litigation kind of circumstance, sir?

2   **A.**   Yes.  As well there were several videos that I watched as

3   well, that's correct.

4   **Q.**   And, in addition, on this particular case you had occasion

5   to review videos from the Genesee County Jail?

6   **A.**   Yes.

7   **Q.**   And in fact we visited the Genesee County Jail yesterday

8   afternoon, did we not, sir?

9   **A.**   Yes, we did.  Yes, toured it.

10  **Q.**   And that visit included review of the areas where this

11  particular incident took place?

12  **A.**   Yes, it did.

13  **Q.**   All right.  As a result of your review of the materials

14  and your expertise and background that you have now told the

15  jury about, were you able to arrive at certain opinions with

16  respect to this case?

17  **A.**   Yes.

18  **Q.**   Now, what I'd like to do to make this efficient, if you

19  will, is I would like to go back to the beginning.  We have

20  watched the video or videos with respect to this incident on

21  numerous occasions during the course of this trial.  The

22  opening scene, so to speak, is in what's referred to as the

23  report-writing room; do you recall that?

24  **A.**   Yes, sir.

25  **Q.**   And could you tell the jury what you recall seeing on the

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 43

1   video and from the other information you had concerning the

2   interaction between Deputy Fuller and the plaintiff, which

3   began this situation?

4            **MR. ERNST:**  Judge, I'm going to object.  He's not an

5   expert on interpreting videos.

6            **THE COURT:**  Pardon?

7            **MR. ERNST:**  I'm going to object because he's asking

8   him to interpret a video.

9            **MR. REISING:**  Just what he viewed on the video,

10  Your Honor.  Not any kind of special interpretation, just what

11  he viewed in the video and what he garnered from the other

12  information concerning the interaction.

13           **THE COURT:**  Well, first of all, let's divide it into

14  two parts.  What did he see in the video?

15           **MR. REISING:**  Okay.  We can do it like that.

16  **BY MR. REISING:**

17  **Q.**   You watched the video, Doctor, concerning the interaction

18  between Deputy Fuller and Mr. Jennings?

19  **A.**   Yes, I did.

20           **THE COURT:**  Talk right into the mike.  Bring it up to

21  you.

22           **THE WITNESS:**  Yes, I viewed the video.

23  **BY MR. REISING:**

24  **Q.**   All right.  Could you tell us what you observed in the

25  video in relation to what that interaction was on September the

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 44

1  18th of 2010?

2  **A.**  I observed Mr. Jennings walking into the report room, was

3  directed over to the, to the wall area, and at that particular

4  time I believe it was the arresting officer Hartner who had

5  removed the handcuffs and then Sheriff's Deputy Fuller came in

6  at about the same time approximately, directed Mr. Jennings to

7  face the wall or at least prior to that take off his

8  sweatshirt, I believe, or a shirt that he had on and then

9  remove the belt, as I recall as well, and then directed him

10  against the wall to do a standard pat-down search, very

11  thorough pat-down search.

12      And Mr. Jennings put his hands up against the wall.

13  Deputy Fuller had him spread his legs.  He was bent over

14  slightly, bent at the waist, and began to proceed to do a

15  pat-down search.  And within that course of performing that

16  particular security function, of doing the search, there came a

17  time when Mr. Jennings' left hand, as I recall, went down by

18  his left side and Deputy Fuller gave him an instruction to keep

19  his hands on the wall.  His hands went back on the wall, as I

20  recall.

21      He then at that time began to continue to search, Deputy

22  Fuller, and again Mr. Jennings turned his head to his right

23  with his hand down to his left and his right elbow was cocked

24  as if it was getting ready to strike Mr. Fuller.

25          **MR. ERNST:**  Objection.  He said "as if."  He cocked

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 45

1    his arm "as if."  That's not an observation.

2         **THE COURT:**  Sir, you can't interrupt an answer.  You

3    can cross-examine him.

4         Go ahead.

5         **THE WITNESS:**  And at that particular time Deputy

6    Fuller pushed him back up against the wall to restrain and

7    control him.  I believe Deputy Kennamer responded.  A

8    confrontation ensued, a struggle ensued.  Mr. Jennings was

9    pinned on the bench.  Subsequent with that struggle they went

10   to the floor.  Other deputies responded in the jail, a code

11   green was called.

12   **BY MR. REISING:**

13   **Q.**   Stop right there, if you could.  In terms of what you've

14   just indicated you observed with respect to the interaction

15   between Deputy Fuller and Mr. Jennings, do you have an opinion

16   with respect to whether or not the conduct that you observed of

17   Deputy Fuller was appropriate or inappropriate?

18   **A.**   It was very appropriate.  He was doing a pat-down security

19   search, which is standard, customary practice and protocol to

20   do before a prisoner is admitted into the jail.

21   **Q.**   And in relation to what you observed after the left-hand

22   arm of Mr. Jennings came off of the wall and there was that

23   follow-up contact between Deputy Fuller and Mr. Jennings, what

24   was your observation as to what Deputy Fuller was attempting to

25   do at that point in time?

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 46

1       **MR. ERNST:**  Judge, that's calling for speculation,

2   his observation about what he was attempting to do.

3       **MR. REISING:**  He's an expert, Your Honor.  He can

4   testify to that.

5       **THE COURT:**  You can cross-examine him.

6       **THE WITNESS:**  He was trying to keep him off balance

7   and give him an opportunity so that he could complete his

8   required search, which was being prohibited by Mr. Jennings'

9   behavior.

10  BY MR. REISING:

11  **Q.**  Did you see anything in that regard which was not

12  appropriate, sir?

13  **A.**  Oh, absolutely not, no.

14  **Q.**  Now, we know that Mr. Jennings, Deputy Fuller initially,

15  and then Deputy Kennamer came together on what's referred to as

16  a bench in the report-writing room.  Do you recall observing

17  that on the video, sir?

18  **A.**  Oh, absolutely, yes.

19  **Q.**  Was there anything in that interaction from your

20  standpoint that was something that you would criticize from the

21  standpoint of the officers?

22  **A.**  Oh, no.  No, sir.  They were trying to control him, and he

23  was resisting.

24  **Q.**  And could you tell the jury in the context of that kind of

25  circumstance what, what should the officer be attempting to do

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 47

1   or officers attempting to do in relation to that particular

2   situation?

3   **A.**   Any time officers perceive resistance during that type of

4   situation they are trained to establish control.  So they are

5   trained to immediately take that individual down to the ground,

6   down to the floor in this particular case.

7        Deputy Kennamer was there to assist.  Mr. Jennings put up

8   a fight and struggle so it was taking two of the officers to

9   try to control him.  Had they been able to control him right

10  there on the bench, that would have probably been the end of

11  it.  They would have probably put him back in handcuffs and

12  simply escorted him back into the jail -- or into the jail.

13       At that time though he continued to resist pretty

14  fervently and that -- so their attempts were to try to control

15  his arms, his wrists, but he was struggling and twisting.  And

16  as I recall reviewing the video, that resistance and struggle

17  ended up down on the floor of the report-writing room.

18  **Q.**   After they got down to the floor -- and it's a cement

19  floor, isn't it?  We were there last night?

20  **A.**   Oh, absolutely.  Very hard.  Concrete.

21  **Q.**   And, per the video, additional officers come in through

22  the sallyport into the report-writing room?

23  **A.**   Yes.

24  **Q.**   Shortly after that occurred?

25  **A.**   Shortly, within a matter of seconds, yes.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 48

1    **Q.**    All right.  One of the people that came into the room was

2    Lieutenant Nuckolls.  He had the white shirt on?

3    **A.**    That's correct.

4    **Q.**    And before Lieutenant Nuckolls did anything other deputies

5    were attempting to control Mr. Jennings on the floor?

6    **A.**    Yes.  That's the trained procedure, to try to use verbal

7    commands and empty hand control techniques prior to escalating

8    up to using any other type of force, and that's what the

9    officers were attempting to do in this case, which was totally

10   appropriate.

11   **Q.**    According to your review of the video, were those empty

12   hand techniques working?

13   **A.**    No, they were ineffective.

14   **Q.**    Did you observe in the video Lieutenant Nuckolls take out

15   his OC spray?

16   **A.**    Yes.

17   **Q.**    All right.  And in fact he OC-sprayed Mr. Jennings.  Is

18   that your understanding?

19   **A.**    That's my understanding.

20              **THE COURT:**  Are you wandering from that microphone?

21              **MR. REISING:**  I hope not, Your Honor.  I'll try not

22   to.

23              **THE COURT:**  Now you are closer.

24              **MR. REISING:**  Okay.

25

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 49

1  **BY MR. REISING:**

2  **Q.**   Did you observe Lieutenant Nuckolls use the OC spray or

3  appear to use the OC spray?

4  **A.**   Yes, I did, right.

5  **Q.**   And while we were at the jail last night, did you have

6  occasion to take a look at the OC spray in question, that type

7  of OC spray?

8  **A.**   That type of spray that they used, yes.

9  **Q.**   And Lieutenant Nuckolls indicated it was nonflammable.  Do

10  you recall, did the container that you looked at last night say

11  it was nonflammable?

12  **A.**   Yes, it did, right on the canister itself.

13  **Q.**   And that's a, a direct spray type OC spray as opposed to a

14  fog?

15  **A.**   That's correct.

16  **Q.**   Lieutenant Nuckolls testified that he sprayed OC spray

17  into the facial area of Mr. Jennings from about a foot away.

18  Assuming that's correct, from your standpoint is that course of

19  conduct on the part of Lieutenant Nuckolls appropriate or

20  inappropriate, sir?

21  **A.**   That was appropriate.

22  **Q.**   What is the purpose of the use of OC spray?

23  **A.**   It's used to control and gain compliance of resistive

24  individuals.  It can be used after empty hand control has been

25  tried or attempted or the force or resistance has escalated to

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 50

1  a point where that is the appropriate use of an intermediate

2  weapon is what it's called or as it's classified.

3      So it's used for pain compliance.  It's used to help the

4  officer gain control primarily so the officer doesn't have to

5  escalate and use any other type of force.

6      It has been very effective on most individuals and

7  shortens the confrontation time span so that we can reduce

8  injuries both to the individual that it's being applied to as

9  well as the officer, who has to try to struggle and control the

10  individual.

11  **Q.**  You mentioned something just now:  Confrontation time

12  span.  Is that important?

13  **A.**  Yes, it is because the longer a confrontation or a

14  struggle continues the more likely that, one, we can have

15  injuries to the individuals, injuries to the officers.  We

16  don't know typically what kind of shape or condition a

17  particular individual might be in so we don't want to -- we

18  want to try to reduce the stress as much as possible during a

19  confrontation, but again, the individual who the officers are

20  struggling with primarily is in control of that.  And the

21  officers are trained to respond to the types of struggle and

22  resistance.

23      So we want to try to shorten that time frame the best

24  possible, and OC is one of those products that has been

25  researched that has shown to do that exactly, to help shorten

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 51

1  this up, get control quickly, and then take control and

2  restrain the individual in a quicker manner.

3  **Q.**  Have you written in the area of OC spray, sir?

4       **THE COURT:**  You are not talking into the mike.

5       **MR. REISING:**  I'm sorry, Your Honor.

6  **BY MR. REISING:**

7  **Q.**  Have you written articles on the area of OC spray and its

8  application?

9  **A.**  In my civil liability book I believe I have a section on

10  use of force in that chapter.  As I recall, it talks about

11  pepper spray and OC, and we certainly do in our book on sudden

12  death and custody.  We have a whole chapter that looks into the

13  application and the use of pepper spray with less lethal

14  weapons.  That has been written about and explains all of the

15  practical use, the bases for using it, and that type of thing.

16  **Q.**  All right.  So after the pepper spray what's the next

17  thing you can recall occurring in association with what

18  transpired in the report-writing room on September the 18th of

19  2010 as it relates to Mr. Jennings?

20  **A.**  The spray was used, and the officers were at least able to

21  control his hands and handcuffs were then applied or reapplied

22  to Mr. Jennings.  The officers then stood Mr. Jennings up,

23  brought him to his knees and then to a standing, an erect,

24  standing position and were beginning to escort him out of the

25  report room into the vestibule into the jail itself.

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 52

1  **Q.**  And the bringing him up from being on the floor to a

2  vertical position, did you observe in the video how it was

3  done?

4  **A.**  Yes, I did.

5  **Q.**  Was that appropriate from your standpoint?

