UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**WILLIAM JENNINGS,**

Plaintiff,                    **HONORABLE AVERN COHN**

v.

**No. 13-13308**

**PATRICK FULLER, et al.,**

Defendants.

_____/


**JURY TRIAL - VOLUME 11**

**Wednesday, November 2, 2016**


Appearances:

                                H. William Reising
                                Christopher J. Scott
Kevin S. Ernst                  Plunkett & Cooney
Law Offices of Kevin Ernst      111 E. Court Street, #1B
645 Griswold Street, #1808      Flint, Michigan   48502
Detroit, Michigan   48226       (810) 232-5100
(313) 965-4822                   On behalf of Defendants

Dean D. Elliott
321 South Williams Street
Royal Oak, Michigan   48067
(248) 543-9000
  On behalf of Plaintiff

-   -   -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan   48226*
*(313)965-4401 · ward@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

*Jury Trial – Volume 11*
*Wednesday, November 2, 2016*

**I  N  D  E  X**

|  | Page | Vol. |
|---|---|---|
| Dismissal of the Unlawful Prosecution Claim ......3 | | 11 |
| Plaintiff's Closing Argument ....................11 | | 11 |
| Defendants' Closing Argument ....................41 | | 11 |
| Plaintiff's Rebuttal Closing Argument ..........63 | | 11 |
| Final Jury Instructions ........................70 | | 11 |
| Certification of Reporter ......................102 | | |

-  -  -

Plaintiff's Exhibits

| Number | Rcvd | Vol. |
|---|---|---|
| 19 | ...................................7 | 11 |
| 20 | ...................................7 | 11 |
| 21 | ...................................7 | 11 |
| 22 | ...................................7 | 11 |
| 24 | ...................................7 | 11 |

-  -  -

*Dismissal of the Unlawful Prosecution Claim*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 3

1              Detroit, Michigan

2              Wednesday, November 2, 2016

3              9:03 a.m.

4              -   -   -

5      **THE CLERK:**  Calling Case Number 13-13308, *Jennings v.*

6  *Fuller.*

7      **THE COURT:**  Be seated.

8      Do you have your witness lists and exhibit lists?

9      **MR. REISING:**  Yes, Your Honor.

10     **MR. ERNST:**  Mr. Elliott is following me.  He will be

11 here in a minute.

12     **THE COURT:**  What?

13     **MR. ERNST:**  Mr. Elliott has it.  He'll be here in a

14 minute.

15     **THE COURT:**  Where is Mr. Elliott?

16     **MR. ERNST:**  He's on his way.

17     **THE COURT:**  Let me see yours.

18     Do you also have a book of exhibits?

19     **MR. REISING:**  Yes.

20     **THE COURT:**  Put that on that table right there.

21     All right.  Would you distribute the draft verdict form

22 and jury instructions to the parties?

23     **THE CLERK:**  I did.

24     **THE COURT:**  Okay.  The one matter that is still open

25 is the question of the dismissal of the unlawful prosecution

*13-13308; Jennings v. Fuller, et al.*

*Dismissal of the Unlawful Prosecution Claim*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 4

1    claim.  You filed a brief, Mr. Reising, and so did plaintiff.

2    You didn't file a reply brief, did you?

3         **MR. REISING:**  I did not file a reply to his

4    particular brief.  We have previously briefed that issue to

5    this court.

6         **THE COURT:**  I know you did.

7        Do you have anything that you want to add that is not

8    reflected in your Plaintiff's Memorandum Regarding Defendants'

9    Motion to Dismiss Plaintiff's Unlawful Prosecution Claims?

10         **MR. ERNST:**  No, thank you, Your Honor.

11         **THE COURT:**  The unlawful prosecution claim will be

12    dismissed.  The Court notes that it was against both Fuller and

13    Kennamer.  As against Kennamer, presumably it was based on

14    his -- the fact that he filed a report, against Fuller that he

15    filed a report and he testified at the preliminary examination.

16        The jury instruction on this claim says the following

17    elements:

18        -- Patrick Fuller and/or David Kennamer initiated or

19    continued a criminal prosecution against him."  The word is

20    frequently used -- also used is "influenced."  That's not in

21    our instruction.

22        -- A lack of probable cause for the criminal prosecution.

23        -- Jennings suffered a deprivation of liberty as a

24    consequence, and it was terminated in his favor.

25        Neither Fuller nor Kennamer initiated or continued a

*13-13308; Jennings v. Fuller, et al.*

*Dismissal of the Unlawful Prosecution Claim*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 5

1    prosecution and did not influence one as such.  This is all

2    pretty well spelled out in the motion papers at Pages 4, 5,

3    6 -- no, I'm sorry, 4 and 5, and the Court incorporates

4    defendants' argument there.

5        The Court also notes that the exhibit lists contained a

6    number of exhibits of reports of other officers, some of whom

7    are parties to this case and some of whom are not parties to

8    this case.

9        It also contains the transcript of the preliminary

10   examination and it also contains both the complaint and the

11   information, and it's clear from reading all of those

12   documents -- that I think the Court has a right to look at even

13   though they were not introduced in evidence but they are listed

14   and filed with the Court -- that what occurred was each of the

15   officers filed a report of their activities that evening in the

16   ordinary course of their work and then there was an amalgamated

17   report, I don't remember which one that was, and then there is

18   the, what is it, the document, the complaint signed by the

19   lieutenant as the complaining witness.

20            **MR. REISING:**  That's correct, Your Honor.

21            **THE COURT:**  What?

22            **MR. REISING:**  That's correct, Your Honor.

23            **THE COURT:**  All right.  That document is prepared by

24   the assistant prosecutor, and it's clear that what occurred

25   here was that the reports of the events of the evening were

*Dismissal of the Unlawful Prosecution Claim*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 6

1    turned over to a lieutenant or somebody in the detective bureau

2    and then he compiled a summary of everything, turned it over to

3    the prosecutor, the prosecutor then prepared the complaint, of

4    which the lieutenant was the complaining witness.  It lists

5    Fuller and Kennamer and one other officer as witnesses, and

6    when you put all of that together, it cannot be said that any

7    reasonable jury could find that Kennamer and Fuller influenced

8    the prosecution.

9         The prosecution came about -- I think the complaint is a

10   year later than the event in question.  Am I right about that?

11             **MR. SCOTT:**  It was just a couple months later,

12   Your Honor.

13             **THE COURT:**  A couple months later, and it followed

14   the ordinary course.  As the record stood before the examining

15   magistrate, there was probable cause.

16        Now, the plaintiff cites *Sykes*, S-y-k-e-s, *v. Anderson*,

17   625 F.3d 294, and the citation of that case is classic.  You

18   find statements of law that favor your position, and you

19   attempt to persuade the judge by those statements of law

20   without regard to the context in which the statements are made

21   by the court.

22        And the record in that case is far different because you

23   have two, two Detroit police officers who deliberately -- who

24   lied.  I don't know whether they deliberately or not.  It's

25   one of the few occasions in which I think you can say that

*13-13308; Jennings v. Fuller, et al.*

 1   somebody lied because their version of what took place and

 2   which the prosecution was based was so far different than the

 3   events in question.

 4        So for that amalgam of reasons I'm going to -- you folks

 5   use unlawful prosecution, most of the cases use malicious

 6   prosecution, and just out of force of habit the Court calls it

 7   malicious prosecution, but whatever you called it, that claim

 8   in this case has been dismissed for the reasons just stated.

 9        Now, do we have your list of witnesses and exhibits?

10        **MR. ELLIOTT:**  Yes.

11        **THE COURT:**  Okay.  Now, my custom is to give each

12   side an hour, with the plaintiff opening and reserving time in

13   its opening for closing.  So with that --

14        **MR. ERNST:**  Judge, this is, as I indicated yesterday,

15   a housekeeping matter.  We didn't formally move to admit the

16   medical records, Exhibits 19, 20, 21 and 22.

17        **THE COURT:**  What?

18        **MR. ERNST:**  Moreover, those videos that we have been

19   watching, I don't think they have formally been admitted into

20   evidence so we just would move to admit those exhibits.

21        **THE COURT:**  Fine.  Those are all admitted.

22        **MR. ERNST:**  Thank you, Your Honor.

23        **THE COURT:**  I have been furnished two exhibit lists,

24   and all of the exhibits on each list have been admitted.

25        **MR. REISING:**  Your Honor, in that same vein, we list

*Dismissal of the Unlawful Prosecution Claim*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 8

1  Dr. Dale Hanson's file marked during his deposition as

2  two different exhibits, Exhibit 1 and Exhibit 2 by plaintiff's

3  counsel, and we would move for the admission of those

4  documents.

5          **THE COURT:**  Well, they are on your list, right?

6          **MR. REISING:**  Correct.

7          **THE COURT:**  I said everything on both lists is

8  admitted.

9          **MR. ERNST:**  But, Your Honor, the records of

10  Dr. Hanson had a bunch of drug references that the Court

11  previously --

12          **THE COURT:**  Well, let me do this.  They are admitted

13  for this purpose.  Have you got your book of exhibits?

14          **MR. ELLIOTT:**  Yes, Your Honor.

15          **THE COURT:**  Put your exhibits up here.

16     Okay.  Before I give these lists to the jury both of you

17  should examine the other's package of exhibits, and if you have

18  any objections to anything that are in any of the exhibits that

19  are on the clerk's bench, we'll deal with it.

20          **MR. ERNST:**  Very well.

21          **THE COURT:**  Okay.  So, with that, I'm going to call

22  in the jury.

23     (Jury in at 9:15 a.m.)

24          **THE COURT:**  Come in, folks.

25          **A JUROR:**  Your Honor, can I go back?  I forgot my

*13-13308; Jennings v. Fuller, et al.*

*Dismissal of the Unlawful Prosecution Claim*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 9

1    glasses.  Can I go back and got them?

2              **THE COURT:**  I'll think about it.  Yes.

3          Be seated.  Okay.

4          All right.  There should be on your seat a verdict form.

5    Is there?

6          Here is how we are going to proceed.  First I'm going to

7    acquaint you with the verdict form.  This is the form that you

8    will have to fill out after you complete your deliberations.

9    It has the questions you are required to answer.

10         And then we're going to hear final argument.  Each side

11   has up to one hour.  The plaintiff, because the plaintiff has

12   the burden of proof, as I will explain to you, can divide that

13   hour into opening and closing.  After the plaintiff gives you

14   their opening argument, the defendant will give closing

15   argument -- then the defendant will give his closing argument,

16   and then the plaintiff has a right to reply.

17         Then you will be instructed on the law of the case.  You

18   will each have a copy of the instructions, but I'm required to

19   read them to you.  So you don't have to take notes during the

20   instructions because you will have a copy of them so you can

21   follow my voice.

22         When the parties argue to you, they can't say "the judge

23   will tell you."  They can say "the judge may tell you" because

24   judges reserve the right to change their mind until the last

25   possible moment.  Okay?

*Dismissal of the Unlawful Prosecution Claim*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 10

1      Now, here is the verdict.  It's divided into several

2  parts.

3      Verdict.  There is one count in this case.  That's the use

4  of unlawful force.  And there are five questions, one as to

5  one of each of the party defendants.  "Was Patrick Fuller's use

6  of force against William Jennings unlawful?"  There's that same

7  question for each of the five.  I will define for you in the

8  instructions "use of force" and "unlawful."

9      Then, as to anyone you answered yes on this part, you go

10  to Causation.  "1.  Did William Jennings suffer damages as a

11  consequence of the use of unlawful force by Patrick Fuller?"

12  Again, it's the same question as to the other four.  I will

13  define in the instructions the meaning of "damages" and "as a

14  consequence," et cetera.

15      II, Amount of Damages.  That's divided into two parts.  If

16  you have answered yes as to at least one of the defendants both

17  on unlawful use of force and causation, then you answer these

18  questions.

19      "1.  The amount of damages William Jennings suffered as a

20  consequence of the use of unlawful force from September 18,

21  2010 to the present is:"

22      "The amount of damages William Jennings is likely to

23  suffer in the future as a consequence of the use of unlawful

24  force is:"

25      Dollar amount in each case.

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 11

1     Then you go to Punitive Damages, and you answer this part

2   only if you have awarded damages in the preceding part as to

3   each one.

4     "1.  Was the conduct of Patrick Fuller toward

5   William Jennings malicious, wanton or oppressive?"

6     You answer that question as to each of the five defendants

7   to whom you found earlier, and I will define for you in the

8   instructions what the meaning of "malicious, wanton or

9   oppressive" is.

10     That's your verdict, and at the end you will note -- oh,

11   there's two parts to that.  Anyone that you find is subject to

12   punitive damages, then you have to assess the amount, and I

13   will tell you how you go about that.  Then your foreperson

14   signs it.

15     I'm going to tell you in the instructions your answers to

16   each and every one of these questions must be unanimous,

17   one way or the other, it's a yes or no, and as to the dollar

18   amount.

19     With that, Mr. Ernst, you may proceed with your final

20   argument.

21     **MR. ERNST:**  Good morning, ladies and gentlemen.

22   First of all, on behalf of Mr. Jennings, Mr. Elliott and

23   myself, I would like to thank you for your time and your

24   attention in this case.  And I apologize for some of the delays

25   that you had to endure because of my inefficiency with

*13-13308; Jennings v. Fuller, et al.*

 1    technology, among other things, but I really appreciate what

 2    you did and I know it's a lot of sacrifice and I hope that at

 3    the end of this trial that you will feel that it was

 4    worthwhile.

 5         The founders of our country created a Constitutional

 6    democracy in which the Constitution is the supreme law of the

 7    land.  And the Constitution provides certain rights that are

 8    guaranteed to every citizen of our country, and these rights

 9    are so precious and their guarantee so important that the

10    rights are not entrusted to any branch of the government.  They

11    are not entrusted to the legislature.  They are not entrusted

12    to the executive.  They are not even entrusted to the

13    independent judiciary.  They are entrusted to you, the people,

14    through the Constitutional right of a jury trial.

15         And in that sense you are the ultimate guardians of the

16    Constitution and of those rights that it embodies, and no one,

17    not the Supreme Court of the United States, can substitute

18    their judgment for the facts of this case for your judgment

19    that you make when you go back into that jury room.  You have

20    the final say, and you have the right to enforce the

21    Constitution against every, every State actor, every Government

22    actor, including the Genesee County Sheriff's Department.

23         Now, when I first got up here and talked to you at the

24    very beginning of this trial, I told you that you are going to

25    find out that Mr. Jennings suffered severe, permanent,

1    life-altering injuries at the hands of the defendants in this

2    case, and I told you that the defendants' story or version

3    about how those injuries occurred would be drastically

4    different than what's showed on the videotape that's in

5    evidence, the objective evidence of this case, and I asked

6    you -- and I told you, rather, at the beginning of this case

7    that at the case's conclusion I would ask you to return a

8    multimillion-dollar verdict for the permanent injuries and the

9    severe injuries that were inflicted on Mr. Jennings.

10        And I also told you about my journey into understanding

11   what happened in this case, and that was that I had all the

12   versions of the police, the police reports and everything, and

13   then I saw the video.  And your journey is somewhat the

14   opposite.  You saw the video first, and you heard the video,

15   the videographer, the forensic videographer put the video in

16   and tell you about how he analyzed it frame for frame, and then

17   you heard the defendants' version.

18        And I asked you at the beginning of the trial whether you

19   could set aside your bias that most of us, including myself,

20   generally have for the police, that when we see somebody pulled

21   over on the side of the road they probably did something wrong

22   and the police were right, and I asked you if you could put

23   aside that bias and rely on your own eyes and your own

24   objective view of what happened.

25        I want you to understand that this is not a case against

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 14

1   law enforcement.  It's not a case against the police.  It's a

2   case about -- it's a case against individual men who abused

3   their authority under the color of law, and it's about a case

4   where five men who are extremely large, trained in self-defense

5   and pressure point control tactics and other martial arts, beat

6   a defenseless man half their size most of the time when he was

7   in handcuffs.

