UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIAM JENNINGS,

      Plaintiff,

v.                                                Case No. 13-13308

PATRICK FULLER, ROBERT NUCKOLLS,           HON. AVERN COHN
DAVID KENAMER, MARK WING and
JASON WHITE,

      Defendants.

_____/

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' POST-TRIAL MOTIONS FOR NEW TRIAL AND JUDGMENT AS A MATTER OF LAW AND GRANTING DEFENDANTS' MOTIONS FOR A REMITTITUR OF COMPENSATORY AND PUNITIVE DAMAGES

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1
  A.   The Case and Disposition .................................................................. 1
  B.   Pretrial ............................................................................................... 1
  C.   Trial .................................................................................................... 2
  D.   Verdict Form and Jury Instructions ..................................................... 4
  E.   Jury Verdict and Judgment ................................................................. 6

II.  POST-TRIAL MOTIONS ................................................................................ 6
  A.   Motions .............................................................................................. 6
  B.   Remittitur ........................................................................................... 7

III. TRIAL EVIDENCE ........................................................................................ 8
  A.   Description of Incident ....................................................................... 8
  B.   Events at Jail ..................................................................................... 9
    1.   Phase 1: Intake Room (two minutes) ........................................... 9
    2.   Phase 2: Sally Port and Hallway I (one minute)......................... 10
    3.   Phase 3: Safety Cell I (one minute) ........................................... 11
    4.   Phase 4: Hallway II (twelve minutes)......................................... 11
    5.   Phase 5: Safety Cell II (two and a half hours)........................... 13
    6.   Phase 6: Continued Detention and Release (four hours)...................... 15
  C.   Injuries ............................................................................................ 15
    1.   Facial.......................................................................................... 15
    2.   Shoulder ..................................................................................... 16
    3.   Eye ............................................................................................. 16
    4.   Mental ........................................................................................ 17
    5.   Other .......................................................................................... 17
    6.   Continued Pain and Suffering .................................................... 17
    7.   Defense Medical Experts ........................................................... 18
    8.   Lack of Continued Treatment ..................................................... 18

IV.  MOTIONS FOR NEW TRIAL, JMOL AND REMITTITUR ............................... 18
  A.   Summary.......................................................................................... 18
    1.   New Trial .................................................................................... 18
    2.   JMOL........................................................................................... 18
    3.   Remittitur ................................................................................... 19
    4.   No Specified Amount .................................................................. 19
  B.   Legal Standards .............................................................................. 19
    1.   New Trial .................................................................................... 19
    2.   JMOL........................................................................................... 20

3.  Remittitur ................................................................................... 20
**V.  IMPROPER EVIDENTIARY RULINGS AS THE BASIS FOR A NEW TRIAL** ........ 20

A.  **Use of Force Policies** ................................................................. 21

B.  **Ross's Opinions** ........................................................................ 22

C.  **Glaza – Video** ........................................................................... 22

**VI.  IMPROPER VERDICT FORM AND JURY INSTRUCTIONS AS THE BASIS FOR A NEW TRIAL** ........................................................................................... 24

**VII.  IMPROPER ARGUMENT OF COUNSEL AS THE BASIS FOR A NEW TRIAL** 25

**VIII.  QUALIFIED IMMUNITY AS THE BASIS FOR A JMOL** .................................... 26

**IX.  EXCESSIVE COMPENSATORY DAMAGES AS THE BASIS FOR A NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR** ......................................... 26

A.  **New Trial Versus Remittitur** ...................................................... 26

B.  **New Trial** ................................................................................... 28

C.  **Remittitur** ................................................................................. 29

**X.  ATTACK ON THE AWARD OF PUNITIVE DAMAGES** ......................................... 31

A.  **The Award of Punitive Damages as the Basis for a JMOL** ......................... 32

1.  **Relevant Law** .......................................................................... 32
2.  **Defendants' Arguments** ........................................................... 32
3.  **Conduct of Defendants** ........................................................... 33
    a.  **Nuckolls** ............................................................................ 33
    b.  **Fuller** ................................................................................ 33
    c.  **Kenamer** ............................................................................ 34
    d.  **Wing** .................................................................................. 34
    e.  **White** ................................................................................. 35

B.  **Excessive Punitive Damages as the Basis for a New Trial** ......................... 35

C.  **Excessive Punitive Damages as the Basis for a Remittitur** ....................... 36

**XI.  DEFENDANTS' ABILITY TO PAY** ..................................................................... 38

**XII.  CONCLUSION** ............................................................................................. 39

# I.       INTRODUCTION

## A.       The Case and Disposition

This is a 42 U.S.C. § 1983 excessive force case.  William Jennings (Jennings), age 43, sued Robert Nuckolls (Nuckolls), Patrick Fuller (Fuller), David Kenamer (Kenamer), Mark Wing (Wing) and Jason White (White) all employed by the Genesee County Sheriff's Department (Department), for mistreatment while in their custody at the Genesee County Jail on September 18-19, 2010 after being arrested for drunk driving.

For the reasons which follow, the defendants' motions for a new trial and judgment as a matter of law (JMOL) are DENIED.  Defendants' motions for a remittitur of compensatory and punitive damages are GRANTED.  *See* pp. 7-8.

## B.       Pretrial

Defendants previously moved for summary judgment and dismissal based on qualified immunity.  The Court denied the motion, *Jennings v. Fuller*, 2015 WL 4075057 (E.D. Mich. 2015), (Doc. 51).  On appeal, the Sixth Circuit affirmed.  *Jennings v. Fuller*, 659 F. App'x 867 (6th Cir. 2016), (Doc. 89).  The Sixth Circuit decision denying qualified immunity is a condensed version of what occurred in the Genesee County Jail on the night in question.

At the final pretrial conference on October 18, 2016, the parties were given copies of a draft verdict form and jury instructions based on their submissions to the Court.  (Doc. 128 at 4).  They were told to review these papers during the course of the trial.  (*Id.*).  This was the first time the parties were given copies and told of their opportunity to object.  See below for further occasions.  *See* pp. 3-4.

1

Before trial, defendants filed motions *in limine* which the Court ruled on as follows:

- Doc. 109 – Memorandum and Order Denying Defendants' Motion for Apportionment of Liability and Damages, and

- Doc. 112 – Order Relating to Motions *In Limine* (denying in relevant part defendants' motion to preclude use of force policies (Doc. 73))

The Court denied the motion to apportion liability and damages because defendants' conduct was a continuous stream of activity producing an indivisible harm in which each defendant's actions was a substantial factor, (Doc. 109 at 3). The Court granted in part and denied in part the motion to preclude in evidence the Sheriff's Department policies on use of force. (Doc. 112 at 1). Specifically, the Court permitted witnesses to be examined as to portions relating to the use of pepper spray, tasers and restraints. (*Id.*).

## C.     Trial

The case went on to a 12-day jury trial, extending from October 19 to November 2, 2016, on liability and damages. The events at the jail were reflected in a video obtained from surveillance cameras inside the jail. At trial, in addition to testimony from Jennings and the defendants,[1] the jury heard from nine witnesses called by Jennings:

- Kenneth Glaza (a forensic video expert) – qualified as expert; testified as to his interpretation of contents of the video;

- William Katsaris (Jennings's expert on police practices) – qualified as expert; testified as to his interpretation of officers' actions in the video;

---

[1] Kyle Guest, a deputy sheriff who was present at the jail but had no physical contact with Jennings, was named as a defendant but dismissed as a party at trial. (Doc. 138 at 14).