6  **A.**  Absolutely, yes.

7  **Q.**  Okay.  Was there anything that you felt was inappropriate

8  in relation to how the officers brought Mr. Jennings up to a

9  vertical position based on what you saw in the video?

10  **A.**  Oh, absolutely not, no.  The trained procedure is to,

11  depending on how the individual is on the ground and their

12  continued resistances, to if at all possible bring them to

13  their knees and then bring them to a standing position, and

14  that's exactly what the officers did in this particular case

15  and then began to escort him into the jail.

16  **Q.**  Once he was up to a vertical position, do you recall from

17  the video that Mr. Jennings had his knees cocked like I do

18  right now?

19  **A.**  If I recall, my impression was they were bent, and he was

20  bent over, yes, waist was bent over and his knees were bent.

21  **Q.**  And what happened next after he was up into that vertical

22  position?

23  **A.**  Well, he continued to turn and struggle and resist, and

24  the officers pulled him up.  And in the course of doing all of

25  that, they, with the resistance and struggle, ended up going

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 53

1  into the side wall portion I think about two or three feet just

2  to the right of the frame of the door.

3  **Q.**  The room that we're talking about, the report-writing

4  room, it's not very big, true?

5  **A.**  Oh, no, it's not very big at all.  There's tables in

6  there.  There were two tables at the time.  There was a bench.

7  So there was not much -- their environment was very, very

8  small, concrete floor, concrete walls, tables, endpoints, so it

9  was a very confined environment.

10  **Q.**  All right.  Was there anything that you observed from the

11  video that suggested to you that the officers who were

12  attempting to control Mr. Jennings, that would be Officer Wing

13  and Officer White or Deputy Wing and Deputy White, did you see

14  anything at all which suggested to you that what they did was

15  inappropriate in terms of trying to control him?

16  **A.**  No, not whatsoever.  They were using standard protocol and

17  procedure.  As I recall, one of them, I can't recall which one,

18  tried to have a wrist lock on the wrist even though the hands

19  were handcuffed.  That's a trained technique.

20      So up until that point, you know, where we are at in the

21  stage of all of this, everything is appropriate what the

22  officers were doing.

23  **Q.**  Now, shortly after that occurred they began moving

24  Mr. Jennings out of report writing through what's called the

25  sallyport?

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 54

1  **A.**   Correct.

2  **Q.**   And did you observe anything, any interaction between

3  Deputy Fuller and the plaintiff in that process?

4  **A.**   Mr. Jennings continued to struggle, and Deputy Fuller

5  tried to control his head and chin, which, again, is another

6  trained technique for escorting.

7      Typically what you want to have in a jail is

8  three deputies, at least three deputies escort, two in the back

9  holding the arms and one in front guiding and protecting the

10  head of the individual so that he doesn't hit the wall, doesn't

11  hit the door frame.  You do that by clasping the chin,

12  underneath the chin with a free hand holding on, securing the

13  head as secure as possible and then walking him to insert him

14  into a cell.

15      And I saw that.  It wasn't quite textbook, but that was

16  the approach they were taking.

17  **Q.**   Was there in fact a door frame around this door opening?

18  **A.**   Oh, yes, steel door frame.  I hit it yesterday.  It was

19  very hard.

20  **Q.**   Shortly after stepping into the sallyport area, per the

21  video Deputy Fuller and the plaintiff fell to the ground; do

22  you recall that?

23  **A.**   Yes, that's correct.

24  **Q.**   Did you observe anything which suggested to you that that

25  fall was occasioned by Deputy Fuller?

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 55

1  **A.**    Did he cause the fall?

2  **Q.**    That he caused it.

3  **A.**    It didn't appear that was the way it looked to me.  It

4  appeared that the feet got tangled up in the struggling and so

5  forth with Mr. Jennings trying to escort him through another

6  confined space, more confined space than the report-writing

7  room was, and the struggle ended up on the floor.

8  **Q.**    The next thing we really see in the video is when they go

9  to safety cell number 6 for the first time.  Do you recall

10  that?

11  **A.**    Yes, sir.

12  **Q.**    And we visited safety cell number 6 last night or all of

13  the safety cells actually, true?

14  **A.**    All in that particular area.  I think there are six of

15  them.  Yes, we went to that particular location in the jail.

16  **Q.**    It's not very far, you have to walk through booking about

17  maybe 40 feet or so from the end of the sallyport into the

18  hallway where the safety cells are located?

19  **A.**    I would agree with that.  Yes, that's correct.

20  **Q.**    You observed Mr. Jennings being brought into that safety

21  cell?

22  **A.**    Yes, I did.

23  **Q.**    And after he was brought into that safety cell do you

24  recall seeing Lieutenant Nuckolls come into the safety cell?

25  **A.**    Yes.

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 56

1  **Q.**    And in fact Lieutenant Nuckolls had his -- had a taser

2  with him?

3  **A.**    That's correct, he did.  He was supervising this whole

4  process of trying to locate Mr. Jennings into the jail.

5  **Q.**    From your standpoint and given what had occurred to that

6  point when Mr. Jennings was in safety cell 6 for the first time

7  on September 18th of 2010, was there anything that you saw

8  which would suggest that Lieutenant Nuckolls should not have

9  had his taser out at that point in time?

10  **A.**    Absolutely not, no.  Absolutely not.

11  **Q.**    Now, was the taser used or not used in safety cell number

12  6 at that point?

13  **A.**    It was not used.

14  **Q.**    All right.  I want you to assume that Lieutenant Nuckolls

15  has testified that he came into safety cell number 6 at that

16  point, observed what was going on, observed the plaintiff and

17  concluded that he would not allow the plaintiff to remain in

18  safety cell number 6 by himself.  From your standpoint and

19  given everything you have seen in the video and your knowledge

20  and experience in police practices, is that type of

21  circumstance I have just suggested to you, do you think that's

22  appropriate or inappropriate to make that kind of decision?

23  **A.**    That was an appropriate professional prudent decision on

24  his part.

25  **Q.**    Why do you say that, sir?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 57

1  **A.**   Well, the whole purpose of a safety cell is to protect the

2  individual detainee, and to place that individual in a cell who

3  is continuing to resist, to struggle and just leave them there

4  with handcuffs on would not adhere to correctional protocol.

5      You have the possibility of the individual further

6  injuring himself.  It's just not proper protocol and practice

7  to leave an individual like that restrained, who they assumed

8  based on the behaviors, it appeared that he might be under the

9  influence of either alcohol or drugs.

10          **MR. ERNST:**  Objection.

11          **THE COURT:**  No, no, no, not appearances.  You

12  asked -- what was the question?  The question was was that an

13  appropriate prudent decision on his part?  Why did you say

14  that?  Okay.  I think he's answered the question.

15          **MR. REISING:**  Pretty much I would say, Your Honor.  I

16  think that's true.

17  **BY MR. REISING:**

18  **Q.**   All right.  So at that point in time Lieutenant Nuckolls

19  gave an order per his testimony to put Mr. Jennings in a

20  so-called restraint chair.  First of all, are you familiar with

21  a restraint chair in a penal institution context?

22  **A.**   Yes, sir, I am.

23  **Q.**   And could you explain what the purpose of a restraint

24  chair is?

25  **A.**   A restraint chair is a device, a less lethal or a less

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 58

1   injurious type of device used for out of control, combative

2   types of -- violent types of individuals, highly agitated

3   individuals a chance for several things.  One, to place them

4   in, that individual, to restore order and internal security to

5   the jail; secondly, for their own protection; and thirdly, so

6   that officers may routinely check with them and manage them in

7   a more proper way; and fourthly, it allows medical personnel to

8   render medical aid and to observe them in a more restricted but

9   confined and restrained manner.

10  **Q.**   In this particular case you watched the video with respect

11  to the attempted chair placement?

12  **A.**   Yes, I did.

13  **Q.**   And could you tell us what you observed in that regard,

14  sir?

15  **A.**   Mr. Jennings was brought out of the cell, safety cell 6

16  and tried to be placed and restrained in the restraint chair

17  and continued to kick and thrash, stiffen his body, twist his

18  body, kick at the officers, which basically impeded their

19  efforts and prevented them from securing him in the restraint

20  chair.

21  **Q.**   Lieutenant Nuckolls has testified that when he observed

22  that going on he made a decision to place Mr. Jennings in the

23  so-called restraint bed.  Do you think that decision is one

24  which would be appropriate or inappropriate given everything

25  you have observed in your training and experience?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 59

1  **A.**   In my experience that would be an appropriate practice,

2  appropriate decision to do that.

3  **Q.**   The video, of course, shows that Mr. Jennings was taken

4  out of the attempt at placement in the chair and placed on the

5  floor; do you recall that?

6  **A.**   Yes.

7  **Q.**   And they -- there were several deputies attempting to hold

8  Mr. Jennings, if you will, in place on the floor while the bed

9  got ready; is that your understanding?

10  **A.**   That's correct, yes, sir.

11  **Q.**   While he was on the floor in the hallway, did you observe

12  Lieutenant Nuckolls use his taser on the lower back area of

13  Mr. Jennings?

14  **A.**   Yes, he did.

15  **Q.**   He put his taser right up to the back of Mr. Jennings,

16  true?

17  **A.**   That's true.  I believe it was the lower back region.

18  **Q.**   And we have heard it was in a so-called drive stun mode.

19  Can you tell the jury what that is?

20  **A.**   The taser can be used in two modes.  Probe mode, which

21  ejects barbs with lead wires anywhere from about 8 to 20 feet.

22  Secondly, the drive stun is an alternative application of the

23  taser in which the cartridges are removed, the probes are

24  removed, and it has direct contact with the skin area

25  preferably in the back is the target area, and it's used for

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 60

1   pain compliance, as it was in this particular case.

2   **Q.**   I would like you to assume that Lieutenant Nuckolls

3   testified that he did that because he was still hopeful of

4   obtaining compliance from Mr. Jennings short of placement in

5   the restraint bed.  That's why he used a taser at that point in

6   time.  From your standpoint, given everything that you have

7   observed in the video and what you've told us about in your

8   training and experience, is that decision that I have just

9   described to you appropriate or inappropriate from your

10  standpoint?

11  **A.**   That was appropriate.  That was an appropriate response by

12  these correctional deputies.

13  **Q.**   Also when he was on the floor that's when the so-called

14  spit mask was applied.  Do you recall that?

15  **A.**   Yes, sir.  Yes.

16  **Q.**   And you've been shown -- strike that.

17       Let me ask you, sir -- this is an exemplar spit mask of

18  the type that was used.  Could you take a look at it and tell

19  me if you're familiar with that type of device?

20  **A.**   Oh, yes.  There's several types on the market that are

21  used, spit hoods, spit masks, but yes, I'm familiar with it.

22  **Q.**   Is the use of a spit mask in a penologic, jail kind of

23  circumstance appropriate if that's what the in-charge officer

24  believes should be done?

25  **A.**   Yes, and it would be done basically -- the only reason you

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 61

1   are going to use it is because the individual has been spitting

2   and spitting at the officers.  So to protect the officer that

3   is applied, and it's a normal type of thing that's used in

4   prisons and in jails.

5   **Q.**   Mr. Jennings in fact was placed in the restraint bed per

6   what we see on the video, true?

7   **A.**   That's correct.

8   **Q.**   And when he was placed on the restraint bed, he was placed

9   on his belly as opposed to his back.  Do you recall that?

10  **A.**   Yes.

11  **Q.**   From your standpoint is placement of that nature on a

12  restraint bed appropriate or inappropriate?

13  **A.**   That would be appropriate, to restrain in that position,

14  to restrain him, and to place him back in the cell.  That's

15  appropriate procedure.

16  **Q.**   Is there any concern when you're placing somebody in a

17  supine position like that about putting them on their back and

18  then restraining them for a length of time from a penologic

19  standpoint?

20  **A.**   I'm not sure I follow that.  You had mixed terms there.

21  **Q.**   Maybe it was too obtuse, and I apologize to you.

22  **A.**   Okay.

23  **Q.**   What happens if somebody is on their back and they have

24  been restrained and they have some sort of event which causes

25  them to regurgitate?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 62

1  **A.**   That is not the preferred position, it's not the safe

2  position that officers are trained to use, in the supine or on

3  the back.  They are trained to prone individuals to prevent

4  that from happening or at least reduce that to a full

5  likelihood.