8        The first thing that we saw in the video was we saw

9   Mr. Jennings go into the Sheriff's Department, and the

10  defendants have maintained that he was noncompliant.  In fact,

11  in his opening statement Mr. Reising said he was a wild man,

12  that was his words, the entire time that he was in there.

13       But let's, let's think about what we saw.  Mr. Jennings

14  came into the police station, he sat down calmly on a bench,

15  and he proceeded to comply with literally a dozen or so

16  commands and follow their orders.

17       He followed all of the commands of the arresting officer,

18  Officer Hartner.  He sat down when he told him.  He allowed him

19  to check his pockets.  He answered booking questions.  He even

20  agreed to, he consented to a blood draw, and when Mr. Jennings

21  was sitting on the bench and Officer Hartner, the arresting

22  officer, told him to stand up so he could get his personal

23  belongings out of his pockets, Jennings did.  He did everything

24  he was told.

25       Then Defendant Fuller walks in.  He told Jennings to stand

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 15

1   up.  Jennings was handcuffed, and Jennings put his head against

2   the wall so he could get uncuffed.  And incidentally that's

3   what Ken Katsaris, the police procedure expert, the Sheriff

4   from Florida, that's what he told you is the ideal way to

5   search a person, and Mr. Jennings complied.

6        But Defendant Fuller told him that he was going to take

7   the handcuffs off.  So Mr. Jennings stood there with his head

8   against the wall.  He let him take the cuffs off.  He put his

9   one hand on the wall, as ordered, then he put his other hand on

10  the wall as ordered.

11       And then Defendant Fuller began to pat him down.  And

12  then, as he began to pat him by the crotch area, Mr. Jennings

13  removed his hand for a split second and put it back on the

14  wall.  You are going to see the video, and you are going to

15  note that it's the same, the same reading on the video.  I

16  think it's 5:14 is when the hand is off the wall, and then when

17  Fuller first takes him down, it's all within the same second on

18  the video.

19       So even before Jennings took his hand off the wall,

20  Officer Fuller told him to take off his sweatshirt.  He did

21  that.  He said to take off his belt.  He did that.  He complied

22  with every single thing that he was ordered to do.

23       And Mr. Katsaris, the Sheriff, and even Deputy Kennamer,

24  said the more times somebody complies with you the more the

25  benefit of the doubt you give them because, you know, if

1   somebody is unruly and they won't do what you say and they

2   start not complying you might take different action, but up

3   until the point that he removed his hand for a split second, he

4   had done everything he was told and he put his hand back on the

5   wall even before the lapse of a second.

6        Now, Mr. Jennings, Mr. Jennings' punishment for taking his

7   hand off the wall for a split second was what?  What was the

8   consequence that he got for that?

9        Defendant Fuller said he told him twice to put his hand

10  back on the wall.  I invite you to do a little experiment when

11  you're back in the jury room.  Take out a stopwatch and say

12  "put your hand on the wall" as fast as you can and see how long

13  it takes, and then watch the video and you will see that

14  Jennings took his hand off the wall and put it back before that

15  could even be said.  But what they, the defendants, have told

16  you was that they told him twice and they gave him a chance to

17  comply with the order, with both orders before they took him

18  down.

19       And you will see that he just, as soon as Jennings removed

20  his hand, even after he put it back, Fuller immediately smashed

21  him into the wall, pushed his face into the wall.  Jennings

22  turns his head so his nose doesn't get crushed, and then he's

23  slammed down into a metal bench and then Fuller pushes his head

24  down into the bench with both hands and Jennings starts

25  screaming.

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 17

1      And then Defendant Kennamer comes in and grabs his arm,

2  holds it out straight and pushes on his elbow like an arm bar,

3  and then they say Mr. Jennings should have put his hands behind

4  his back?  How could you put your hands behind your back if

5  someone is holding one of your arms straight in an arm bar and

6  another man is on top of you?

7      So then Jennings is pulled down to the ground and the

8  officers get on top of him, and then Officers Wing and White

9  come in and they get on top of him.  And Mr. Jennings continues

10  to scream the whole time, and according to him, he says that he

11  can't breathe.

12      So, as he's laying on the floor, you see -- with Officers

13  Wing and White, then you see Defendant Nuckolls, Lieutenant

14  Nuckolls, the ranking officer, he calmly walks in and looks

15  around and bends down and sprays Jennings directly in the face

16  from point-blank range with pepper spray.

17      At that point a couple of the officers get off Jennings.

18  He's handcuffed, and he's just lying there.  He's virtually

19  motionless until Defendant White takes his hand and grinds his

20  face into the ground, and when Jennings reacts to that action,

21  when he reacts in pain from having his face ground into the

22  cement, they call that resisting.

23      (Video excerpt played.)

24          **THE JURORS:**  Mr. Ernst, we can't see.  Thank you.

25          **MR. ERNST:**  At this point Officer Wing grabs Jennings

1   by the handcuffs and Officer White grabs his arm and they lift

2   his arms up like this and rip Jennings up to his feet.

3        Then Officer Wing gets Jennings in what's called an escort

4   hold.  When Jennings, his arms are like this, he puts his arm

5   under here, under Jennings' arm on his shoulder and he grabs

6   the other arm near his handcuffs.

7        Officer White grabs Jennings by the right arm, and they --

8   Officer Wing takes a step back and has position and turns him

9   into the wall while White, his hand is over here, pushes him

10  into the wall, and Jennings hits his head on the wall because

11  he's handcuffed and he can't protect his face.

12       When White pushes him, and I ask you to watch this on the

13  video, you will notice that Jennings' arms go like this.  His

14  right arm like this goes like this.  If Officer White was

15  pulling on Jennings to prevent him from going to the wall, his

16  arm would be like this, but it's not, it's like this, and

17  that's because he got pushed.

18       (Video excerpt played.)

19            **MR. ERNST:**  And you will have the video when you're

20  in the jury room or you will be able to access it, and you can

21  stop it wherever you want and check and see.  And everybody

22  agrees that Mr. Jennings hit the wall there except Darrell

23  Ross, who said he didn't.  The question is did he fling himself

24  into the wall or did somebody push him because the defendants'

25  testimony is that Jennings launched himself backwards into the

1   wall even though he hit face first.

2       Now, the officers tell you that Jennings is resisting the

3   entire time, and every time we ask them to point it out they

4   say you can't see it on the video, you can't see him resisting.

5   But we had a forensic videographer examine every single frame

6   of this to see if Jennings is resisting, and at no time can you

7   see it.

8       So, in other words, the police want you to believe what

9   they say instead of believing the video.  But you saw the

10  video, and you can have a choice of believing your own eyes of

11  what you see on the video or believing what the police officers

12  tell you, what the sheriff's deputies tell you when the video

13  isn't playing.

14      For example, the officers tell you Jennings hurled himself

15  into the wall.  They tell you Fuller and White never pushed on

16  his head.  Nobody ever pushed on his head.  Officer Fuller said

17  that in the next frame that we see that when he put his hand

18  under the chin of Jennings he did it to protect Jennings from

19  bashing his own head into the metal door frame.  So, in other

20  words, this action, where he puts his hand under there and

21  slams him to the ground, was done for Jennings protection.  So

22  now we're going to see the video and see if that appears to be

23  true.

24      (Video excerpt played.)

25          **MR. ERNST:**  You saw that video.  You can believe your

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 20

1   own eyes or you can believe what the police officers tell you

2   when that video is not playing.

3        Then Mr. Jennings, after he's taken down by Defendant

4   Fuller, is taken to a safety cell.  There you can see Jennings

5   lying face down.  You can see his head, you can see his feet,

6   and he's virtually motionless.  He's handcuffed again, as he

7   was in that last picture.

8        And the defendants tell you that in the safety cell

9   Mr. Jennings was not being compliant.  He's laying there

10  facedown handcuffed.  What more compliance can he possibly

11  give?

12       And defendants claim that Mr. Jennings is constantly

13  "kicking, spitting and biting" and that he's being combative,

14  you just can't see it on the video.  Again, our videographer

15  analyzed it frame by frame, and there's no evidence that

16  Mr. Jennings ever kicked a deputy, that he was spitting at

17  them, and the only evidence of any biting is when Fuller stuck

18  his hand over his mouth, stuck his hand over Jennings' mouth

19  after Jennings had been pepper-sprayed and was struggling to

20  breathe.

21       And this is what I don't understand.  Why would you take

22  the handcuffs off of somebody who was so combative?  Because

23  that's what the defendants say, they were trying to take the

24  handcuffs off of Jennings in safety cell 6.  And why would you

25  take the handcuffs off somebody if they presented a danger to

1    you, if they were combative and you were worried about your own

2    safety?

3        And they also said they wanted to search him because he

4    might have contraband or weapons.  Why would you take the

5    handcuffs off of somebody that you thought might have

6    contraband or weapons?  You can search him with the handcuffs

7    on.

8        And they also said that they wanted to take the handcuffs

9    off because he presented a danger to himself if they left the

10   handcuffs on.  Why would you present more of a danger to

11   yourself if you were handcuffed than if your hands were free?

12   If you wanted to hurt yourself, you could use your hands.

13       But this is what I really don't understand.  They said

14   that the safety cells are designed for people who might injure

15   themselves.  So if they are designed for people who might

16   injure themselves, why would you pull him out of the safety

17   cell because they might injure themselves?

18       And they said that the safety cells were designed for

19   combative, unruly inmates.  Well, why would you pull somebody

20   out of the safety cell if they were combative and unruly?

21   Those are all the reasons that you put him in there and leave

22   him in there.

23       (Video excerpt played.)

24       **MR. ERNST:**  Now I want to talk about the restraint

25   chair.  There is no legitimate reason to take Mr. Jennings out

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 22

1   of safety cell 6 and put him inside -- and put him in a

2   restraint chair when he was already handcuffed and in a place

3   that's designed for people who might be a danger to themselves

4   or might be unruly.

5        This was not done to protect Mr. Jennings.  It was not

6   done to protect the defendants because there was no legitimate

7   reason to take him out of the safety cell in the first place.

8   There's only one potential reason that this was done, and that

9   was to punish Mr. Jennings.

10       And while he was still handcuffed and after he had been

11  pepper-sprayed, he's thrown into a restraint chair, and then

12  Defendant Fuller puts his hand over his mouth because

13  supposedly he's spitting.  And you heard Mr. Katsaris say you

14  never do that.  You don't put your hand over somebody's mouth

15  who has been pepper-sprayed in the face, and it's only common

16  sense that you don't do that.

17       But the defendants say that Mr. Jennings, because he was

18  struggling in that scenario and because he was having a

19  physiological response to the pain and the pepper spray, that

20  that equals resisting.  And they claim he was kicking, but

21  there was nobody near his feet, and even though it's plain that

22  this didn't happen based on the video, they claim that Jennings

23  was biting, kicking and spitting.

24       But, again, the videographer looked at this frame by

25  frame, and nothing like that happened.  And you saw it, too.

1   You saw the video in the hallway when he was put in the

2   restraint chair, and again, you can believe your own eyes or

3   you can believe what the defendants tell you happened when the

4   video is not playing.

5        And then we have the taser incident, and timing is very

6   important here because what is clear is that Defendant Fuller,

7   who was kind of milling about there when Mr. Jennings was on

8   the ground after they threw him down from the restraint chair,

9   he walks over to get the restraint bed before the taser is

10  applied.

11       So, in other words, Lieutenant Nuckolls had already

12  decided that they were going to put him in a restraint bed and

13  had already given the command so what possible reason is there

14  to tase him at that point?  He's going to get put in a

15  restraint bed and we are just waiting for Deputy Fuller to

16  wheel it back down, but instead they decide they are going to

17  tase him and they pull up his shirt and make sure they can get

18  it on his bare skin just to make sure it's especially painful.

19       And then Mr. Jennings is put in leg shackles and he's

20  carried like a hog-tied animal over to the restraint bed, and

21  they say that while they are carrying him with all of those

22  officers on four sides of him and he's handcuffed behind his

23  back and leg-shackled and pepper-sprayed in the face with a

24  spit mask over his face that he's still resisting.

25       So, according to the defendants, if you react to pain, if

1  you react to pepper spray, if you react to being carried like a

2  hog-tied animal where the weight of your body is pulling on

3  your limbs, if you react to that pain, you are resisting.

4      And, once again, the resisting they claim is not depicted

5  anywhere in the video.  It's all in -- you just have to believe

6  their testimony that he was resisting.

7      Now, Mr. Jennings is taken over to the restraint bed, and

8  despite the clear dictates of their own policy that says under

9  no circumstances are you to be placed facedown after you've

10 been pepper-sprayed, that's precisely what they did.  They put

11 him in the restraint bed facedown, and they even got on top of

12 him and kneeled on him while he was facedown and while he

13 was -- after he had been pepper-sprayed and while he had a spit

14 hood over his face so they could tighten up the restraints.

15     And you heard about the Seattle man who died from that

16 kind of circumstance, when you have a spit mask and you have

17 been pepper-sprayed and people are on top of you when you are

18 facedown and restrained.  And that's -- it's only common sense.

19 If you are in that position and people are on top of you, you

20 can't breathe.  Your diaphragm can't expand, all your organs

21 are pressed down, and that's why you don't do it.

22     But then Lieutenant Nuckolls claims that he was allowed to

23 violate that policy that says under no circumstances because

24 Mr. Jennings had been decontaminated, and he says that that

25 occurred when Mr. Jennings was facedown on the restraint bed.

1     But think about that.  For one thing, he had already put

2  him facedown before he was decontaminated so that's a clear

3  violation of the policy and it doesn't make sense and it's just

4  a post hoc fabrication to try to justify what was clearly --

5  what he clearly wasn't allowed to do.

6     But, more importantly, that didn't happen.  As you could

7  see in the video, the only thing that Nurse Stephanie did was

8  she reached in with one hand, lifted the spit mask up and

9  looked at Jennings and put the spit mask down.  She was there a

10  total of a couple seconds and then walked away.

11     And that's not how -- Lieutenant Nuckolls said that she

12  wiped him down with a 4x4 cloth, which didn't happen.  And,

13  incidentally, when Nuckolls was asked at his deposition that

14  precise question, he said, "To tell you the truth, I honestly

15  didn't see anything."  But when he got here and he had to

16  explain why he restrained him against the policy, he changed

17  his testimony 180 degrees and said, "Oh, Nurse Stephanie wiped

18  him down."

19     And then we called Nurse Stephanie, and what did she say?

20  She looked at that video and said, "No, I didn't wipe him down

21  there, I didn't decontaminate him, I decontaminated him in

22  safety cell 6."

23     And then I said, "Really?"  And I showed her the blood

24  draw that occurred there and said, "Is that you?"  And she

25  started to say yes, but then she realized that that person had

1   red pants on and she didn't and so she said, "Oh, no, that's

2   not me."

3       But there was nobody else in safety cell 6.  So, in other

4   words, if the Nuckolls' lie wasn't enough, this nurse came in

5   here -- and you saw her on the stand -- and when I asked her if

6   she wanted to change her testimony since there's no video

7   showing her in safety cell 6 and there's no evidence that she

8   decontaminated him at any point in time, she sat there for like

9   a minute and said -- and I said, "Ma'am?"

10      And she said, "I'm thinking about it."

11      You saw the video and the restraint bed.  You can believe

12  your own eyes or you can believe what they tell you when the

13  video isn't running.

14      Then, after Mr. Jennings is humiliated, after he's

15  pepper-sprayed, after he's sitting there like an animal with a

16  spit hood over his face, they wheel him into safety cell 6 and

17  they leave him there for 2 1/2 hours unattended with, with

18  pepper spray on his face that has never been washed off.