- Dale Hanson (Jennings's treating physician) – testified as to his medical treatment of Jennings;

- John Waters (Jennings's treating ophthalmologist) – testified as to his medical treatment of Jennings;

- Gerald Shiener (Jennings's examining psychiatrist) – qualified as expert; testified as to his mental examination of Jennings and officers' actions in the video;

- Magdalena Jennings (Jennings's mother) – testified as to her interactions with Jennings and the impact of the incident on him personally;

- Sharon Jankowski (Jennings's girlfriend, mother of child) – testified as to her interactions with Jennings and the impact of the incident on him personally;

- Stephanie Tompkins (a nurse at the jail during the incident) – testified as to her physical examination of Jennings at the jail; and

- Francis Hartner (Flint Township Police and arresting officer) – testified as to his observations of Jennings in arresting him and in the intake room

At the close of Jennings's case in chief, defendants moved for JMOL under Fed. R. Civ. P. 50(a) based on qualified immunity. (Doc. 115 at 6-9). The Court denied the motion. (Doc. 138 at 19).

The Court discussed with the parties the draft of the verdict form and jury instructions at the close of the case in chief. (*Id.* at 123-24). The parties were told to raise any objections in writing by the next day, with proposed additions, deletions or modifications redlined. (*Id.*). Neither party raised an objection. (Docs. 139, 140).

The jury heard from four witnesses called by defendants:

- Darrell Ross (defendants' expert on police practices) – qualified as expert; testified as to defendants' actions in the video;

- William Kohen (defendants' expert orthopedist) – qualified as expert; opined as to Jennings's claimed shoulder injury from defendants' acts;

- Thomas Byrd (defendants' expert ophthalmologist) – qualified as expert; opined as to Jennings's claimed cataract injury from defendants' acts; and

- Kirk Stucky (defendants' expert psychologist) – qualified as expert; opined as to Jennings's claimed PTSD injury from defendants' acts

At the close of evidence, the Court gave another draft of the verdict form and jury instructions to each party. (Doc. 140 at 3). No objection was raised. (*Id.*).

### D.    Verdict Form and Jury Instructions

Defendants contest details of the verdict form and jury instructions. The verdict form is attached, Exhibit A, and the relevant jury instructions are set out below.

Prior to final argument, the Court distributed a copy of the verdict form to each juror and acquainted the jury with it. (*Id.* at 9-11). Liability was to be considered separately as to each defendant. Compensatory damages were to be assessed in the collective. Punitive damages were to be assessed separately as to each defendant.

After final argument, a copy of the jury instructions was given to each juror. (*Id.* at 70-91). As to the use of excessive force and compensatory damages, the Court said in part:

Under the Fourth Amendment of the Constitution of the United States, every citizen has a right to be free from unreasonable search and seizure, which includes the right to be free from excessive use of force or unlawful force . . . .

. . . The use of force is considered a seizure under the Fourth Amendment. You must keep this in mind when I use the term "excessive force["] . . . or "unlawful force" in these instructions. . . .

There is no precise definition or formula available for determining whether the force is unlawful in a particular case. In determining whether a

defendant used unlawful force, the relationship between the need and the amount of force that was used, whether the person poses an immediate threat to the safety of a defendant or others, and whether he is actively resisting detention. . . .

Whether the force used by a defendant was reasonable must be judged from the perspective of an objectively reasonable law enforcement officer. It is your decision what force a reasonable law enforcement officer would have used which controls, not the state of mind of a defendant himself. . . .

Damages must be reasonable. If you should find that William Jennings is entitled to a verdict, you may award William Jennings only such damages as will reasonably compensate William Jennings for such injury and damage as you find was sustained as a proximate result of a defendant's acts or omissions. . . .

You are not permitted to award speculative damages. So you are not to include in any verdict compensation for such prospective loss which, although possible, is not reasonably certain to occur in the future. . . .

No evidence of the value of such intangible things as mental or physical pain and suffering has been or need be introduced in that respect. It is not the value you are trying to determine, but an amount that will fairly compensate William Jennings for the damage he has suffered. There is no exact standard of fixing compensation to be awarded on account of such elements of damage. Any such award should be fair and just in light of the evidence.

(*Id.* at 81-83, 85-86). As to punitive damages, the Court said in part:

In addition to actual damages, the law permit[s] the jury under certain circumstances to award the injured person punitive damages in order to punish the wrongdoer for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct.

If you find from a preponderance of the evidence that William Jennings is entitled to a verdict for compensatory damages and you further find that the act or omission of a defendant proximately causing actual injury or damage to William Jennings was maliciously or wantonly or oppressively done, then you may add to the award of actual damages such amount as you shall agree to be proper as punitive damages. . . .

Whether or not to make an award of punitive damages in addition to actual damages is a matter exclusively within the province of the jury if you find from a preponderance of the evidence in the case that a defendant's

act or omission which proximately caused actual damage to William Jennings was maliciously or wantonly or oppressively done. . . .

You should also bear in mind not only the conditions under which and the purposes for which the law permits an award of punitive damages to be made but also the requirement of the law that the amount of such extraordinary damages when awarded must be fixed with calm discretion and sound reason and must never be either awarded or fixed in an amount because of any sympathy or bias or prejudice with respect to any party in the case.

(*Id.* at 86-88).

### E.    Jury Verdict and Judgment

The jury returned a verdict, (Doc. 119), finding each of the defendants liable and

awarded an aggregate of $36.63 million in damages, broken down as follows:

| <u>Compensatory</u>: | <u>Punitive</u>: |
|---|---|
| • $10.42 million (past and present)<br>• $7.21 million (future)<br><br>**TOTAL:   $17.63 million** | • $5 million (Nuckolls)<br>• $5 million (Fuller)<br>• $4 million (Kenamer)<br>• $3 million (Wing)<br>• $2 million (White)<br><br>**TOTAL:        $19 million** |

The Court entered a judgment reflecting the verdict, (Docs. 122, 153).

### II.    POST-TRIAL MOTIONS

### A.    Motions

Defendants have filed nine post-trial motions as follows:

- Doc. 142 – Motion for New Trial Based on Evidentiary Rulings
  [*See* Part V, *infra*]

- Doc. 150 – Motion for New Trial Based on Improper Verdict Form,
  Improper Standards and Improper Argument of Counsel
  [*See* Parts VI-VII, *infra*]

- Doc. 143 – Motion for JMOL Based on Qualified Immunity
  [*See* Part VIII, *infra*]

6

- Doc. 144 – Motion for New Trial or, Alternatively, Remittitur Based on Excessive Compensatory Damages [*See* Part IX, *infra*]

- Doc. 149 – Motion for New Trial, JMOL or Alternatively Remittitur Based on Excessive Punitive Damages as to Nuckolls [*See* Part X, *infra*]

- Doc. 145 – Motion for New Trial, JMOL or Alternatively Remittitur Based on Excessive Punitive Damages as to Fuller [*See* Part X, *infra*]

- Doc. 147 – Motion for New Trial, JMOL or Alternatively Remittitur Based on Excessive Punitive Damages as to Kenamer [*See* Part X, *infra*]

- Doc. 148 – Motion for New Trial, JMOL or Alternatively Remittitur Based on Excessive Punitive Damages as to Wing [*See* Part X, *infra*], and

- Doc. 146 – Motion for New Trial, JMOL or Alternatively Remittitur Based on Excessive Punitive Damages as to White [*See* Part X, *infra*]

Jennings responded, (Docs. 165-66, 168-74). Defendants replied, (Docs. 178-82).[2]

## B. Remittitur

The Court suggests a remittitur of $12.63 million as to compensatory damages, reducing the award from $17.63 million to $5 million, and a remittitur of punitive damages for each defendant as follows:

- Nuckolls – $3 million remittitur (reduced from $5 million to $2 million)

- Fuller – $4 million remittitur (reduced from $5 million to $1 million)

- Kenamer – $3 million remittitur (reduced from $4 million to $1 million)

- Wing – $2 million remittitur (reduced from $3 million to $1 million)

- White – $1 million remittitur (reduced from $2 million to $1 million)

---

[2] The Court stayed execution of the judgment pending resolution of defendants' post-trial motions. (Doc. 125).