6  **Q.**   In this particular case there's testimony from Lieutenant

7  Nuckolls and also from the nurse that saline solution was

8  applied to the face of Mr. Jennings while he was on the

9  restraint bed but before the restraint bed was placed into

10  safety cell number 6.  Decontamination is something which is

11  part of OC spray and its aftermath, true?

12  **A.**   That's correct, yes.

13  **Q.**   And it's appropriate to decontaminate somebody as best you

14  can, true?

15  **A.**   Yes, yes.

16  **Q.**   OC spray, just so everybody understands, do you happen to

17  know what the composition of OC spray is?

18  **A.**   Cayenne pepper.

19  **Q.**   The same cayenne pepper I can buy in the supermarket?

20  **A.**   That's true.

21  **Q.**   And, in particular, what portion of the cayenne pepper

22  gets used; do you know?

23  **A.**   It's about two percent, as I recall.

24  **Q.**   Is it the oil from the pepper which creates the issue?

25  **A.**   That's correct.  That's right.

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 63

1  **Q.**   From your standpoint and given your experience, does OC

2  spray cause any type of permanent injury, sir?

3  **A.**   No.

4  **Q.**   I did ask you to look at some policies that were in place

5  at the time of this incident from the Office of the Genesee

6  County Sheriff, did I not?

7  **A.**   Yes.

8  **Q.**   One those policies concerned placement of somebody on a

9  restraint bed who had previously been pepper-sprayed?

10  **A.**   Correct.

11  **Q.**   Assuming that what I told you earlier concerning the

12  saline solution to the facial area of Mr. Jennings is a correct

13  statement, from your standpoint was that policy followed or not

14  followed?

15  **A.**   It was followed.

16  **Q.**   There has been a lot of discussion, I suppose, in this

17  case about active versus passive resistance.  How would you

18  characterize the resistance that you saw on the video

19  concerning Mr. Jennings?

20  **A.**   It was very active type of resistance, very combative type

21  of resistance.  In fact, it was such that Mr. Jennings bit

22  Deputy Fuller's pinkie, and it required several officers to

23  restrain and control him.  He had to be placed back in

24  handcuffs.

25       The resistance was so active that pepper spray had to be

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 64

1  used, the taser had to be used.  The restraint chair was

2  attempted, that was not successful, and so the behavior was

3  such that the restraint bed was the appropriate type of device

4  to use based on his continuing resistance, active resistance.

5  **Q.**  After Mr. Jennings was placed in the restraint bed, he

6  again was placed back in safety cell number 6.  Is that your

7  understanding?

8  **A.**  That's correct.

9  **Q.**  Did you watch the portion of the video that showed him in

10  the restraint bed in the safety cell number 6?

11  **A.**  Yes, the full entire time he was in that cell.

12  **Q.**  Was he moving or not moving in association with that

13  observation that you made on the video?

14  **A.**  He continued to thrash his head, his arms, his legs, his

15  hands, his arms, feet kicking and thrashing from time to time

16  throughout the whole period of time that he was confined in

17  that cell.

18  **Q.**  Are those cells, by the way, under video surveillance?

19  **A.**  Absolutely.  Yes, they are.

20  **Q.**  Did you observe the video last evening?

21  **A.**  The video or the --

22  **Q.**  Well, no, observe the video camera and the setup?

23  **A.**  Yes, I saw the setup of the camera in the cell itself and

24  the various portions in the jail where it's monitored.

25  **Q.**  Your understanding of that monitoring-on-the-video basis

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 65

1    was what in terms of there being continuous monitoring of those

2    videos?

3    **A.**    Yes, it provided continuous observation from -- in the

4    sergeant's control room as well as the entire control room of

5    the jail itself, which is manned 24 hours a day.  So it allowed

6    constant monitoring and as well deputies made periodic visual

7    checks at the cell and noted their observations on their

8    charting form, which is attached to the door right outside the

9    cell.

10   **Q.**   Did you look at that particular document in association

11   with the materials supplied to you, that charting form you just

12   mentioned?

13   **A.**    Yes, I did.

14   **Q.**   And is there any indication on that form from your review

15   that there was any issue with respect to Mr. Jennings having

16   any type of physical problem whatsoever?

17   **A.**    There was none from viewing the video or what was noted on

18   the observation, the charting form itself, none.

19   **Q.**   We have five officers involved in this case.  At the end

20   is the guy who started the whole thing with the plaintiff,

21   okay?  That's him.  Raise your hand.  That's number one, so to

22   speak.  His conduct that you observed on the video from start

23   to finish, was it approach or inappropriate as far as you are

24   concerned?

25   **A.**    It was very appropriate.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Direct*
*Monday/October 31, 2016/Volume 9*

V9-Page 66

1   **Q.**   Number two is Deputy Kennamer.  Same question.  From your

2   review of the video and your understanding of what transpired,

3   was his conduct appropriate or inappropriate?

4   **A.**   It was very appropriate.

5   **Q.**   Number three, Deputy White.  Did you see anything which

6   suggested to you his conduct was either appropriate or

7   inappropriate that night?

8   **A.**   It was appropriate, very appropriate.

9   **Q.**   Number four is Deputy Wing.  Did you see anything that

10  suggested to you that Deputy Wing did something which was

11  either -- was inappropriate that night?

12  **A.**   No, it was appropriate.

13  **Q.**   Okay.  And, last but not least, that's Lieutenant Nuckolls

14  on the end.  From your standpoint did you see anything which

15  suggested to you that Lieutenant Nuckolls acted in a manner

16  which was not appropriate in relation to what he did on the

17  evening in question, September the 18th of 2010?

18  **A.**   No, it was appropriate also.

19          **MR. REISING:**  One second, Your Honor.

20      Your Honor, I have nothing further of this witness.

21          **THE COURT:**  Are you ready to cross-examine him?

22          **MR. ERNST:**  Could I have five minutes to go to the

23  men's room, Your Honor?

24          **THE COURT:**  Yes.  We can take a short break.

25      You can step down, sir.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9–Page 67

1    (Jury out at 11:03 a.m.)

2    (Recess from 11:03 a.m. until 11:14 a.m.)

3                    -   -   -

4                                          (11:14 a.m.)

5                    **CROSS-EXAMINATION**

6    **BY MR. ERNST:**

7    **Q.**   So you have been retained by Plunkett Cooney, the law firm

8    Plunkett Cooney in this case, correct?

9    **A.**   That's correct.

10   **Q.**   The law firm that represents these defendants, correct?

11   **A.**   That's correct.

12   **Q.**   And you indicated that you charged $300 per hour, correct?

13   **A.**   That's correct.

14   **Q.**   Plus expenses, correct?

15   **A.**   Yes.

16   **Q.**   And you have received $5,000 so far not counting today's

17   proceeding, correct?

18   **A.**   That's correct.

19   **Q.**   And you have been retained in hundreds of police and

20   correction cases, correct?

21   **A.**   Correct.

22   **Q.**   And you work for the police 98 to 99 percent of the time,

23   correct?

24   **A.**   That's correct.

25   **Q.**   And the last time you worked for a plaintiff was 1997 or

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 68

1    '8, correct?

2    **A.**   Correct.

3    **Q.**   And how many have you worked for Plunkett Cooney?

4    **A.**   I don't recall.  I don't know.  I don't keep tabs on that.

5    **Q.**   All right.  But it's multiple times, you would agree with

6    that, correct?

7    **A.**   I would say four or five times, but I'm not sure.

8    **Q.**   And, sir, you are currently a professor at Valdosta State

9    University; is that correct?

10   **A.**   Yes.

11   **Q.**   And you indicated that you had about 800 students,

12   correct, that are under you?

13   **A.**   Seven to eight hundred students, yes.

14   **Q.**   But your previous job was at Western Illinois, correct?

15   **A.**   Yes.

16   **Q.**   And there you had 2100 students under you, correct?

17   **A.**   That's correct.

18   **Q.**   And you said that was the second or third largest program

19   in the country, correct?

20   **A.**   At that time, yes, sir.

21   **Q.**   And, sir, the reason that you left Western Illinois to

22   take a job at a smaller university with lesser, fewer people

23   under you was because you were under an ethics violation

24   investigation, correct?

25   **A.**   That's not correct.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 69

1  **Q.**   Sir, I'm going to hand you a document, and it says "The

2  Executive Ethics Commission of the State of Illinois, In Re:

3  Darrell Ross"?

4  **A.**   That's correct.

5  **Q.**   And that was in 2010, correct?

6  **A.**   That's correct.

7  **Q.**   And they interviewed you just a few days after you took

8  the job at Valdosta, correct?

9  **A.**   No, that's not correct.

10  **Q.**   Okay.  Now, you indicated that you have some

11  90 publications, correct?

12  **A.**   That's correct.

13  **Q.**   And many of them were commission, correct?

14  **A.**   What do you mean commission?

15  **Q.**   Somebody paid you to do the work, to publish, correct?

16  **A.**   No, sir, they did not.

17  **Q.**   But you have spoken before numerous police groups,

18  correct?

19  **A.**   That's correct.

20  **Q.**   And you get paid by those police groups, do you not?

21  **A.**   No, I do not.

22  **Q.**   Well, you get paid by the Michigan Municipal League,

23  correct?

24  **A.**   I don't think I have ever spoke on their behalf that I can

25  recall.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 70

1    **Q.**   Well, you get contracted by them to do work, correct?

2    **A.**   To work on particular cases, I have in the past, yes.

3    **Q.**   All right.  Sir, in this case you indicated that you

4    reviewed a complaint in this matter, correct?

5    **A.**   That's correct.

6    **Q.**   What's the date of that complaint?

7    **A.**   It would be September 18, 2010.

8    **Q.**   The date of the complaint?

9    **A.**   You are talking about the incident, when it occurred?

10   **Q.**   No.  You indicated that you reviewed the complaint that

11   started this federal case, correct?

12   **A.**   I would have to go back and look at the documents to see

13   when the complaint was filed.

14   **Q.**   And so if I told you it was August 2013, you wouldn't

15   quarrel with that, correct?

16   **A.**   No, sir.

17   **Q.**   And in that complaint Mr. Jennings maintained that he

18   injured his shoulder, correct?

19   **A.**   As I recall.

20   **Q.**   And you also indicated that you reviewed some depositions,

21   correct?

22   **A.**   Yes.

23   **Q.**   And some police reports, correct?

24   **A.**   One police report.

25   **Q.**   Okay.  And whose police report was that?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 71

1  **A.**   I believe that was Officer Hartner, if I recall.

2  **Q.**   Okay.  You've done a lot of work at various academic

3  institutions, correct?

4  **A.**   That is correct.

5  **Q.**   But you've never been the sheriff of a county jail,

6  correct?

7  **A.**   No, sir.

8  **Q.**   And you've written various columns, correct, for various

9  agencies, correct?

10  **A.**   Columns?  I'm not ...

11  **Q.**   Well, you've written -- well, you are a columnist for

12  what's called PoliceOne.com, correct?

13  **A.**   I write articles for them from time to time.

14  **Q.**   I guess you are quarreling with the word "columnist."

15  Okay.  You write articles, correct?

16  **A.**   Correct.  I have in the past.

17  **Q.**   Some of your articles were called "Legal Issues and

18  Concepts," correct?

19  **A.**   Correct.

20  **Q.**   And so you are an expert on legal issues, correct?

21  **A.**   Well, I have a civil liability book out.

22  **Q.**   Sir, just answer yes or no.

23  **A.**   I have a good understanding of the civil and criminal

24  liability, yes.

25  **Q.**   But you have been never been a judge, correct?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 72

1  **A.**   No, I have not.

2  **Q.**   And you have never been a lawyer, correct?

3       **THE COURT:**  Wait a minute.  Don't turn your head to

4  the back.

5       **MR. ERNST:**  I'm sorry.

6  BY MR. ERNST:

7  **Q.**   And you have never been a lawyer, correct?

8  **A.**   That's correct.

9  **Q.**   And you never even went to law school, correct?

10  **A.**   No, sir.

11  **Q.**   And you have also written articles regarding positional

12  asphyxia, correct?

13  **A.**   Yes.

14  **Q.**   And you made conclusions about whether positioning caused

15  people to stop breathing, correct?

16  **A.**   That's correct, based on the science.

17  **Q.**   Just answer my questions yes or no, please.

18       And so you consider yourself an expert on whether

19  positioning of people caused them to stop breathing, correct?

20  **A.**   Yes.

21  **Q.**   And you have also written articles on the medical

22  implications of pepper spray, correct?