19      And they leave him there for 2 1/2 hours, and no one ever

20  comes in to check on him except to do a blood draw because the

21  only thing they are concerned with is getting a drunk driving

22  conviction and punishing him instead of caring about that he

23  might be in some danger given what just happened to him.

24      Now, you saw the -- I'm going to, I'm going to -- I just

25  want you to look at safety cell 6 before the incident and see

 1   if Jennings is kicking, biting and spitting at the deputies as

 2   they claim.

 3       (Video started and continued while the following

 4       proceedings occurred.)

 5       **MR. ERNST:**  And I would ask that you pay careful

 6   attention to his feet, which you can see sticking out from

 7   under the deputies, and his head, which remains virtually

 8   motionless the entire time.

 9       (Video stopped.)

10       And now I would like for Mr. Elliott to show you what

11   Mr. Jennings looked like when he was in the safety cell after

12   he had been restrained facedown in the restraint bed.

13       (Video excerpt played.)

14       **MR. ERNST:**  Mr. Jennings remained in that position

15   for 2 1/2 hours, 150 minutes.  And he has a spit mask on and

16   he's bleeding from the nose even according to the defendants,

17   and he's been pepper-sprayed in the face.

18       And what you see there, what you see there, ladies and

19   gentlemen, is someone that's panicked and afraid that he might

20   suffocate.  In fact, Mr. Jennings was so panicked and afraid

21   that he might suffocate that he bit through the spit mask and

22   chipped his tooth.  He bit through the spit mask so he could

23   breathe.

24       When any person, when any human being is suffocating, they

25   move around and try to breathe, and medical professionals call

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 28

1   it an autonomic response, which is an uncontrollable struggle

2   to breathe, but these defendants call it resisting because they

3   testified that Mr. Jennings continued to resist even in the --

4   even in safety cell 6 after he had been tied down like an

5   animal and left there for 2 1/2 hours.

6       As a result of these events, Mr. Jennings suffered severe

7   permanent injury that affects him every day and that has

8   altered his life.  And what the defendants want you to believe

9   is that Mr. Jennings was the cause of those injuries because

10  when they inflicted pain and he responded to that pain he was

11  resisting, and when that resistance occurred they needed to

12  inflict more pain.  And when he responded to that additional

13  pain and pulled away, that constituted additional resistance,

14  which justified additional pain, additional pain-compliance

15  tactics.

16      So the reaction to pain, according to the defendants, is

17  known as resisting, and the defendants are allowed -- that that

18  resisting justifies the use of additional pain-compliance

19  techniques.

20      And then, after all of this was over, the defendants had

21  the gall to file a criminal complaint and say they were the

22  victims of Mr. Jennings.  They were the victims of

23  Mr. Jennings' resistance.

24          **MR. REISING:**  Your Honor, I'm going to object to this

25  because that claim has been dismissed.

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 29

1    **THE COURT:**  The jury understands what the case is

2    about, and they understand the difference -- I'm going to tell

3    them about lawyers' argument.

4        You go ahead.

5        **MR. ERNST:**  Thank you, Your Honor.

6        Now, Mr. Jennings has basically three severe permanent

7    injuries.  The first one is Post-Traumatic Stress Disorder.

8    It's an injury that generally is permanent, and it can be

9    severe even though it's not totally disabling.  People that

10   have Post-Traumatic Stress Disorder can function, sometimes at

11   relatively high levels, but that doesn't mean they don't

12   suffer.

13       And Post-Traumatic Stress is caused by an overwhelming

14   fear of death in a situation that you basically don't have

15   control over the circumstances, and that's exactly what

16   Mr. Jennings went through.  Even, even the defendants' doctors

17   admit -- even the defendants' psychologist, I should say,

18   admits that this is the type of event that causes

19   Post-Traumatic Stress Disorder.  And the symptoms are

20   unpredictable and episodic, and they can be just as intense

21   even years after the accident and just as intense for the rest

22   of your life.

23       And there's generally several symptoms that are closely

24   associated with it.  One of them is avoidance, and avoidance

25   generally means that the defendant or the injured person avoids

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

1   situations that cause any memories of the trauma, and it often

2   means that those people do not seek medical attention or

3   psychological or psychiatric treatment because it reminds them

4   of the trauma.

5       And it's also accompanied by panic attacks, anxiety, and

6   paranoia is a very common symptom of it, too.  There's also

7   nightmares and night terrors, and it can lead to other

8   illnesses.  They call it, the psychologists and psychiatrists

9   call it co-morbidities, and one of those co-morbidities is

10  depression and anxiety.

11      And these are the types of symptoms that Mr. Jennings has

12  and that he will have for the rest of his life are the odds.

13  It's more likely than not that he will have those kinds of

14  symptoms for the rest of his life.  Are they there all the

15  time?  No, they are not, but they are there occasionally, and

16  that's the nature of the beast.  That's the nature of the

17  illness.

18      Now, you know, Mr. Jennings, you heard him on the witness

19  stand in his rebuttal case when he recorded his conversation

20  with Dr. Stucky, and he was asked why did you record that

21  conversation?  Why did you do that?  Did your lawyers tell you

22  to do it?

23      I'll tell you why he did it.  He did it for the same

24  reason that he built a safe room in his basement.  He did it

25  for the same reason that he installed a 14-camera system

1   looking to keep track outside of his house.  He did it for the

2   same reason that he left his dogs, his dogs outside at night

3   after this event happened.  Because he's paranoid, and he's

4   unable to trust anybody, including Dr. Stucky.

5       And that's what his mom told you, that he has those kind

6   of symptoms, that's what his girl friend told you, and that's

7   what his doctor told you.  And can you imagine going through

8   your life not being able to trust anybody, what that must be

9   like?

10      And one of the other points that I would like to make is

11  you heard Dr. Stucky say Jennings made an honest effort and

12  answered all the questions honestly, but you know who didn't

13  answer all of the questions honestly?  Dr. Stucky.

14      And I happen to have the transcript of what Dr. Stucky

15  testified to, and he was asked whether Mr. Jennings had

16  Post-Traumatic Stress Disorder, and he agreed with

17  Dr. Shiener's diagnosis of the disorder and this is why.  He

18  said -- when asked to name some of the criteria, he said:

19      "So Post-Traumatic Stress Disorder requires multiple

20  criteria.  One is the person is usually actively avoiding

21  things that remind them of the trauma.  He did express some of

22  those symptoms, although they weren't as significant as they

23  had been initially after the event."

24      Now, this is what he said with regard to the nightmares:

25      "The other is what's called reexperiencing.  This is where

1  somebody would be having active nightmares or flashbacks.

2  Again, Jennings had reported he had those in the past but was

3  not having them anymore."

4      And then this is what Mr. Jennings said:

5      "Q.  Did you ever have nightmares or anything like that?

6      "A.  Yeah.

7      "Q.  What are the nightmares about?

8      "A.  A lot of them I just -- I don't remember.  I just

9  wake up and sweating and my heart is pounding.  I sit and try

10  to remember them and just -- I can't."

11      So Dr. Stucky lied about whether Jennings had reported

12  nightmares, and that's because if he admits it then he cannot

13  come to the conclusion that Jennings does not have PTSD.  So

14  that was his way of trying to differ with Dr. Shiener, by lying

15  about whether Jennings reported having nightmares currently,

16  and Jennings clearly did and he taped it, but Dr. Stucky got up

17  there and said he didn't and that's why he doesn't have PTSD.

18      And I -- one of the things, one of the other things that

19  really comes across from Mr. Jennings is he doesn't feel safe

20  anywhere, and I wonder what that must feel like.  I wonder what

21  it must feel like to especially not feel safe around law

22  enforcement officers, the people who are supposed to protect

23  you, and Jennings doesn't even feel safe in his own house

24  because he has to build a safe room, install cameras and leaves

25  his dogs outside.

1      And those are the types of injuries, psychological

2   injuries that aren't easy to see and don't appear every day and

3   are to some degree hard to understand but that impact a person,

4   dramatically impact a person for the rest of his life.  His

5   life is changed, and it will never be the same.

6      Now, he also has a couple permanent physical injuries that

7   are debilitating.  Now, first of all, he has a shoulder injury

8   and he has pain there.  Now, every doctor, Dr. Hanson and

9   Dr. Kohen, agreed that what they saw on the video could cause a

10  shoulder injury.  Even the defendants' expert that they paid to

11  reach an opinion agreed with that.

12      So at first both Dr. Kohen and Dr. Hanson, Mr. Jennings'

13  unpaid treating physician, said that they thought he would --

14  based on his symptoms and his range of motion, they thought he

15  had a torn rotator cuff.  But Dr. Hanson ordered an MRI, and

16  the MRI showed that he did not have a torn rotator cuff so he

17  ordered that Jennings go to physical therapy.

18      And his PT therapist diagnosed him with a winged scapula,

19  which was explained by Dr. Hanson, and it's basically when your

20  shoulder blade, the nerve running to your shoulder blade

21  becomes compromised and it won't stay glued to your back, it

22  won't stay glued to your muscles.

23      And then that particular diagnosis from the PT, from the

24  physical therapist, was confirmed by Dr. Hanson, and he also

25  talked about Mr. Jennings' prognosis and he said Mr. Jennings

1  can expect constant pain basically every day for the rest of

2  his life.

3       Now, again, it might not always be overwhelming, disabling

4  pain, but that pain still impacts a person daily, and it cannot

5  be corrected by surgery and it cannot be corrected by therapy.

6  According to Dr. Hanson, it can only be managed by the use of

7  pain medication.

8       And being in constant pain wears on a person.  It, it has

9  affects just beyond the physical.  It wears people down over

10  time, and it wears them down emotionally and psychologically.

11  And they get irritable and they become disgruntled, and

12  oftentimes are hard to deal with.  That's what being in

13  constant pain does to somebody.

14       And you know what else that does for Mr. Jennings?  It

15  reminds him of the night, it reminds him of the event because

16  that's when his shoulder was injured.  So it's not hard -- it

17  shouldn't be hard to understand why Mr. Jennings would avoid

18  seeking treatment for injuries that remind him of what happened

19  that night because that's part of his Post-Traumatic Stress

20  Disorder.

21       And, finally, with regard to his permanent injuries, he

22  has permanent eyesight disability.  Before Mr. Jennings entered

23  that jail his eyes uncorrected by glasses were near -- he had

24  near-perfect vision.  He was 20/25 in one eye and 20/20 in the

25  other, I believe.  20/25 in the left.  That's his weaker eye.

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

1   You saw Mr. Jennings on the video.  He wasn't wearing glasses

2   when he walked in there.

3       Now, after this, he has traumatic cataracts in both eyes.

4   And, again, both Dr. Waters, Mr. Jennings' treating eye doctor,

5   who isn't paid to give opinions, diagnosed him with traumatic

6   cataracts, and Dr. Byrd, the paid doctor, the doctor defendants

7   paid to give them an opinion, agrees that he has traumatic

8   cataracts.

9           **THE COURT:**  You have ten minutes.

10          **MR. ERNST:**  Okay.  And they also agree that there's

11  no other evidence explaining how these traumatic cataracts

12  occurred other than the injuries Mr. Jennings received on the

13  night of this incident.

14      And Dr. Waters testified that based on the guides to the

15  evaluation of permanent impairment put out by the American

16  Medical Association that Mr. Jennings has a 71 percent

17  permanent impairment if there is successful bilateral cataract

18  surgery and that he's severely visually impaired now.  In fact,

19  he's basically blind in his left eye especially if there's any

20  glare like from headlights or from the sun or anything like

21  that.  So, as a result of the injuries to his face,

22  Mr. Jennings is now permanently visually impaired.

23      Now, Dr. Byrd said -- I was having a little trouble

24  understanding it, but he says he can correct it by putting some

25  lenses in there, and he can make it so he can read if you have

1   one eye for close so you can read something and then one eye

2   for far like if you are driving or something.  That seems to be

3   a little hard to believe, that some person would agree that

4   they are going to be like this to read and like this to drive.

5   I didn't exactly understand it, but Dr. Byrd didn't even

6   discuss the American Medical Association tables and findings

7   regarding eye disabilities.

8        And Dr. Byrd is paid to form an opinion, paid to give

9   testimony, Dr. Waters is not, and I would just ask you, if you

10  had an eye problem, which one of those two doctors would you go

11  to?

12       Now, finally -- and then I'm going to start talking about

13  how I think you should compensate Mr. Jennings for his

14  injuries, but Mr. Jennings had some acute injuries, as they are

15  called, in other words, injuries that basically resolved within

16  the first six weeks.

17       He had facial fractures, and those were proven by the

18  multiplane CAT scan.  And this idea that Mr. Jennings somehow

19  doesn't have -- or these injuries, these facial fractures

20  weren't caused, weren't caused by what happened in the jail

21  because the original one doesn't show it but only the second

22  one, well, the second one has multiplanes and it's a better

23  one, but are the defendants really trying to contend that

24  Mr. Jennings went and beat himself up after he got out of the

25  jail and that's how he got those injuries or that there's some

1   other cause for them?

2       He also has -- and you can look at the pictures which we

3   have put into evidence that show the severity of his facial

4   injuries.

5       He also had, he also had injuries to his ribs, a

6   concussion, headaches, shoulder injury, severe bruising.  His

7   wrists were all bruised up.  His legs had big scabs and

8   bruises.  He had abrasions all over him.  He had contusions.

9   He had a taser burn.  He was pepper-sprayed, and his facial

10  skin peeled off.  He had blurry vision from the time he left

11  the jail.  And, I mean, literally the guy was like injured head

12  to toe.

13      And you saw him when he got out of bed the next morning.

14  He couldn't even get up.  He had to be helped up.  And what we

15  saw in that video with Mr. Jennings torqued down in a restraint

16  bed and left there for 2 1/2 hours with nobody checking on him,

17  that should never happen in America.  That is not how we treat

18  people here.

19      So there is a lot of different ways a jury can determine

20  damages.  One of them -- first of all, in this case there's

21  two types.  They are called compensatory and punitive.

22      Compensatory are designed to compensate the victim for his

23  injuries.  In this case Mr. Jennings has hospital bills of

24  approximately -- the first from Genesys is $2,690, and the

25  second one from McLaren is $13,846.

*Plaintiff's Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 38

1     But those are not his serious damages.  There's a lot of

2  different ways that juries can determine damages.  One of them

3  I think that you might want to think of is you can award him

4  his damages for the acute injuries that he suffered.  So that's

5  the first form of damages.

6     So for six weeks Mr. Jennings suffered all of those

7  injuries and laid there in pain.  It's hard to put -- I can't

8  say that there's some logical formula for forming, for awarding

9  those.  It's based on a -- but juries do it every day.  So I

10  think that Mr. Jennings should be awarded 1.5 million for that

11  beatdown that he took essentially and for the six weeks of pain

12  and agony that he suffered as a result of that.

13     And then I think that the jury should -- you, ladies and

14  gentlemen, should award him something for being torqued down in

15  that restraint bed for 2 1/2 hours, and actually he, he started

16  at 5:45, I'm sorry, 5:35, and he was finally released at

17  8:00 a.m. the next day.  I think that outrageous kind of

18  conduct, the suffering that Mr. Jennings had -- can you imagine

19  like basically feeling like you are going to drown, basically

20  feeling like you are going to suffocate for two and-a-half

21  hours?  I think you should pay him for every minute, for every

22  minute he was in there.  I think you should give him $10,000 a

23  minute and that it would be 1.45, $1,450,000.

24     Then, ladies and gentlemen, we have his permanent

25  injuries.  So from November 2nd, that's basically the six-week

1  anniversary of the beating, until November 2nd -- November 2nd,

2  2010 to November 2, 2016 we have his permanent shoulder injury,

3  his permanent eyesight disability and his Post-Traumatic Stress

4  Disorder.  One way you can think about it is just award him

5  hourly rates, and you know that the minimum wage is $8.50 an

6  hour.  So that's how I calculated it.  So for every -- I think

7  you should give him minimum wage for all three of those

8  permanent injuries.