This reduces the aggregate award of (1) compensatory damages to $5 million and (2) punitive damages to $6 million, yielding a total award of $11 million.

Jennings shall advise the Court within 20 days if he accepts the remittitur. If not, a new trial on all issues will be granted.

### III.    TRIAL EVIDENCE

### A.    Description of Incident

#### 1.

To have a full appreciation of what occurred at the jail a detailed account is necessary. The narrative which follows reflects the actions of each of the defendants. It is based on an examination of video images and audio that were admitted at trial in conjunction with the trial testimony of experts and eyewitnesses.

The account as to the defendants supports the jury's finding that each defendant acted wantonly and oppressively. The account justifies a single award of compensatory damages and separate awards of punitive damages.

#### 2.

The floor of the jail is concrete. Nuckolls was the lieutenant in charge of the jail on September 18, 2010. Fuller, Kenamer, White and Wing were deputies who acted under Nuckolls's orders. Jennings weighed 160 pounds, Fuller 280 pounds, White 215 pounds and Wing 250 pounds. The weight of Kenamer and Nuckolls is unknown.

#### 3.

The incident began when Jennings was brought into an intake room of the jail and ended upon his release from custody 7 hours later. Events are divided by phases

8

of Jennings's movement through the jail.  The first 3 hours were depicted on video.  The video includes audio during the first two phases of events at the jail.

## B.  Events at Jail

### 1.  Phase 1: Intake Room (two minutes)

Fuller began a pat-down search of Jennings after removing his handcuffs.[3] Jennings stood over a metal bench, his back to Fuller, hands on the wall and legs apart. Jennings removed his clothing as instructed; he was told to keep his hands on the wall.

As Fuller patted the crotch area, Jennings briefly lowered his left hand to his side. Jennings replaced the hand as Fuller pushed Jennings's body into the wall from behind. As he was pushed, Jennings briefly turned his head rightward (which he testified was to avoid injury to his nose and face).[4]

Kenamer, facing away, turned and saw Jennings on the wall.  He joined Fuller.

Together, Fuller and Kenamer pinned Jennings down to the bench face-first as he audibly screamed.  Fuller and Kenamer leaned over Jennings with their bodies and pressed his face into the bench.  Jennings twisted and continued to cry out.

Kenamer pulled Jennings to the floor by the arm.  Jennings landed on his side and assumed a fetal position.  Fuller and Kenamer knelt over him.  Kenamer pressed a knee into Jennings's upper back then neck, pushing off the floor with his other leg. Fuller pressed a knee into Jennings's lower back.  Jennings continued screaming.

---

[3] The officers testified the intake room was unsecure because an inmate could exit the jail through an unlocked door in the garage to which it was connected.

[4] Jennings was initially searched in connection with his arrest.  Fuller never completed his search of Jennings at the jail.

White, Nuckolls and Wing entered the room.  White went to the left side of Jennings and Wing to the right.  Kenamer held Jennings's head to the floor as Fuller made a fist with his hand and struck Jennings in the back at a 90 degree angle.

Fuller, Kenamer and White flipped Jennings over face-down onto the floor.  The four crouched over Jennings, their movements outside of view.

Nuckolls circled the officers, kneeled behind Kenamer and directed a can of pepper spray toward Jennings's face.[5]  As Jennings cried out, movement by Kenamer revealed White pressing Jennings's face into the floor with a hand.

Kenamer, affected by the spray, stood and walked away.  Jennings was now handcuffed.  White continued to press Jennings's face into the floor as he screamed.

Nuckolls made the decision that Jennings be taken to a safety cell.[6]

White and Wing pulled Jennings backward off the floor to an upright position by his handcuffed arms.  Jennings's body swept into the bench and his legs flailed.  Fuller trailed Jennings, holding onto his neck and chin with both hands.

## 2.    Phase 2: Sally Port and Hallway I (one minute)

The four moved through the doorway into a sally port.  Nuckolls followed behind. While holding Jennings's head as he was pulled backward, Fuller collapsed face-forward into Jennings.  Jennings and Fuller tumbled to the floor.

---

[5] Jennings testified after being pepper sprayed he had trouble breathing and no recollection of the incident until he awoke strapped to a restraint bed, described *infra*. Dr. Shiener attributed this to psychogenic amnesia, a condition in which a person blocks a disturbing experience from his mind and is unable to recall it.

[6] Guest and Nuckolls testified the purpose of a safety cell is to monitor inmates who pose a danger to themselves or are combative.

Jennings landed back-first as <u>Fuller</u> fell on top of him with the weight of his body. As <u>Fuller</u> fell, he pressed one hand downward on Jennings's face as the other caught the wall.  While on top of Jennings, <u>Fuller</u> continued to press Jennings's face into the floor with one hand while pushing off the wall with the other.

<u>White</u> and <u>Wing</u> pulled Jennings upright by his handcuffed arms.  Jennings faced the camera with his eyes shut and face bloody and bruised, wailing.

Jennings pulled away from <u>White</u> and <u>Wing</u> toward the wall.  <u>Fuller</u> took hold of his neck and chin again with both hands.

The four passed through a hallway to another room.  <u>Nuckolls</u> followed.

### 3.  <u>Phase 3: Safety Cell I</u> (one minute)

The four entered a safety cell.  Jennings remained handcuffed.  <u>White</u> and <u>Wing</u> held his elbows at a 45 degree angle from his back while <u>Fuller</u> kept a hold of his head.

<u>White</u>, <u>Wing</u> and <u>Fuller</u> forcibly lowered Jennings face-forward to the floor.  The three officers crouched over him, holding him down.  Jennings appeared still while handcuffed and on the floor.  <u>Wing</u> removed a key to unlock Jennings's handcuffs.

<u>Nuckolls</u> entered, carrying a taser.  <u>Nuckolls</u> circled the officers and stood over Jennings.  <u>Nuckolls</u> testified he made the decision to put Jennings in a restraint chair. <u>Wing</u> testified he never unlocked the handcuffs because he deemed Jennings resistant.

<u>Wing</u> testified he put gloves on because Jennings was spitting blood.  <u>Fuller</u>, <u>White</u> and <u>Wing</u> pulled Jennings up and back into the hallway by the handcuffed arms.

### 4.  <u>Phase 4: Hallway II</u> (twelve minutes)

Fuller, White, Wing and Jennings entered the hallway moving toward a restraint chair, followed by <u>Nuckolls</u>.  <u>Kenamer</u> stood behind the chair.