23  **A.**   Yes.

24  **Q.**   Okay.  So you think you are an expert on the medical

25  implications of pepper spray, correct?

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 73

**A.**    The symptomatologies of that.

**Q.**    Okay.  But -- and you have also written articles on sudden deaths in police custody, correct?

**A.**    Yes.

**Q.**    And so you think you are an expert on study deaths in police custody, correct?

**A.**    Arrest-related deaths, yes.

**Q.**    But you are not a medical examiner, correct?

**A.**    No, sir.

**Q.**    You have never been a coroner, correct?

**A.**    No.

**Q.**    You have never been a pathologist, correct?

**A.**    No.

**Q.**    You have never been a medical doctor of any kind, correct?

**A.**    Never.

**Q.**    You never went to medical school, correct?

**A.**    Correct.

**Q.**    In fact, your medical views are generally not accepted by the medical community; isn't that correct?

**A.**    I don't think they have ever said they weren't, but I published in medical journals.

**Q.**    So, sir, if a fully licensed medical doctor that is the head of an emergency psychiatric ward at a major local hospital who has been hired by the State of Michigan to advise on the use of restraints in the correctional and psychiatric care

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 74

1   setting testified that it is never okay to restrain someone

2   facedown, he would be wrong and you would be right, correct?

3   **A.**   I would disagree with that, absolutely.

4   **Q.**   Okay, all right.  And you don't agree that strapping

5   somebody facedown in restraints with a spit hood could cause a

6   risk of compromised breathing, correct?

7   **A.**   That's correct.

8   **Q.**   And you don't even agree that strapping somebody down in a

9   spit hood in restraints even if he vomited could cause

10   compromised breathing, correct?

11   **A.**   No, I can't see that.

12   **Q.**   But you would agree with me that vomit in a spit hood

13   could create a problem with breathing, correct?

14   **A.**   It's possible.

15   **Q.**   And blood in a spit hood could create a problem with

16   breathing, correct?

17   **A.**   It's possible.

18   **Q.**   And isn't it true that when a spit hood like the one you

19   were shown is soaked with bodily fluids air cannot pass through

20   because it holds the fluids in, correct?

21           **MR. REISING:**  Wait a minute, Your Honor.  I'm going

22   to object --

23           **THE COURT:**  Wait a minute.  Would you repeat that

24   question?

25

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 75

1   **BY MR. ERNST:**

2   **Q.**   I said would you agree that a spit hood like the one you

3   were just shown when it's soaked with bodily fluids air cannot

4   pass through it because it holds the fluids in, correct?

5        Right, sir?

6   **A.**   Repeat the question.  I was waiting for an objection and a

7   ruling.

8            **MR. ERNST:**  Could you read it back, please, Sheri.

9            **THE COURT:**  Do you understand the question?

10           **THE WITNESS:**  No.

11           **THE COURT:**  You don't?  Okay.  The witness doesn't

12   understand the question.

13           **MR. ERNST:**  I'm asking the court reporter to please

14   read it back.

15       (The following record was then read:  "I said would you

16       agree that a spit hood like the one you were just shown

17       when it's soaked with bodily fluids air cannot pass

18       through it because it holds the fluids in, correct?")

19           **THE WITNESS:**  I disagree.

20   **BY MR. ERNST:**

21   **Q.**   You served as an expert witness in a case involving a guy

22   called Brian Torgerson versus the Seattle Police Department,

23   correct?

24   **A.**   I believe so, yes.

25   **Q.**   And your views on whether facedown restraint could not

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 76

1   cause asphyxia and breathing problems didn't exactly ring true

2   for Mr. Torgerson, correct?

3   **A.**   I'm not sure what you mean by "ring true."

4   **Q.**   Well, he asphyxiated when he was restrained facedown with

5   a spit hood on him; isn't that correct?

6   **A.**   He died from other complications from the spit hood, sir.

7   **Q.**   In fact, in that case there were similar facts as to this

8   case; wouldn't you agree, sir?

9   **A.**   Similar, although it was not in a jail.

10  **Q.**   Okay.  There was an altercation between Mr. Torgerson and

11  the police, correct?

12  **A.**   Correct.

13  **Q.**   And you wrote a report for that case, correct?

14  **A.**   That's correct.

15  **Q.**   And you reviewed the deputies' depositions or various of

16  them anyway when you wrote your report, correct?

17  **A.**   They were police officers, but yes.

18  **Q.**   Okay, police officers.  And in that case Mr. Torgerson was

19  handcuffed behind his back, correct?

20  **A.**   That is correct.

21  **Q.**   And during the altercation primarily he was restrained

22  facedown, correct?

23  **A.**   Correct.

24  **Q.**   And he was held down by several officers, correct?

25  **A.**   For a period of time, yes.  Momentarily.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 77

1  **Q.**   And during the altercation he was struck in the face by

2  one of the officers and started bleeding, correct?

3  **A.**   I don't recall that.

4  **Q.**   Okay.  And he vomited, correct?

5  **A.**   I don't, I don't believe that's -- I would have to look.

6  It was several years ago.

7  **Q.**   Okay.  I'm going to give you various of the

8  depositions from that case and ask you if you would

9  look at Ms. Bruno's [sp] deposition at Page 44.

10  **A.**   I'm there.

11  **Q.**   Okay.  And it indicates that Mr. Torgerson vomited,

12  correct?

13  **A.**   Let me -- if you will give me a chance to read the page.

14  **Q.**   Oh, I'm sorry.

15  **A.**   That's correct.  There were, as it said, spurts of

16  vomiting on Page 44.  Spurts of vomiting.

17  **Q.**   And then --

18       **MR. REISING:**  I would object to the relevance of this

19  line of questioning because --

20       **THE COURT:**  There is no question pending.  This is

21  impeachment testimony.

22  **BY MR. ERNST:**

23  **Q.**   And then after --

24       **THE COURT:**  I assume.

25       **MR. ERNST:**  That's correct, Your Honor.  He said that

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 78

1  there's no problems with putting a spit hood and putting

2  somebody prone, and I want to impeach him with that position.

3  **BY MR. ERNST:**

4  **Q.**   And then after Mr. Torgerson vomited they -- the officers

5  put a spit hood on him in response to that, correct?

6  **A.**   That's correct.

7  **Q.**   Okay.  And in fact Mr. Torgerson vomited and bled into the

8  spit hood, correct?

9  **A.**   I would have to go back and look at the whole document

10  again, sir.

11  **Q.**   Okay.  If you just want to look at Exhibit C, Page 63,

12  Officer Conners.

13  **A.**   You say Tab C, Page 63?

14  **Q.**   Yeah.  I was trying to tab them with the actual

15  officer's ...

16       And he was asked beginning at Line 7, question:

17            **MR. REISING:**  Your Honor, the witness is looking at

18  the document.  He hasn't responded to the last question.

19            **THE COURT:**  There's no question pending.

20            **MR. ERNST:**  Right.  I asked him to look at the

21  document, and now I'm going to say --

22            **THE COURT:**  Wait a minute.  Have you finished reading

23  it, sir?

24            **THE WITNESS:**  I have now.

25            **THE COURT:**  Go ahead.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 79

1  **BY MR. ERNST:**

2  **Q.**   Okay.  At Line 7 was this question given and was this

3  answer given:

4      "Q.  Was the spit sock pretty much saturated with blood

5  and vomit and --

6          **THE COURT:**  Slower, slower, slower.

7          **MR. ERNST:**  I'm sorry.

8  **BY MR. ERNST:**

9      "Q.  Was the spit sock pretty much saturated with blood

10  and vomit and other fluids?

11      "A.  Yes.  As much as it, you know, it can only hold so

12  much fluid and then it stops.  I mean it's designed to not

13  swell up and shut off because it's a net, but it looked to me

14  like it had a good deal of it that was kind of sopped into it."

15      Correct?

16  **A.**   That's correct.

17  **Q.**   And the spit hood is saturated with blood and vomit

18  because blood and vomit doesn't pass through the --

19          **MR. ERNST:**  Can I see the spit hood?

20          **MR. SCOTT:**  It's up there.

21  **BY MR. ERNST:**

22  **Q.**   -- the white part of that spit hood, correct?

23  **A.**   It can get stuck in there, but some can come out and soak

24  it as well.

25  **Q.**   In fact, the spit hood is designed so bodily fluid does

*13-13308; Jennings v. Fuller, et al.*

1  not pass through it, correct?

2  **A.**   Correct, but it helps the breathing process.  You can

3  breathe in it, but it stops anything coming out.

4  **Q.**   Sir, when I say "correct," I'm asking for a yes-or-no

5  answer.

6  **A.**   Sometimes I can't answer just yes or no.

7  **Q.**   Then just indicate you can't answer yes or no.

8  **A.**   I will.  Thank you.

9  **Q.**   In fact, doesn't the spit hood product sheet say:

10          "Note:  The hood should not be used on any person who

11              is unconscious, vomiting, in respiratory distress or

12              in obvious need of medical attention.  Anyone wearing

13              a spit hood should be under the constant supervision

14              of responsible parties."

15      Isn't that what it says, sir?

16  **A.**   I have not read it and I don't know what you are reading

17  from.

18  **Q.**   All right.  So even though you give advice on the use of

19  it, you have never read the product sheet of it; is that

20  correct, sir?

21  **A.**   No, I have.  Which one are you reading from?  This

22  particular one or the one that was used in the Torgerson case?

23  **Q.**   The one that you have in front of you.  Is it different

24  than the Torgerson case?  Is that your testimony, sir?

25  **A.**   Yes, it is.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 81

1    **Q.**   Okay.  And isn't it true that in Torgerson after he

2    stopped breathing that there was -- that the spit hood had been

3    so saturated that air couldn't pass through it, correct?

4    **A.**   I don't believe that was true.

5    **Q.**   Okay.  Well, there was saliva contained within the

6    interior of the spit hood after they took it off, correct?

7    **A.**   I believe that was true, some.

8    **Q.**   And there was mucus, correct?

9    **A.**   Some.

10   **Q.**   And blood, correct?

11   **A.**   Correct.

12   **Q.**   And vomit, correct?

13   **A.**   Spurts of vomit, not full vomit, no.

14   **Q.**   Just answer my questions yes or no, sir.  Okay?

15       And just like in this case Mr. Torgerson was handcuffed

16   behind his back and there were deputies putting their weight on

17   him, correct?

18   **A.**   That's correct.

19   **Q.**   And that's when Mr. Torgerson stopped breathing, correct?

20   **A.**   No, that's not correct.

21   **Q.**   Okay.  And in fact Mr. Torgerson was strapped facedown to

22   a flat board and there were several deputies who put weight on

23   him at various times, correct?

24   **A.**   No, not that I recall.  They carried him out of the

25   apartment.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 82

1   **Q.**   Okay.  Sir, could you turn to Tab E?

2   **A.**   Say it again, please.

3   **Q.**   Tab E, E as in Edward.

4   **A.**   I'm there.

5   **Q.**   Okay.  And this is the statement of a civilian witness

6   named a Elisa Hedin, H-e-d-i-n.  Didn't she say, "The police

7   officer stayed on his back while the man was strapped down to

8   the board underneath him"?

9   **A.**   I have no idea where you're reading from.

10  **Q.**   Paragraph 6.

11  **A.**   On what page?

12  **Q.**   Well, if you just follow the paragraphs, it's Paragraph 6.

13  They are all numbered.  It's the third page in.

14  **A.**   All right.  Thank you.

15  **Q.**   Doesn't it say:

16              "The police officer stayed on his back while the man

17              was strapped onto the board underneath him. I

18              remember feeling appalled at how much force was being

19              used against him.  It seemed very excessive.  At some

20              point I became --

21          **THE COURT:**  Slower.

22          **MR. ERNST:**  "At some point I became aware that the

23  man had stopped breathing.  I then saw the officers get off him

24  and he was rolled over to his back.  Their response to the fact

25  that he was not breathing seemed very nonchalant.  They did not

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 83

1   seem to be in a hurry to start CPR or anything like that.  It

2   was almost like they were moving in slow motion, and they were

3   very casual in their actions as he laid there not breathing.

4   Eventually officers and other medics started trying to

5   resuscitate him and he was taken away.  I did not see him

6   again."

7        Is that what it says, sir?

8   **A.**   That's what she saw, and that's what that says.

9   **Q.**   Okay.  And then, according to Deputy Dupina [sp] or, I'm

10  sorry, Officer Dupina, the officers kneeled on his back for 15

11  to 20 seconds after Mr. Torgerson stopped breathing, correct?