9      So for the six years from the, from November 2nd to today

10  for the permanent shoulder injury I did 16 waking hours because

11  the shoulders and the eyesight really only affect him when he's

12  awake.  So for those two calculations we have six years at

13  16 hours a day equals that many hours times 8.50 per hour

14  equals 297,840.  The same for his permanent eyesight.

15      But for his Post-Traumatic Stress, that affects him all

16  the time.  He wakes up with nightmares in a sweat, as he

17  described.  So I think you should give him 24 hours for that,

18  and that amount is -- and the same amount, 8.50 per hour,

19  446,760.

20      Then the final component of this, and it's on your verdict

21  form, are for what's called future damages.  Now, there's --

22  Mr. Jennings has a life expectancy of 36 years based on the

23  Social Security actuarial tables, and there's no -- there are

24  no -- there's no countervailing evidence to suggest anything

25  else.

1    So based on that he would have -- again, it's based on

2  16 hours a day for his permanent shoulder and eyesight

3  disability, and it's based on 8.50 per hour for his shoulder

4  for the rest of his life, $1,787,040.  The same amount for the

5  permanent eyesight disability.  And, again, for his

6  Post-Traumatic Stress and Concussive Disorder, $2,680,560 at

7  24 hours a day at 8.50 an hour.

8         **THE COURT:**  You've got two minutes.

9         **MR. ERNST:**  And finally, ladies and gentlemen,

10  there's a component of this case that are called punitive

11  damages, and those are damages to punish the wrongdoers.  You

12  can basically send them a message and send a message to anybody

13  that thinks they can do that.

14    And they, they still haven't learned their lesson.  They

15  didn't even get disciplined.  There wasn't even a real

16  investigation done here.  Lieutenant Nuckolls investigated

17  himself.

18    Every one of them said they would do it all over again.

19  They would put him -- they would risk his life and put him

20  facedown in a restraint bed with a spit hood after he had been

21  pepper-sprayed.

22    So you can send a message that they will hear from Detroit

23  to the Genesee County Jail with your punitive damage award.  I

24  think you should award 2 million against Lieutenant Nuckolls

25  and 1 million each against the rest of the defendants.

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 41

1      Thanks a lot for your attention.

2          **THE COURT:**  Thank you.  We'll take a short recess.

3      (Jury out at 10:22 a.m.)

4          **THE COURT:**  While Mr. Ernst has used up his time, I

5  will give him ten minutes in rebuttal so you have an hour and

6  ten minutes.

7          **MR. ERNST:**  Thank you, Your Honor.

8          **MR. REISING:**  Thank you, Your Honor.

9      (Recess from 10:22 a.m. to 10:31 a.m.)

10      (Jury in at 10:31 a.m.)

11          **THE COURT:**  You can sit down.

12      Go ahead, sir.

13          **MR. REISING:**  Thank you, Your Honor.

14      Good morning, ladies and gentlemen.

15          **THE JURORS:**  Good morning.

16          **MR. REISING:**  As you recognize, I'm sure by now, we

17  are close to the end of the journey.  We have been here for

18  2 1/2 weeks.  We have heard a lot of testimony.  We have

19  participated in what I think is one of the great institutions

20  of this country, that is, a jury trial.

21      One of the few things I agree with Mr. Ernst about is the

22  fact that --

23          **THE COURT:**  Use the mike, sir.  The mike, the

24  microphone.

25          **MR. REISING:**  Yes, Your Honor.

*13-13308; Jennings v. Fuller, et al.*

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 42

1    The jury trial is something which is sacrosanct and a

2    pillar of our Constitutional form of Government, just like

3    voting.

4    And you are the trier of fact with respect to this case.

5    That's what your function is.  You have been here for 2 1/2

6    weeks now.  You have listened to a lot of testimony.

7    I had told you in my opening you were going hear

8    contradictory testimony, and you certainly have.  You have

9    heard contradictory testimony about events, about consequences,

10    and it's your job in the end, and this is probably the hardest

11    part of your job as a juror, to go back in that jury room and

12    distill what you have heard and come up with a verdict, a

13    verdict that has to be unanimous, as the judge has told you.

14    And that's hard work, no question about it, and I

15    thank you and my clients thank you for all of the hard work

16    and, frankly, for all of the inconvenience that this jury trial

17    has put you to.  You have been out of your regular lives for

18    going on, as I said, about three weeks, and I know and I

19    appreciate what that does.

20    Now, we are here in this case because the claim is one of

21    unlawful force.  That's what the claim is.  You will see at the

22    top of the verdict form, you have got a verdict form that the

23    judge has an already passed out, it says unlawful force, and

24    that's what we're talking about here, unlawful force.  Not that

25    you can't use force, but you can't use unlawful force.

1      And I agree about that.  Unlawful force is a violation of

2  the Fourth Amendment of the Constitution of this country.

3  Force is not.  And there's a difference, and you have to make

4  that decision in the process of your evaluation of the

5  evidence.  Was force used?  Was the force unlawful?  And

6  there's a difference.

7      We start in this particular case, as you might recall, you

8  watched the video, and we start with a circumstance where

9  Mr. Jennings is in the so-called report-writing room and is

10 undergoing a so-called pat-down search by Deputy Fuller.

11 That's when it starts.

12     We put up on the screen there photos, two photos of that

13 circumstance.  This photo right here shows the left arm of

14 Mr. Jennings clearly off the wall at that point in time.  It

15 wasn't one second.  It was about ten seconds his hand is off

16 the wall.

17     Also note where Deputy Fuller is at that point in time.

18 He's down in the same area.  He sees that.  He reacts to that.

19     You will see in the next photo, which is the next -- over

20 here, he responds to that.  You will see that Mr. Jennings

21 turns his head to the right and cocks his right arm like this.

22 Again, that's the aggressive posture that Deputy Fuller sees at

23 that point in time.

24     This is all going on in real time.  You saw how quickly it

25 took place when you actually saw the video earlier this

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 44

1   morning.  It's going on a split-second basis, and Deputy Fuller

2   is making decisions on a split-second basis.

3        He concludes that Mr. Jennings is coming off the wall and

4   it needs to be dealt with.  What does he do?  We know what he

5   does.  You have watched the video.  He takes Mr. Jennings down

6   to that bench right there.  There's a bench right here.  Do you

7   see that bench right there?  A metal bench along the wall.  He

8   takes Mr. Jennings down to that bench because his concept is I

9   have got to get this back under control.  I have got to get

10  Mr. Jennings with his hands behind his back to handcuff him.

11  It's as simple as that.  That's what's going on.

12       As he's doing that, Deputy Kennamer, who is over here,

13  sees what's going on and comes over to assist.  We saw Deputy

14  Kennamer and Deputy Fuller struggling with Mr. Jennings on the

15  bench, and then we also saw that Mr. Jennings was taken to the

16  floor by Deputy Fuller and by Deputy Kennamer because they

17  couldn't get control of him on the bench.

18       I have heard the word "thrown."  I have heard the word

19  "pushed."  There's no indication that he was thrown or pushed

20  either to the bench or to the floor if you watch that video.

21  It doesn't matter what some video expert says.  You have your

22  eyesight.  You can watch the video.  You determine what you

23  think happened with respect to that circumstance.

24       Now, I will say this.  You also saw Mr. Katsaris do a

25  straight arm bar technique on Mr. Elliott.  Did you see that?

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 45

1   It took place right here at the end of the jury box.  If you
2   watched that closely, that took place in a very rapid fashion,
3   number one, and put Mr. Elliott on the floor, number two, in no
4   uncertain terms.  And Mr. Katsaris says that wasn't even being
5   done at a real-time pace.  Okay?  He slowed it down for demo
6   purposes.

7       So the point being a straight arm bar technique is an
8   approved PPCT technique to control an inmate that is not in
9   compliance.  And you saw how it's done.  It isn't like you're
10  playing checkers, okay?  This is the real world, the real
11  world.

12      Deputy Kennamer tried to use a different version of the
13  straight arm bar technique to get control to help Deputy Fuller
14  that didn't work.  They are struggling on the floor of the
15  room.  Because of that straggle and the noise, the other
16  deputies come in, Deputy Wing, Deputy White, Lieutenant
17  Nuckolls.

18      Lieutenant Nuckolls, he is the ranking officer.  He is in
19  charge.  He comes into the room at that point in time.  He's
20  the guy who is making the decisions about what should be done
21  or not done with respect to the handling of Mr. Jennings.

22      He determines that it would be prudent to use pepper spray
23  to control Mr. Jennings because the techniques they have tried
24  to that point in time have not done what needed to be done,
25  i.e., get Mr. Jennings under control and get him handcuffed.

*13-13308; Jennings v. Fuller, et al.*

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 46

1    He does give a short one-second burst of OC spray.  You

2    have heard that the OC spray is really cayenne pepper oil.

3    That's what it is.  It is made from cayenne peppers.  It does

4    have an effect on your face.  It's meant to.  Not permanent,

5    but it does have an effect.

6        It's meant to distract the individual, to otherwise get

7    control of the individual.  That's what, that's what it's for.

8    You use pepper spray to distract the individual because that

9    individual becomes concerned about their face and the next

10   thing you know they can be handcuffed.  He was handcuffed.

11   They put him in handcuffs again in the report-writing room.

12       You then see Mr. Jennings brought up to a vertical

13   position in the report-writing room by Deputy White and Deputy

14   Wing.  He goes to -- he's brought up by going to his knees

15   first, then up to his feet.

16       You heard Darrell Ross, the expert that was here, testify

17   that that was an appropriate technique, to bring an inmate or a

18   person from floor level to a vertical position.  That's a good

19   way of doing it.  That's an appropriate way of doing it.  It is

20   not excessive force.

21       When you watch the video, you will see that Deputy Wing

22   wasn't even struggling to do anything.  He's just guiding him

23   up.

24       He gets up to his feet.  He's coiled.  As soon as he gets

25   to his feet and coiled, he springs toward the wall and strikes

1    the wall apparently.  He wasn't pushed.  That's something which

2    the zealous advocates for Mr. Jennings assert, but of course

3    Mr. Jennings can't testify to that because, don't forget, at

4    the time he was pepper-sprayed he says he lost all memory from

5    that point right through the very end of this whole process

6    when he's in the restraint bed in safety cell 6.

7         It's not until the very end when he wakes up does he have

8    any recollection.  So all the time from pepper spray through

9    two hours plus in a restraint bed he's got no recollection of

10   what happened.  He doesn't know.

11        Many times typically in these cases you will get a story,

12   you will get testimony from the individual that says this

13   happened to me, that happened to me.  You can't have that in

14   this case because Mr. Jennings has no memory.

15        We go through the doorway.  Mr. Jennings and Deputy Fuller

16   fall to the floor.  If you watch the video closely, you will

17   see that Mr. Jennings is turned facing essentially Deputy

18   Fuller because he's continuing to struggle.  Feet get tangled

19   up, and they fall to the floor.  It's as simple as that.

20        When that occurs, you will see, when you look at the video

21   carefully, Deputy Fuller has his right hand out and he's

22   bracing himself on a table which is in that room with his right

23   hand.  Admittedly, a portion of his body falls to the floor.

24   Plaintiff falls to the floor.  He may well have struck his face

25   in that process, it's certainly possible, but it wasn't because

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 48

1   of an act which can be categorized as being excessive force.

2       He gets back up.  He goes to safety cell number 6 for the

3   first time.  He goes to safety cell number 6 because that was

4   the decision made by Lieutenant Nuckolls to place him in safety

5   cell number 6 with the hope that he would settle down and this

6   whole situation would be over.

7       They get him into safety cell number 6, and I have heard

8   these comments that there's nothing, there's no indication that

9   Mr. Jennings is doing anything inappropriate in safety cell

10  number 6.  Well, you can't see much from the camera angle in

11  safety cell number 6 in terms of what's going on because you've

12  got three deputies in front of Mr. Jennings and you really

13  can't see any of the detail about the interaction between those

14  three deputies and Mr. Jennings.

15      In any event, Lieutenant Nuckolls comes in.  He assesses

16  the situation in safety cell number 6 and decides he cannot

17  leave Mr. Jennings in safety cell number 6 by himself even if

18  he was handcuffed.  It's not the appropriate thing to do.  He

19  chose not to do that.

20      He decided, he determined that it would be appropriate to

21  place Mr. Jennings in the restraint chair that we've talked

22  about, and a restraint chair of course is a chair that's used

23  in prisons to put unruly inmates into to hopefully get them to

24  calm down, number one, and number two, to do something for them

25  if they need treatment or anything like that because of what's

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 49

1   happened up to that point in time.

2        Unfortunately, and you can watch the video, Mr.,

3   Mr. Jennings goes ballistic when they try to put him into the

4   restraint chair.  He's prone like this.  He's kicking.  He's

5   not going to go in that restraint chair, and he didn't.  So the

6   only other option that Lieutenant Nuckolls thought was

7   appropriate was to place him into the restraint bed, and that's

8   what was done.

9        Now, before they could put him in the bed they had to get

10  the bed ready and so they put Mr. Jennings on the floor there

11  in the hallway of the safety cell area and held him there so he

12  wouldn't hurt himself or hurt anybody else, and then when it

13  was appropriate they moved him from that location up to the

14  restraint bed.

15       Now, while he was down there on the floor, he did get

16  tasered.  You heard Lieutenant Nuckolls say he tasered him with

17  the hope that that taser would have an effect and that this

18  would be over.  You wouldn't have to put Mr. Jennings in the

19  restraint bed.  You wouldn't have to have him in that restraint

20  bed for two hours plus.  It would be over.  He could go back to

21  a safety cell, and we could move on.

22       Unfortunately that taser didn't have any effect.

23  Certainly there's nothing to say that Lieutenant Nuckolls used

24  either the pepper spray or the taser because he wanted to

25  inflict pain on the plaintiff.  As a matter of fact, the

V11-Page 50

1    testimony of Lieutenant Nuckolls is just to the contrary.  He

2    didn't do either to inflict pain.

3         Now, obviously they are pain-compliance techniques, but he

4    didn't do it because he's tired of this guy and I'm going to

5    give him, you know, the zap of a cattle prod or something like

6    that.  That's not what we're talking about here.  It didn't

7    happen like that.

8         Mr. Jennings did remain in that bed for a bit more than

9    two hours.  He was under constant video surveillance during

10   that time.

11        You heard the testimony of Dr. Ross that when he went to

12   the jail, you know, he saw the system.  There is a camera in

13   every safety cell.  There are screens in both the sergeant's

14   office and the control center of the jail, and those cells are

15   monitored 24-7.

16        In addition, there is a document that was marked in

17   evidence, the so-called safety cell door sheet.  I don't know

18   if you remember that.  I've got it right here, I think.  It's

19   an exhibit that's actually a plaintiff's exhibit.

20        And it indicates when you look at it Mr. Jennings was

21   yelling.  That's what this sheet says.  Yelling on repeated

22   occasions.  It wasn't like he was not saying something.  He

23   apparently was yelling, just like he had been yelling

24   throughout this entire process.

25        You also saw, and if you look at the video again, all

1   during the time that he was in that bed he was continuing to

2   struggle.  He was continuing to flail.  He never really settled

3   down until the very end.

4        He is released from that bed.  He did go to medical, the

5   medical department at the jail.  You have seen a photo that was

6   shown to you of Mr. Jennings taken -- a booking photo taken on

7   the day, September the 18th, 2010.  It does show he has some

8   injuries to the area of his face, no question about that.

9        There's a second photo that you were shown dated October

10  the 10th of 2010, approximately three weeks later.

11  Mr. Jennings was shown that photo during his testimony.  He

12  agreed that photo showed he had no residuals of whatever

13  happened to his face at the jail three weeks later.