Jennings was forcibly directed into the chair, where he twisted and flailed his legs as White, Wing, Fuller and Kenamer held him down. Fuller covered Jennings's mouth with his hands, at which time he testified Jennings bit him. Fuller testified he covered Jennings's mouth because Jennings was spitting in the direction of officers.[7]

In the struggle, Jennings turned around in the chair and wrapped both legs around Kenamer's leg. Kenamer pulled Jennings face-down to the floor by the neck. Kenamer stayed on top of Jennings and kept a knee on his head, with body weight.

White, Wing, Nuckolls and Kenamer crouched over Jennings. Kenamer pulled a spit hood over Jennings's head, covering his face. He pressed Jennings's head into the floor with both hands, pushing off the floor with both feet.

Jennings's feet kicked against the wall as officers handled him, his body obscured. Wing pressed a knee on Jennings's upper back and neck with body weight.

Movement by Kenamer revealed the back of Jennings's shirt raised, exposing his lower back. Nuckolls directed the taser toward Jennings's lower back for a 5-second cycle as Jennings was handcuffed on the floor.[8]

Nuckolls testified he made the decision to put Jennings in a restraint bed. Fuller left and returned wheeling a bed.

---

[7] Spitting is a common reaction to pepper spray exposure.

[8] The taser can be applied in 1-second increments. White testified that the jail taser log, Pl's Exh. 12, reflected that most applications were one second in duration.

White, Wing, Fuller, Kenamer and Nuckolls lifted Jennings's body upward by the arms and legs. They forcibly directed him face-down onto the bed, with spit hood on.[9]

In the bed, Fuller kept a knee on Jennings's torso as he leaned over him with body weight. Wing pressed a knee near Jennings's head with body weight.

In a 5-minute struggle, officers held Jennings down, strapped him into the bed and removed the handcuffs. Jennings tried to move under the straps but could not.

Tompkins approached and interacted briefly with Jennings. She touched and looked at his face.[10] Nuckolls testified Tompkins wiped the face with a cloth.

### 5. Phase 5: Safety Cell II (two and a half hours)

Kenamer wheeled Jennings, strapped to the bed, into the safety cell. He left.

Jennings remained strapped face-down to the bed with spit hood on.[11] He twisted his body left and right between periods of motionlessness.

Twenty-two minutes in, Kenamer, Wing and Fuller entered with a different nurse, followed by Nuckolls. Kenamer held Jennings, strapped in the bed, down by the neck and knelt on his shoulders with body weight. Wing knelt on Jennings's leg with body weight, leaning a hand against the wall.

---

[9] Nuckolls testified Jennings was placed face-down because of the risk of choking from vomit due to alcohol intoxication. Nuckolls acknowledged any vomit would remain in the spit hood, which was designed to contain bodily fluids. Dr. Shiener testified lying face-down with a spit hood makes it harder to clear vomit.

[10] Tompkins testified she cleaned Jennings's face in the safety cell. When shown the video, she testified that the nurse seen in the cell (the only one) was not her. There was no treatment note. Tompkins testified the person must have been an outside nurse involved in a blood draw.

[11] Dr. Shiener testified lying in a restraint bed face-down compromises breathing due to pressure on the back and has risks including death.

13

The nurse carried a tub of items. She approached and examined Jennings, but the view was obscured. The nurse moved items back and forth from the tub.

Jennings testified the nurse drew blood from his arm. A bandage was visible on his arm after the nurse left. Jennings testified his face was never washed.

No one else entered the cell. Jennings testified he heard an unidentified person say to him "you're going to die." Jennings continued to twist but was mostly stationery, punctuated by moments of lifting his head upward from the bed.

Jennings testified he could not breathe under the spit hood due to the pepper spray and went in and out of consciousness. The hood was soaked in his blood. In an effort to breathe, Jennings chewed a hole in the hood, chipping a tooth in the process. Jennings testified he was afraid he was going to suffocate and die in the bed.

Over two hours later, six new officers from the next shift entered and talked to Jennings. He was freed from the bed, searched and allowed to remove the spit hood.

Two new nurses examined Jennings briefly. According to a nurse's notes, Jennings's blood pressure was 130/110 mmHg (elevated), his heart rate 108 bpm and his breathing "shallow."[12] He complained of burning in his eyes, which the nurse noted were "swollen shut and purple," and below which there was "blood dried at nostrils."[13]

Jennings washed his face in the sink. He was handcuffed and escorted out.

_____

[12] Dr. Shiener testified a diastolic pressure of 110 is a "dangerous" level and treatable on an emergency basis.

[13] Jennings testified "my head felt like it was in a vice. Every muscle in my body pretty much hurt. My lungs, my mouth, my face was on fire." When he got to a hospital, he "was having trouble seeing, still having trouble breathing. Severe headache. . . . I had no strength. I could barely walk."

As he exited into the hallway, Jennings's face appeared swollen and bruised. This was reflected in his booking photograph.[14]

### 6.     Phase 6: Continued Detention and Release (four hours)

While waiting for an initial appearance before a judge (via videoconference), Jennings testified he was placed in a "drunk tank" and told by inmates they heard officers apply a taser to him. Upon release from the jail, the nurse recommended Jennings go to the hospital for an x-ray of his chest and face.

### C.     Injuries

### 1.     Facial

Two days after the incident, Jennings went to Dr. Hanson's office. Extensive bruising to the face and extremities, bilateral black eyes, tenderness above facial bones and complaints of extreme pain in Jennings's face were noted.

Dr. Hanson's office referred Jennings to the emergency department where images of Jennings's face were taken. A fracture of a facial bone below an eye and a "crunched" nasal bone were found, with mild displacement. The fractures were expected to (and did) heal over time without surgical intervention.

Nine days later, Jennings returned to Dr. Hanson for a follow-up appointment. The imaging results were discussed. Abrasions to Jennings's face were noted as were complaints of soreness in his ribs and upper body.

---

[14] Photographs of Jennings, Pl's Exh. 1, depicting his injuries were placed in evidence. The photographs showed extensive bruising, swelling, markings and discoloration to areas of his face, head, neck, back, wrist, shoulders, hips, knees and legs. The area below Jennings's right eye is raised, puffy and purple. Blood is visible in the white of his eye.

### 2. Shoulder

In 2014, Jennings was again seen by Dr. Hanson.  He complained of muscle spasms in his neck and back.  In range-of-motion tests, a "crinkling" sound and reported pain were noted in shoulder functioning.  Dr. Hanson referred Jennings to physical therapy.

Jennings had a physical therapy evaluation in 2016.  The therapist found he had a "winged" scapula (shoulder blade),[15] confirmed by Dr. Hanson and for which there is no effective treatment.  Jennings takes muscle relaxers and limits use of upper extremities.

After review of the video, Dr. Hanson opined the jail incident likely caused the injury.

### 3. Eye

Two months after the incident, Jennings saw Dr. Waters.  Dr. Waters found he had developed a cortical cataract in his left eye.  Jennings later was diagnosed with a cataract in his right eye.

Dr. Waters noted that degenerative changes in someone Jennings's age would be unusual absent diabetes or family history.  Jennings was not diabetic and his type of cataracts was not inheritable.  Upon review of post-incident photographs, Dr. Waters opined the cataracts likely were induced by trauma from the jail incident.

---

[15] This condition is caused by nerve damage which results in an abnormal protrusion of the shoulder blade upon rotation.