12  **A.**   I don't know that that's true.

13  **Q.**   Okay.  Can you turn to Exhibit D, Page 49.

14  **A.**   You said D as in dog?

15  **Q.**   Yeah.

16  **A.**   I don't have a 49.

17  **Q.**   I'm sorry, it's --

18       Let me ask you this.  Did Mr. Dupina indicate at Page 47

19  that two officers kneeled on his back for four to five minutes?

20  **A.**   What line are you reading from?

21  **Q.**   We'll start with Line 12.  Does it say, "And the

22  two officers did this --

23       Well, I'm sorry.  Just read it from the top because you've

24  got to put it in context.  Please read it from the top of the

25  page, and then I'll ask you some questions.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 84

1      Let me know when you --

2   **A.**   I have read it.  I'm ready.

3   **Q.**   Okay.  And so were these questions asked beginning at

4   Line 4:

5      "Do you now recall him being held down by two officers

6   with their knees on his upper back?

7      "A.   Yes.

8      "Q.   And do you recall that this was when he was in a

9   facedown position?

10      "A.   Yes.

11      "Q.   With his hands handcuffed behind his back?

12      "A.   Yes.

13      "Q.   And the two officers did this for a period of

14   approximately four to five minutes?

15      "A.   I don't really have a time frame, but it sounds

16   reasonable.

17      "Q.   And they were replaced by two other officers?

18      "A.   I don't recall that happening.

19      "Q.   At all times when you were down there in the lobby do

20   you agree with Officer Mishaud [sp] that at least two officers

21   had their knees on Mr. Torgerson's upper back while he was

22   being held facedown?

23      "A.   Yes.

24      "Q.   And they were on him like that when he stopped

25   breathing?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 85

1    "A.  Yes."

2    Correct?

3  **A.**   That's what this says on this one page, yes.

4  **Q.**   Okay.  And then if you turn to Tab C, Officer Conners, and

5  go to Page 144.

6  **A.**   I'm there.

7  **Q.**   Okay.  And starting on Line 4, he was asked:

8    "And Despite the fact that he was in what you perceived as

9  respiratory distress, you and the other officers continued to

10 hold him prone on the ground?

11   "A.  Yes.

12   "Q.  Using your body weight?

13   "A.  Using my leg over his shoulder."

14   Okay.  Did I read that correctly?

15 **A.**   Not on my page I didn't see what you just read, but ...

16 **Q.**   Okay.  I'll show you.

17 **A.**   Because it says it was "to some degree."

18 **Q.**   Starting there.

19 **A.**   You didn't read the full page, sir, as you've done in the

20 past.

21 **Q.**   Yeah, I didn't read the full page.

22 **A.**   Those questions are correct, and on that context of the

23 question on that page.

24 **Q.**   Okay.  Thank you.

25   And, as you indicated, Mr. Torgerson stopped breathing and

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 86

1  eventually died, correct?

2  **A.**   He did.

3  **Q.**   And you opined that when Mr. Torgerson was struggling

4  while he was handcuffed facedown with a spit mask over his face

5  that constituted resisting, correct?

6  **A.**   He did resist, yes, he did.

7  **Q.**   Okay.  And you opined that the officers responding to

8  Mr. Torgerson's situation responded appropriately and were

9  properly trained in the use of a spit hood, correct?

10  **A.**   That's correct.

11  **Q.**   Okay.  And, sir, with regard to, with regard to Officer

12  Bruno, B, if you turn to Page 89.

13  **A.**   You are saying the Tab B?

14  **Q.**   Officer Bruno.  I tried to match the tab with the first

15  letter of their last name.

16  **A.**   I have no 89.

17  **Q.**   You don't have this?  Let me see.

18  **A.**   Okay.

19  **Q.**   Did Officer Bruno give these questions -- or answer these

20  questions like this:

21      "Q.  Did anybody at SPD prior to this incident ever teach

22  you anything about any dangers to the person that you are

23  applying the spit hood to, that is, any dangers associated with

24  the use of the spit hood insofar as it relates to the person

25  you are going to be putting it on?

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 87

1    "A.  I don't recall if we had any exact training on that.

2    "Q.  Or even general training?

3    "A.  I don't recall."

4    That's what she testified to, correct?

5  **A.**  But, again, you left out where they had training in

6  post --

7  **Q.**  Sir, I just asked you if that was what she testified to.

8  Could you please answer my questions yes or no.

9  **A.**  I can't answer that.

10  **Q.**  Okay.  And then if you look at Officer Dupina's testimony,

11  D, Page 69.

12  **A.**  Yes, I'm there.

13  **Q.**  Hold on, hold on.  I'm sorry, sir.  I've got the wrong

14  page on that.  One second.

15    I'm sorry, 68.

16  **A.**  You said 68?

17  **Q.**  Yes.

18  **A.**  Okay.  I'm there.

19  **Q.**  And if you'll look at Line 10, did Officer Dupina give

20  this answer to this question:

21    "Q.  Okay.  Prior to this incident involving

22  Brian Torgerson, had you had any training on the use of spit

23  sacks?

24    "A.  No."

25    Did I read that correctly?

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 88

1   **A.**    That's what he said there on that page, correct.

2   **Q.**    All right.  And then finally with regard to Officer

3   Auterrer [sp] with an A at Page 100.  If you look at Line 6:

4          "Q.  Okay.  Have you ever had any training on any dangers

5   associated with the use of a spit hood?

6          "A.  No."

7          Did I read that correctly?

8   **A.**    Correct.  You read that correctly.

9   **Q.**    And so despite that, sir, you still opined that the

10  officers were properly trained?

11          **THE COURT:**  Wait a minute.

12          **MR. REISING:**  Objection to this line of questioning.

13          **THE COURT:**  Why?

14          **MR. REISING:**  He's talking about training,

15  Your Honor.  That's a deliberate indifference standard kind of

16  circumstances.  There's no --

17          **THE COURT:**  Sir, we are not trying that case.  We're

18  trying this case.

19          **MR. ERNST:**  I understand.

20          **THE COURT:**  Do you have any more questions?

21  BY MR. ERNST:

22  **Q.**    Yeah.  Despite that, you testified that the officer had --

23  that the officer was properly trained in the use of a spit

24  hood, correct?

25  **A.**    Officers.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 89

1  **Q.**   Okay.

2  **A.**   You didn't pinpoint the ones who actually put the spit

3  hood on the person.

4  **THE COURT:**  I suggest, Mr. Ernst, at this point you

5  move on.

6  **BY MR. ERNST:**

7  **Q.**   In fact, you opined that the Seattle Police Department

8  officers' training regarding this incident was outstanding,

9  correct?

10  **A.**   That's correct, for the officers engaged.

11  **Q.**   But the Justice Department disagreed with you; isn't that

12  correct, sir?

13  **A.**   I believe they did.

14  **Q.**   In fact, the Justice Department forced the Seattle Police

15  Department to be -- the entire department to be retrained,

16  correct?

17  **A.**   Not because of this case.

18  **Q.**   With regard to Mr. Jennings' case, you issued a report

19  that absolved the officers of any wrongdoing and maintained

20  that their training was entirely proper, correct?

21  **A.**   Correct.

22  **MR. REISING:**  Excuse me, Your Honor, training is not

23  an issue in this case.

24  **THE COURT:**  Training is not an issue.

25  **MR. ERNST:**  I know, Your Honor, but he asked him

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 90

1   extensively was he trained in these things.

2            **THE COURT:**  No, training is not an issue in this

3   case.  You are going to have to reframe that question.

4            **MR. ERNST:**  Okay.

5   **BY MR. ERNST:**

6   **Q.**  Well, you gave a report indicating that the officers'

7   training in this case was proper, correct?

8   **A.**  Correct.

9   **Q.**  Sir, I'm going to ask you a question.  Would you agree --

10  well, strike that.

11       You would agree with me that before you decide to use any

12  force on an inmate who has not obeyed an order, you would

13  consider all of the things that happened up to that time

14  including whether the inmate had been compliant up to that

15  time, correct?

16  **A.**  It depends.

17  **Q.**  Do you have your report in front of you, sir?

18  **A.**  Yes, I do.

19  **Q.**  Now, you indicated that in the report-writing room that

20  Deputy Fuller gave Jennings two instructions to keep his hands

21  on the wall, correct?

22  **A.**  What page are you on?

23  **Q.**  Page 9 of your report.

24  **A.**  What paragraph?

25  **Q.**  Sir, you don't remember what you put in your report?

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 91

1    **A.**    Well, it's 22 pages.  I want to make sure I'm answering

2    your question correctly.

3    **Q.**    Okay.  One second.

4         Hold on one second, sir.

5         Okay.  It's in the first paragraph.

6              **THE COURT:**  On the first page?

7              **MR. ERNST:**  No, on Page 9, Your Honor, in the first

8    paragraph.

9              **THE COURT:**  On what page?

10              **MR. ERNST:**  Page 9.  Page 9, first paragraph.

11   **BY MR. ERNST:**

12   **Q.**    Then, let's see, about halfway down, the fifth sentence or

13   the fifth line, I'm sorry, the first full sentence it says,

14   "During the search Fuller gave Mr. Jennings instructions twice

15   about keeping his hands on the wall during the search and he

16   did not comply."  Correct, that's what you said?

17   **A.**    Correct.

18   **Q.**    And then how much time did Mr. -- did Deputy Fuller give

19   Jennings to comply with the first command to keep his hands on

20   the wall?

21   **A.**    I don't know.  I didn't time it.

22   **Q.**    How much time did he give him to comply with the

23   second command to keep his hands on the wall?

24   **A.**    I didn't time it.  It's on the video.

25   **Q.**    Okay.  And you would agree with me, sir, that there's a

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 92

1   continuum of force, correct?

2   **A.**   I would agree with that.

3   **Q.**   And that continuum basically says you use as little force

4   as necessary to obtain your goal or to obtain the compliance,

5   correct?

6   **A.**   No, that's not correct.

7   **Q.**   Okay.  Well, you would agree with me, sir, that you should

8   use as little force as necessary to obtain your goal, correct?

9   **A.**   No, I don't agree with that at all.

10  **Q.**   Okay.  You would agree with me that if you are going to

11  give somebody an order that you give them a chance to comply

12  before you escalate the situation, correct?

13  **A.**   Correct, unless they --

14  **Q.**   Just answer my questions yes or no.

15         **THE COURT:**   Just yes, no, I can't answer yes or no,

16  or I don't understand.

17         **THE WITNESS:**   I can't answer yes or no to that

18  question.

19  **BY MR. ERNST:**

20  **Q.**   Okay.  And you also indicated that Mr. Jennings -- I'm

21  sorry, that Deputy Fuller's use of force was in direct response

22  to Mr. Jennings' repeated sudden movements, correct?

23  **A.**   Are you still on that same page?

24  **Q.**   Yeah, it's Page 9.

25  **A.**   Yes, I would agree with that.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 93

1  **Q.**   And that, if you look at Page 6, you say "after the

2  second command Jennings turned and looked at Fuller," correct?

3  **A.**   Page 6?

4  **Q.**   Yes, Page 6.

5  **A.**   What paragraph are you on on that one?

6  **Q.**   The first -- I'm sorry.  Well, the first full paragraph.

7  **A.**   That's correct.

8  **Q.**   Okay.  And that you said that he turned and assumed an

9  aggressive stance towards Deputy Fuller, correct?

10  **A.**   Correct.

11  **Q.**   And you said that you didn't see anything inappropriate

12  with the use of pepper spray and laying a person prone,

13  correct?

14  **A.**   That's correct.

15  **Q.**   Did you happen to review the general orders from the

16  Genesee County Sheriff's Office?

17  **A.**   Yes, I did.

18  **Q.**   And general policy, I'm sorry, General Order 2B4 says.

19         "Under no circumstances will any person sprayed with

20         OC spray be allowed to lie facedown after restraints

21         are in place or the subject is subdued."

22       You agree that's what it says, correct?

23  **A.**   I would have to see the policy, if you don't mind me

24  looking at it.

25  **Q.**   Don't mind at all.  It's B4.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 94

1    **A.**    That's what it says, yes.

2    **Q.**    Okay.  It doesn't say except in the circumstances if the

3    person has been decontaminated, correct?  It doesn't say that?

4    **A.**    It doesn't say that, but that's the practice.