14       Mr. Jennings gets released from jail.  His mother takes

15  him to McLaren Hospital where she was working at the time.  He

16  goes to the emergency department.  He undergoes a battery of CT

17  scans, five or six, including a CT scan of his face, which is

18  normal.

19       He has no complaints whatsoever concerning his left

20  shoulder, concerning his eyesight, concerning his teeth, which

21  is one of the issues we heard about, too.  He had a chipped

22  tooth, remember that?  Nothing in those records about anything

23  like that.  They were primarily addressing the facial swelling

24  that he had at that point in time.

25       Two days later he went to see Dr. Hanson's associate.  She

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 52

1   says that he should go to Genesys because they are associated

2   with Genesys, that office.  So he goes to Genesys and has

3   another CAT scan.  You heard about that CAT scan, showing he

4   has some undisplaced fractures in the area of his face and in

5   particular around his nose, okay?

6        I have heard some testimony saying pooh-pooh on the first

7   CT scan.  Well, you know, I doubt that the doctor who took that

8   CT scan at McLaren Hospital and interpreted it would say

9   pooh-pooh.  That was my interpretation, no fracture.  Two days

10  later or three days later there was a fracture.

11       What happened in between times?  We don't know.  You have

12  to decide that, okay?  Did something happen?  I don't know.

13  Certainly there was no fracture when he went to McLaren

14  Hospital on the same date we are talking about,

15  September 18th of 2010.

16       After going to Genesys emergency room, he went back to see

17  his primary care physician, Dr. Hanson, on September the

18  29th of 2010.  You might remember, he's testified by

19  deposition.  His deposition was shown here, Dr. Hanson.

20       Dr. Hanson released him PRN at that point in time.  No

21  further appointments.  Didn't have any complaints about his

22  left shoulder.  Didn't have any vision complaints.  Didn't have

23  any complaints other than the complaints surrounding his face

24  and the fact that he still had evidence of some facial

25  injuries, which, as I indicated, cleared up within ten days of

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 53

1   when he saw Dr. Hanson on October 10th of 2010.

2        So that's all the medical care and treatment that

3   Mr. Jennings has related to all of these horrific injuries you

4   have heard about, Post-Traumatic Stress Disorder, permanent

5   cataract injury and a permanent shoulder injury.  All of the

6   medical care and treatment he had was over by September the

7   29th of 2010 except for going back to Dr. Hanson's office in

8   November to get tested for diabetes.  Nothing was done at that

9   time with respect to any other type of injury, no complaint of

10  injury, diabetes, didn't have diabetes.

11       When is the next time he sees Dr. Hanson, his primary care

12  physician?  September the 24th of 2014, four years later.  Why

13  is he there?  I have got a shoulder complaint in my left

14  shoulder.

15       Now, what prompted that?  I don't know.  He saw Dr. Kohen

16  on September 4 of 2014, just a few days before that.  You saw

17  Dr. Kohen's deposition played by video here yesterday.

18  Dr. Kohen said he had a problem potentially with what's

19  referred to as the supraspinatus muscle of the left shoulder.

20  That's on the top of your shoulder.

21       I'm sure Dr. Kohen, in retrospect, would have loved to

22  have seen the testing which was done on September 24th of 2014

23  when Mr. Jennings underwent the arthrogram and that test was

24  interpreted as being normal.  You heard Dr. Hanson say that.

25  There was no abnormality of the shoulder.  He didn't have an AC

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 54

1    joint issue.  That's the gold standard test of that kind of

2    thing.  He didn't have one.

3         So we have to go to plan B at that point in time

4    apparently because the next thing we hear is that he's got some

5    sort of problem with his shoulder that nobody detected before

6    that, and it involves the shoulder having an issue on certain

7    movement.

8         Well, you know, if that's true, you would think that

9    Dr. Kohen, when he evaluated and examined the left shoulder of

10   Mr. Jennings within a month of when this all took place, less

11   than a month, would have found that condition.  He didn't find

12   any such condition at that point in time.  So if he's got this

13   condition now, something else caused it.  It wasn't this

14   incident we're talking about here.

15        Dr. Kohen also indicated, if you think about his

16   testimony, that yes, there are certain injuries to the shoulder

17   that can be caused by some of the activities he saw, but not

18   the type of injury that he felt Mr. Jennings potentially had

19   when he examined him.  Not that type of injury.  It wasn't an

20   injury -- remember, he described it like this.  It's an injury

21   which is caused from throwing, a maneuver like that.  A lot of

22   pitchers get that injury, you know, because of the stress they

23   put on their shoulder and their arm.  So Dr. Kohen opined no

24   relationship when you think about that testimony.

25        We have also heard testimony concerning PTSD.  Do you

1   remember when I asked the doctor concerning PTSD:  And is it
2   necessary that the individual have a memory?  He said yes.
3   Well, guess what?  Mr. Jennings has no memory of the vast
4   majority of whatever occurred here.  His memory stops with the
5   OC spray.  So it's within a few minutes of when the incident
6   starts to the OC spray, a couple of minutes that he has
7   potentially a memory about, but of course even that memory
8   might be foggy because he was intoxicated.  Don't forget, he
9   comes to the jail because he has been arrested for drunk
10  driving, and he has been found to be intoxicated.  That's why
11  he's there.
12      They talked about cataracts per that circumstance.
13  Initially it was cataracts as a result of being tasered in the
14  face.  That certainly wasn't the case.  That didn't happen.  It
15  was contracts as a result of OC spray.  Well, that's not going
16  to fly.  So now we're down to cataracts because of trauma.
17      Well, if you think about it, when you look at the photos
18  you will see that the cataract primary was in the left eye.
19  The major trauma was to the right eye of this gentleman, not
20  the left eye.
21      In addition to that, both ophthalmologists who have
22  testified in this case have indicated that you can have a
23  so-called idiopathic cataract, that is to say, there's no known
24  cause.  We all get them.  You live long enough, you get a
25  cataract.  Some people develop them earlier in life than

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 56

1   others, but cataracts are part of the living process, so to

2   speak.  Fortunately, medical science has reached the point

3   where cataracts can be dealt with very simply these days.

4       You heard Dr. Byrd describe the operative intervention,

5   15 minutes.  You get a new lens.  You get back to 20-25 vision.

6   Even if you didn't have that vision before the surgery, he can

7   put you back to 20-25 vision in both eyes.

8       And I think he described the procedure as being the meat

9   and potatoes of the ophthalmology business.  There are

10  literally tens of thousands of those surgeries done every day

11  of the week.  They are lined up.  You know, if you go into an

12  outpatient surgery center, there will be 15 or 20 people

13  waiting to have their cataract surgery done.  It's a very

14  successful surgical process or procedure in this country.

15      And I heard plaintiff's counsel say he didn't understand

16  how you could have one eye for farsightedness, one eye for

17  reading.  Contacts are the same way, if you want contacts like

18  this.  It's no different.  You can customize what you want

19  these days.  It's amazing, you know.

20      So plaintiff also brought up the idea that there was a

21  violation of the policies and procedures of the Office of the

22  Genesee County Sheriff in this case having to do with the

23  placement of Mr. Jennings on the restraint bed.  If you look at

24  that policy, what it says is -- it says:

25          "Under no circumstances will any person sprayed with

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 57

1       OC spray be allowed to lie facedown after restraints

2       are in place or subject is subdued."

3   He wasn't subdued until he was in the restraint bed, okay?

4   And as soon as he was subdued, Nurse Stephanie, watched by

5   Lieutenant Nuckolls, wiped his face off with saline solution.

6   So he was decontaminated at that point in time.  No violation

7   of that policy.

8       I heard yesterday Mr. Jennings when he took the stand in

9   rebuttal say that there was a lot of lying going on in this

10  case.  Remember, he made that statement?  Let's think about --

11  a little bit about what he had to say in this case during his

12  examination.

13      He took the stand.  He was asked questions by his lawyer.

14  I got to ask him questions.  One of the things he said was I've

15  got emphysema.  Remember?  He said I have got emphysema, a

16  medical condition, emphysema.  Dr. Hanson, his primary care

17  physician, testified just the opposite, he doesn't have

18  emphysema, I never made that diagnosis, I have no idea where

19  that came from.

20      Mr. Jennings testified initially that he had no issues

21  prior to September the 18th of 2010 with anxiety or with

22  depression.  Well, it turns out that he did consult with

23  Dr. Hanson for just those kinds of conditions prior to

24  September the 18th of 2010 and agreed that he was even referred

25  to a psychiatrist by Dr. Hanson's office because of those same

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 58

1    issues in 2009.  So he had those issues preexistent to

2    September the 18th of 2010.

3        Mr. Jennings suggested, in fact testified, that he has to

4    have some assistance with bathing.  Do you remember that?

5    That's what he testified to.  When he was bathing, he has to

6    have assistance, and the assistant is his live-in girl friend,

7    mother of his daughter.  But when she testified, she said I

8    don't do anything like that, I don't do that, not me.  So,

9    again, something that would -- you've got to think about.

10        There's other issues out there, too, when you think back

11   through his testimony with respect to what he says occurred or

12   didn't occur that you've got to take into consideration.  I was

13   in the middle of my examination of Mr. Jennings and asking him

14   about wage loss because wage loss is typically one of the

15   components of damages in any type of claim like this, and

16   plaintiff's counsel says we're not making any wage loss claim.

17   Well, that's a good thing.  And why?  Because this guy has been

18   working ever since this incident without loss of time.  He's

19   got a responsible job.  You heard him describe what he does.

20   He installs automation equipment and apparently is pretty good

21   at it, all right?

22        He wants you to believe that he's not as forthcoming as he

23   used to be, and yet he admits that he has a loving relationship

24   with his girl friend and with his daughter Channing.

25        And, like a lot of people in this country these days, he

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 59

1   apparently has decided he's going to make his last stand at his

2   home.  He's got a safe room down in the basement and has done

3   some things that would suggest that he thinks that harm is

4   going to come his way, but there's no evidence of anything like

5   that.

6        He's had no psychological treatment whatsoever, zero.

7   He's had no treatment for his left shoulder aside from a course

8   of physical therapy back in 2014.  He's really had no treatment

9   or any type of definitive treatment for his cataract condition.

10  He is wearing corrective lenses apparently now, but you have

11  not heard that he has any difficulty whatsoever being able to

12  perform his job duties or whatever else he might want to do.

13       You have been able to observe him during the course of

14  this trial, and I leave that to your own discretion about what

15  you have observed in terms of does he appear normal or not

16  normal because of anything which occurred at the Genesee County

17  Jail.

18       You're going to get jury instructions, as the judge told

19  you, and as the judge also told you, he's the final arbiter of

20  that so anything I quote from jury instructions has to be I

21  believe the judge may give you this instruction, all right, and

22  you have to view it in that regard.  He'll tell you what the

23  final instruction is.

24       I'm going to say that the instruction that I believe he

25  may give you says that whether force used by a defendant, in

*13-13308; Jennings v. Fuller, et al.*

*Defendants' Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 60

1    this case one of these five individuals here, was reasonable

2    must be judged from the perspective of an objectively

3    reasonable law enforcement officer.  You have to put yourselves

4    in the shoes of these gentlemen or of a reasonable corrections

5    officer in the circumstance that they found themselves in and

6    decide whether or not there was unlawful force used.

7         And the issue of -- or as it relates, I should say, as it

8    relates to the issue of liability for those kinds of things,

9    the intent of the officer is irrelevant.  It's just the

10   objective reasonable officer and what that person would have

11   done.

12        If you find he was unreasonable, then guess what, then you

13   made a decision that there is in fact potential liability for

14   that individual.  You heard during plaintiff's closing he kept

15   on using the word "they."  They, they, they.  We know based on

16   all the testimony that once Lieutenant Nuckolls came to that

17   room, the report-writing room and took over, he made the

18   decisions with respect to how the situation should be handled.

19   Everybody else in that room was subordinate to him.  They

20   followed his direction in terms of what they should or should

21   not do with respect to handling the plaintiff.

22        Now, objectively reasonable.  That's what you're going to

23   be concerned about, and the judge will, I believe, may tell you

24   that you have to take all the facts and circumstances

25   confronting a defendant, it should be considered in the context

*13-13308; Jennings v. Fuller, et al.*

1   of that circumstance.

2       You had a very dynamic situation occurring in report

3   writing.  You have seen it.  I'm not going to play it again.  I

4   think you have probably seen it too many times, but you had

5   that.  You have to decide, the response of Deputy Fuller or

6   Deputy Kennamer and the other deputies, was it objectively

7   reasonable in terms of what they did.

8       Dr. Ross on that witness stand, a well-qualified expert in

9   the area of police policies, procedures and corrections

10  procedures, having previously worked for the Michigan

11  Department of Corrections and now teaching at the university,

12  said what they did was appropriate.

13      The judge is going to instruct you about damages, as he's

14  already told you.  There are two components in a case of this

15  nature, compensatory damages and punitive damages.

16      What I would say to you about that circumstance is that

17  you have to make sure that you are following the jury

18  instructions very carefully in relation to what constitutes

19  damage which is compensable in nature.  Just because you

20  believe that an officer may have committed something which was

21  unlawful in relation to Mr. Jennings doesn't mean that that

22  unlawful act caused damage to Mr. Jennings.  You have to find

23  both unlawful act and proximate cause between that unlawful act

24  and damage to Mr. Jennings for it to be compensable.

25      You also have been told, and I'll cover this very briefly,

1  that the violation of the policies and procedures is a bad

2  thing.  A violation of the policies and procedures of the

3  Office of the Genesee County Sheriff does not mean there was a

4  Constitutional violation with respect to whatever occurred.

5  You have to make that decision, was there a Constitutional

6  violation.  The policy and procedure and its violation can be

7  something you can take into consideration, but it does not

8  control.  It does not control.  You are the arbitrator or the

9  arbiters, I guess I should say, of whether or not there was a

10  Fourth Amendment violation.

11      Again, I thank you for your time.  And one last comment.

12  I'm obviously of the opinion that my clients in this case, the

13  named defendants sitting across that table, did not commit

14  excessive force, did not commit unlawful force and therefore

15  don't have any liability with respect to the plaintiff,

16  Mr. Jennings.  I would urge that you check the boxes no when

17  you come to the various boxes on the verdict form.  Where it

18  says yes or no, check the box no, and once you do that, your

19  job is done.

20      One last thing.  Plaintiff's counsel gets to come back up

21  in front of you and argue one last time.  I don't.  Keep in

22  mind that if I did I would come back and say essentially what

23  I'm telling you right now.  Thank you very much.

24          **THE COURT:**  Thank you.

25      Mr. Ernst.

*Plaintiff's Rebuttal Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 63

 1        **MR. ERNST:**  Thank you, Your Honor.

 2        Now, Mr. Reising and the defendants continue to testify in

 3    ways that are diametrically opposed to the video.  In fact, I

 4    find it very interesting.

 5        **THE COURT:**  Talk right in the mike.

 6        **MR. ERNST:**  Thank you.  Sorry.

 7        I find it very interesting that not once, not once did

 8    they show you the video when they were testifying, when they

 9    were doing closing or at any other time, and that is because

10    what they say cannot be reconciled with what the video shows.

11        For example, Mr. Reising got up and said that Mr. Jennings

12    had his hand off the wall for ten seconds.  I wrote it down and

13    I quoted it.  The video, you are going to have a chance to see

14    the video.  He didn't have his hand off the wall for not even

15    one full second.

16        And Mr. Reising said that these officers had to make

17    split-second decisions.  When Nuckolls walked into the

18    report-writing room, that wasn't a split-second decision.  He

19    walked in there and walked all around before he pepper-sprayed

20    him.

21        When Nuckolls walked into the safety cell with his taser

22    out, that wasn't a split-second decision to order Mr. Jennings

23    back into that restraint chair.  He paced back and forth with

24    his taser in that cell and then ordered them out.