The cataracts affect Jennings's vision. He was advised to avoid nighttime driving and stairs. Cataracts may be improved by surgery, which Jennings has not elected.[16]

### 4.      Mental

In 2015, Jennings was examined by Dr. Shiener. After the examination and review of the video, Dr. Shiener diagnosed Jennings with Post-Traumatic Stress Disorder (PTSD) related to the jail incident.[17]

Jennings said he suffered anxiety in going to public places, and sat with his back to the wall for safety. Jennings said he no longer initiated social activities and had recurring nightmares and flashbacks in which he re-lived the incident. Dr. Shiener observed Jennings's mood was depressed and his thoughts disorganized, reflecting an inability to concentrate. Dr. Shiener noted that discussing the incident with Jennings triggered in him restlessness, hand wringing, rapid breathing and altered expression.

Jennings did not receive ongoing counseling or treatment for the PTSD.

### 5.      Other

Following the incident, Jennings installed a 16-camera video surveillance system in his house. Jennings later moved to a house in another county, he said out of fear that officers from the Department would retaliate against him if he stayed.

### 6.      Continued Pain and Suffering

Jennings testified he gets agitated with his 3-year-old daughter's horseplay around him because the noise interferes with his concentration. He did not get agitated

---

[16] Jennings testified he declined surgery because he could not afford to take the weeks off work (and lost income) needed to recuperate.

[17] PTSD is a mental disorder formed after exposure to a traumatic event in which the person continues to experience distress afterward related to the event.

over this before the incident.  Since the incident, Jennings said he has intimacy issues with his girlfriend and experiencing "uncontrollable" emotions.

### 7.    Defense Medical Experts

Drs. Kohen, Byrd and Stucky testified that Jennings's claimed shoulder, eye and PTSD injuries were not caused by the incident or permanently disabling.

### 8.    Lack of Continued Treatment

Since his initial contact with physicians, Jennings has had little contact thereafter. It appears that he has suffered no permanent damage.

## IV.    MOTIONS FOR NEW TRIAL, JMOL AND REMITTITUR

### A.    Summary

Defendants seek a (1) new trial on various grounds; (2) JMOL on various grounds; and (3) remittitur of both compensatory and punitive damages.

### 1.    New Trial

Specifically, defendants seek a new trial on the following grounds:

- Evidentiary rulings (discussed in Part V, *infra*);

- Verdict form (discussed in Part VI, *infra*);

- Jury instructions (discussed in Part VI, *infra*);

- Argument of counsel (discussed in Part VII, *infra*); and

- Excessive compensatory and punitive damages (discussed in Parts IX-X, *infra*)

(Docs. 142, 144-50).

### 2.    JMOL

Defendants seek JMOL on the following grounds:

- Qualified immunity (discussed in Part VIII, *infra*); and

- Award of punitive damages as to each defendant (discussed in Part X, *infra*)

(Docs. 143, 145-49).

### 3. Remittitur

Defendants seek a remittitur on the following grounds:

- Excessive compensatory damages (discussed in Part IX, *infra*); and

- Excessive punitive damages (discussed in Part X, *infra*)

(Docs. 144-149).

### 4. No Specified Amount

Significantly, defendants do not state a specific amount for a remittitur of compensatory or punitive damages.

### B. Legal Standards

The legal standards governing the grant of a new trial, JMOL and remittitur are set out below.

### 1. New Trial

"[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045-46 (6th Cir. 1996); *see also* Fed. R. Civ. P. 59(a).

The movant bears the burden to establish a new trial is warranted. *Clarksville-Montgomery Cty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991). The trial evidence is construed in the light most favorable to the non-movant. *Swans v. City of Lansing*, 65 F. Supp. 2d 625, 637-38 (W.D. Mich. 1998).

## 2. JMOL

A motion for JMOL "may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Paschal v. Flagstar Bank*, 295 F.3d 565, 582 (6th Cir. 2002); *see also* Fed. R. Civ. P. 50(b). The trial evidence is construed in the light most favorable to the non-movant. *Paschal*, 295 F.3d at 582.

## 3. Remittitur

"A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive." *Fuhr v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 761 (6th Cir. 2004) (citations omitted). "A jury verdict should not be remitted unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 547 (6th Cir. 2007) (quotations and citations omitted). "A court should not reduce an award unless it is: 1) beyond the range supported by proof; 2) so excessive as to shock the conscience; or 3) the result of mistake." *Id.* (quotations and citations omitted).

## V. IMPROPER EVIDENTIARY RULINGS AS THE BASIS FOR A NEW TRIAL

Defendants seek a new trial based on evidentiary rulings of the Court during trial. Specifically, they challenge the Court's decision to:

- permit witnesses to be examined about certain use of force policies of the Sheriff's Department;

- disallow Ross from characterizing officers' actions using legal terms; and

- allow Glazer to opine about his interpretation of events depicted in the video

These rulings are not grounds for a new trial.

## A.    Use of Force Policies

Defendants say the Court erred in allowing testimony regarding the Sheriff's Department's policies on use of force.  Defendants also say that use of force policies are irrelevant because they do not bear on the standard for liability and that they likely led the jury to measure defendants' conduct by requirements stricter than those of the Constitution.

A motion *in limine* regarding the use of force policies was denied, (Docs. 73, 112).  The Court reaffirms this ruling.

The use of force policies were not in evidence.  The Court allowed witnesses to be examined as to portions of the policies relating to the use of pepper spray, tasers and restraints.

While use of force policies do not establish the standard for liability, they are relevant to the circumstances in which force was used.  The use of force policies provided context and reflected the training of defendants and procedures that governed their conduct.  Further, the policies were independently relevant to the nature of the defendants' conduct.  For example, Nuckolls testified he knew that orders he gave (e.g., to strap Jennings face-down to the restraint bed after being pepper sprayed) were against policy.  This goes to wantonness.

Any potential for juror confusion as to the difference between the policies and legal standard for liability was resolved by the Court's instructions.  Jurors were instructed to consider all of the facts and circumstances, of which use of force policies were only a part, in evaluating reasonableness.  In response to a jury question about a

specific policy dealing with pepper spray, the Court admonished that such "regulations are not law."  (Doc. 141 at 6).

## B.  Ross's Opinions

Defendants say the Court erred by restricting Ross, defendants' expert on police practices, from opining as to whether officers' conduct was "reasonable" and "sadistic and malicious."  Defendants say Ross's expert opinion in this regard merely "embraced" ultimate questions of fact as allowed under Fed. R. Evid. 704(a).

The terms "reasonable and "sadistic and malicious" are legal terms relating to whether conduct is lawful or can be considered grounds to award punitive damages.  An expert may not offer an answer to the ultimate questions that are reserved to the jury's judgment.  *See Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994) (""[D]eliberate indifference" is a legal term . . . .  It is the responsibility of the court, not testifying witnesses, to define legal terms.  The expert's testimony in this regard invaded the province of the court.").

Katsaris, plaintiff's expert, was subject to the same restrictions in his testimony.  Katsaris and Ross each testified as to what practices were "appropriate" or "inappropriate," not "reasonable" or "excessive."  This was a proper restriction.

## C.  Glaza – Video

Defendants object to Glaza describing events depicted in the video since he was not there and the video speaks for itself.  Defendants say Glaza's characterization of the substance of what took place went beyond his expertise as a forensic video expert.