5    **Q.**    I just asked you if it says that, okay?

6          And it doesn't say except in the circumstances where

7    somebody has been wiped off with a 4x4 piece of cloth, correct?

8    It doesn't say that?

9    **A.**    It doesn't say that there.

10   **Q.**    Sir, now, you indicated that you did not see any deputies

11   apply PPCT in the report-writing room, correct?

12   **A.**    I didn't observe any, no.

13   **Q.**    Okay.  And you also testified that the deputies followed

14   the proper procedure in bringing Mr. Jennings to his feet,

15   correct?

16   **A.**    That's correct.

17   **Q.**    But you would agree if you grab somebody on or near the

18   handcuffs and pull them back even if you have one of his arms

19   that that could cause a shoulder injury, correct?

20   **A.**    It's possible.

21   **Q.**    In fact, if defendants' own orthopedic doctor reviewed the

22   video and said lifting someone up like what he observed in that

23   video could cause shoulder injuries, you would agree with that

24   doctor, wouldn't you?

25          **MR. REISING:**  Objection, that's not the testimony of

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 95

1    Dr. Kohen, Your Honor, so I object.

2             **MR. ERNST:**  That's exactly the testimony.  I asked

3    him hypothetically.

4             **THE COURT:**  The jury will remember the testimony.

5         Rephrase your question or repeat it.

6    **BY MR. ERNST:**

7    **Q.**   If the defendants' own orthopedic doctor viewed the video

8    and said lifting someone up like what he observed in that video

9    could cause a shoulder injury, you wouldn't disagree with him,

10   right?

11   **A.**   That's his opinion.

12   **Q.**   I'm asking if you would disagree with him, sir.

13   **A.**   I would have to see that.

14   **Q.**   Well, you would agree with me that an orthopedic doctor

15   knows more about the mechanics of an injury than you, correct?

16   **A.**   I would agree.

17   **Q.**   And, sir, you testified that -- today that Mr. Jennings

18   hit the wall when he was going from the report-writing room

19   into the sallyport area, correct?

20   **A.**   Prior to that.

21   **Q.**   Right, prior to it.  But in your report, sir, didn't you

22   testify or didn't you write -- if you look at Page, on the

23   bottom of Page 10 and in the beginning of Page 11 -- hold on

24   one second.  I've got a page missing here.  I'll come back to

25   that question.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 96

1      Isn't it true, sir, that you put in your report that Wing

2  and White, after Wing and White pulled Jennings to his feet

3  they prevented Jennings from hitting the wall, correct?

4  **A.**   Where are you at again, sir?

5  **Q.**   I'm asking you if you put it in your report.

6  **A.**   I would have to see what page you are talking about.

7  **Q.**   So you don't remember putting that in there, right?

8          **THE COURT:**  He said you would have to cite what

9  you --

10         **MR. ERNST:**  All right.

11  BY MR. ERNST:

12  **Q.**   It's at the bottom of Page 11 and beginning of Page 12,

13  the absolute last sentence on Page 11:

14             "Deputy White and Wing assisted Mr. Jennings up by

15             using arms as shown in video and not by the handcuffs

16             as he claimed.  Mr. Jennings continued to resist by

17             moving and twisting his torso, lost his balance, and

18             the deputies kept him from striking the wall."

19      Correct?

20  **A.**   That's what it says, correct.

21  **Q.**   So if Wing and White themselves said Jennings hit the

22  wall, they would be wrong, correct?

23  **A.**   I don't know what they said.

24  **Q.**   Well, I'm asking you if they did say that they would be

25  wrong, correct?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 97

1   **A.**   No.

2   **Q.**   Okay.  Now, sir, you would agree with me that the purpose

3   of a safety cell is to house detainees or prisoners who are

4   suicidal or a danger to themselves, correct?

5   **A.**   That's correct.

6   **Q.**   And it's also for medical observation, correct?

7   **A.**   That's correct.

8   **Q.**   And it's also to house or to segregate unruly detainees,

9   correct?

10   **A.**   That's correct.

11   **Q.**   Okay.  And you indicated that once Mr. Jennings was

12   brought into safety cell 6 and he was prone on the floor he

13   continued to resist and straggle against the deputies and

14   that's depicted in the video, correct?

15   **A.**   Correct.

16   **Q.**   Okay.  Sir, if that's where you put unruly detainees, then

17   they should have put Mr. Jennings in there and left him in

18   there, correct?

19   **A.**   Not handcuffed, no.

20   **Q.**   Well, you wouldn't remove handcuffs from a combative

21   detainee, correct?

22   **A.**   Yes, you would.

23   **Q.**   Wouldn't that put your security at risk, sir?  Isn't that

24   correct?

25   **A.**   Not if he's in the cell.

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 98

1   **Q.**   So one of the things you could have done is you could have

2   had him back up to the handcuff port and uncuffed him that way,

3   correct?

4   **A.**   That's been done, but if you are --

5   **Q.**   Sir, I just asked you if that's one way you could have

6   done it, correct?

7   **A.**   That's one way, but it's not the proper way.

8   **Q.**   And you would agree with me that you can search somebody

9   if they are handcuffed, correct?

10  **A.**   That's correct.

11  **Q.**   And you would agree with me that if those officers -- the

12  first time they went into safety cell 6, there were like

13  four or five of them, correct?

14  **A.**   I don't recall how many went inside.

15  **Q.**   But there were multiple ones, correct?

16  **A.**   I would agree with that, yes.

17  **Q.**   And that Lieutenant Nuckolls had his taser out, correct?

18  **A.**   Yes.

19  **Q.**   And Jennings was handcuffed and prone on that cement slab,

20  correct?

21  **A.**   That's correct.

22       **MR. REISING:**   I'm going to object to the

23  characterization "thrown on the cement slab."

24       **THE COURT:**   Repeat the question.

25

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 99

1  **BY MR. ERNST:**

2  **Q.**   He just said correct.  Well, you were there, you were at

3  the jail yesterday, correct?

4  **A.**   Yes.

5  **Q.**   And in that safety cell there's a cement slab that's

6  about, I don't know, a foot off the ground or 18 inches off the

7  ground or something like that, correct?

8  **A.**   That's correct.

9  **Q.**   And there were four to five deputies, and Lieutenant

10  Nuckolls had his taser out, correct?

11  **A.**   Yes.  I answered that, yes.

12  **Q.**   So they could have just walked out of there and left

13  Mr. Jennings in, correct?

14  **A.**   Not handcuffed, no.

15  **Q.**   Well, you are not saying that Mr. Jennings posed a danger

16  to himself, are you, sir?

17  **A.**   He could, yes.

18  **Q.**   Well, that's where you put somebody who poses the ultimate

19  danger; that's where you put somebody who is suicidal, correct?

20  **A.**   But not with an instrument that you can use as a weapon.

21  **Q.**   Just answer my question yes or no.  Is that correct,

22  that's where you put somebody who is suicidal?

23  **A.**   Suicidal, yes.

24  **Q.**   Sir, you would agree with me that placing Jennings in the

25  safety cell initially was the proper procedure, correct?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 100

1   **A.**   Correct.

2   **Q.**   Okay.  So then putting him in a restraint chair after that

3   was just punishment, correct?

4   **A.**   Absolutely not.

5   **Q.**   Sir, you believe that you can use punishment in a

6   corrections setting for the purposes of behavior modification,

7   correct?

8   **A.**   Where did I say that?

9   **Q.**   Did you serve as an expert witness in the case involving

10   the Michigan Saginaw County Jail in a case called *Rose, et al.*

11   with a bunch of different plaintiffs versus Saginaw County?

12   **A.**   I don't recall that case, sir.

13   **Q.**   Here, let me show you this case and see if it refreshes

14   your memory.

15   **A.**   Do I have time to read the whole thing?

16   **Q.**   No, I'll just show you the front page and ask you if it

17   refreshes your memory.  I'm going to ask you a couple of

18   questions.

19        **THE COURT:**  Wait a minute.

20     Did you see the front page?

21        **THE WITNESS:**  Yes, sir.

22        **THE COURT:**  Does that recall the case to you?

23        **THE WITNESS:**  No, it does not.

24   BY MR. ERNST:

25   **Q.**   Do you recall a bunch of women brought a lawsuit because

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 101

1   they were -- well, a lawsuit that was filed in federal court in

2   front of the Honorable David Lawson; do you recall that?

3   **A.**   I would have to -- let's see.  What year was this?  It

4   doesn't even say.

5   **Q.**   That would be 2001.

6   **A.**   I would have to -- quite frankly, I would have to read the

7   documents to give you a full answer to that.  It doesn't come

8   back to me.

9   **Q.**   And that --

10           **THE COURT:**  Wait a second, wait a second.

11       Do you recall a case in federal court involving the

12   Saginaw County Jail and a group of women?

13           **THE WITNESS:**  No, sir, I do not.

14   **BY MR. ERNST:**

15   **Q.**   Well, sir, the -- I want you to turn to Page 27 of Judge

16   Lawson's opinion.

17   **A.**   Okay.  I'm there.

18   **Q.**   Okay.  And it says, about the first full paragraph about

19   halfway down:

20               "The defendants have also offered the reports of

21               two expert witnesses who believe that 'placing a

22               detainee for a limited duration under close

23               supervision in the nude in an administrative

24               segregation cell is a reasonable alternative

25               legitimately related to detention objectives.'"

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 102

1      And it cites expert report of Darrell Ross at Paragraph

2  11.  Do you see that?

3  **A.**   That's exactly true.  That's correct.

4  **Q.**   Okay.  And the Court found that confining detainees, women

5  detainees naked in a cell served no legitimate correctional

6  function, correct?

7          **MR. REISING:**  Objection, Your Honor.  This is not

8  about naked women and detainees in this case.  This is highly

9  prejudicial.

10         **THE COURT:**  We had to have sex in it at some point, I

11  mean, in today's world.

12      What's your objection, sir?  I'm sorry, I shouldn't have

13  said that.

14         **MR. REISING:**  The objection is relevance.

15         **THE COURT:**  What?

16         **MR. REISING:**  It's irrelevant, Your Honor, to this

17  case, and there has been no showing that this witness in terms

18  of his opinion or that opinion was part of what Judge Lawson

19  relied upon in his decision.  We don't know that.

20         **THE COURT:**  I have to sustain the objection.

21  BY MR. ERNST:

22  **Q.**   You think it's all right to inflict punishment to modify

23  behavior in a correctional setting; isn't that correct, sir?

24  **A.**   I have never opined to that, never.

25  **Q.**   But you indicated in your report that it was legitimate to

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 103

1  remove Jennings from the safety cell because he might harm

2  himself, correct?  And that's at Page 14.

3  **A.**   Yes, as I have said, leaving him handcuffed would be a

4  harm to himself.

5  **Q.**   It's just a yes-or-no question.  Is that correct?

6  **A.**   I've got 14 here, sir, and I have got a lot of information

7  on Page 14 which connects to that question.

8  **Q.**   Okay.  If you can't answer it yes or no, you can say that.

9  **A.**   I have already answered the question.

10        **THE COURT:**  Repeat the question.

11        **THE WITNESS:**  Yes, sir.

12  **BY MR. ERNST:**

13  **Q.**   You said it was legitimate to remove Jennings from safety

14  cell 6 because he might harm himself, correct?

15  **A.**   That's correct.

16        **THE COURT:**  Does that report have that sentence in

17  it?

18        **THE WITNESS:**  I'm not sure what sentence he's -- I

19  would have to find it, Judge.

20  **BY MR. ERNST:**

21  **Q.**   Sir, didn't you review your report before you testified

22  today?

23        **THE COURT:**  Show him the report.

24        **MR. ERNST:**  He's got it in front of him, Judge.

25        **THE COURT:**  Go up there and point out to him the

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 104

1   sentence you are talking about.

2        **MR. ERNST:**  One second.

3   **BY MR. ERNST:**

4   **Q.**  All right.  It's in the first paragraph.  It's the third

5   sentence.

6   **A.**  You are on Page 14?

7   **Q.**  Yes.

8   **A.**  The third sentence?

9   **Q.**  From the top, yes.

10  **A.**  That's not my --

11  **Q.**  What?

12  **A.**  Could you read me it?

13  **Q.**  Is it starts with "further."

14  **A.**  I'm with you now.  Okay, that's right.

15  **Q.**  You indicated in your report that it was legitimate to

16  remove Jennings from the safety cell because he might harm

17  himself; is that correct?