25        When Nuckolls tasered Mr. Jennings, that wasn't a

*13-13308; Jennings v. Fuller, et al.*

*Plaintiff's Rebuttal Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 64

1   split-second decision.  He had officers holding him down, and

2   they held him down and pulled up his shirt and tasered him.

3       And when he decided to put Mr. Jennings in a restraint

4   chair, that wasn't a split-second decision, and none of those

5   officers involved in it were split-second decisions.

6       You know, there's some kind of undercurrent here that

7   suggests that, oh, unless the officer did it himself he's not

8   really liable.  Well, if two people hold me down and one person

9   punches me in the face, all three of them are liable because

10  they all are in a joint enterprise.  The ones holding me down

11  prevent me from protecting himself.  So when you do something

12  together, everybody has the same liability.

13      And I have heard a lot of minimalizing.  Oh, it's just

14  cayenne pepper.  Did you ever cut a pepper and then accidently

15  rub your eye?  Well, imagine that times about 5,000.  That's

16  what cayenne pepper feels like.

17      And I heard repeatedly, oh, the pepper spray didn't have

18  any effect.  Really?  Other than the screaming, you mean?

19      The taser didn't have any effect.  Really?  Other than the

20  screaming and the jolting back of Mr. Jennings' body?

21      You know, Mr. Reising repeatedly said, oh, Mr. Jennings

22  woke up two hours later in safety cell 6 when he was strapped

23  down.  That's not what Mr. Jennings said.  He said he woke up

24  and he was strapped down and then he was in there for

25  two hours.  He woke up at the beginning, and he knew there had

1   been a blood draw taken from him.  He felt a prick in the, you

2   know, he can't see it, but he felt the pain of a pinprick.

3        And then there is some idea that, oh, you know, Jennings

4   has some nefarious motive because he says he can't remember

5   from the time he got pepper-sprayed until the time he wrote up

6   in the report-writing room.

7        Why would that benefit him?  If he wanted to lie about

8   something, he could say, oh, yeah, they did this and that and

9   this and that.  Why would it benefit him to forget?  He forgot

10  because that is a classic symptom of Post-Traumatic Stress

11  Disorder.  It's so painful that your brain won't let you recall

12  it, and that's why you forget.

13       You know, there was some argument about the use of

14  reasonable force and what an objectively reasonable officer

15  would do.  You know, who told you what an objectively

16  reasonable officer would do?  Mr. Katsaris.  He told you all

17  along the way what objectively reasonable officers would do,

18  how they would react to the force, how they would react to the

19  situation, and what types of force they would use.

20       They would not take him down and throw him down on the

21  bench.  They would move him back and search him.

22       They would not react that way to a split-second removal of

23  the hand because Mr. Jennings had been compliant all the way up

24  until them.  They would have issued him an order and given him

25  a chance to comply.

1    You don't -- once the person is handcuffed, you put the

2    taser away.  Once a person is handcuffed, you put the pepper

3    spray away.  You put your toys away when they get handcuffed

4    and you've got four officers there to control him.

5    And so in the -- Mr. Reising stated that in the hallway

6    they were holding Mr. Jennings down so he wouldn't hurt

7    himself.  Is that why Kennamer put his knee and his weight on

8    Mr. Jennings' head?  That's not holding him down so he won't

9    hurt himself.  That's holding him down and inflicting pain.

10   And, yeah, Mr. Jennings was yelling when he was in that,

11   when he was in safety cell 6 after he had been restrained.  The

12   officers didn't even go in to look at them, but he's yelling

13   because he can't breathe and his eyes are burning and he's hurt

14   badly and, as he said, basically everything hurt on him from

15   head to toe.

16   There's a suggestion that because the bruising wasn't

17   still evident some 14, 16 days later Mr. Jennings doesn't have

18   injury.  You can't see fractures.  You can't see PTSD.  You

19   can't see shoulder injuries.  Just because the bruising goes

20   away doesn't mean the pain goes away.

21   And there's a claim that Mr. Jennings didn't complain

22   about his tooth at McLaren.  If I go to the hospital for some

23   injuries, I don't tell them something I would tell my dentist.

24   I mean, if you chip your tooth, you go to the dentist.

25   And Mr. Reising also said there was certainly no fracture

*Plaintiff's Rebuttal Closing*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 67

1  at McLaren on 9-18.  So there's some -- so now we have like

2  this phantom defense.  There's a phantom cause of his

3  fractures.  There was a fracture on 9-18.  They just didn't see

4  it because they used an inferior CT technique.  They used a

5  single plane, which takes little slices like this, as opposed

6  to multiplane, which takes them like this, like this, and then

7  on an angle so you can see a three-dimensional CAT scan and you

8  can see much more.

9       There's also some phantom, apparently there's some phantom

10  cause of his shoulder injury.  There's no other explanation,

11  none, that indicates that he hurt his shoulder any other way

12  than here.

13       And this incidentally, ladies and gentlemen, this is what

14  I want to show you.  Mr. Reising showed you the picture of

15  Mr. Jennings with his hand off the wall at 12:04.  Look at the

16  time here, 12:04, and Officer Fuller is already hands on.  So

17  that means within that same second, 12:04, he's got his hands

18  off -- his one hand comes off the wall for a split second, and

19  he's already got his hands on him.

20            **THE COURT:**  One minute.

21            **MR. ERNST:**  Okay.  Dr. Kohen, when Mr. Reising -- I

22  mean, I'm sorry -- when Mr. Jennings went to see Dr. Kohen, he

23  told him he had a torn rotator cuff.  He got scared, and that's

24  when he went to his doc.  But, as you can see from this record

25  that Mr. Elliott is going to show you in just one second, he

1  did get treatment for his shoulder very close in time to this

2  incident.  He got a cortisone shot.

3       And, finally, the fact that some of these defendants were

4  just following orders is not a defense.  It wasn't a defense at

5  Nuremberg.  It wasn't a defense at My Lai.  You can't follow

6  illegal orders.  You can't put somebody in a restraint bed and

7  beat them up when they are not resistant.

8       So this is what it says:

9            "He does remember two or three days after coming home

10           after the jailhouse beating he did have left shoulder

11           pain.  This did not respond totally to a shot of

12           corticosteroids at that time."

13           **THE COURT:**  Thank you, Mr. Ernst.

14           **MR. ERNST:**  Thank you, Your Honor, and thank you,

15  ladies and gentlemen of the jury.

16           **THE COURT:**  Anyone want to break?

17       Okay.  We'll go ahead with the jury instruction.

18           **MR. ERNST:**  Your Honor, can we have a minute on that?

19           **THE COURT:**  I guess so.  Okay.

20       (Jury out at 11:29 a.m.)

21       (Recess from 11:29 a.m. to 11:36 a.m.)

22           **THE COURT:**  Are we all set?

23           **MR. ERNST:**  Judge, I'm going to approach.  I'm

24  requesting these instructions.

25           **THE COURT:**  No, I'm not listening to any

 1   instructions.  You had ample opportunity.

 2           MR. ERNST:  But we did, Judge, I presented these same

 3   instructions in my original thing, and you took them out --

 4           THE COURT:  I can't help it, Mr. Ernst.  You had

 5   ample opportunity.

 6           MR. ERNST:  Until when?

 7           THE COURT:  Oh, the last four or five days.

 8           MR. ERNST:  Judge, we have to wait until the close of

 9   proofs and then --

10           THE COURT:  No, we don't.  It's too late, it's too

11   late.  Sit down, sit down.

12           MR. ERNST:  Can I just --

13           THE COURT:  I said sit down.

14           MR. ERNST:  Can I make a record?

15           THE COURT:  You can make a record after I get done

16   instructing the jury.

17           MR. ERNST:  Okay.

18           THE COURT:  You know, I have been very patient with

19   you, sir, I really have.  When I walked in there this morning

20   at 9:00 o'clock, you heard me tell the jury they will have a

21   written copy of these instructions.  How many drafts have I

22   give you over the last few days, four, three?  I haven't kept

23   track of them, but you have had at least three or four drafts

24   of the instructions, including one yesterday where we talked

25   about them.  You had ample time to suggest changes to the

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 70

1   instructions.  After the final argument is over and the judge

2   is about to instruct the jury and tell them they will have a

3   full copy to follow him is a little late in the day.

4          **MR. ERNST:**  Well, Your Honor, you just instructed the

5   jury that you could change your mind at any point.

6          **THE COURT:**  The jury is coming in.

7      (Jury in at 11:38a.m.)

8          **THE COURT:**  Come in, folks.

9      Okay.  On your seats you've got a copy of the instructions

10  so you can follow through as I read them to you.

11     By the way, this is Kim Altman.  She's my senior clerk.

12  You haven't seen her before, but Ben, who you saw earlier, is

13  out of the city this week.  Thank you.

14     Now that you have heard the evidence and the argument, it

15  becomes my duty to instruct you as to the law applicable to

16  this case.  You will recall that during the trial I gave you

17  several instructions.  Any instructions which I gave you during

18  the trial should be considered by you along with these

19  instructions in your deliberations.

20     In giving you these instructions, I'm going to divide them

21  into three parts.  First I will give you several basic

22  instructions -- instructions that apply to a juror's duties in

23  considering a case generally.  These instructions will be

24  followed by instructions on the law applicable to the case you

25  have just heard.  Those, in turn, will be followed by

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 71

1    additional instructions regarding the verdict and your

2    deliberations.

3        Listen carefully.  If you have any questions or you are

4    not sure you understand them completely, towards the close I

5    will tell you how you can talk with me.

6        It is your duty as jurors to follow the law as stated in

7    these instructions and apply the rules of law I give you to the

8    facts as you find them from the evidence you have heard and

9    seen.

10        You are not to single out one instruction alone as stating

11    the law but must consider these instructions as a whole.

12    Neither are you to be concerned with the wisdom of any rule of

13    law stated by me.  Regardless of any opinion you may have as to

14    what the law ought to be, it would be a violation of your sworn

15    duty to base a verdict upon any other view of the law than that

16    given in these instructions, just as it would be a violation of

17    your sworn duty as judges of the facts to base a verdict upon

18    anything but the evidence you have heard and seen.

19        Nothing I say in these instructions is to be taken as an

20    indication that I have any opinion about the facts of the case

21    or what that opinion may be.  It is not my function to

22    determine the facts, but rather yours.

23        Justice through trial by jury always depends upon the

24    willingness of each individual juror to seek the truth as to

25    the facts from the same evidence presented to all of the jurors

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 72

1    and to arrive at a verdict by applying the same rules of law as

2    given in these instructions.

3        As I have told you, you have been chosen and sworn as

4    jurors to try the issues of fact presented by this case.  You

5    are to perform this duty without bias or prejudice to any

6    party.  Our system of law does not permit jurors to be governed

7    by sympathy, prejudice or public opinion.  The parties expect

8    that you will carefully and impartially consider all of the

9    evidence in the case, follow the law as stated by me, and reach

10   a just verdict.

11       Each of the defendants in this case is entitled to the

12   same fair and unprejudiced treatment as an individual would be

13   under like circumstances, and it is your duty to decide the

14   case with the same impartiality you would use in deciding a

15   case between individuals.  Also, as I read these instructions

16   to you, they generally apply to each party separately.

17       Now, the evidence in the case consists of the sworn

18   testimony of the witnesses regardless of who may have called

19   them and all of the exhibits received in evidence regardless of

20   who may have produced them and all facts which may have been

21   admitted or stipulated to by the parties.

22       Any evidence as to which an objection was sustained by me

23   and any evidence I ordered stricken must be disregarded by you

24   in arriving at your decision.  Anything you may have seen or

25   heard outside the courtroom is not evidence and is to be

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 73

1    disregarded.

2        Arguments, statements and remarks of the lawyers are not

3    evidence, and you should disregard anything said by a lawyer

4    which is not supported by the evidence and by your own general

5    knowledge and experience.

6        If any reference by me or any lawyer to any matter of

7    evidence does not coincide with your own recollection, it is

8    your recollection which should control you during your

9    deliberations.

10       Several times during the trial you have been excused or

11   trial delayed while questions of law and matters solely for me

12   to consider have been discussed with the lawyers.  This is a

13   usual and regular procedure.  No prejudice or unfavorable

14   inference should be held by you against a lawyer because of

15   this procedure.  Do not discuss or consider what you think

16   transpired in the courtroom in your absence.

17       From time to time you may have heard objections from

18   one of the lawyers.  It is not only the right but the duty of a

19   lawyer during a trial to make objections, and a lawyer would be

20   derelict in his duty if the lawyer did not raise objections

21   whenever in his judgment the evidence offered was contrary to

22   law, rules or procedure as he in his best judgment interprets

23   them.  Do not allow yourself to be swayed in your honest

24   judgment because of any objections of a lawyer for either side

25   during the trial.

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 74

1    On occasion during the course of the trial it appeared

2  necessary in my judgment to caution a lawyer who out of zeal

3  for his cause may have said or done something I thought

4  inappropriate.  You should, of course, draw no inference

5  against a side to whom a caution may have been directed.  Any

6  expression or statement by me was for the sole purpose of

7  assuring that the trial was being fairly conducted and that

8  you, the jury, had an opportunity to fairly hear and consider

9  the testimony and exhibits.

10    As the sole judges of the facts, you must determine which

11  of the witnesses you believe, what portion of their testimony

12  you accept, and what weight you attach to it.

13    At times during the trial I may have sustained objections

14  to a question without permitting the witness to answer or,

15  where an answer had been given, I may have instructed that it

16  be stricken and that you disregard it and dismiss it from your

17  minds.  You may not draw any inference from an unanswered

18  question, nor may you consider testimony which has been

19  stricken in reaching your decision.

20    The law requires that your decision be made solely upon

21  the competent evidence before you.  Such items as I have

22  excluded from your consideration were excluded because they

23  were not legally admissible.

24    The law, however, does not require you to accept all of

25  the evidence I have admitted, even though it may be competent.

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 75

1   In determining what evidence you will accept, you must make

2   your own evaluation of the testimony given by each of the

3   witnesses and determine the degree of weight you choose to give

4   his or her testimony.

5       The testimony of a witness may fail to conform to the

6   facts as they occurred because the witness is intentionally

7   telling a falsehood or because the witness did not accurately

8   see or hear that about which the witness testified or because

9   recollection of the event is faulty or because the witness did

10  not express himself or herself clearly in giving testimony.

11      There's no magical formula by which one may evaluate

12  testimony.  You, as jurors, bring with you to this courtroom

13  all of the experience and background of your lives.  In your

14  everyday affairs you determine for yourself the reliability or

15  unreliability of statements made to you by others.  The same

16  tests that you use in your everyday dealings are the tests

17  which you apply when you deliberate.

18      The interest or lack of any interest in the outcome of the

19  case, the bias or prejudice of a witness if there be any, the

20  age, the appearance, the manner in which the witness gives

21  testimony on the stand, the opportunity that the witness had to

22  observe the facts concerning which the witness testified, the

23  probability or improbability of the witness's testimony when

24  viewed in the light of all of the other evidence in the case

25  are all items to be taken into your consideration in

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 76

1   determining the weight, if any, you will assign to that

2   witness's testimony.

3        If such considerations make it appear that there is a

4   discrepancy in the evidence, you will have to consider whether

5   the apparent discrepancy may not be reconciled by fitting the

6   two stories together.  If, however, that is not possible, then

7   you are going to have to determine which of the conflicting

8   versions you will accept.

9        A witness may be discredited or impeached by contradictory

10  evidence or by evidence that at some other time the witness has

11  said or done something, or has failed to say or do something,

12  which is inconsistent with the witness's present testimony.  If

13  you believe that any witness has been impeached and thus

14  discredited, it is your exclusive province to give the

15  testimony of that witness such credibility, if any, as you may

16  think it deserves.

17       With regard to a party which is a witness, what he said or

18  did earlier may be considered not only in deciding whether you

19  should believe the testimony of the party, but may also be

20  considered as evidence of the facts in this case.