**1.**

 "A party may not assert as error the introduction of evidence unless a timely objection is made."  *Helminski v. Ayerst Labs., a Div. of Am. Home Prod. Corp.*, 766 F.2d 208, 211 (6th Cir. 1985); Fed. R. Evid. 103(a)(1).  Failure to object waives the issue unless error was obvious and altered the trial's outcome.  *Helminski*, 766 F.2d at 211 (noting such objections are considered under a plain-error standard); *Gleason v. Noyes*, 125 F.3d 855 (6th Cir. 1997) (defining plain error); Fed. R. Evid. 103(e).

Defendants did not object to Glaza's qualifications as a forensic video expert, his expert report, or the bulk of his testimony concerning interpretation of the actions displayed in the video images.  Defendants had the video in advance of trial and were aware of its contents.  Defendants listed a forensic video expert of their own as a witness but decided not to call the expert at trial.  (Doc. 74 at 3).  The jury was instructed on the nature of expert testimony and told that it need not credit an expert's opinions.  (Doc. 140 at 77).

Because defendants failed to raise at trial the objection they now assert regarding Glaza's testimony, they have waived any right to object.  *See Helminski*, 766 F.2d at 211.  Defendants have not shown Glaza's testimony would have changed the trial's outcome as it was derivative of the video.  *See Gleason*, 125 F.3d at 855.

**2.**

The video was not a continuous stream.  Time passes between frames.  Due to the low rate of frames per second, a critical eye is needed to decipher what changes between frames mean given the increment of time.  This is true for events occurring in a single frame (e.g., the taser being applied).  An ability to analyze "motion blur" in the

picture gives a viewer information as to speed and timing. Glaza's testimony in this regard aided the jury in interpreting contents of the video that were otherwise unclear.

## VI. IMPROPER VERDICT FORM AND JURY INSTRUCTIONS AS THE BASIS FOR A NEW TRIAL

Defendants say the jury instructions and verdict form should have read "excessive" instead of "unlawful" force. They seek a new trial on this basis.

### A.

"The necessity of a retrial is avoided when, by design or through sheer neglect, the losing party fails to make objection at the proper time." *Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 547 (6th Cir. 1995) (citation omitted); Fed. R. Civ. P. 51(d)(1). "Thus, it must be clear, if no objection is made to an instruction after the jury is charged, that the trial judge knew both that the party in fact objected to the instruction and the basis for that objection." *Preferred RX, Inc.*, 46 F.3d at 547. Unpreserved objections are evaluated for plain error. *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 750 (6th Cir. 1996); Fed. R. Civ. P. 51(d)(2).

Defendants were given the opportunity to review and object to the jury instructions and verdict form. (Doc. 138 at 123-24; Doc. 140 at 3). They did not. (Docs. 139, 140). Defendants are, thus, not entitled to a new trial based on either ground. The complaint of the wording "unlawful" versus "excessive" is over form, not substance.

### B.

The use of force is evaluated objectively from the perspective of a reasonable police officer under the circumstances, with consideration given to such factors as (1) the need for application of force, (2) the relationship between the need and amount

of force used, (3) the extent of injury, and (4) whether the subject posed an immediate threat or was actively resisting. *Graham v. Connor*, 490 U.S. 386, 390-99 (1989).

Jurors were instructed "unlawful force" meant force beyond that reasonably necessary to accomplish a lawful purpose and was to be assessed objectively based on the circumstances. (Doc. 140 at 82-83). Jurors were told to consider (1) the relationship between the need and amount of force, (2) whether the subject posed an immediate threat, and (3) whether there was active resistance. (*Id.*). This was a correct statement of law. *See Graham*, 490 U.S. at 390-99. The Court used the phrase "unlawful" as a plain-language equivalent of "excessive," a legal term of art with the same meaning of unreasonableness described in the jury instructions.

## VII.    IMPROPER ARGUMENT OF COUNSEL AS THE BASIS FOR A NEW TRIAL

Defendants seek a new trial based on statements by plaintiff's counsel during closing argument asking the jury to "send a message" to other police officers in support of its request for punitive damages. Defendants say this remark inflamed the jury's passions and asked it to punish the defendants by awarding an excessive verdict.

"Misconduct by an attorney that results in prejudice may serve as a basis for a new trial." *Fuhr*, 364 F.3d at 759. "The burden of showing prejudice rests with the party seeking the new trial, and district courts have broad discretion in deciding whether to grant a motion for a new trial." *Id.* "The failure to object to the [] prejudicial comments at trial 'raise[s] the degree of prejudice which must be demonstrated in order to get a new trial on appeal.'" *Balsley v. LFP, Inc.*, 691 F.3d 747, 761-62 (6th Cir. 2012).

Defendants said nothing about the closing argument at trial. The jury was instructed specifically on the circumstances in which punitive damages may be

awarded. (Doc. 140 at 86-88). Such argument is routinely allowed and has not been a basis for a new trial. *See Clark v. Chrysler Corp.*, 436 F.3d 594, 609-10 (6th Cir. 2006).

As to anything said by lawyers in the course of witness examination, defendants did not object contemporaneously and have not shown any particular remark prejudiced them. At times during the trial, the Court admonished lawyers of plaintiff and defendants for errant remarks during trial.

## VIII. QUALIFIED IMMUNITY AS THE BASIS FOR A JMOL

Defendants again seek dismissal of the case based on qualified immunity. Defendants point to no new evidence to support a defense of qualified immunity.

Previously, the Court, *Jennings v. Fuller*, 2015 WL 4075057, at *3-4 (E.D. Mich. 2015), and Sixth Circuit, *Jennings v. Fuller*, 659 F. App'x 867 (6th Cir. 2016), described the conduct of defendants displayed in the video that precluded dismissal of the case on the ground of qualified immunity. Nothing in the trial record negated these findings or gives the Court need to rehear or reconsider the issue of qualified immunity.

## IX. EXCESSIVE COMPENSATORY DAMAGES AS THE BASIS FOR A NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR

Defendants' attack on the jury's award of $17.63 million in compensatory damages is twofold. First, defendants say the award is so excessive as to require a new trial. Second, defendants say in the alternative that the amount is excessive and must be remitted. Defendants do not specify an amount of damages.

### A. New Trial Versus Remittitur

The verdict of liability was clearly correct. There is no doubt that the forces used to subdue Jennings were excessive. Indeed, the panel decision rejecting the defense of qualified immunity made clear that the question of liability was for the jury, and the jury

26

in this case so found.  What motivated the jury was the severity of defendants' conduct as displayed in the video images.  However, the amount awarded was out of line.

Defendants' papers include two scales.  The first scales the level of injuries suffered by Jennings at the hands of defendants as follows:

### Level of P's Harm – Scale of 1 to 10

| 1 | - | P experienced very little harm as a result of D's actions |
|---|---|---|
| 5 | - | P experienced real harm, but not severe and/or was of a general nature |
| 7 | - | P experienced severe harm as a result of D's actions |
| 10 | - | P died as a result of D's conduct |

The second scales the level of defendants' conduct as follows:

### Level of D's Conduct – Scale of 1 to 10

| 1 | - | D's conduct was not overt, and proof was not compelling |
|---|---|---|
| 5 | - | D's conduct was harmful to P, but not severe |
| 7 | - | D's conduct amounted to a deliberate indifference to a risk of injury to the P |
| 10 | - | D's conduct was overt and direct, and resulted in death |

Here, Jennings experienced severe harm as a result of defendants' actions and defendants' conduct amounted to deliberate indifference to a risk of injury to Jennings.