18  **A.**  In handcuffs.  Let's put the whole line in there, sir.

19  **Q.**  Sir, just answer my questions yes or no.

20        **THE COURT:**  Read the sentence to him, sir.

21  **BY MR. ERNST:**

22  **Q.**  Okay.

23        "Further, it would not be prudent to leave him in a

24        cell in his combative state and handcuffs as the

25        potential existed where he might injury [sic]

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 105

1        himself."

2    Correct?

3    **A.**    Correct.

4    **Q.**    But you didn't see Mr. Jennings do anything up to that

5    point that indicated he would injure himself, correct?

6    **A.**    Yes, I did.

7    **Q.**    Okay.

8    **A.**    It started it in the report room.

9             **THE COURT:**  No, no, no.  You disagreed when you said

10   yes.

11   **BY MR. ERNST:**

12   **Q.**    Well, if there's a concern that an inmate might hurt

13   himself, you put him in the safety cell, correct?

14   **A.**    You try.

15   **Q.**    That's why they call it a safety cell, correct?

16   **A.**    Correct, or a restraint chair.

17   **Q.**    Sir, just answer my questions.

18   And Jennings didn't do anything to harm himself in the

19   safety cell, correct?

20   **A.**    He wasn't given an opportunity to, sir.

21   **Q.**    Sir, just answer my question, sir.  Is that correct?

22   **A.**    That's correct.

23   **Q.**    Thank you.  And in fact in your report you said that the

24   situation in the safety cell had not deescalated at all; isn't

25   that correct?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 106

1   **A.**   That's correct.

2   **Q.**   And you also claimed that Jennings bit Fuller while the

3   spit mask was being put on Jennings, correct?

4   **A.**   That's correct.

5   **Q.**   Sir, did you see the video?

6   **A.**   Yes, I did.

7   **Q.**   Deputy Fuller was nowhere even in the picture when

8   Mr. Jennings was -- when the spit mask was being placed on

9   Mr. Jennings; isn't that correct?

10  **A.**   I wouldn't disagree with that.

11  **Q.**   You would agree that it would be improper for a

12  corrections officer to put his hand over the mouth of a person

13  who had been pepper-sprayed, correct?

14  **A.**   No.

15  **Q.**   You also agreed that Deputy Kennamer kneeled on

16  Mr. Jennings' head when they were out in the hallway after he

17  was taken out of the safety cell, correct?

18  **A.**   That's correct.

19  **Q.**   So if Deputy Kennamer claims that he never kneeled on his

20  head, Deputy Kennamer would be wrong, correct?

21          **MR. REISING:**   Objection, Your Honor.  This witness is

22  not here to testify about the credibility of Deputy Kennamer.

23  He can respond to questions about what he observed on the

24  video.

25          **THE COURT:**   Reframe your question.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 107

1   **BY MR. ERNST:**

2   **Q.**   You would disagree with me that if Deputy Kennamer

3   testified that he never kneeled on Mr. Jennings' head that he

4   would be wrong based on what you saw in the video, correct?

5            **MR. REISING:**   Same objection, Your Honor.

6            **THE COURT:**   No, he can answer.

7            **THE WITNESS:**   Someone kneeled on his head, as I saw

8   it.  I don't know which particular deputy.

9   **BY MR. ERNST:**

10  **Q.**   Okay.  You are aware of the effects of OC spray or pepper

11  spray, correct?

12  **A.**   That's correct.

13  **Q.**   And you would agree that they cause the tissue in your

14  throat to swell if you get some in your throat, correct?

15  **A.**   It's possible.

16  **Q.**   And it may cause the tissue around your mouth to swell if

17  you get some in your mouth, correct?

18  **A.**   It's possible.

19  **Q.**   And you would agree that it causes the tissue in your nose

20  to swell if you get some in your nose, correct?

21  **A.**   Correct.

22  **Q.**   And if all of those membranes swelled up, you would agree

23  that it could cause difficulty breathing, correct?

24  **A.**   No.

25  **Q.**   You would agree with me that a person who has been

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 108

1   pepper-sprayed and was bleeding from the nose and had a spit

2   hood over his head and who was torqued down on a restraint bed

3   facedown might have trouble breathing, just like the plaintiff

4   in the *Torgerson* case, correct?

5        **MR. REISING:**  I'm going to object, Your Honor,

6   because there's no testimony that the plaintiff in this case

7   was torqued down to the restraint bed.  Just the contrary.  The

8   question assumes facts not in evidence.

9        **THE COURT:**  No, no.  Well, first of all, you don't

10  argue in your objection.  That's called an argumentative

11  objection, and that's inappropriate.

12       Reframe your question.

13  **BY MR. ERNST:**

14  **Q.**   You've agreed with me that a person who had been

15  pepper-sprayed who was bleeding from the nose, who had a spit

16  hood over his face and who was placed in a restraint bed

17  facedown, the deputies kneeled on him as they tightened the

18  restraint down might have difficulty breathing similar to the

19  man in the *Torgerson* case, correct?

20       **THE COURT:**  No, strike the last bit.

21  **BY MR. ERNST:**

22  **Q.**   Okay.  Just that he would have difficulty breathing under

23  those circumstances, correct?

24  **A.**   I disagree with that.

25  **Q.**   Sir, you are a completely biased witness; you would agree

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 109

1   with that, correct?

2   **A.**   No, I would not.

3   **Q.**   Well, you work for the police 99 percent of the time --

4          **THE COURT:**   Now you are getting into an argument with

5   the witness.

6          **MR. ERNST:**   Okay.  I was just asking him to show --

7          **THE COURT:**   You've already covered this once.

8          **MR. ERNST:**   I'm asking him a little bit different

9   question.

10          **THE COURT:**   Well, I don't think it's a little bit

11   different.  Ask your next question.

12          **MR. ERNST:**   Okay.

13   **BY MR. ERNST:**

14   **Q.**   Well, you have worked numerous times for police officers

15   and various societies that they have, and they have paid you

16   money on a regular basis, correct?

17   **A.**   That's not true.

18   **Q.**   Sir, in your resume you list various consulting

19   activities, correct?

20   **A.**   Yes.

21   **Q.**   And, among them, you have provided updated information and

22   edited and revised curriculum for the MMRMA, Livonia, Michigan,

23   correct?

24   **A.**   That's correct.  What page are you on?

25   **Q.**   Well, I'm just asking you in general because I have a

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 110

1  different resume from you.

2      And that would be -- tell us what the MMRMA is.

3  **A.**   Michigan Municipal Risk Management Authority.

4  **Q.**   So that's like an insurance company that pays you money to

5  do work for them in the area of -- in this type of area,

6  correct?

7  **A.**   No, they are --

8  **Q.**   If I say correct, you can say no.

9  **A.**   You are not giving the full -- it's not correct.

10 **Q.**   That's all you need to say.

11      Then you were a consultant to the Meggitt Corporation on

12 lethal force simulator training, correct?

13 **A.**   They are a private contract, that's correct, yes.

14 **Q.**   And then you are contracted to provide more updated

15 research for the MMRMA in sudden in-custody death, correct?

16 **A.**   What year was that?

17 **Q.**   2010, I believe.

18 **A.**   Correct.

19 **Q.**   And then you were employed again in '08 by the same

20 agency, Michigan Municipal Risk Management Authority, to

21 provide some more training in that area, correct?

22 **A.**   Correct.

23 **Q.**   And then in April and May of 2007 you consulted with them

24 to review use of lethal force, correct?

25 **A.**   Correct.

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 111

1    **Q.**   So, sir, you rely on these police agencies and insurance

2    companies to provide a substantial amount of your income,

3    correct?

4    **A.**   That's incorrect.

5    **Q.**   And that's why you never represent plaintiffs; isn't that

6    correct?

7            **THE COURT:**  That's argumentative.

8            **MR. ERNST:**  Thanks.  Nothing further.

9            **THE COURT:**  Do you have any redirect?

10            **MR. REISING:**  Your Honor, I have no questions of this

11    witness.

12            **THE COURT:**  Thank you.  The witness is excused.

13        Do you have another witness?

14            **MR. REISING:**  Yes, Your Honor, I do.

15            **THE COURT:**  Who is your next witness?

16            **MR. REISING:**  It would be by video, a medical

17    deposition by video.

18            **THE COURT:**  How long is the video?

19            **MR. REISING:**  57 minutes, Your Honor.

20            **THE COURT:**  So we won't finish it today.  After that

21    video, who is your next witness?

22            **MR. REISING:**  We have two more videos.

23            **THE COURT:**  And how long are they?

24            **MR. REISING:**  One is a little more than an hour,

25    one is a little less than an hour, so I'm going to say

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 112

1   two hours plus all together.

2            MR. ERNST:  About an hour each, more or less.

3            THE COURT:  Are you going to have any rebuttal

4   evidence?

5            MR. ERNST:  I don't believe so, Your Honor.

6            THE COURT:  Okay.  I think what we will do is we'll

7   start with the videos at 9:30 tomorrow -- no, we'll start now

8   with them because we're going to start tomorrow at 9:30.  We'll

9   finish the testimony tomorrow, and you will hear the argument

10  and get your instructions on Wednesday.  Plan on being here all

11  day Wednesday or as long as it takes to reach a verdict.  Okay?

12  And we'll provide lunch for you.

13           MR. ERNST:  Your Honor, could we approach for a

14  second?

15           THE COURT:  So start with the video, if you will.

16     What?

17           MR. ERNST:  We have got to resolve video issues, some

18  objections.

19           THE COURT:  We'll deal with them when we get done

20  here, okay?

21           MR. ERNST:  They are ones that need to be made --

22           THE COURT:  In the video there are objections?

23           MR. ERNST:  Yeah, there's ones that need to be made.

24           THE COURT:  Well, give it to me.

25           MR. ERNST:  All right.  Can we excuse the jury?

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 113

1        **THE COURT:**  In the mean time the operator is setting

2    up the video.  Show me what it is.

3        See, I wasn't there at the video so if there's any

4    objection I have to resolve it.  So don't pay any attention to

5    what we're doing.

6        **MR. ERNST:**  That's the first one right here.

7        **THE COURT:**  I'm going to excuse you for a couple

8    minutes, folks.

9        (Jury out at 12:16 p.m.)

10       **THE COURT:**  Here, Mr., Mr. -- highlight the portions

11   of the deposition that are in question, and also I'm going to

12   admonish the parties this all should have been done well in

13   advance so we didn't have to deal with objections in the middle

14   of the deposition at trial.

15       **MR. REISING:**  Your Honor, we tried to.

16       **THE COURT:**  Well, you didn't tell me about it.  You

17   didn't give me them.  I don't have a highlighted deposition.

18   Poor trial practice.

19       Sheri, go and tell the jury that they can go home and come

20   back tomorrow morning at 9:30.

21       (The jury was dismissed at 12:18 p.m.)

22       **THE COURT:**  Are there also objections to the other

23   two depositions?

24       **MR. REISING:**  Yes.

25       **THE COURT:**  I am dumbfounded.  I must tell both of

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 114

1   you I'm dumbfounded that I should be dealing with objections to

2   depositions in the middle of the trial.

3          **MR. REISING:**  I agree, Your Honor.

4          **THE COURT:**  I think, Mr. Reising, you can let your

5   clients go home.  They don't have to be here.

6          **MR. REISING:**  Okay.  Thank you.

7          **THE COURT:**  Have you got your own copies of the

8   transcript, Mr. Reising?

9          **MR. REISING:**  Yes, we have it right here, Your Honor.

10         **MR. SCOTT:**  We didn't have any objections that needed

11  to be resolved in that particular deposition.

12         **MR. REISING:**  None from our end.  It was from the

13  plaintiff's end.

14         **MR. SCOTT:**  I asked him to resolve these a week ago,

15  and they didn't respond.

16         **MR. ERNST:**  Well, Your Honor --

17         **THE COURT:**  I'm not going to go back.  I have

18  expressed myself.

19         **MR. ELLIOTT:**  Your Honor, here is a highlighted copy.

20         **THE COURT:**  I want all three depositions.

21      All right.  The first is Dr. Kohen's deposition at Page 6:

22      "And was there anything in those police reports that could

23  explain Mr. Jennings having some kind of problem with his left

24  shoulder?

25      "Objection to the question.  Calls for hearsay.  The

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 115

1   police reports are not in evidence."