21       If a witness is shown knowingly to have testified falsely

22  concerning any material matter, you have a right to distrust

23  such witness's testimony in other particulars and you may

24  reject the testimony of that witness or give it such

25  credibility as you may think it deceives.

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 77

1     When I say "knowingly," I mean voluntarily and
2  intentionally and not because of mistake or accident or other
3  innocent reason.
4     The rules of evidence ordinarily do not permit witnesses
5  to testify as to opinions or conclusions.  An exception to this
6  rule exists as to those whom we call "expert witnesses."
7  Witnesses, who by education and experience have some expertise
8  in some art, science, profession or calling may state their
9  opinions as to relevant and material matters in which they
10  profess to be expert and may also state their reasons for the
11  opinion.
12     You should consider each expert opinion received in
13  evidence in this case and give it such weight as you may think
14  it deserves.  If you should decide that the opinion of an
15  expert witness is not based upon sufficient education and
16  experience or if you should conclude that the reasons given in
17  support of the opinion are not sound or if you feel that it is
18  outweighed by other evidence, you may disregard the opinion
19  entirely.
20     In resolving any conflict that may exist in the testimony
21  of expert witnesses, you should weigh the opinion of one expert
22  against that of another.  In doing this, you should consider
23  the relative qualifications and credibility of the expert
24  witnesses as well as the reasons for each opinion and the facts
25  or other matters upon which it is based.

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 78

1    Now, generally speaking, there are two types of evidence

2  from which a jury may properly find the truth as to the facts

3  of a case.  One is direct evidence, such as the testimony of an

4  eyewitness.  The other is indirect or circumstantial evidence,

5  the proof of a chain of circumstances pointing to the existence

6  or nonexistence of certain facts.

7    As a general rule, the law makes no distinction between

8  direct and circumstantial evidence but simply requires that the

9  jury find the facts in accordance with a preponderance of

10  evidence in the case, both direct and circumstantial.

11    In weighing all of the evidence as to a fact, it is proper

12  to consider the number of witnesses testifying on one side or

13  the other side as to that fact, but the number of witnesses

14  alone should not persuade you if the testimony of the lesser

15  number of witnesses is more convincing.

16    During the trial certain evidence was presented to you by

17  a video of a deposition.  A deposition is a record of the sworn

18  testimony of a witness taken before an authorized person.  The

19  party and their lawyers had the right to be present and to

20  examine and cross-examine the witness.  This evidence is

21  entitled to the same consideration as you would give the same

22  testimony had the witness testified in open court.

23    No party must call as witnesses all persons who may have

24  been present at any time or place involved in the case or who

25  may appear to have some knowledge of the matters at issue in

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 79

1  this trial, nor does the law require any party to produce as

2  exhibits all papers and things mentioned in the evidence in

3  this case.

4       You should consider the testimony of law enforcement

5  officers just as any other evidence in the case, and in

6  evaluating their credibility you should use the same guidelines

7  you apply to the testimony of any witness.  You should not give

8  either greater or lesser credence to the testimony of a witness

9  merely because he is a law enforcement officer.

10       This case should be considered and decided by you as a

11  case between persons of equal standing in the community, of

12  equal worth and holding the same or similar situations in life.

13  All persons stand equal before the law and are to be dealt with

14  as equals in a court of justice.

15       You have a right to consider all of the evidence in light

16  of your own general knowledge and experience in the affairs of

17  life and take into account whether any particular evidence

18  seems reasonable and probable.

19       Now, that concludes the part of my instructions explaining

20  your duties and the general rules that apply in every case.  In

21  a moment I will explain the elements of William Jennings'

22  claims against the defendants.

23       I shall now discuss with you the law applicable to this

24  case.  First I will give you the definition of some of the

25  terms or words I shall use in this portion of the instructions.

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 80

1   Listen carefully because I will not repeat these definitions.

2        Then I will tell you what must be proved with regard to

3   liability and damages.  After that I will describe to you the

4   claims, and in the last part of these instructions I will tell

5   you the rules of law you must follow when deliberating on these

6   matters.

7        When I use the term "preponderance of the evidence," I

8   mean evidence which proves that something is more likely so

9   than not so.  In other words, a preponderance of the evidence

10  in the case means such evidence as when considered and compared

11  with that opposed to it has more convincing force and produces

12  in your minds a belief that what is sought to be proved is more

13  likely true than not true.

14       In determining whether any fact in issue has been proved

15  by a preponderance of the evidence in the case, you may

16  consider the testimony of all the witnesses regardless of who

17  may have called them and all of the exhibits received in

18  evidence regardless of who may have produced them.

19       In these instructions you are told that your verdict

20  depends upon whether you find certain facts have been proved.

21  The burden of proving a fact is upon the party whose claim or

22  defense depends upon that fact.  The party who has the burden

23  of proving a fact must prove it by a preponderance of the

24  evidence as I have already defined that term for you.

25       William Jennings has filed this case under the provisions

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 81

1    of the United States Code -- United States Code Title 42,

2    Section 1983, which gives a person the right to bring a lawsuit

3    for a violation of a Constitutional right by a law enforcement

4    agent -- by a law enforcement officer acting in an official

5    capacity.

6         In order to prevail on this claim, William Jennings must

7    prove two things:  That a defendant acted under color of law

8    and that the defendant deprived William Jennings of one or more

9    Constitutional rights.

10        "Acting under color of law" simply means acting in one's

11   capacity as a law enforcement officer.  There is no dispute

12   that the defendants in this case were acting under color of law

13   at the time of the circumstances in question, and you must find

14   that this element -- you must find this element to have been

15   established.

16        Under the Fourth Amendment of the Constitution of the

17   United States, every citizen has a right to be free from

18   unreasonable search and seizure, which includes the right to be

19   free from excessive use of force or unlawful force and to be

20   free from prosecution in the absence of probable cause.

21        The use of force and the prosecution are each considered a

22   seizure -- no, forget that.  The use of force is considered a

23   seizure under the Fourth Amendment.  You must keep this in mind

24   when I use the term "excessive force in prosecution" or

25   "unlawful force" in these instructions.

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 82

1    The federal civil rights statute in which William Jennings
2    sues provides that a person may seek relief in federal court by
3    way of damages against any person or persons who, under color
4    of any state law -- under color of law subjects such person to
5    the deprivation of rights, privileges or immunities secured or
6    protected by the Constitution or laws of the United States.

7    It is not necessary to find that a defendant had any
8    specific intent to deprive William Jennings of his
9    Constitutional rights or that the defendant acted with
10   malice or ill will in order to find for Mr. Jennings.
11   William Jennings is entitled to relief if a defendant's
12   intended actions resulted in a violation of his Constitutional
13   rights.  Whether any of the defendants acted with subjective
14   good faith or with evil motive is irrelevant in determining
15   whether the defendant used unlawful force.

16   William Jennings claims that he was subjected to unlawful
17   force by each defendant during his detention in the Genesee
18   County Jail.  In that regard, as previously mentioned, every
19   person has a Constitutional right to be free from unreasonable
20   force while being detained by a law enforcement officer.

21   There is no precise definition or formula available for
22   determining whether the force is unlawful in a particular case.
23   In determining whether a defendant used unlawful force, the
24   relationship between the need and the amount of force that was
25   used, whether the person poses an immediate threat to the

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 83

1    safety of a defendant or others, and whether he is actively

2    resisting detention.

3         However, a defendant is not allowed to use any force

4    beyond that reasonably necessary to accomplish a lawful

5    purpose.  Thus, if you find that a defendant used greater force

6    than was reasonably necessary in the circumstances of this

7    case, you must find that defendant is liable for a violation of

8    William Jennings' Constitutional rights.

9         Whether the force used by a defendant was reasonable must

10   be judged from the perspective of an objectively reasonable law

11   enforcement officer.  It is your decision what force a

12   reasonable law enforcement officer would have used which

13   controls, not the state of mind of a defendant himself.

14        Evil intention on the part of a law enforcement officer

15   will not establish a Constitutional violation if the force used

16   was objectively reasonable.  At the same time, if the force

17   used was unreasonable, you must hold the law enforcement

18   officer liable for a Constitutional violation, even if you

19   believe he had good intentions.

20        When considering whether a defendant's actions are

21   objectively reasonable under the Fourth Amendment, all of the

22   facts and circumstances confronting the defendant may be

23   considered, including procedures governing conduct and his

24   training.

25        Take the next page out.  Just throw it on the floor.

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 84

1    If you believe that William Jennings' Constitutional

2  rights were violated, you must then consider whether the

3  violations caused injury or damage to William Jennings.  Any

4  injury or damage is caused by an act or a failure to act

5  whenever it appears from the evidence in the case that the act

6  or omission played a substantial part in bringing about or

7  actually causing the injury or damages and that the injury or

8  damage was either a direct result or a reasonably probable

9  consequence of the act or omission.

10    The law does not necessarily recognize only one cause of

11  an injury or damage, consisting of only one factor or thing or

12  the conduct of one person.  On the contrary, many factors or

13  things or the conduct of two or more persons may operate at the

14  same time, either independently or together, to cause injury or

15  damage and in such a case each may be a cause.

16    If William Jennings has proven a claim against a

17  defendant, you must determine the damages to which

18  William Jennings is entitled.  You should not interpret the

19  fact that I am giving you instructions about William Jennings'

20  damages as an indication in any way that I believe that

21  William Jennings should or should not win this case.

22    It is your task first to decide whether a defendant is

23  liable.  I am instructing you on damages only so that you will

24  have guidance in the event you decide that a defendant is

25  liable and that William Jennings is entitled to recover money

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 85

1    from a defendant.

2         Damages must be reasonable.  If you should find that

3    William Jennings is entitled to a verdict, you may award

4    William Jennings only such damages as will reasonably

5    compensate William Jennings for such injury and damage as you

6    find was sustained as a proximate result of a defendant's acts

7    or omissions.

8         Compensatory damages are not restricted to actual loss or

9    injury, tangible and intangible.  They are an attempt to

10   restore William Jennings, that is, to make William Jennings

11   whole or as William Jennings was immediately prior to the

12   injuries.

13        You are not permitted to award speculative damages.  So

14   you are not to include in any verdict compensation for such

15   prospective loss which, although possible, is not reasonably

16   certain to occur in the future.

17        If you find for William Jennings, you should compensate

18   him by awarding him money damages for any bodily injury and any

19   resulting pain and suffering, disability, disfigurement, mental

20   anguish and loss of enjoyment of life, social pleasure,

21   embarrassment, humiliation or mortification experienced in the

22   past and which you find from the evidence that he is reasonably

23   entitled to suffer in the future from the injury in question.

24        No evidence of the value of such intangible things as

25   mental or physical pain and suffering has been or need be

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 86

1  introduced in that respect.  It is not the value you are trying

2  to determine, but an amount that will fairly compensate

3  William Jennings for the damage he has suffered.  There is no

4  exact standard of fixing compensation to be awarded on account

5  of such elements of damage.  Any such award should be fair and

6  just in light of the evidence.

7      If you find for William Jennings, you should compensate

8  him for any aggravation of any existing disease or physical

9  condition (or activation of any such latent condition)

10  resulting from such injury.  If you find that there was an

11  aggravation, you should determine, if you can, what portion of

12  the condition resulted from the aggravation and make allowance

13  in your verdict only for the aggravation.  However, if you

14  cannot make that determination or if it cannot be said that the

15  condition would have existed apart from the injury, you should

16  consider and make allowance in your verdict for the entire

17  condition.

18      In addition to actual damages, the law permit the jury

19  under certain circumstances to award the injured person

20  punitive damages in order to punish the wrongdoer for some

21  extraordinary misconduct and to serve as an example or warning

22  to others not to engage in such conduct.

23      If you find from a preponderance of the evidence that

24  William Jennings is entitled to a verdict for compensatory

25  damages and you further find that the act or omission of a

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 87

1   defendant proximately causing actual injury or damage to

2   William Jennings was maliciously or wantonly or oppressively

3   done, then you may add to the award of actual damages such

4   amount as you shall agree to be proper as punitive damages.

5       An act or a failure to act is "maliciously done" if

6   prompted or accompanied by ill will or spite or grudge towards

7   the injured person.

8       An act or failure to act is "wantonly done" if it is done

9   in reckless or callus disregard of or indifference to the right

10  of the injured person.

11      An act or failure to act is "oppressively done" if done in

12  a way or manner that injures or damages or otherwise violates

13  the rights of another person with unnecessary harshness or

14  severity, as by misuse or abuse of authority or power or by

15  taking advantage of some weakness, disability or misfortune of

16  another person.

17      Whether or not to make an award of punitive damages in

18  addition to actual damages is a matter exclusively within the

19  province of the jury if you find from a preponderance of the

20  evidence in the case that a defendant's act or omission which

21  proximately caused actual damage to William Jennings was

22  maliciously or wantonly or oppressively done.

23      You should always bear in mind that such extraordinary

24  damages may be allowed only if you should first unanimously

25  award William Jennings a verdict for compensatory damages.

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 88

1    You should also bear in mind not only the conditions under

2    which and the purposes for which the law permits an award of

3    punitive damages to be made but also the requirement of the law

4    that the amount of such extraordinary damages when awarded must

5    be fixed with calm discretion and sound reason and must never

6    be either awarded or fixed in an amount because of any sympathy

7    or bias or prejudice with respect to any party in the case.

8    As I have told you, neither in these instructions nor in

9    any ruling or remark that I have made during the course of the

10   trial have I intended to offer any opinion or suggestion to you

11   as to how I would resolve any issues in this case.

12   Your verdict must represent the considered judgment of

13   each of you.  In order to return a verdict, it is necessary

14   that each of you agree.  Your verdict must be unanimous.

15   It is your duty to consult with one another and to

16   deliberate with a view to reaching an agreement if you can do

17   so without violence to individual judgment.  Each of you must

18   decide the case for yourself, but do so only after an impartial

19   consideration of the evidence with your fellow jurors.  In the

20   course of your deliberation do not hesitate to reexamine your

21   own views and change your opinion if convinced it's erroneous,

22   but do not surrender your honest conviction as to the weight or

23   effect of the evidence solely because of the opinion of your

24   fellow jurors or for the mere purpose of returning a verdict.

25   You are not partisans.  You are judges, judges of the

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 89

1    facts.  Your sole interest is to ascertain the truth from the

2    evidence in the case.

3        When you go to the jury room, you should select one of you

4    to act as your foreperson.  The foreperson will then preside

5    over your deliberations and be your spokesperson here in the

6    courtroom.

7        If it becomes necessary during your deliberations to talk

8    with me, you may send a note by the bailiff signed by your

9    foreperson or by one or more of you.  None of you should

10   attempt to communicate with me by any means other than a signed

11   written note.  I will not communicate with you other than in

12   writing or orally in open court.

13       Read the instructions.

14       You are entitled to see the exhibits.  I suggest you begin

15   your deliberations, and then, if it would be helpful to you,

16   you may ask for any or all of them by sending me a note.

17       Now, with regard to the video, if you want to see any

18   video replayed, send me a note and you will come back into the

19   courtroom and we will play the portion of the video that you

20   have asked for in the note.  Any individual juror has a right

21   to ask to see the videos, you simply send a note through your

22   foreperson, but you all have to look.

23       The form of verdict has been furnished you.  You will take

24   it to the jury room, and when you have reached unanimous

25   agreement to the answers to the questions set forth in

*13-13308; Jennings v. Fuller, et al.*

*Final Jury Instructions*
*Wednesday/November 2, 2016/Volume 11*

V11-Page 90

1   accordance with these instructions, you will have your

2   foreperson fill in the date, sign the answers to the questions

3   upon which you have unanimously agreed, and then return with

4   them to the courtroom.

5        You will note that most of the questions call for a

6   yes-or-no answer.  Other questions call for a dollar amount.