Were the Court to grant a new trial as to the whole of the case, there is little doubt that a second jury would find liability.  There is no greater likelihood of the

damages awarded by the jury being, in order of magnitude, more appropriate to the injuries suffered by Jennings and the wrongful conduct of defendants.

For these reasons, the excess of the compensatory damages award is best rectified not by a new trial on damages but rather a remittitur.

## B.    New Trial

### 1.

Defendants assert a novel argument for the Sixth Circuit.  They say that the amount awarded in compensatory damages was so grossly excessive as to have resulted from passion, prejudice and caprice, and therefore a new trial is the only proper remedy; remittitur is not sufficient.  For support, they cite the Fifth Circuit's decision in *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683-84 (5th Cir. 1986) (concluding on appeal that a jury's excessive verdict was a basis from which to infer that the trial was fundamentally unfair).[18]  This argument is rejected.

The Court's research reveals no case in which an inference of unfairness has been made solely from an excessive jury award (absent a separate judicial finding of prejudice), and nothing compelling such an inference.[19]  The Sixth Circuit has suggested the opposite.  *See Louisville & N. R. Co. v. Tucker*, 211 F.2d 325, 334 (6th Cir. 1954) ("Appellant's claim that the verdict was excessive by reason of passion and

---

[18] The district court in *Wells* remitted the jury's $1.9 million award to $250,000 (by a factor of seven) for a school district's failure to afford an employee due process in terminating him.

[19] Other courts in the Fifth Circuit have declined to construe *Wells* as compelling a new trial for excessive damages and observe no court has done so.  *See In re Actos Prod. Liab. Litig.*, 2014 WL 5461859, at *42-45 (W.D. La. 2014).

prejudice is not supported by the record. We are not referred to any evidence or facts in the record evidencing passion or prejudice other than the size of the verdict.").

## 2.

The jury's compensatory damage award was excessive. This can be attributed to the conduct of defendants displayed in the video which the jury viewed and heard repeatedly during trial. Each defendant's testimony at trial that he used a proportionate amount of force to counter a threat posed by Jennings was implausible and directly contradicted by the video. The verdict does not suggest a decision motivated by passion, prejudice or caprice, but instead by the video and other facts of the case.

### C.     Remittitur

#### 1.

Defendants seek a remittitur of the jury's award of compensatory damages of:

- $10.42 million (past and present)
- $7.21 million (future)

Defendants do not specify an amount but observe the award is grossly excessive. They cite awards in other cases involving vision loss, physical harm, PTSD and death.

#### 2.

The circumstances here call for remittitur of the compensatory damages to the highest amount supported by the evidence. The award here clearly exceeds the amount which the jury reasonably could find.

#### 3.

The Court deems Jennings's request for damages persuasive evidence that the maximum supportable amount is not higher than the amount he asked the jury to award.

Jennings requested $4 million in past and present damages and $6.24 million in future damages.  There is no evidentiary basis to deviate above this amount.

Jennings sought past and present damages for pain and suffering, vision loss, shoulder injury and PTSD.  He sought future damages for vision loss, shoulder injury and PTSD—injuries he described as "permanent" medical conditions.  His medical expenses were *de minimis*.  The following factors mitigate against the damages figure—past, present and future—that Jennings attributed to the claimed medical injuries:

- Jennings has had minimal continued medical care

- there has been no diminishment in his earnings

- he continues to work 50 to 70 hours a week

- he has had only a single visit to a doctor for his psychological injuries and that visit was for an evaluation for the diagnosis, and

- he has a continued committed relationship

In light of these considerations, Jennings's request for damages was essentially for pain and suffering.

Comparison to other police brutality cases is unhelpful to the Court.  As stated in Part X, the cases cited by defendants involving death or without video evidence or by juries in other circuits is not persuasive.

There is scant guidance for courts to use in evaluating the excessiveness of a jury's award of damages for pain and suffering.[20]  Courts must ensure that awards are

---

[20] Commentators have urged the adoption of a uniform schedule of damages for objective comparison of injury types akin to the sentencing guidelines regime in criminal cases.  *See* Mark Geistfeld, *Placing A Price on Pain and Suffering: A Method for Helping Juries Determine Tort Damages for Nonmonetary Injuries*, 83 CAL. L. REV. 773, 791-93 (1995) (*citing* Frederick S. Levin, Note, Pain and Suffering Guidelines: A Cure for Damages Measurement "Anomie," 22 U. MICH. J.L. REF. 303, 311-23 (1989)).

not beyond the maximum damages a jury reasonably could find compensatory for a party's loss. *See Denhof*, 494 F.3d at 547. The Court may remit the damages award to a lesser amount that it considers fair and just compensation.

The trial evidence does not support a $17.63 million award. Jennings was subjected to three hours of serious physical pain, including loss of consciousness and a struggle to breathe as officers forced his body into hard surfaces, applied pepper spray and a taser, and exerted significant pressure onto his head, neck and back. He feared impending death due to an inability to breathe, a serious form of mental anguish. That said, Jennings did not die from the encounter and was resistant for parts of it, though in reaction to defendants' wrongful conduct. A substantial, but lesser, amount is proper.

The Court finds helpful a listing of objective criteria considered by other courts in making these determinations. *See* 22 Am. Jur. 2d Damages § 832. Courts have consulted whether harm was catastrophic, if injuries are ongoing or temporary, whether emotional difficulties are involved, life expectancy and presence of disability. *Id.* Jennings is employed. His injuries were not fatal. He is not advanced in age or totally or permanently disabled. This supports a moderate award in the acceptable range.

The Court is satisfied that an award of $5 million in compensatory damages is the maximum amount supported by the trial evidence. This encompasses all pain and suffering and medical injuries sustained by Jennings—past, present and future.

## X.       ATTACK ON THE AWARD OF PUNITIVE DAMAGES

Defendants' attack on the jury's award of $19 million in punitive damages is threefold. First, defendants say that there was inadequate evidence that their conduct was wanton to justify an award of punitive damages. Second, defendants say that the

31

jury's award of punitive damage as to each of them was so excessive as to warrant a new trial. Third, defendants say in the alternative that each award of punitive damages was excessive and must be remitted.

## A. The Award of Punitive Damages as the Basis for a JMOL

### 1. Relevant Law

Punitive damages may be awarded in § 1983 cases for conduct that reflects a "wanton disregard of a plaintiff's constitutional rights." *Vetters v. Berry*, 575 F.2d 90, 96 (6th Cir. 1978). As described in *Redmond v. Baxley*, 475 F. Supp. 1111, 1118 (E.D. Mich. 1979) (Pratt, J.) (discussing deliberate indifference under the Eighth Amendment),

> "Wanton", of course, is a legal term of art. The standard definition of a wanton act is "one done in reckless or callous disregard of, or indifference to, the rights of one or more persons". 3 Devitt and Blackmar, Federal Jury Practice and Instructions, s 85.11. "Ill will is not a necessary element of a wanton act . . ." Black's Law Dictionary (Fourth Ed. 1968) at 1753.

The Supreme Court has said of the purpose of punitive damages:

> The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior. *E.g.*, Restatement (Second) of Torts § 908(1) (1979); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 9 (5th ed.1984); C. McCormick, Law of Damages 275 (1935).

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n.9 (1986).