2       I think that's a legitimate objection.

3       **MR. SCOTT:**  He reviewed the police reports,

4   Your Honor.

5       **THE COURT:**  I don't care whether he reviewed them or

6   not.  They are not in evidence.  They are hearsay.  His opinion

7   on what's in a police report is not relevant.

8       "Okay.  And in your experience in treating patients with

9   shoulder conditions do they generally seek treatment say within

10  weeks, months of the incident?"

11      That's a legitimate question.

12      **MR. SCOTT:**  What page?

13      **MR. REISING:**  I'm sorry, Your Honor, what page were

14  you just reading from in the transcript?

15      **THE COURT:**  24.

16      **MR. ERNST:**  Your Honor, there's an objection at 21.

17      **THE COURT:**  I already took care of that.  Mine

18  carries over to 21.

19      **MR. ERNST:**  Oh, I see.  I see.  It says 6 on top and

20  then --

21      **THE COURT:**  Okay.  The question on Page 24 is okay.

22  The question on Page 25 is okay.

23      The question on 26 is okay.

24      **MR. ERNST:**  And the rest involves the same bar fight.

25      **THE COURT:**  What?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 116

1      **MR. ERNST:**  The rest involves the same bar fight.

2  That was just our cross to show that he didn't have any

3  information.

4           **THE COURT:**  I'm going through them, please.

5           **MR. ERNST:**  Okay.

6           **THE COURT:**  The question on 33, the objection is

7  sustained on the bar fight.  That carries over to Pages 34 and

8  35.  All of that should be deleted.

9      That takes care of the Kohen deposition.  Give me the next

10 deposition.

11     Can I have the next one?

12          **MR. ERNST:**  We're getting it for you.  Just a second.

13 We are highlighting it all.

14          **THE COURT:**  Where is the next deposition?

15          **MR. ERNST:**  We are getting it, Judge.

16          **MR. SCOTT:**  Are you going to do Byrd or Stucky?

17          **MR. ERNST:**  Stucky.

18          **THE COURT:**  The deposition is Eric Stucky.

19          **MR. SCOTT:**  Kirk Stucky.

20          **THE COURT:**  What is Stucky?

21          **MR. SCOTT:**  He's a neuropsychologist.

22          **THE COURT:**  The question on Page 12, the first

23 question, the objection is sustained.

24          **MR. SCOTT:**  Does that only resolve those

25 two questions on Page 12?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 117

1    **THE COURT:**  Wait a minute.  The first question I

2  sustained the objection, but the second question --

3    **MR. SCOTT:**  The one that starts on Line 17?

4    **THE COURT:**  At 17.

5    **MR. SCOTT:**  That's fine?

6    **THE COURT:**  The question on 17 is okay.

7    **MR. SCOTT:**  Thank you.

8    **THE COURT:**  But you have to interlineate the

9  conversation, take the conversation off.  You go from the

10  question to the answer.

11    **MR. SCOTT:**  He's going to edit the video.

12    **THE COURT:**  Yeah.  The question on 13 is okay.  The

13  question on 16, the objection is sustained.

14    **MR. ELLIOTT:**  Your Honor, could we revisit 13 for

15  one minute?  Mr. Stucky brings in the fact that Mr. Jennings

16  used cocaine in that answer, and that's not been allowed in the

17  trial.

18    **THE COURT:**  Strike the word "cocaine."

19    The question on inconsistencies in Page 16 is sustained.

20    The question on 17 is okay.

21    What is this witness, is he a psychologist?

22    **MR. ERNST:**  Yes.

23    **THE COURT:**  He can't answer questions about the CT

24  scans.

25    **MR. REISING:**  He works and interprets CT scans all

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 118

 1   the time, Judge.

 2             **MR. SCOTT:**  He specializes in head injuries.

 3             **THE COURT:**  No, not a psychologist.

 4             **MR. SCOTT:**  He's the head of neurotrauma.

 5             **THE COURT:**  I don't care what he's the head of.  He's

 6   a psychologist.

 7             **MR. SCOTT:**  But he works on a continuous basis --

 8             **THE COURT:**  So that's up to them how they let him

 9   work, but I sustain the objection.

10             **MR. SCOTT:**  So on Page 17 what does that pertain to?

11   The McLaren records are already in evidence.

12             **THE COURT:**  "Question:  Is it inconsistent when

13   someone has Post-Traumatic Stress Disorder to maintain a

14   long -- be a father to a child?"

15        The question on 21, the answer is nonresponsive because he

16   could have said yes or no and he goes on later with a lot of

17   speculation.  No, I'm going to sustain that.

18        I'm also going to sustain all of 22 and 23 because I think

19   the questions are -- the answers aren't responsive to the

20   questions and I don't understand the questions.  22 and 23 will

21   be stricken.  It's a garbled question and answer.

22             **MR. SCOTT:**  Got it.

23             **THE COURT:**  Are there any more objections in that?

24             **MR. ELLIOTT:**  Your Honor, on the plaintiff's

25   examination I had to ask him questions about --

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 119

1      **THE COURT:**  Where is that?

2         **MR. ELLIOTT:**  It's towards the back.

3      **THE COURT:**  What pages?

4    On 46 I really don't understand what's going on.

5         **MR. ELLIOTT:**  Your Honor, what happened was he had

6  offered an opinion that he believed Mr. Jennings was on drugs

7  because of his response to the taser, and so there was a series

8  of questions about that on 46 and 47 and 48 and 49.

9         **MR. ERNST:**  It should all be out.

10         **MR. ELLIOTT:**  And 50 and 51.  It's all about --

11         **MR. SCOTT:**  He conceded he wasn't a taser expert, we

12  would agree --

13      **THE COURT:**  All of that should come out.

14      **MR. SCOTT:**  Right.

15      **THE COURT:**  This is a psychologist.  What's he got to

16  do commenting on the videos?

17         **MR. ELLIOTT:**  We agree.

18      **THE COURT:**  That should all come out.

19         **MR. SCOTT:**  Dr. Shiener watched the videos,

20  Your Honor.

21      **THE COURT:**  Yeah, but the way this goes it's all

22  garbled.

23         **MR. ELLIOTT:**  And the tox screen, Your Honor?

24      **THE COURT:**  What?

25         **MR. ELLIOTT:**  He was shown the toxicology report that

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 120

1   showed that Mr. Jennings had no positive result for drugs, and

2   that's on Page 52 and 53.

3          **THE COURT:**  He said I'm not an expert on tasers, and

4   he's got no business commenting.

5          **MR. SCOTT:**  The whole discussion regarding the --

6          **THE COURT:**  I'm not -- I don't understand what the

7   objections on 52 are.

8          **MR. SCOTT:**  I think we're agreeing to just take all

9   of that out, Your Honor.

10         **MR. ELLIOTT:**  52, 53, 54.

11         **MR. SCOTT:**  There was a discussion about a tox screen

12  that you have already determined wasn't relevant.

13         **THE COURT:**  What?

14         **MR. SCOTT:**  You already ruled that the toxicology

15  screen was not relevant so we'll take that out.

16         **THE COURT:**  That's right.

17     Well, at 56 and 57 you are back at the same thing.  I

18  already ruled on it.

19         **MR. ELLIOTT:**  Then at the bottom of 57 the expert had

20  offered an opinion that Jennings had been in five different

21  jails for over two years of imprisonment and I was showing him

22  his prison record.  That should come out as well because the

23  Court has limited that testimony as well.

24         **MR. REISING:**  Well, Your Honor, the witness

25  testified --

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 121

1          **THE COURT:**  58, 59, 60 and 61 is also garbled.  Well,
2    I don't know how you deal with 59 and 60, but it seems to me
3    most of that should come out.

4          **MR. ELLIOTT:**  Your Honor, the only testimony that's
5    in evidence is that Mr. Jennings had prior incarcerations.
6    There is nothing about the time or the specific jails.

7          **THE COURT:**  I know.  There is also a question:
8      "You are not qualified to opine on how a person reacts
9    under certain drugs, are you?
10     "I wouldn't call myself an expert in that area, no."
11     So this should come out.
12     Then we get back to the drugs again on 69.

13         **MR. SCOTT:**  Mr. Hilliard [sp] had a long examination.

14         **THE COURT:**  69 should be cleaned up.

15     70 and 71 should be cleaned up.  All of that colloquy
16   should come out.

17     86, we are again getting this colloquy between counsel
18   that should come out.

19     That's also on 88 and 89.  All of that should have been
20   done in advance.

21     Have you got one more?

22         **MR. ERNST:**  Yes, Your Honor.

23         **THE COURT:**  Where is it?

24         **MR. ERNST:**  Right here, sir.

25         **THE COURT:**  Byrd is an expert in what?

*13-13308; Jennings v. Fuller, et al.*

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 122

1      **MR. REISING:**  Ophthalmology, Your Honor.

2      **THE COURT:**  There's a little bit of colloquy on 14,

3  Page 14, that should come out.

4      On 19 there's colloquy that should come out.

5      **MR. SCOTT:**  Are you waiving that objection on 14?

6      **MR. ELLIOTT:**  He just said it should come out.

7      **THE COURT:**  There's colloquy on Pages 18 and 19 that

8  should come out starting with Mr. Ernst's objection.

9      Page 23 should be cleaned up.

10      **MR. ERNST:**  I'm sorry, 23 what, Your Honor?

11      **THE COURT:**  Cleaned up.

12      **MR. ERNST:**  Oh, cleaned up.

13      **THE COURT:**  26 should be cleaned up.

14      27 should be cleaned up.

15      Mr. Scott's objections on Page 23 should be deleted.  So

16  we should just go question and answer, question and answer.  I

17  think that's it.

18      Page 38 is a deletion.  Page 38 there's a couple of

19  deletions, and that's it.

20      **MR. ERNST:**  When you say deletions, Your Honor, do

21  you mean --

22      **MR. SCOTT:**  Objection?

23      **THE COURT:**  Here they are.  Here they are.

24      Okay.  I will expect for the jury a list of the witnesses,

25  just witnesses, who they are, just 1, 2, 3, 4 so the jury can

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 123

1    follow, recall who the witnesses were.  Yours will be rather

2    short.  Yours will be rather long.

3        And then a list of the exhibits and a copy of the exhibits

4    that are allowed to go into the jury room.

5        **MR. SCOTT:**  Are the exhibits marked during the

6    depositions permitted in?

7        **THE COURT:**  Only if they were admitted at the time.

8    I don't know what exhibits were involved in the depositions.

9        **MR. REISING:**  There were two exhibits, Your Honor,

10   for instance, in Dr. Hanson's deposition --

11       **THE COURT:**  I don't know.  I just said the exhibits

12   that go into the jury room should be listed.

13       **MR. REISING:**  I agree.

14       **MR. SCOTT:**  So the ones that are marked at the trial

15   depositions are exhibits?

16       **THE COURT:**  I don't know.  He may have objections to

17   them.  The fact that they are marked does not mean they are

18   admissible.

19       **MR. SCOTT:**  If there's no objection in the

20   deposition --

21       **THE COURT:**  Did you hear what I said, Mr. Scott?  You

22   two work it out.  If there's a disagreement, then you show me

23   which exhibits they are and I'll resolve the disagreement.

24       Also, you have a draft of the instructions and the verdict

25   form, and if there's any problems with those, we'll deal with

*Darrell Ross, Ph.D. - Cross*
*Monday/October 31, 2016/Volume 9*

V9-Page 124

1  them tomorrow afternoon at some point.

2          **MR. SCOTT:**  Thank you, Your Honor.

3          **THE COURT:**  Now, if there's an objection to an

4  instruction, it's either an objection that it should be deleted

5  or modified or you have an instruction that you want added.

6  Full text.

7      Now, I'm surprised on the 10th day of trial that there

8  still isn't a full understanding by some of the lawyers of how

9  this Court conducts a trial.  Okay?

10     I'll see you tomorrow morning at 9:30.

11         **MR. ERNST:**  Thanks, Your Honor.

12         **MR. REISING:**  Thank you, Your Honor.

13         **MR. SCOTT:**  Thank you.

14         **THE COURT:**  I must tell you, it is unlikely that the

15  malicious prosecution claim will go to the jury.

16     (Proceedings adjourned at 12:44 p.m.)

17                           -   -   -

18

19                **C E R T I F I C A T I O N**

20     I certify that the foregoing is a correct transcription of

21  the record of proceedings in the above-entitled matter.

22

23  s/ Sheri K. Ward_____                11/17/2016
    Sheri K. Ward                          Date
24  Official Court Reporter

25                           -   -   -