7   All of the answers, as I have said, must be unanimous.

8        That, ladies and gentlemen, are your instructions.  I will

9   now administer the oath to your bailiff.

10       Raise your right hand.

11       (The bailiff was sworn.)

12            **THE COURT:**  Thank you.

13       Now, I'm going to give you a green folder to take into the

14   jury room.  The folder has a verdict form in it.  That's the

15   one that you will fill out after you conclude your

16   deliberations.  And it has some pieces of paper that are

17   labeled "Message from the jury," and you only deliberate when

18   all eight of you are in the room.  If for any reason one of you

19   leaves the room, for any reason, you've got to stop talking

20   about the case until that person comes back.

21       You control your own hours.  If you haven't reached a

22   verdict by 4:00 o'clock, unless you tell me you are not far

23   away, I'm going to excuse you and you will come back tomorrow

24   morning at 9:00 o'clock.

25       When you leave, you give the green folder to the bailiff.

V11-Page 91

1    And so when you get back and all eight of you are in the room,

2    you give the green -- she will give you back the green folder.

3        You give her the green folder.  When you get back, she

4    will give it back to you.  In other words, if the green folder

5    isn't in the jury room, you are not supposed to talk about the

6    case.  Okay?

7        You are now excused.  Your lunch should be here in about

8    15 minutes.  Thank you.

9        (Jury out at 12:11 p.m.)

10           THE COURT:  Do you have something for the Court,

11   Mr. Ernst?

12           MR. ERNST:  Yes, Your Honor, I have.

13           THE COURT:  Okay.  I forgot to tell them they can

14   have a list of the exhibits and the witnesses.

15       Yes, sir.

16           MR. ERNST:  All right.  Your Honor, when we were in

17   your chambers yesterday, I asked are we were going to meet --

18           THE COURT:  What?  I don't know what you are saying.

19           MR. ERNST:  When we were in your chambers yesterday,

20   I asked you if we were going to meet today and talk about the

21   jury instructions, you said no so I'm not sure when we were

22   expected to offer changes, but I wanted to offer the one from

23   *Cox v. Treadway* about excessive force against a restrained

24   person who is in police custody.  And the Sixth Circuit

25   specifically found that the general charge that you just gave

*13-13308; Jennings v. Fuller, et al.*

V11-Page 92

1   to the jury -- it says the charge actually given the jury in

2   this case did not substantially cover the post-restraint

3   Fourth Amendment law that was partially contained in

4   appellant's requested instructions because the charge as given

5   could have allowed the jury to believe that some force could be

6   used on a restrained suspect in police custody as long as the

7   force was not excessive, and the instruction that we provided

8   in our previous instructions is a post-restraint excessive

9   force instruction and --

10          THE COURT:  As I recall, the first time we had an

11  instruction conference I told you two to get together and give

12  me a common set with those portions that each of you wanted

13  added, deleted or modified.

14          MR. ERNST:  And we did.

15          THE COURT:  And when I came to the conclusion -- I

16  think I told you this in the jury room -- that you were so far

17  apart I was going to draft the instructions and submit them to

18  you and you had the right to submit anything you wanted to me

19  to add, delete or modify, and it was clear from what I said

20  that I wasn't paying any attention at that moment to what you

21  had previously submitted as a draft of the instructions.

22       Am I correct, Mr. Reising?

23          MR. REISING:  That's my recollection, Your Honor.

24          THE COURT:  Rather complete.

25          MR. ERNST:  Your Honor, my --

*13-13308; Jennings v. Fuller, et al.*

V11-Page 93

1      **THE COURT:**  So the fact that it was in your draft

2  doesn't mean a thing because I wasn't paying any attention to

3  your draft or to the defendants' draft.  You would have had to

4  submit it, and I kept -- as a matter of fact, two days ago when

5  I gave you the drafts marked up I said if you have any

6  additions, deletions or modifications you have to present them

7  to me in the precise words that you want added, the precise

8  words you wanted deleted or the precise words you wanted

9  modified.  So for you to come after the final argument for the

10  first time with a suggestion as to an instruction is a little

11  late in the day.

12      **MR. ERNST:**  Well, Your Honor, I beg to differ with

13  the Court's rendition.

14      **THE COURT:**  Well, I'm sorry, sir.  You know

15  something, Mr. -- I don't want to sound imperious, but there's

16  a difference between you and me.  I'm the judge.

17      **MR. ERNST:**  I agree, but I'm trying to make a record.

18      **THE COURT:**  And you are supposed to follow my

19  instructions, not yours.  Do you have anything --

20      **MR. ERNST:**  I agree, Your Honor.  I am just trying to

21  make a record.  My understanding --

22      **THE COURT:**  You have made your record.  You haven't

23  even handed me what you want.

24      **MR. ERNST:**  These are the two.  And we previously

25  submitted them, Your Honor, and when we were in your chambers,

V11-Page 94

1    you went through them and ripped some of them out.

2           **THE COURT:**  You know, your problem, Mr. Ernst, is you

3    don't listen to the judge.  All right.  Have you given a copy

4    of them to Mr. Reising?

5           **MR. ERNST:**  Previously.

6           **THE COURT:**  No, just now.

7           **MR. ERNST:**  No, but we have one.

8           **THE COURT:**  Okay.  I have it.  Thank you.

9        Do you have anything else?  You better file it in some

10   fashion.

11          **MR. ERNST:**  Very well, Your Honor.

12          **THE COURT:**  Do you have anything else?

13          **MR. ERNST:**  Well, there's two instructions, but I

14   assume you are rejecting both of them.

15          **THE COURT:**  Do you have anything else?

16          **MR. ERNST:**  Not other than those two instructions,

17   Your Honor.

18          **THE COURT:**  Thank you.

19          **MR. ERNST:**  Thank you.

20          **THE COURT:**  Do you have anything, Mr. Reising?

21          **MR. REISING:**  Your Honor, I think that we previously

22   objected --

23          **THE COURT:**  What?

24          **MR. REISING:**  We previously objected to the

25   instruction concerning --

*13-13308; Jennings v. Fuller, et al.*

V11-Page 95

1        **THE COURT:**  I understand, I understand.  This is a

2   quote from a case, and that isn't how you deal with

3   instructions.  It reminds me of railroad lawyers in the railway

4   when they went through something.  They would collect all of

5   the phrases in all of the case and then put them under a staple

6   and say these are our instructions.  That isn't how you deal

7   with the instructions.  Thank you.

8       Do you have anything else, anybody?

9        **MR. REISING:**  I have nothing for you, sir.

10        **THE COURT:**  Okay.  Just so you know, I'm going to

11  have the bailiff hand them the lists that you furnished of the

12  admitted exhibits and the witnesses.

13        **MR. REISING:**  That's fine, Your Honor.

14        **THE COURT:**  Thank you.

15      Now, I have a rule once the jury deliberates you can go

16  anywhere on the face of the earth as long as I can get in touch

17  with you and you are back here in ten minutes.

18        **MR. SCOTT:**  Thank you, Your Honor.

19        **THE COURT:**  Now, all four of you don't -- two on each

20  side, so I suggest you give Kim your cell phone numbers if you

21  leave the building.

22        **MR. REISING:**  Correct.

23        **THE COURT:**  Thank you.

24        **MR. ERNST:**  Your Honor, we are going to go over each

25  other's exhibits; is that correct?

*13-13308; Jennings v. Fuller, et al.*

V11-Page 96

1          **THE COURT:**  I don't know what you just said.

2          **MR. ERNST:**  We are going to go over each other's

3  exhibits.

4          **THE COURT:**  What?  Just leave them there.

5          **MR. ERNST:**  But you said we could go over them.

6          **THE COURT:**  Oh, yeah, you can go over them, but you

7  don't take them away.  You sit right there and you don't take

8  anything out, and if you have a problem with them, I'll be

9  here.  You call me.

10      Thank you.  We're in recess.

11      (Discussion held off the record.)

12          **MR. ERNST:**  Your Honor, the other thing is with these

13  exhibits.  We have already been through this with the doctor's

14  report as far as the exhibits.

15          **THE COURT:**  I can't hear you, Mr. Ernst.

16          **MR. ERNST:**  I'm sorry, Your Honor.  I'm trying to

17  talk loud.

18          **THE COURT:**  Show me the exhibit book.  Give me the

19  book.  Well, first show it to him, the book.

20          **MR. ERNST:**  It's his book.

21          **MR. SCOTT:**  They are objecting to our exhibit.

22          **THE COURT:**  Okay.

23          **MR. REISING:**  It's actually plaintiff's exhibit from

24  Dr. Hanson's deposition that we want to mark now.

25          **MR. ERNST:**  No, that's not from his deposition, I

*13-13308; Jennings v. Fuller, et al.*

V11-Page 97

1    don't think, but --

2            **MR. REISING:**  Yes, it is.

3            **MR. SCOTT:**  There were two exhibits marked at

4    Dr. Hanson's deposition.  This is both of them, Exhibit A in

5    this book.

6            **MR. ERNST:**  But, Your Honor, the records that are

7    relevant and that are not prejudicial were included in our

8    exhibit.

9            **THE COURT:**  Wait, what page?

10           **MR. ERNST:**  They have like his entire medical

11   history, which is --

12           **MR. SCOTT:**  Dr. Hanson was examined on his entire

13   chart.

14           **MR. ERNST:**  No, he wasn't.

15           **MR. SCOTT:**  Yes, he was.  They asked when did you see

16   him next.

17           **THE COURT:**  No, no.  You're not --

18       What pages did he testify to?

19           **MR. SCOTT:**  I believe all of them, Your Honor.

20           **THE COURT:**  No, he couldn't.  Come on.

21           **MR. ERNST:**  He testified to the ones that are in our

22   book.

23           **THE COURT:**  Take this exhibit out.

24           **MR. REISING:**  Let me see what's in your book.

25           **THE COURT:**  Okay.  First of all, the exhibit itself

*13-13308; Jennings v. Fuller, et al.*

V11-Page 98

1    is not marked with its number.  It's just in the book under a

2    tab.

3             **MR. ERNST:**  Yeah, it's a deposition exhibit that was

4    never introduced in the case.

5             **THE COURT:**  No, this kind of an exhibit never would

6    have been allowed.

7             **MR. ERNST:**  Right.

8             **THE COURT:**  What other one is there?

9             **MR. ERNST:**  I don't know.  That's the first one we

10   saw.

11            **THE COURT:**  Well, go through the book and tell me.

12   I'm not going to give them the list yet.

13       Is Exhibit 14 in your book?

14            **MR. ELLIOTT:**  Exhibit 14 is in plaintiff's book, yes.

15            **THE COURT:**  It should be taken out if it's in there.

16            **MR. ERNST:**  Which is what?

17            **THE COURT:**  Let me see the plaintiff's book.  Give me

18   the plaintiff's book, please, that is there.

19            **MR. ELLIOTT:**  This is not our book.

20            **THE COURT:**  Where is your book?

21            **MR. ELLIOTT:**  It was on the table, Your Honor.  I put

22   it here this morning.  It was a pile of all of the admitted

23   exhibits.

24            **THE COURT:**  No, then she put them in a notebook.  I

25   told her to punch holes and put them in a notebook.

*13-13308; Jennings v. Fuller, et al.*

V11-Page 99

1          **MR. ELLIOTT:**  Okay.  Exhibit 1 is our photos.

2    Exhibit 2 is the booking photo.  Exhibit 3 are the stills.

3    Exhibit 13 is the safety cell 6 exhibit.

4          **THE COURT:**  Exhibit 14 comes out.

5          **MR. ELLIOTT:**  Exhibit 14, the complaint and the --

6          **THE COURT:**  Yes.

7          **MR. ELLIOTT:**  Exhibit 19 is McLaren records.

8          **MR. REISING:**  Okay.

9          **THE COURT:**  Exhibit 20 is Genesys records.

10   Exhibit 21 is Dr. Water -- is it Water?

11         **MR. ELLIOTT:**  Dr. Waters.

12         **THE COURT:**  Plural or singular?

13         **MR. ERNST:**  I think it's plural.

14         **MR. REISING:**  Yeah, it's Waters.

15         **THE COURT:**  Waters?

16         **MR. ELLIOTT:**  Yes.

17         **THE COURT:**  Records.  22 is Hanson, Dr. Hanson?

18         **MR. ERNST:**  Hanson.

19         **THE COURT:**  Hanson records.  24 is the videos, and 25

20   is the life expectancy tables.

21      Well, you guys work out those exhibits, and if you have a

22   problem you call me.  That's all I can tell you.

23         **MR. ERNST:**  Judge, this is what we object to.

24         **THE COURT:**  Okay.  On the plaintiff's admitted

25   exhibits I have stricken 14 from the list.

V11-Page 100

1          Now, on defendants' trial exhibits, A is Dr. Hanson's

2    records.

3               MR. SCOTT:  We're going to consolidate that with

4    plaintiff's.

5               THE COURT:  What?

6               MR. SCOTT:  We're going to consolidate that with

7    plaintiff's exhibit.

8               THE COURT:  All right.  Now, Exhibit A is

9    Dr. Hanson's records.  Is there is a dispute as to what will be

10   in the book?

11              MR. ERNST:  Yeah.  The Court has already indicated

12   this lengthy history is not coming in.

13              THE COURT:  No, the lengthy history is not coming in.

14              MR. REISING:  We agree.  That's coming out.  We're

15   down to just a few pages, Your Honor.

16              THE COURT:  Well, tell me which pages you are

17   disagreeing with.

18              MR. ERNST:  This is one of them, Your Honor.  There's

19   an incident of August 3rd of '09.

20              MR. ELLIOTT:  At the bottom in the handwriting about

21   a fight at the bar.

22              THE COURT:  Well, whose records are these?

23              MR. REISING:  Dr. Hanson's records.

24              MR. ERNST:  It's about he got maced at a bar on

25   August 3rd, '09.  There was no fight.

                  *13-13308; Jennings v. Fuller, et al.*

V11-Page 101

1          **MR. SCOTT:**  He was examined on that issue.

2          **THE COURT:**  I told you this business about the bar is

3     out.

4          **MR. REISING:**  He already testified about that.

5          **MR. SCOTT:**  That's a different bar fight.

6          **MR. REISING:**  That's a different bar fight.

7          **MR. ERNST:**  Yeah, it's even more ancient in time.  It

8     wasn't even a fight.  He just got maced by the bouncer.

9          **THE COURT:**  The bouncer did this.  That shouldn't be

10    in the record.  It's is not to be sanitized.

11       I'm modifying the exhibit list to say Dr. Hanson records,

12    not Exhibits 1 and 2 from deposition.

13         **MR. REISING:**  Well, Exhibit Number 2, Your Honor,

14    from the deposition --

15         **THE COURT:**  No, it's just Dr. Hanson's records,

16    period.

17         **MR. REISING:**  I understand that, but --

18         **THE COURT:**  Is Exhibit A, period.

19         **MR. REISING:**  Right, but part of Exhibit A is our

20    record --

21         **THE COURT:**  I'm not putting it on the list.  That's

22    all I'm saying.

23         **MR. REISING:**  Okay.

24         **THE COURT:**  That's all.  But Dr. Waters' records are

25    in there.

*13-13308; Jennings v. Fuller, et al.*

V11-Page 102

1      Well, you've got to get straightened out what's in the

2  book.  I'm leaving the bench for the moment.  If you need me,

3  we'll come back.  Sheri and I will be here if you have a

4  disagreement.

5      (Proceedings adjourned at 12:30 p.m.)

6                         -   -   -

7

8                 **C E R T I F I C A T I O N**

9      I certify that the foregoing is a correct transcription of

10  the record of proceedings in the above-entitled matter.

11

12  s/ Sheri K. Ward_____                    11/18/2016
     Sheri K. Ward                            Date
13  Official Court Reporter

14                         -   -   -

15

16

17

18

19

20

21

22

23

24

25

                    *13-13308; Jennings v. Fuller, et al.*