### 2. Defendants' Arguments

Defendants say they are entitled to JMOL because there was inadequate evidence that each defendant's conduct was wanton. *See Vetters*, 575 F.2d at 96. Given the conduct of:

- Nuckolls,

- Fuller,

- Kenamer,

- Wing, and

- White

summarized below, punitive damages were warranted as to each of the defendants.

### 3. Conduct of Defendants

#### a. Nuckolls

Nuckolls was the officer most responsible for what occurred.  He was in charge of the jail on the night in question.  He ordered Jennings restrained in a bed hooded and face-down.  He applied the pepper spray and used a taser gun to restrain Jennings.

Nuckolls testified he did nothing wrong and defended his use of pepper spray and a taser gun.  Nuckolls said he was reacting to a resistant person in custody and his actions were consistent with his obligations.  Nuckolls also testified that he knew the restraint bed was contrary to policy.  Finally, he investigated the incident himself and found no wrongdoing.

#### b. Fuller

The video displays Fuller pushing Jennings into a wall and pinning him face-down to a bench.  The video also displays Fuller continually (1) pressing Jennings's face into hard surfaces, and (2) forcibly applying body weight to his back, torso, head and neck.

Fuller denied pressing Jennings's face into the bench.  He denied that he knew the force he used caused Jennings pain.  He was not disciplined.  He testified he did nothing more than was appropriate to overcome Jennings's resistance.  He testified he would not change his conduct if faced again with the same situation.

33

### c.　　Kenamer

Kenamer helped with pinning Jennings to the bench and pressing his face into it, and pulled him from the bench to the floor.  Kenamer held Jennings while he was being pepper sprayed.  Kenamer pulled Jennings by the neck from the restraint chair to the floor and forcibly applied body weight to his neck, torso and back.  Kenamer knelt on top of Jennings's head, pressing it into the floor.  He covered Jennings with a spit hood.

Kenamer denied pressing Jennings's head into the floor.  He did not admit to kneeling on Jennings's head.  Kenamer testified he was unaware of Nuckolls's use of a taser despite standing across from Nuckolls at the time, watching Jennings as it was deployed.  Kenamer said he did nothing more than was appropriate to bring a resisting inmate into compliance.

### d.　　Wing

Wing pulled and lifted Jennings by the handcuffed arms.  Wing pressed a knee into Jennings's back, neck and head with body weight as Jennings was being placed into the restraint bed.  Wing held Jennings down while he was being pepper sprayed and tased.  Wing knelt on Jennings's leg with body weight after Jennings was strapped in to the restraint bed.

Wing said he did nothing untoward in his actions.  His testimony was inconsistent with what the video displayed.  Wing denied that anything was done by the defendants to Jennings to cause him to scream in pain.  He testified that he did nothing wrong in the incident and would not change his conduct if confronted with the same situation.

### e. White

White continually pressed Jennings's face into the floor of the intake room while crouched over him. White held Jennings down while he was being pepper sprayed and tased. White pulled and lifted Jennings by the handcuffed arms.

White denied pressing Jennings's face into the floor or applying body weight to him. He could not explain how Jennings got facial injuries following the incident. White testified he was unaware of Nuckolls's use of the taser against Jennings despite being crouched next to Nuckolls when it was administered. White testified he did nothing more than was appropriate to the efforts to overcome Jennings's resistance. White testified he would not change his conduct if confronted with the same situation.

### B. Excessive Punitive Damages as the Basis for a New Trial

Defendants say they are entitled to a new trial on the ground that the amount of punitive damages awarded by the jury as to each defendant was clearly excessive so as to have been motivated by passion, prejudice or caprice.

For the reasons described in Part IX.A, the better course is a remittitur and not a new trial to remedy the excess punitive damages awarded by the jury.

While the amount of punitive damages fixed was excessive, the reasons behind the award were legitimate. As displayed in the video, defendants exercised their authority in a gratuitous manner and with indifference to Jennings. No defendant showed remorse for his actions, and most said they would take the same actions again.

This is conduct deserving of punishment and deterrence. The jury arrived at the right result for the right reasons, even if in doing so it went overboard. There is no basis for a finding the punitive damage award was motivated by passion, prejudice or caprice.

## C.    Excessive Punitive Damages as the Basis for a Remittitur

### 1.

Each of the defendants moves for a remittitur of the punitive damages awarded Jennings or a new trial if he declines to accept the reduced amount.  The aggregate of the punitive damages awarded was $19 million.  The percentage amount allocated as to each defendant was as follows:

- Nuckolls –   $5 million   –    26%
- Fuller –        $5 million   –    26%
- Kenamer – $4 million   –    21%
- Wing –         $3 million   –    16%
- White –       $2 million   –    11%

These percentages are a rough assessment of the jury's finding as to the severity of each defendant's conduct and the wantonness of the conduct of each defendant.

### 2.

Jennings in his closing statement suggested to the jury an award of punitive damages as follows:

- Nuckolls –   $2 million
- Fuller –        $1 million
- Kenamer – $1 million
- Wing –         $1 million
- White –       $1 million

**3.**

An award of punitive damages is by its very nature speculative and arbitrary. *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013). There are "guideposts" to assess excessiveness. They are the (1) degree to which a person's conduct was reprehensible, (2) ratio of compensatory to punitive damages, and (3) comparative value as to similar cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575-86 (1996).

**4.**

Defendants, in justification of a remittitur, offer a matrix of cases in which police officers found to have used excessive force were subject to punitive damages. The matrix is unhelpful because it mostly consists of cases involving death, no video evidence and verdicts reached by juries in other circuits.

No useful purpose is served by detailing the level of plaintiff's harm versus the level of the officers' conduct. The conclusion to be drawn from these cases is that punitive damage awards were generally parallel, if not modestly lower, than the compensatory damages.

As related above, punitive damages are a form of penalty, and are intended as a caution to others that the bad conduct has consequences. As related above, defendants' conduct amounted to deliberate indifference to a risk of injury to Jennings. The jury in its verdict and Jennings in his request for damages agreed that the conduct of Nuckolls deserved more severe punishment than that of other defendants.

**5.**

Given the harm suffered by Jennings and the level of conduct of the defendants, as well as the variance of the awards of punitive damages, the Court is satisfied that a remittitur as follows

- Nuckolls –   $2 million
- Fuller –       $1 million
- Kenamer – $1 million
- Wing –        $1 million
- White –       $1 million

is in order.  This is a sufficient penalty to satisfy the purposes of an award of punitive damages in the circumstances of this case.

## XI.       DEFENDANTS' ABILITY TO PAY

Defendants have expressed a concern that each cannot afford to pay punitive damages should he be required to do so.  Their fears are misplaced.  Genesee County has undertaken their defense.  The Court will take judicial notice of the fact that they are represented by a single law firm.

No effort was made at trial to distinguish between the financial resources of individual defendants.  Commonly in Michigan, awards of damages against police officers are paid by the municipalities for which they work and receive indemnity.

It is highly unlikely the County will abandon defendants at this late date.  Indeed, it is surprising the issue is even raised.

## XII.  CONCLUSION

There is an old idiom.  "A picture is worth a thousand words."  It is attributed to

prominent journalists and advertisers in the early twentieth century.[21]  Little better

explains the verdict reached in this case.

SO ORDERED.


s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  May 23, 2017
        Detroit, Michigan

---

[21] There is debate as to whether the sentiment behind this famous saying is of
Chinese, Japanese or other origin.  *See* http://www.phrases.org.uk/meanings/a-picture-
is-worth-a-thousand-words.html.